> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GIBSON BRANDS, INC.,[1] *et al.*, | Case No. 18-11025 (CSS) |
| Debtors. | Jointly Administered |

---

### DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

Dated: July 12, 2018

GOODWIN PROCTER LLP
Michael H. Goldstein (admitted *pro hac vice*)
Gregory W. Fox (admitted *pro hac vice*)
Barry Z. Bazian (admitted *pro hac vice*)
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Telephone: (212) 813-8800
Email: mgoldstein@goodwinlaw.com
      gfox@goodwinlaw.com
      bbazian@goodwinlaw.com

PEPPER HAMILTON LLP
David M. Fournier (DE 2812)
Michael J. Custer (DE 4843)
Marcy J. McLaughlin (DE 6184)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302) 777-6500
Email: fournierd@pepperlaw.com
      custerm@pepperlaw.com
      mclaughlinm@pepperlaw.com

*Counsel for the Debtors and Debtors in Possession*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Gibson Brands, Inc. (4520); Cakewalk, Inc. (2455); Consolidated Musical Instruments, LLC (4695); Gibson Café & Gallery, LLC (0434); Gibson International Sales LLC (1754); Gibson Pro Audio Corp. (3042); Neat Audio Acquisition Corp. (3784); Gibson Innovations USA, Inc. (4620); Gibson Holdings, Inc. (8455); Baldwin Piano, Inc. (0371); Wurlitzer Corp. (0031); and Gibson Europe B.V. (Foreign). The Debtors' corporate headquarters is located at 309 Plus Park Blvd., Nashville, TN 37217.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ............................................. 1

    A.    Rules of Interpretation, Computation of Time and Governing Law .................... 1

    B.    Defined Terms ........................................................................................................ 2

ARTICLE II. ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS ....................................................................................................... 19

    A.    Administrative Expense Claims ........................................................................... 19

    B.    Professional Fee Claims ....................................................................................... 19

    C.    DIP Facility Claims .............................................................................................. 20

    D.    Priority Tax Claims .............................................................................................. 21

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ............................................................. 21

    A.    Summary .............................................................................................................. 21

    B.    Elimination of Vacant Classes ............................................................................ 22

    C.    Voting; Presumptions .......................................................................................... 23

    D.    Cramdown ............................................................................................................ 23

    E.    Classification and Treatment of Claims and Equity Interests ............................. 23

    F.    Special Provision Governing Unimpaired Claims .............................................. 30

    G.    Subordinated Claims ............................................................................................ 31

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ............................................ 31

    A.    Voting Classes ..................................................................................................... 31

    B.    Acceptance by Impaired Classes of Claims ........................................................ 31

    C.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code .................. 31

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................ 31

    A.    General Settlement of Claims .............................................................................. 31

    B.    Corporate Existence ............................................................................................. 32

C.      Vesting of Assets in the Reorganized Debtors ................................................. 32

D.      The New Exit ABL Facility and the New Take-Out Facility ............................ 33

E.      Authorized Financing ........................................................................................ 34

F.      Treatment of Vacant Classes ............................................................................ 34

G.      Management Incentive Plan ............................................................................... 34

H.      Management Employment and Consulting Agreements .................................... 34

I.      Sources of Consideration for Plan Distributions .............................................. 34

1.      Issuance of New Common Stock, New Warrants and Related
        Documentation .................................................................................................. 34

2.      Intercompany Claims. ....................................................................................... 35

J.      Non-Debtor Subsidiaries ................................................................................... 35

K.      ITLA Guaranty Claims Against Certain Non-Debtor Subsidiaries .................. 36

L.      Release of Liens, Claims and Equity Interests .................................................. 36

M.      Certificate of Incorporation and Bylaws ........................................................... 36

N.      Directors and Officers of Reorganized Gibson .................................................. 37

O.      Corporate Action ................................................................................................ 37

P.      Cancellation of Documents; Prepetition ABL/Term Loan Agreement;
        DIP Facility; Prepetition Indenture ................................................................... 38

Q.      Cancellation of Existing Instruments Governing Security Interests .................. 39

R.      Equity Interests in Subsidiaries; Corporate Reorganization ............................. 39

S.      Restructuring Transactions ................................................................................ 39

T.      Plan Supplement, Other Documents and Orders and Consents Required
        Under the Restructuring Support Agreement ..................................................... 40

U.      Effectuating Documents; Further Transactions ................................................. 40

V.      Transaction Expenses ......................................................................................... 40

W.      Litigation Trust .................................................................................................. 40

1. *Formation of Litigation Trust* ...................................................... 40

2. *Litigation Trustee* ..................................................................... 43

3. *Fees and Expenses of the Litigation Trust* ................................. 43

4. *Proceeds of the Litigation Trust* .............................................. 43

5. *Limitation of Liability* .............................................................. 43

6. *Indemnification* ....................................................................... 43

7. *Tax Treatment* ......................................................................... 44

X. No Revesting of Litigation Trust Assets .................................... 44

Y. Books and Records Retention; Cooperation and Access to Books and Records ....................................................................................... 45

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....................................................................................... 45

A. Assumption and Rejection of Executory Contracts and Unexpired Leases ....................................................................................... 45

B. Notice of Cure Amounts ............................................................ 46

C. Rejection of Executory Contracts or Unexpired Leases ............... 47

D. Claims on Account of the Rejection of Executory Contracts or Unexpired Leases ....................................................................... 47

E. Director and Officer Insurance Policies ...................................... 47

F. Indemnification Provisions ......................................................... 48

G. Compensation and Benefit Programs .......................................... 48

H. Workers' Compensation Benefits ............................................... 48

I. Insurance Policies ...................................................................... 48

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS .......................... 49

A. Dates of Distributions ................................................................ 49

B. Distribution Agent ..................................................................... 49

C.      Cash Distributions.................................................................................50

D.      Rounding of Payments..........................................................................50

E.      *De Minimis* Distribution .......................................................................50

F.      Distributions on Account of Claims Allowed After the Effective Date .............50

G.      General Distribution Procedures...........................................................51

H.      Address for Delivery of Distributions....................................................51

I.      Undeliverable Distributions and Unclaimed Property ........................51

J.      Withholding Taxes................................................................................51

K.      Setoffs ..................................................................................................52

L.      Surrender of Cancelled Instruments or Securities ...............................52

M.      Lost, Stolen, Mutilated or Destroyed Securities ..................................52

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,
            UNLIQUIDATED AND DISPUTED CLAIMS...........................53

A.      Filing of Proofs of Claim .....................................................................53

B.      Disputed Claims and Equity Interests ..................................................53

C.      Procedures Regarding Disputed Claims ...............................................53

D.      Allowance of Claims.............................................................................53

1.      *Allowance of Claims* ...........................................................................53

2.      *Prosecution of Objections to Claims* ..................................................54

3.      *Estimation* ..........................................................................................54

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION
            AND CONSUMMATION OF THE PLAN.................................54

A.      Conditions Precedent to Confirmation of the Plan ..............................54

B.      Conditions Precedent to Consummation of the Plan ...........................55

C.      Waiver of Conditions............................................................................56

E.    Effect of Non-Occurrence of Conditions to Confirmation and Consummation ................................................................................ 56

ARTICLE X. RELEASE, INJUNCTION AND RELATED PROVISIONS ............................ 56

A.    General ........................................................................................... 56

B.    Release by Debtors ........................................................................ 56

C.    Release by Holders of Claims and Equity Interests ...................... 57

D.    Discharge of Claims ...................................................................... 57

E.    Exculpation ................................................................................... 58

F.    Preservation of Rights of Action .................................................. 58

G.    Injunction ...................................................................................... 59

ARTICLE XI. BINDING NATURE OF PLAN ....................................................... 59

ARTICLE XII. RETENTION OF JURISDICTION ................................................... 59

ARTICLE XIII. MISCELLANEOUS PROVISIONS ................................................. 61

A.    Dissolution of the Committee ....................................................... 61

B.    Payment of Statutory Fees ............................................................ 61

C.    Modification of Plan ..................................................................... 62

D.    Revocation of Plan ........................................................................ 62

E.    Entire Agreement .......................................................................... 62

F.    Votes Solicited in Good Faith ....................................................... 62

G.    Terms of Injunctions or Stays ...................................................... 62

H.    Additional Documents .................................................................. 63

I.    Notice of Effective Date ............................................................... 63

J.    Closing of Chapter 11 Cases ........................................................ 63

K.    Successors and Assigns ................................................................. 63

L.    Reservation of Rights .................................................................... 63

M.    Further Assurances ................................................................................................ 64

N.    Severability ........................................................................................................... 64

O.    Service of Documents ........................................................................................... 64

P.    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
the Bankruptcy Code ............................................................................................ 66

Q.    Governing Law ..................................................................................................... 66

R.    Tax Reporting and Compliance ........................................................................... 66

S.    Schedules .............................................................................................................. 66

T.    No Strict Construction ......................................................................................... 66

U.    Controlling Document ......................................................................................... 67

**DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

GIBSON BRANDS, INC. and its debtor affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), propose the following first amended joint chapter 11 plan of reorganization (the "Plan"), which supersedes in all respects the plan of reorganization the Debtors filed on June 20, 2018 in the above-captioned chapter 11 cases, for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtors. This is a single Plan for all of the Debtors with respect to the classification, treatment and voting of Claims against, and Equity Interests in the Debtors. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of the Plan. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (as such term is defined herein), distributed contemporaneously herewith, for a discussion of the Debtors' history, business, results of operations, historical financial information, events leading up to commencement of these Chapter 11 Cases, projections and properties, and for a summary overview and analysis of this Plan and the treatment of Claims and Equity Interests provided for herein. There also are Exhibits, Plan Schedules, Plan Documents and other agreements and documents that will be Filed with the Bankruptcy Court that are referenced in this Plan, the Plan Supplement, and the Disclosure Statement. All such Exhibits, Plan Documents, Plan Schedules and other agreements and documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the Restructuring Support Agreement, and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its Consummation.

The classification and treatment of Claims against, and Equity Interests in, the Debtors and the Plan Distribution under this Plan are on a Debtor by Debtor basis. To the extent Claims against, and Equity Interests in, more than one Debtor are classified in one Class, the Class shall be deemed to include sub-classes for each such Debtor. If the Plan cannot be confirmed as to some or all of the Debtors, then, without prejudice to the respective parties' rights under the Restructuring Support Agreement, and subject to the terms set forth herein and therein, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor and confirm the Plan as to the remaining Debtors. The Debtors reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims or Equity Interests as set forth in Article III hereof.

Notwithstanding any rights of approval that may exist pursuant to the Restructuring Support Agreement or otherwise as to the form or substance of the Disclosure Statement, the Plan or any other document relating to the transactions contemplated hereunder or thereunder, none of the Supporting Noteholders, the Supporting Principals, or the Ad Hoc Committee of Secured Notes, and none of their respective representatives, members, financial or legal advisors, or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties whatsoever concerning the information contained herein.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME,
## GOVERNING LAW AND DEFINED TERMS

**A.      Rules of Interpretation, Computation of Time and Governing Law**

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended,

modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "*ABL Revolver Claims*" means the claims of the ABL Revolver Lenders under the Prepetition ABL/Term Loan Agreement.

2.      "*ABL Revolver Lenders*" means those banks, financial institutions and other parties identified as lenders that provided revolving loans to the Debtors pursuant to the Prepetition ABL/Term Loan Agreement as of and prior to the Petition Date.

3.      "*Accrued Professional Compensation*" means all Professional Fee Claims to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount).  To the extent that any amount of a Professional's fees or expenses are reduced by Final Order, or the Professional otherwise agrees to reduce its fees and expenses, then at such time those reduced amounts shall no longer constitute Accrued Professional Compensation.

4.      "*Ad Hoc Committee of Secured Notes*" means those certain beneficial holders of Prepetition Secured Notes represented by the Ad Hoc Committee of Secured Notes Professionals, and identified from time to time in a statement Filed in the Chapter 11 Cases pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure.

5.      "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) a Professional Fee Claim; (c) the Transaction Expenses; (d) the DIP Facility Claims, including the fees and expenses of the DIP Agent and the DIP Lenders, including their respective professional and advisory fees and expenses; (e) the Prepetition 507(b) Claims; and (f) all fees and charges assessed against the Debtors' Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

6.      "*Ad Hoc Committee of Secured Notes Professionals*" means, collectively, (a) Paul, Weiss; (b) PJT Partners; (c) Young Conaway Stargatt & Taylor, LLP, as local counsel to the Ad Hoc Committee of Secured Notes; (d) Anderson Mori & Tomotsune, as Japanese counsel to the Ad Hoc

Committee of Secured Notes; and (e) any other professionals that may be retained by the Ad Hoc Committee of Secured Notes.

7.      "*Affiliate*" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

8.      "*Allowed*" means, with respect to any Claim, except as otherwise provided herein:  (a) a Claim that has been allowed by a Final Order; (b) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtors (with such consent as required pursuant to the Restructuring Support Agreement) prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Reorganized Debtors on or after the Effective Date; or (iii) in accordance with the Schedules, subject to any limitations on allowance imposed by section 502 of the Bankruptcy Code, or applicable law, (including as a result of a timely Filed objection that is not yet the subject of a Final Order); (c) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely Filed by the Claimant before the applicable bar date for such Claim or has otherwise been deemed timely Filed under applicable law; or (d) a Claim that is Allowed pursuant to the terms of this Plan.

9.      "*Allowed Claim* or *Allowed Equity Interest*" when used in reference to a particular Class means a Claim or an Equity Interest of such Class that has been Allowed.

10.     "*Allowed Class 5 Prepetition Secured Notes Claim*" means an Allowed Class 5 Claim equal to the amount of the Allowed Prepetition Secured Notes Claim that is Secured as determined, without offset, counterclaim or defense of any kind, as of the Effective Date, in accordance with Section 506 of the Bankruptcy Code, and consistent with Plan Value.

11.     "*Allowed Prepetition Secured Notes Claim*" means a Claim equal to (a) the sum of:  (i) $375,000,000, consisting of the outstanding principal amount of Obligations, under, and as defined in, the Prepetition Indenture as of the Petition Date, (ii) $8,227,865.00, consisting of accrued and unpaid interest on the Prepetition Secured Notes as of the Petition Date, and (iii) all other Obligations under, and as defined in, the Prepetition Indenture, which shall be fixed in a liquidated amount as may be agreed by the Debtors and the Required Supporting Noteholders (or in the absence of an agreement, as set by the Bankruptcy Court) on or prior to the Confirmation Date.

12.     "*Allowed Unsecured Prepetition Secured Notes Claim*" means an Allowed Class 6 Claim equal to the difference between (i) the Allowed Prepetition Secured Notes Claim and (ii) the amount of the Allowed Class 5 Prepetition Secured Notes Claim.

13.     "*Amended Organizational Documents*" means the amended and restated certificate of incorporation and by-laws or other applicable organizational documents of Reorganized Gibson, which shall be Filed with the Plan Supplement and which shall be consistent with the terms of the Restructuring Support Agreement and this Plan.

14.     "*Assets*" means all of the right, title, and interest of a Debtor in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

15.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable nonbankruptcy law, including actions or remedies arising under sections 502, 510 or 542-553 of the Bankruptcy Code.

16.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

17.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

18.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

19.     "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

20.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

21.     "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including under alter ego or veil piercing theories or theories of similar effect), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including the Avoidance Actions); (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including any fraudulent transfer or similar claims.

22.     "*Chapter 11 Cases*" means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code, and styled *In re Gibson Brands, Inc., et al.*, Case No. 18-11025 (CSS).

23.     "*China Guitar*" means Gibson's wholly-owned subsidiary, Qingdao Gibson Musical Instrument Co.

24.     "*Claim*" means any "claim," as defined in section 101(5) of the Bankruptcy Code against any Debtor.

25.     "*Claims Bar Date*" means, as applicable, (a) 5:00 p.m. prevailing Eastern Time on August 20, 2018, (b) the Governmental Bar Date, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims, pursuant to the Claims Bar Date Order, the Confirmation Order, or such other order entered by the Bankruptcy Court.

26.     "*Claims Bar Date Order*" means that certain *Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* entered by the Bankruptcy Court on June 8, 2018 [Dkt. No. 255], as may be amended from time to time.

27.     "*Claims Register*" means the official register of Claims maintained by Prime Clerk LLC.

28.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

29.    "*Collateral*" means any property or interest in property of any Debtor's Estate that is subject to a valid and enforceable Lien to secure a Claim.

30.    "*Committee*" means the official committee of unsecured creditors in the Chapter 11 Cases appointed pursuant to section 1102 of the Bankruptcy Code.

31.    "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

32.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

33.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

34.    "*Consummation*" means the occurrence of the Effective Date.

35.    "*Convenience Claim*" means a General Unsecured Claim that is either (a) an Allowed Claim in an amount that is equal to or less than $25,000, or (b) an Allowed Claim in an amount that is greater than $25,000, but with respect to which the Holder of such Allowed Claim voluntarily and irrevocably reduces the aggregate amount of such Allowed Claim to $25,000 pursuant to a Convenience Claim Election.

36.    "*Convenience Class Cap*" means $100,000 in the aggregate or such greater amount, if any, that is approved in writing by the Required Supporting Noteholders not later than five (5) days prior to the deadline to vote to accept or reject the Plan.

37.    "*Convenience Claim Election*" means a timely election by a Holder of a General Unsecured Claim to reduce its aggregate Allowed Claim to $25,000 and agree to the classification and treatment of its Allowed Claim as a Class 8 Allowed Convenience Claim made in connection with, and pursuant to the procedures approved by the Bankruptcy Court governing, voting on the Plan.

38.    "*Cure*" means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to: (x) (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (b) permit the Debtors to assume such executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; and (y) provide such cure and compensation as required pursuant to section 1124(2) of the Code.

39.    "*Debtor(s)*" means, individually, Gibson Brands, Inc., Cakewalk, Inc., Consolidated Musical Instruments, LLC, Gibson Café & Gallery, LLC, Gibson International Sales LLC, Gibson Pro Audio Corp., Neat Audio Acquisition Corp., Gibson Innovations USA, Inc., Gibson Holdings, Inc., Baldwin Piano, Inc., Wurlitzer Corp., and Gibson Europe B.V.

40.    "*Debtor(s) in Possession*" means, individually, each Debtor, as debtor in possession in its Chapter 11 Case and, collectively, all Debtors, as debtors in possession in the Chapter 11 Cases.

41.    "*Definitive Documents*" has the meaning assigned to such term in the Restructuring Support Agreement.

42.    "*DIP Agent*" means the administrative agent and collateral agent under the DIP Facility, and any successors thereto.

5

43.    "*DIP Backstop Party*" means KKR Credit Advisors (US) LLC, Melody Capital Partners, L.P., Grantham, Mayo Van Otterloo & Co., LLC, and Silver Point Capital Fund, L.P. and/or certain funds or accounts managed, advised or controlled by, or by any subsidiary or Affiliate of, any of the foregoing.

44.    "*DIP Backstop Premium*" means the backstop fee provided for in the DIP Facility and the DIP Orders, earned by, and to be paid to, the DIP Backstop Parties.

45.    "*DIP Facility*" means that certain senior secured superpriority post-petition credit facility made available to the Debtors pursuant to the DIP Facility Term Sheet, the DIP Facility Loan Agreement and the DIP Orders.

46.    "*DIP Facility Claim*" means any Claim of the DIP Agent, any DIP Lender, and any DIP Backstop Party arising from, under or in connection with, the DIP Facility, including arising from or in connection with the refinancing of the Prepetition ABL/Term Loan Facility pursuant to the DIP Facility and the DIP Orders.

47.    "*DIP Facility Loan Agreement*" means that certain Debtor-in-Possession Term Loan Agreement, dated as of May 4, 2018, among the Debtors, the DIP Agent, and the DIP Lenders thereto from time to time, together with all exhibits, supplements, schedules and appendices thereto (as amended, modified, waived, or supplemented from time to time in accordance with its terms) and in form and substance materially consistent with the DIP Facility Term Sheet as modified by the DIP Orders.

48.    "*DIP Facility Term Sheet*" means that certain DIP Facility Term Sheet annexed as Annex B to the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance therewith and in accordance with the terms of the Restructuring Support Agreement, the DIP Facility Loan Agreement and the DIP Orders).

49.    "*DIP Lenders*" means the banks, financial institutions and other parties identified as lenders in the DIP Facility Loan Agreement, and their successors and permitted assigns.

50.    "*DIP Orders*" means, collectively, the Interim DIP Order and Final DIP Order.

51.    "*Disclosure Statement*" means that certain *First Amended Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization*, approved by the Bankruptcy Court on July [__], 2018, as amended, supplemented, or modified from time to time that describes this Plan, including all Exhibits and schedules thereto and references therein.

52.    "*Disputed*" means a Claim or Equity Interest, or any portion thereof: (a) that is the subject of a Filed objection or request for estimation or that is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order; or (b) that is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law, which dispute has not been withdrawn, resolved, or overruled by Final Order; *provided, however*, that any Claim that is expressly Allowed by this Plan in Article III shall not be Disputed.  For the avoidance of doubt, if no Proof of Claim has been Filed by the applicable Claims Bar Date and the Claim is not listed on the Schedules or has been or hereafter is listed on the Schedules as $0, disputed, contingent, or unliquidated, such Claim shall be Disallowed and shall be expunged from the Claims Register without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

53.    "*Distribution Agent*" means Reorganized Gibson or any party designated by Reorganized Gibson to serve as distribution agent under this Plan, except that, for purposes of distributions under this Plan:  (i) the DIP Agent will be and shall act as the Distribution Agent for Holders of Allowed DIP Facility Claims; (ii) the Prepetition Indenture Trustee will be and shall act as the

Distribution Agent for Holders of Allowed Prepetition Secured Notes Claims; and (iii) the Litigation Trustee will be and shall act as the Distribution Agent for the Litigation Trust with respect to any distributions from the Litigation Trust to Litigation Trust Beneficiaries.

54.     "*Distribution Record Date*" means the date for determining which Holders of prepetition Claims are eligible to receive distributions hereunder, which date shall be the Confirmation Date.

55.     "*D&O Liability Insurance Policies*" means any and all insurance policies for directors' and officers' liability maintained by the Debtors immediately prior to the Petition Date, maintained by the Debtors during the Chapter 11 Cases, and the Tail Policy.

56.     "*Domestic Term Loan Claims*" means the claims of the Domestic Term Loan Lenders arising from, based upon, or relating to the Prepetition ABL/Term Loan Agreement and any Prepetition 507(b) Claims of the Domestic Term Loan Lenders and the Prepetition ABL/Term Loan Agent.

57.     "*Domestic Term Loan Lenders*" means those banks, financial institutions and other parties identified as lenders that provided term loans to the Debtors pursuant to the Prepetition ABL/Term Loan Agreement prior to and as of the Petition Date.

58.     "*DTC*" means the Depository Trust Company.

59.     "*Effective Date*" means the Business Day on which all conditions precedent specified in Article IX.A of this Plan have been satisfied (or waived in accordance with Article IX.C of this Plan).

60.     "*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

61.     "*EQ*" means Gibson's wholly-owned subsidiary, Qingdao Epiphone Musical Instrument Co., Ltd.

62.     "*Equity Interest*" means any Equity Security in any Debtor, including all issued, unissued, authorized or outstanding shares of stock or limited company interests, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to such Debtor, and all rights arising with respect thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and put rights; and (4) stock-appreciation rights.  The term "Equity Interest" also includes any Claim that is determined to be subordinated to the status of an Equity Security, whether under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

63.     "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

64.     "*Estates*" means the bankruptcy estates of the Debtors created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

65.     "*Excluded Non-Debtor Subsidiaries*" means the following Entities:  (i) Gibson GI Holdings, B.V. and its direct and indirect subsidiaries; (ii) Baldwin (Dongbei) Piano & Musical Instrument Co., Ltd.; and (iii) EQ.

66.     "*Excluded Debtor Subsidiaries*" means Gibson Innovations USA, Inc., Cakewalk Inc., Wurlitzer Corp., and Baldwin Piano Inc.

67.    "*Exculpated Parties*" means, collectively, each in its capacity as such:  (a) the Debtors, (b) the Reorganized Debtors, (c) the DIP Agent, (d) the DIP Lenders, (e) the DIP Backstop Parties, (f) the Prepetition Indenture Trustee (and any of its predecessor trustees under the Prepetition Indenture), (g) the Committee and each of its members (but solely in their capacity as members of the Committee and not in any other capacity), (h) the Ad Hoc Committee of Secured Notes and each of its members, (i) each of the Supporting Noteholders, (j) the Supporting Principals, (k) the New Exit ABL Facility Lenders, (l) the New Take-Out Facility Lenders (if any), (m) the New Exit ABL Facility Agent, (n) the New Take-Out Facility Agent (if any), and (o) the Related Persons of each of the foregoing (a) through (n).

68.    "*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

69.    "*Exhibit*" means an exhibit annexed hereto, to the Plan Supplement or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

70.    "*Existing Executive Compensation Agreements*" means, as to David Berryman and Henry Juszkiewicz, all employment, services, separation, retention, incentive, bonus or similar agreement or arrangement with any of the Debtors.

71.    "*Exit Premium*" has the meaning assigned to such term in the DIP Facility.

72.    "*File*," "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

73.    "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, and (II) Granting Adequate Protection to Prepetition Secured Parties* [Dkt. No. 220].

74.    "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors in accordance with the Restructuring Support Agreement, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed to be legally binding and effective, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

75.    "*General Unsecured Claim*" means any prepetition Claim against any Debtor that is not a/an:  (a) DIP Facility Claim; (b) Administrative Expense Claim; (c) Priority Tax Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Allowed Class 5 Prepetition Secured Notes Claim; (g) ABL Revolver Claim; (h) Domestic Term Loan Claim; (i) ITLA Unsecured Guaranty Claim; (j) Gibson Holdings Claim; (k) Convenience Claim; or (l) Intercompany Claim.  For the avoidance of doubt, Allowed Unsecured Prepetition Secured Notes Claims are classified as General Unsecured Claims by this Plan.

76.    "*Gibson*" means Gibson Brands, Inc., a Debtor in the Chapter 11 Cases.

77.    "*Gibson Japan*" means Gibson's wholly-owned subsidiary, Kabushiki Kaisha Gibson Guitar Corporation Japan.

78.    "*Gibson Holdings*" means Gibson Holdings, Inc.

79.    "*Gibson Holdings Claim*" means a Claim that is not a Secured Claim against Gibson Holdings, Inc., including ITLA Unsecured Guaranty Claims and Allowed Unsecured Prepetition Notes Claims against Gibson Holdings.

80.    "*Governmental Bar Date*" means 5:00 p.m. prevailing Eastern Time on October 29, 2018, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

81.    "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

82.    "*Holder*" means any Person holding a Claim against, or Equity Interest in, any Debtor.

83.    "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

84.    "*Initial Distribution Date*" means, subject to the "Treatment" sections in Article III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims.

85.    "*Intercompany Claims*" means any Claims of a Debtor against any other Debtor.

86.    "*Interim DIP Order*" means the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties and (III) Scheduling Final Hearing* [Dkt. No. 71].

87.    "*ITLA*" means that certain International Term Loan Agreement, dated as of February 15, 2017, (as amended, supplemented, or otherwise modified, from time to time), by and among Gibson Innovations Limited, as Borrower, Gibson Brands, Inc., as Company, Gibson GI Holding B.V. as Dutch Parent, the guarantors identified therein, Elavon Financial Services DAC, UK Branch, as Agent, and the lender parties signatory thereto

88.    "*ITLA Accrued Interest*" has the meaning ascribed to such term in Article III.E.6 of this Plan.

89.    "*ITLA Gibson Holdings Claim*" means any Claim against Gibson Holdings of the agent or lenders under the ITLA with respect to the guaranty of the ITLA by Gibson Holdings.

90.    "*ITLA Injunction*" has the meaning ascribed to such term in Article V.K of this Plan.

91.    "*ITLA Non-Debtor Guaranty Release Funding*" has the meaning ascribed to such term in Article V.K of this Plan.

92.    "*ITLA Unsecured Guaranty Claim*" means any Claim of the agent or lenders under the ITLA, to the extent such Claim is guaranteed by any of the Debtors, excluding the ITLA Gibson Holdings Claim.

93.     "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement or waterfall or value allocation priority that has the practical effect of creating a security interest, in respect of such asset.

94.     "*Litigation Claims*" means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any Entity, including the Causes of Action of the Debtors.

95.     "*Litigation Trust*" means the trust established for the Litigation Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Litigation Trust Agreement.

96.     "*Litigation Trust Agreement*" means the trust agreement, to be dated as of or prior to the Effective Date, between the Debtors and the Litigation Trustee, governing the Litigation Trust, which shall be substantially in the form attached to the Plan Supplement.

97.     "*Litigation Trust Assets*" means the Litigation Trust Funding Amount, all interest earned on such funds, and the proceeds of the Litigation Trust Claims.

98.     "*Litigation Trust Beneficial Interest*" means an interest in the Litigation Trust that will enable the Holder thereof to share, subject to prior payment in full in Cash of any adequate protection claims payable pursuant to the terms of the DIP Orders to the extent not otherwise paid in full in accordance with the DIP Orders prior to the Effective Date, in the distributions made under the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement.

99.     "*Litigation Trust Beneficiaries*" means Holders of Allowed General Unsecured Claims and Holders of Allowed ITLA Unsecured Guaranty Claims.

100.     "*Litigation Trust Claims*" means:  (i) all Avoidance Actions, and (ii) all Causes of Action, in each case, arising out of, or related to, the Prepetition ABL Term Loan Agreement and/or the ITLA solely against the Prepetition ABL/Term Loan Agent, the Prepetition ABL/Term Loan Lenders, the ITLA Lenders and each of their Related Persons (and excluding all Causes of Action that are released and/or exculpated pursuant to Articles X.B and X.E of the Plan).

101.     "*Litigation Trust Expenses*" has the meaning ascribed to such term in <u>Article V.W</u> of this Plan.

102.     "*Litigation Trust Funding Amount*" means, with the consent of the Required Supporting Noteholders, $500,000.00 which shall be contributed by the Reorganized Debtors to the Litigation Trust on the Effective Date to fund the Litigation Trust Expenses.

103.     "*Litigation Trust Indemnified Parties*" means the Litigation Trust Trustee and its consultants, agents, attorneys, accountants, financial advisors, beneficiaries, estates, employees, officers, directors, principals, professionals, and other representatives, each in their respective capacity as such.

104.     "*Litigation Trust Trustee*" means the Person appointed by agreement among the Debtors and the Required Supporting Noteholders to act as trustee of the Litigation Trust in accordance with the terms of the Plan, the Confirmation Order and the Litigation Trust Agreement, or any successor appointed in accordance with the Litigation Trust Agreement.

105.    *"Local Rules"* means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

106.    "*Management Employment and Consulting Agreements*" means the employment and/or consulting agreements between Gibson and David Berryman or Henry Juszkiewicz, which shall be Filed with the Plan Supplement and shall be in form and substance consistent with the terms of the Restructuring Support Agreement (as amended, modified, waived, or supplemented from time to time in accordance with its terms).

107.    "*Management Incentive Plan*" means an employee management incentive plan in a form to be Filed with the Plan Supplement to be implemented on the Effective Date that shall provide for grants of options and/or restricted units of New Common Stock reserved for management, directors, officers, and other key employees of the Debtors in an amount of up to 12% of the New Common Stock, which shall be in form and substance consistent with the terms of the Restructuring Support Agreement (as amended, modified, waived, or supplemented from time to time in accordance with its terms).  The primary participants in and the structure of the Management Incentive Plan, including the amount, form, exercise price, allocation and vesting of such equity-based awards with respect to such primary participants, shall be determined by the New Board of Reorganized Gibson.

108.    "*New Board*" means the initial board of directors of the Reorganized Debtors, and their Affiliates, as described in Article V.N hereto.

109.    "*New Common Stock*" means the shares of New Common Stock in Reorganized Gibson, par value $0.001 per share, to be issued on the Effective Date in accordance with the terms of this Plan.

110.    "*New Common Stock Agreement*" means the agreement to be entered into by all Holders of New Common Stock, which shall provide for reasonable and customary protections of minority shareholders as negotiated in accordance with the Restructuring Support Agreement and substantially in the form Filed with the Plan Supplement (as amended, modified, waived, or supplemented from time to time in accordance with its terms), and which shall be in form and substance acceptable to the Required Supporting Noteholders.

111.    "*New Exit ABL Facility*" means, if applicable, a new asset based revolving credit facility to be provided to the Reorganized Debtors on the Effective Date by the New Exit ABL Facility Lenders pursuant to the New Exit ABL Facility Documents, and which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders.

112.    "*New Exit ABL Facility Agent*" means, if applicable, the administrative agent and collateral agent under the New Exit ABL Facility, and its successors and assigns.

113.    "*New Exit ABL Facility Documents*" means, if applicable, the credit agreement governing the New Exit ABL Facility, and the related notes, guarantees, security documents, and intercreditor agreement, as applicable, which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders and materially consistent with the forms Filed with the Bankruptcy Court on or before ten (10) days prior to the commencement of the Confirmation Hearing or such later date on or prior to the Effective Date as may be agreed by the Debtors and the Required Supporting Noteholders  (as the same may be amended, modified, waived, or supplemented from time to time in accordance with its terms).

114.    "*New Exit ABL Facility Lenders*" means, if applicable, the banks, financial institutions and other parties identified as lenders in the New Exit ABL Facility Documents from time to time.

115. "*New Exit ABL Term Sheet*" means, if applicable, the term sheet summarizing the general terms and conditions of the New Exit ABL Facility, which shall be Filed with the Bankruptcy Court on or before ten (10) days before the Voting Deadline, and which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders.

116. "*New Take-Out Facility*" means, if applicable, a new term loan facility to be provided to the Reorganized Debtors upon the Effective Date by the DIP Lenders pursuant to the New Take-Out Facility Documents, and which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders.

117. "*New Take-Out Facility Agent*" means, if applicable, the administrative agent and collateral agent under the New Take-Out Facility, and its successors and assigns.

118. "*New Take-Out Facility Documents*" means, if applicable, the credit agreement governing the New Take-Out Facility, and the related notes, guarantees, security documents, and intercreditor agreement, as applicable, which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders and materially consistent with the forms Filed with the Bankruptcy Court on or before ten (10) days prior to the commencement of the Confirmation Hearing or such later date on or prior to the Effective Date as may be agreed by the Debtors and the Required Supporting Noteholders (as the same may be amended, modified, waived, or supplemented from time to time in accordance with its terms).

119. "*New Take-Out Facility Lenders*" means, if applicable, the DIP Lenders, and such other banks, financial institutions and other parties identified in the New Take-Out Facility Documents from time to time.

120. "*New Take-Out Facility Term Sheet*" means, if applicable, the term sheet summarizing the general terms and conditions of the New Take-Out Facility, which shall be Filed with the Bankruptcy Court on or before ten (10) days before the Voting Deadline, and which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders.

121. "*New Warrants*" means the warrants to be issued pursuant to the Management Employment and Consulting Agreements.

122. "*Non-Debtor Subsidiaries*" means a direct or indirect subsidiary of Gibson that is not a Debtor, but excluding the Excluded Non-Debtor Subsidiaries.

123. "*Ordinary Course Professionals Order*" means the *Order Pursuant to Section 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtors to Retain and Compensate Professionals Employed in the Ordinary Course of Business Nunc Pro Tunc to the Petition Date* [Dkt. No. 163].

124. "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense Claim.

125. "*Other Secured Claim*" means any Secured Claim other than a DIP Facility Claim, an Allowed Prepetition Secured Notes Claim or a Prepetition ABL/Term Loan Secured Claim.

126. "*Paul, Weiss*" means the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, in its capacity as counsel to the Ad Hoc Committee of Secured Notes.

127. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability

company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

128.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

129.    "*Pillsbury*" means the law firm of Pillsbury Winthrop Shaw Pittman LLP, in its capacity as counsel to the Supporting Principals.

130.    "*PJT Partners*" means the financial advisory firm of PJT Partners, LLP, in its capacity as financial advisor to the Ad Hoc Committee of Secured Notes.

131.    "*Plan*" means this *Debtors' First Amended Joint Chapter 11 Plan of Reorganization*, including the Exhibits and Plan Schedules and all other supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

132.    "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Equity Interests under this Plan.

133.    "*Plan Documents*" means any of the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement, the New Exit ABL Facility Documents (if any), the New Take-Out Facility Documents (if any), the Management Employment and Consulting Agreements, the New Warrants, the New Common Stock Agreement, the Amended Organizational Documents, and the Management Incentive Plan, each of which shall be in form and substance consistent with the terms of the Restructuring Support Agreement (as amended, modified, waived, or supplemented from time to time in accordance with its terms).

134.    "*Plan Schedules*" means all schedules annexed either to the Plan Supplement or as an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time).

135.    "*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including the Exhibits, Plan Documents and Plan Schedules, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, which shall be Filed with the Bankruptcy Court no later than ten (10) days before the Voting Deadline (unless otherwise ordered by the Bankruptcy Court).  The documents that comprise the Plan Supplement shall be subject to any consent or consultation rights provided hereunder and thereunder, including as provided in the definitions of the relevant documents, and shall be in form and substance consistent with the Restructuring Support Agreement.

136.    "*Plan Value*" means the value of the New Common Stock in Reorganized Gibson of the Effective Date as determined by the Bankruptcy Court in connection with the Confirmation Hearing.

137.    "*Post-Petition*" means the time period beginning immediately upon the filing of the Chapter 11 Cases and ending on the Effective Date.

138.    "*Post-Petition Rate*" means the Federal judgment rate pursuant to 28 U.S.C. § 1961 (Post Judgment Interest Rates) as of the Effective Date.

139.    "*Prepetition 507(b) Claims*" means those certain super-priority administrative claims granted pursuant to Paragraph 16(c) of the Final DIP Order.

140.    "*Prepetition ABL/Term Loan Agent*" means Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Prepetition ABL/Term Loan Agreement, and its successors and assigns.

141.    "*Prepetition ABL/Term Loan Professional Fees*" means the reasonable fees, costs, and out-of-pocket expenses incurred by the professionals employed by the Prepetition ABL/Term Loan Lenders and Prepetition ABL/Term Loan Agent and as provided for in the DIP Orders.

142.    "*Prepetition ABL/Term Loan Lenders*" means the ABL Revolver Lenders and the Domestic Term Loan Lenders under the Prepetition ABL/Term Loan Agreement.

143.    "*Prepetition ABL/Term Loan Agreement*" means the Amended and Restated Loan Agreement, dated as of February 15, 2017, by and among Gibson, Gibson International Sales LLC, Gibson Innovations USA, Inc., and Gibson Pro Audio Corp., as borrowers, the other subsidiaries of Gibson that are guarantors and grantors thereunder, the Prepetition ABL/Term Loan Agent, and the Prepetition ABL/Term Loan Lenders (as amended, modified, waived, or supplemented from time to time in accordance with its terms).

144.    "*Prepetition ABL/Term Loan Secured Claim*" means any Claim of the Prepetition ABL/Term Loan Lenders or the Prepetition ABL/Term Loan Agent arising under the Prepetition ABL/Term Loan Agreement and the documents ancillary thereto

145.    "*Prepetition Indenture*" means that certain Indenture, dated as of July 31, 2013, by and among Gibson, each of the other guarantors and grantors thereunder, and the Prepetition Indenture Trustee under which Gibson issued the Prepetition Secured Notes (as amended, modified, waived, or supplemented from time to time in accordance with its terms).

146.    "*Prepetition Indenture Trustee*" means Wilmington Trust, National Association, as successor to Wells Fargo Bank, National Association, a national banking association, in its capacity as indenture trustee and collateral agent under the Prepetition Indenture, or any successor trustee.

147.    "*Prepetition Indenture Trustee Professional Fees*" means the reasonable fees, costs and out-of-pocket expenses incurred by professionals employed by the Prepetition Indenture Trustee and as provided for in the DIP Orders.

148.    "*Prepetition Secured Noteholders*" means the Holders of the Prepetition Secured Notes and their successors and permitted assigns.

149.    "*Prepetition Secured Notes*" means the 8.75% Senior Secured Notes due 2018 issued by Gibson pursuant to the Prepetition Indenture.

150.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

151.    "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim in a particular Class bears to (b) the aggregate Allowed amount of all Claims in such Class, unless this Plan provides otherwise.

152.    "*Professional*" means (a) any Person employed in the Chapter 11 Cases pursuant to section 327, 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Person seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section

503(b)(4) of the Bankruptcy Code, excluding, for the avoidance of doubt, any Person employed by the Supporting Noteholders, the Supporting Principals, the Ad Hoc Committee of Secured Notes, the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, the Prepetition ABL/Term Loan Lenders, the DIP Agent, or the DIP Lenders.

153.    "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for any Professional, whether accrued, contingent or unpaid, for fees and expenses (including transaction fees) for legal, financial advisory, accounting or other services and reimbursement of expenses of each Professional that is awardable and allowable under sections 328, 330 or 331 of the Bankruptcy Code or otherwise Allowed after the Petition Date and prior to and including the Effective Date.

154.    "*Professional Fees Bar Date*" means the Business Day that is thirty (30) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

155.    "*Professional Fee Reserve Account*" means a segregated account for the benefit of the Professionals to be funded on the Effective Date in an amount sufficient to pay the Professional Fee Reserve Amount.

156.    "*Professional Fee Reserve Amount*" means an amount sufficient to pay the Debtors' reasonable estimate, as of the Effective Date, of the Allowed Professional Fee Claims, and which amount shall be funded into the Professional Fee Reserve Account on the Effective Date.

157.    "*Profits Interest*" means a profits interest in the TEAC Shares, the proceeds of which shall be payable Pro Rata to Holders of Allowed Class 7 General Unsecured Claims within ten (10) Business Days of receipt by the Reorganized Debtors of the proceeds from any liquidity event resulting from the sale, financing secured by, or other monetization of the TEAC Shares (subject to the right of the Required Supporting Noteholders to elect to waive Prepetition Secured Noteholders' entitlement to receive their Pro Rata share of such distribution in accordance with Article III.E.7 of the Plan).

158.    "*Proof of Claim*" means a proof of Claim Filed against any Debtor in the Chapter 11 Cases.

159.    "*Reinstated*" means, with respect to any Claim, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim in accordance with Section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

160.    "*Rejected  Executory Contract/Unexpired Lease List*" means the list, if any, and any amended list, if any, as determined by the Debtors in accordance with the Restructuring Support Agreement, identifying Executory Contracts and/or Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to the Plan, and which shall be Filed with the Plan Supplement and shall be acceptable to the Debtors and the Required Supporting Noteholders.

161.    "*Related Persons*" means, with respect to any Person, such Person's Affiliates and each of such Person's and its Affiliates' predecessors, successors, assigns, Affiliates, subsidiaries, managed accounts or funds, and all of their respective current and former officers, directors, principals, employees, shareholders, members, partners, agents, managers, managing members, investment advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case, acting in such capacity, and any Person claiming by or through any of them, and each of such Person's respective heirs, executors, estates, servants and nominees.

162.    "*Released Parties*" means, collectively, each in its capacity as such:  (a) the Debtors, (b) the Reorganized Debtors, (c) the DIP Agent, (d) the DIP Lenders, (e) the DIP Backstop Parties, (f) the Prepetition Indenture Trustee (and any of its predecessor trustees under the Prepetition Indenture), (g) the Ad Hoc Committee of Secured Notes and each of its members, (h) each of the Supporting Noteholders, (i) the Supporting Principals, (j) the New Exit ABL Facility Lenders, (k) the New Take-Out Facility Lenders (if any), (l) the New Exit ABL Facility Agent, (m) the New Take-Out Facility Agent (if any) (n) the Litigation Trust Trustee, and (o) the Related Persons of each of the foregoing (a) through (n).

163.    "*Releasing Parties*" means, collectively, each in its capacity as such: (a) the Debtors, (b) the Reorganized Debtors, (c) Holders of Claims that vote to accept the Plan, (d) Holders of Claims that are Unimpaired under the Plan, (e) Holders of Claims or Equity Interests that are deemed to reject the Plan and do not opt out of granting the releases set forth in <u>Article X</u>, (f) Holders of Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and that, if entitled to do so, do not indicate that they opt out of granting the releases set forth in <u>Article X</u>, (g) Holders of Claims that vote to reject the Plan but do not indicate that they opt out of granting the releases set forth in <u>Article X</u>, (h) the DIP Agent, (i) the DIP Lenders, (j) the DIP Backstop Parties, (k) the Prepetition Indenture Trustee (and any of its predecessor trustees under the Prepetition Indenture), (l) the Ad Hoc Committee of Secured Notes and each of its members, (m) the Committee and each of its members (but solely in their capacity as members of the Committee and not in any other capacity), (n) the Supporting Principals, (o) the New Exit ABL Facility Lenders, (p) the New Take-Out Facility Lenders (if any); (q) the New Exit ABL Facility Agent; (r) the New Take-Out Facility Agent (if any), (s) the Litigation Trust Trustee, and (t) the Related Persons of each of the foregoing (a) through (s).

164.    "*Reorganized Debtors*" means (i) Reorganized Gibson and (ii) each other Debtor, as reorganized pursuant to this Plan on and after the Effective Date, but excluding the Excluded Debtor Subsidiaries.

165.    "*Reorganized Gibson*" means Gibson, as reorganized pursuant to this Plan on and after the Effective Date.

166.    "*Required Lenders*" has the meaning assigned to such term in the DIP Facility.

167.    "*Required Supporting Noteholders*" means (a) as long as the Ad Hoc Committee of Secured Notes controls more than 50% of the principal amount of the Prepetition Secured Notes, the Ad Hoc Committee of Secured Notes, and (b) if the Ad Hoc Committee of Secured Notes controls less than 50% of the principal amount of the Prepetition Secured Notes, Supporting Noteholders controlling at least 50.1% of the principal amount of the Prepetition Secured Notes, in the case of each of (a) and (b), as applicable, at the time such action, consent, approval or waiver is solicited.

168.    "*Required Supporting Litigation Trust Beneficiaries*" means Litigation Trust Beneficiaries holding at least 50.1% of the Litigation Trust Beneficial Interests.

169.    "*Restructuring*" means the financial restructuring of the Debtors, the principal terms of which are set forth in this Plan, the Disclosure Statement, the Plan Supplement and the Restructuring Support Agreement.

170.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of April 30, 2018, by and among the Debtors, the Supporting Noteholders, and the Supporting Principals, including the First Amendment to the Restructuring Support Agreement, dated May 4, 2018 and the Second Amendment to the Restructuring Support Agreement, dated June 12, 2018 (as amended, modified, waived, or supplemented from time to time in accordance with its terms).

171.    "*Restructuring Transactions*" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the consummation of the transactions provided for under or contemplated by the Restructuring Support Agreement; (b) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of this Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable law; (c) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the Plan Documents, and the Restructuring Support Agreement; and (d) all other actions that are necessary or appropriate and consistent with the Plan, the Plan Documents, and the Restructuring Support Agreement.  The Restructuring Transactions may include a taxable transfer of substantially all or a part of the Debtors' assets or Entities to a newly-formed Entity (or an Affiliate or Subsidiary of such Entity) formed and controlled by certain Holders of Claims against the Debtors and, in such case, some or all of the New Common Stock (and/or other Equity Interests) issued to such Holders of Claims pursuant to the Plan may comprise stock (and/or other Equity Interests) of such new Entity (or an Affiliate or Subsidiary of such Entity), *provided, however*, any such transfer shall not affect the treatment of any other Holders of Allowed Claims against the Debtors.

172.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtors with the Bankruptcy Court.

173.    "*SEC*" means the Securities and Exchange Commission, or any successor agency.

174.    "*Secured Claim*" means a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

175.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

176.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

177.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

178.     "*Servicer*" means an indenture trustee, owner trustee, pass-through trustee, subordination agent, agent, servicer or any other authorized representative of creditors of the Debtors recognized by the Debtors or the Reorganized Debtors.

179.     "*Solicitation"* means the solicitation of votes of those parties entitled to vote to accept or reject the Plan.

180.     "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including such taxes on prime contracting and owner-builder sales), privilege taxes (including privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

181.     "*Subsidiaries*" means the Debtors other than Gibson.

182.     "*Supporting Noteholders*" means those beneficial Holders of the Prepetition Secured Notes that are parties to the Restructuring Support Agreement, together with their respective successors and permitted assigns, and other beneficial Holders of the Prepetition Secured Notes, that subsequently become party to the Restructuring Support Agreement in accordance with the terms thereof.

183.     "*Supporting Principals*" means, together, Henry Juszkiewicz and David Berryman.

184.     "*Tail Policy*" has the meaning ascribed to such term in <u>Article VI.F</u> of this Plan.

185.     "*Take-Out Equity Option*" has the meaning ascribed to such term in <u>Article II.C.iii</u> of this Plan.

186.     "*TEAC*" means TEAC Corp.

187.     "*TEAC Shares*" means the Equity Interests in TEAC owned by Gibson Holdings.

188.     "*Transaction Expenses*" means the fees, costs and expenses incurred by (i) the Ad Hoc Committee of Secured Notes Professionals, (ii) one primary counsel and one local counsel for the DIP Agent as provided for in the DIP Orders, (iii) the Prepetition Indenture Trustee Professional Fees, (iv) the Prepetition ABL/Term Loan Agent Professional Fees, and (v) Pillsbury and one local counsel to the Supporting Principals; *provided that* the fees and expenses payable to the Supporting Principals and their professionals will be subject to an aggregate cap of $100,000.00, *provided, further* that the Transaction Expenses (i) shall be payable without the requirement or need to file any retention applications, fee applications, or any other applications in the Chapter 11 Cases or obtain any order from the Bankruptcy Court with respect thereto, (ii) shall be Allowed in full as Administrative Expense Claims without the filing of a Professional Fee Claim, and (iii) shall not be subject to any offset, defense, counterclaim, reduction, or credit.

189.     "*Transfer*" means, with respect to any security or the right to receive a security or to participate in any offering of any security, (i) the sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in, or other disposition of such security or right or the beneficial ownership thereof, (ii) the offer to make such a sale, transfer, constructive sale, or other disposition, and (iii) each option, agreement, arrangement, or understanding, whether or not in writing and whether or not directly or indirectly, to effect any of the foregoing. The term "constructive sale" for purposes of this definition means (i) a short sale with respect to such security or right, (ii) entering into or acquiring an offsetting derivative contract with respect to such security or right, (iii) entering into or acquiring a futures or forward contract to deliver such security or right, or (iv) entering into any transaction that has substantially the same effect as any of the foregoing. The term "beneficially owned"

or "beneficial ownership" as used in this definition shall include, with respect to any security or right, the beneficial ownership of such security or right by a Person and by any direct or indirect subsidiary of such Person.

190.    "*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

191.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

192.    "*Voting Classes*" means Classes 4 (to the extent not previously refinanced in accordance with the DIP Orders), 5, 6, 7, and 8 under this Plan.

193.    "*Voting Deadline*" means the date established by order of the Bankruptcy Court for the timely submission of a ballot to accept or reject the Plan.

# ARTICLE II.
## ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS

## A.    Administrative Expense Claims

On the later of the Effective Date, or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each case, as soon as reasonably practicable thereafter, and in the case of an Allowed Professional Fee Claim subject to the provisions of Article II. B., each Holder of an Allowed Administrative Expense Claim will receive, in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as may be agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; *provided, however*, that Administrative Expense Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

## B.    Professional Fee Claims

1.    Professional Fee Reserve Account

On the Effective Date, the Debtors will establish the Professional Fee Reserve Account and fund into the Professional Fee Reserve Account Cash equal to the Professional Fee Claim Reserve Amount for the benefit of the Professionals.  The Professional Fee Reserve Account shall only be available to satisfy the Allowed Professional Fee Claims.  The DIP Agent, the DIP Lenders, the Prepetition Indenture Trustee, the Prepetition Secured Noteholders, the Prepetition ABL/Term Loan Agent and the Prepetition ABL/Term Loan Lenders: (i) shall not preclude the use of the Debtors' Cash to fund the Professional Fee Reserve Account in the amount of the Professional Fee Claim Reserve Amount, (ii) shall not foreclose on the Professional Fee Reserve Account, (iii) shall subordinate their security interests, Liens, and Claims (including any superpriority Claim) in the Professional Fee Reserve Account to the payment of the Allowed Professional Fee Claims, (iv) shall only have a security interest, Lien and superpriority Claim upon and to, and the right of enforcement against, such remaining amount in the Professional Fee Reserve Account after payment of the Allowed Professional Fees, and (v) waive, and shall have not right to seek, disgorgement with respect to the payment of any Allowed Professional Fees; *provided, however*, that the Reorganized Debtors shall have a reversionary interest in the excess, if any, of the amount of the Professional Fee Reserve Account over the aggregate Allowed Professional Fee Claims of the Professionals.

2.     <u>Final Fee Applications and Payment of Professional Fee Claims</u>

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must File, within sixty (60) days after the Effective Date, and serve on the Debtors, the Reorganized Debtors, the U.S. Trustee, and counsel to the Ad Hoc Committee of Secured Notes, an application for final allowance of such Professional Fee Claim; and *provided* that the Reorganized Debtors will pay Professionals in the ordinary course of business, for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court in full in Cash; and *provided further*, that any professional that may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.

Objections to any Professional Fee Claim must be Filed and served on the Debtors, the Reorganized Debtors, the U.S. Trustee, counsel to the Ad Hoc Committee of Secured Notes, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, the Ad Hoc Committee of Secured Notes and the party requesting payment of a Professional Fee Claim).

After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals when such Claims are Allowed by a Final Order by the Reorganized Debtors, including from the Professional Fee Reserve Account in the case of the Debtors' Professionals.

The Professionals shall reasonably estimate their Professional Fee Claims before and as of the Effective Date, and shall deliver such estimate to the Debtors and counsel to the Ad Hoc Committee of Secured Notes no later than ten (10) calendar days prior to the Effective Date; <u>provided</u>, <u>however</u>, that such estimate shall not be considered a representation with respect to the fees and expenses of such Professional, and such Professionals are not bound to any extent by the estimates.  If any of the Debtors' Professionals fails to provide an estimate or does not provide a timely estimate, the Debtors may estimate the unbilled fees and expenses of such Professional, in consultation with the Ad Hoc Committee of Secured Notes.  The total amount so estimated shall be utilized by the Debtors to determine the Professional Fee Reserve Amount, but the Professional Fee Reserve Amount shall not limit the amount of Professional Fees that may be Allowed by the Bankruptcy Court or limit the obligation of the Reorganized Debtors to pay Professional Fees in the amounts Allowed by the Bankruptcy Court.

**C.**     **DIP Facility Claims**

On the Effective Date in full and final satisfaction, settlement, discharge and release of, and in exchange for, all DIP Facility Claims, the DIP Facility Claims shall be:

    (i)     at the election of the Required Lenders, refinanced in whole or in part with the proceeds of the New Take-Out Facility;

    (ii)     to the extent that the DIP Facility Claims are not refinanced in full with the proceeds from a New Take-Out Facility in accordance with clause (i) of this <u>Article II.D</u>, at the election of the Required Lenders, exchanged in full for New Common Stock at a price per share equal to 80% of Plan Value, subject to dilution for any New Common Stock issued:  (A) to the DIP Backstop Parties on account of the DIP Backstop Premium; (B) in

accordance with the Management Incentive Plan; (C) on account of the Exit Premium; and (D) upon the exercise of the New Warrants (collectively, the "**Take-Out Equity Option**"); or

(iii)     indefeasibly paid, in full, from a combination of some or all of:  (A) the proceeds of the New Take-Out Facility; and/or (B) the Take-Out Equity Option;

and, in any case, the DIP Facility Loan Agreement and all related loan documents, and all Liens and security interests granted to secure the DIP Facility Claims, will be deemed to be terminated, extinguished and released, and the DIP Agent will promptly execute and deliver to the Reorganized Debtors, at the Reorganized Debtors' sole cost and expense, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors to effectuate the foregoing.  Notwithstanding the foregoing, the DIP Facility Loan Agreement shall continue in effect solely for the purpose of preserving the DIP Agent's and the DIP Lenders' right to any contingent or indemnification obligations of the Debtors pursuant and subject to the terms of the DIP Facility Loan Agreement or DIP Orders.

## D.     Priority Tax Claims

On or as soon as reasonably practicable after the earlier of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (b) such other treatment as is consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code and acceptable to the Required Supporting Noteholders. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

## A.     Summary

All Claims and Equity Interests, except Administrative Expense Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for purposes of classification, voting, confirmation, treatment and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The classification and treatment of Claims and Equity Interests in this Article III does not limit or impair the releases, injunctions or exculpations provided for in Article X of the Plan, or any right or remedy of a Holder of a Claim or Equity Interest to enforce the terms and provisions of this Plan or any of the Plan Documents.

The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

The classification and treatment of Claims against, and Equity Interests in, the Debtors are on a Debtor by Debtor basis.  To the extent Claims against, and Equity Interests in, more than one Debtor are classified in one Class, the Class shall be deemed to include sub-classes for each such Debtor.

**Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | ABL Revolver Claims | Unimpaired | Deemed to Accept |
| 4 | Domestic Term Loan Claims | Impaired/ Unimpaired | Entitled to Vote/ Deemed to Accept[2] |
| 5 | Allowed Prepetition Secured Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims – (Other than Class 7, 8 and 9 Claims) | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims Against Gibson Holdings | Impaired | Entitled to Vote |
| 8 | Convenience Class Claims | Impaired | Entitled to Vote |
| 9 | Intercompany Claims | Impaired/Unimpaired | Deemed to Accept/ Deemed to Reject |
| 10 | Equity Interests in Gibson | Impaired | Deemed to Reject |
| 11 | Equity Interests in Subsidiaries (Other than Excluded Debtor Subsidiaries) | Unimpaired | Deemed to Accept |
| 12 | Equity Interests in Excluded Debtor Subsidiaries | Impaired | Deemed to Reject |

**B.    Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

---

[2] The treatment of Class 4 Domestic Term Loan Claims depends on whether the Prepetition ABL/Term Loan Agreement is refinanced prior to the Effective Date.  Accordingly, to the extent such refinancing has not occurred prior to the date votes on the Plan are solicited, Holders of Class 4 Domestic Term Loan Claims shall receive ballots and be entitled to vote on the Plan.  To the extent the Purchase Option or the ABL Refinancing is implemented prior to the Confirmation Date to repay the remaining obligations due under the Prepetition ABL/Term Loan Agreement, Allowed Class 4 Domestic Term Loan Claims shall be paid in full and Unimpaired under the Plan and any votes cast by Holders of such Claims shall not be counted and Class 4 shall instead be deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

C.      **Voting; Presumptions**

Only Holders of Allowed Claims in Classes 4 (to the extent not previously refinanced in accordance with the DIP Orders), 5, 6, 7 and 8 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.  Holders of Claims in Classes 4 (to the extent not previously refinanced in accordance with the DIP Orders), 5, 6, 7, and 8 will receive ballots containing detailed voting instructions.

Holders of Allowed Claims or Equity Interests in Classes 1, 2, 3, and 11 are Unimpaired under the Plan and accordingly are deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Allowed Claims in Class 9 are either Impaired by reason of neither receiving nor retaining any property under the Plan, or Unimpaired under the Plan, and accordingly are either deemed to reject the Plan or accept the Plan, respectively.  Therefore, each Holder of a Class 9 Claim is not entitled to vote to accept or reject the Plan.

Holders of Allowed Equity Interests in Classes 10 and 12 shall neither receive nor retain any property under the Plan and accordingly are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

D.      **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may, subject to the terms of the Restructuring Support Agreement, (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code, or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

E.      **Classification and Treatment of Claims and Equity Interests**

        1.      Class 1 – Other Priority Claims

                •       *Classification*:  Class 1 consists of the Other Priority Claims.

                •       *Treatment*:  On or as soon as reasonably practicable after the earlier of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date, or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors (with the consent of the Required Supporting Noteholders) or Reorganized Debtors which election shall be consistent with the Restructuring Support Agreement:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.

                •       *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to

section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

- *Classification*: Class 2 consists of the Other Secured Claims.

- *Treatment*: On or as soon as reasonably practicable after the earlier of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date, or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors (with the consent of Required Supporting Noteholders) or Reorganized Debtors which election shall be consistent with the Restructuring Support Agreement:  (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) return of the Collateral securing such Allowed Class 2 Claim; or (D) such other treatment rendering such Claim Unimpaired.  Except with respect to Claims that are treated in accordance with the preceding clause (C), each Holder of an Allowed Other Secured Claim will retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Unimpaired, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 – ABL Revolver Claims

- *Classification*:  Class 3 consists of ABL Revolver Claims.

- *Allowance*:  All ABL Revolver Claims that are Secured shall have been paid in full in Cash prior to the Confirmation Hearing or have been Cash collateralized and thus shall be Allowed in the amount of $0.

- *Treatment*:

  (i)    On the Effective Date each Holder of an Allowed Class 3 Claim shall neither receive nor retain any property (other than retaining Cash collateral securing any outstanding letters of credit and any Cash received in repayment of such ABL Revolver Claims pursuant to the DIP Orders) and any and all ABL Revolver Claims shall be deemed paid in full, satisfied, settled, discharged and released and all prepetition letters of credit outstanding on the Effective Date shall be terminated and replaced with new letters of credit issued under the New Exit ABL Facility, or, at the election of the Debtors (with the consent of the Required Supporting Noteholders), shall be secured by Cash collateral equal to 103% of the face amount of such letters of credit. On the

Effective Date, all Liens securing the ABL Revolver Claims (other than any Liens on Cash collateral securing any outstanding letters of credit) shall be automatically released, terminated, void and of no further force or effect.

(ii) All unpaid reasonable and necessary fees and out-of-pocket expenses of the Prepetition ABL/Term Loan Agent and the Prepetition ABL/Term Loan Lenders shall be paid in full in Cash on the Effective Date, without the need to file any application with, or obtain any order (other than the Confirmation Order) from, the Bankruptcy Court.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

4.      Class 4 –Domestic Term Loan Claims

- *Classification*:  Class 4 consists of the Domestic Term Loan Claims.

- *Allowance*: If the Domestic Term Loan Claims that are Secured are paid in full in Cash prior to the Effective Date, such Domestic Term Loan Claims shall be Allowed in the amount of $0; *provided*, *however*, that if the Domestic Term Loan Claims that are Secured are not paid in full in Cash prior to the Effective Date, such Domestic Term Loan Claims (if any) shall be allowed in an amount equal to the sum of:  (i) the principal amount outstanding as of the Effective Date; (ii) any accrued and unpaid prepetition interest; and (iii) any accrued and unpaid reasonable and necessary Prepetition ABL/Term Loan Professional Fees and accrued and unpaid postpetition interest, in each case, as allowed pursuant to Section 506 of the Bankruptcy Code.

- *Treatment*:

(i) If the Allowed Domestic Term Loan Claims that are Secured are paid in full in Cash prior to the Effective Date, on the Effective Date, all Allowed Domestic Term Loan Claims shall neither receive nor retain any property (other than retaining Cash received in repayment of such Domestic Term Loan Claims pursuant to the DIP Orders) and all Domestic Term Loan Claims shall be deemed paid in full, satisfied, settled, discharged and released.  On the Effective Date, all Liens securing the Domestic Term Loan Claims shall be automatically released, terminated, void and of no further force or effect.

(ii) If the Allowed Domestic Term Loan Claims that are Secured are not paid in full in Cash prior to the Effective Date, on the Effective Date, all Allowed Domestic Term Loan Claims that are Secured shall be, with the consent of the Required Supporting Noteholders, either: (i) paid in full in Cash on the Effective Date; or (ii) receive such treatment rendering such Claim Unimpaired, including a Cure pursuant to Section 1124(2) of the Bankruptcy Code.

       (iii)    All accrued and unpaid Prepetition ABL/Term Loan Professional Fees shall be paid in full in Cash on the Effective Date, without the need to file any application with, or obtain any order (other than the Confirmation Order) from, the Bankruptcy Court.

- *Impairment and Voting*:  To the extent that Class 4 Claims are Allowed, Class 4 is either Unimpaired and the Holders of Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or impaired and are entitled to vote to accept or reject the Plan.  Votes of Holders of Class 4 Claims on the Plan will be solicited, but such votes will only be tabulated in the event that Class 4 is Impaired.

5.        Class 5 – Allowed Prepetition Secured Notes Claims

- *Classification*:  Class 5 consists of the Allowed Prepetition Secured Notes Claims.

- *Allowance*:  The Claims of the Holders of the Prepetition Secured Notes shall be Allowed Class 5 Prepetition Secured Notes Claims, consistent with Plan Value, in the applicable amount of $212,750,000, allocated as applicable among the Debtors.  For the avoidance of doubt, the Holders of the Prepetition Secured Notes shall have an Allowed Class 6 General Unsecured Claim in the amount of the Allowed Unsecured Prepetition Secured Notes Claim and shall participate in Class 7 as set forth herein.

- *Treatment*:

       (i)    On the Effective Date, the Allowed Class 5 Prepetition Secured Notes Claims shall be exchanged for New Common Stock equal to 100% of the New Common Stock authorized and outstanding as of the Effective Date, prior to, and subject to, dilution for the issuance of New Common Stock: (A) on account of the DIP Facility Claims, if applicable; (B) to the DIP Backstop Parties on account of the DIP Backstop Premium; (C) on account of the Exit Premium; (D) in accordance with the Management Incentive Plan; and (E) upon the exercise of the New Warrants.

       (ii)    On the Effective Date, each Holder of an Allowed Class 5 Prepetition Secured Notes Claim shall receive from the Distribution Agent its Pro Rata share of New Common Stock, in full and final satisfaction, settlement, discharge and release of, and in exchange for its Allowed Class 5 Prepetition Secured Notes Claim, in accordance with the Plan and pursuant to the Prepetition Indenture.

       (iii)    On the Effective Date, all Liens securing the Allowed Prepetition Secured Notes Claims shall be automatically released, terminated, void and of no further force or effect.

       (iv)    All unpaid fees and expenses of the Ad Hoc Committee of Secured Notes Professionals and the Prepetition Indenture Trustee Professional Fees shall be paid in full in Cash on the Effective Date, without the need to file any application with, or

obtain any order (other than the Confirmation Order) from, the Bankruptcy Court.

- *Impairment and Voting*:  Class 5 is Impaired, and Holders of Allowed Prepetition Secured Notes Claims are entitled to vote to accept or reject the Plan.

6.       Class 6 – General Unsecured Claims (other than Class 7, 8 and 9 Claims)

- *Classification*:  Class 6 consists of the General Unsecured Claims (other than Class 7, 8 and 9 Claims), including the ITLA Unsecured Guaranty Claim.

- *Allowance*:  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors will have and will retain any and all rights and defenses under bankruptcy or non-bankruptcy law that the Debtors had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by order of the Bankruptcy Court. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, no General Unsecured Claim will become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim.  All Class 6 General Unsecured Claims based upon the ITLA Unsecured Guaranty Claim shall be Disputed until the entry of a Final Order adjudicating or settling any Avoidance Actions brought against the Holders of such Claims.

- *Treatment*:  On the Effective Date, subject to the provisions of the Restructuring Support Agreement, each Holder of an Allowed Class 6 Claim, in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive a Pro Rata Litigation Trust Beneficial Interest on, or as soon as reasonably practicable after the earlier of:  (a) the Effective Date, or (b) such date as the General Unsecured Claim becomes an Allowed General Unsecured Claim.

- *Impairment and Voting*:  Class 6 is Impaired, and the Holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Plan.

7.       Class 7– General Unsecured Claims Against Gibson Holdings

- *Classification*:  Class 7 consists of the General Unsecured Claims against Gibson Holdings

- *Allowance*:  The Gibson Holdings Claims will be Allowed in an amount either: (i) as determined by a Final Order; (ii) or an agreement among the Debtors or the Reorganized Debtors (as applicable), the Required Supporting Noteholders, and the Holder of the Gibson Holdings Claim, as approved by a Final Order; *provided, however*, the ITLA Gibson Holdings Claim shall be Disputed until the entry of a Final Order adjudicating or settling any Avoidance Actions brought against the Holders of such Claims; and *provided, further, however*, that the Gibson Holdings Claims based upon the Allowed Prepetition Secured Notes

Claim shall be Allowed in the amount of the Allowed Prepetition Secured Notes Claim.

- *Treatment*:

    (i)     Each Holder of an Allowed Class 7 Claim, in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall have the right to receive, upon the earlier to occur of (x) the Effective Date, if such Gibson Holdings Claim is not Disputed, (y) entry of a Final Order Allowing the Class 7 Gibson Holdings Claim, if such Gibson Holdings Claim is Disputed, or (z) the five year anniversary of the Effective Date, a Profits Interest in a number of TEAC Shares having a value on the date of such distribution equal to such Holder's Pro Rata share of the aggregate value of the TEAC Shares as of the Effective Date (based on the last trading value of shares in TEAC on the Effective Date) as determined by the Bankruptcy Court at the Confirmation Hearing, plus interest at the Post-Petition Rate from the Effective Date until the date of such Distribution, *provided, however*, that at the election of the Required Supporting Noteholders, the Holders of Gibson Holdings Claims based upon the Prepetition Secured Notes Claim may, prior to or after the Effective Date, elect to waive their recovery in Class 7 and instead treat their recovery in Class 5 as being also on account of their Gibson Holdings Claims in Class 7, *provided further, however*, that any such waiver of recovery in Class 7 by the Required Supporting Noteholders shall not result in a larger Pro Rata distribution to any other Holder of a Gibson Holding Claim in Class 7.

    (ii)    Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors will have and will retain any and all rights and defenses under bankruptcy or non-bankruptcy law that the Debtors had with respect to any Class 7 Gibson Holdings Claim, except with respect to any Class 7 Gibson Holding Claim Allowed by order of the Bankruptcy Court or under the Plan and any Gibson Holdings Claims based upon the Allowed Prepetition Secured Notes Claims.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, no Class 7 Gibson Holdings Claim will become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Allowed Class 7 Claims are entitled to vote to accept or reject the Plan.

8.      Class 8 – Convenience Claims

- *Classification*:  Class 8 consists of the Convenience Claims.

- *Allowance*:  Notwithstanding any provisions of the Plan to the contrary, a Convenience Claim will be deemed Allowed, without offset, counterclaim or defense of any kind if it is (i) set forth in a timely Filed Proof of Claim that is not validly objected to (ii) listed on the Schedules, or (iii) set forth in a timely and valid Convenience Claim Election, in each case of not more than up to an amount equal to $25,000 per Claim.

- *Treatment*:  Except to the extent that a Holder of an Allowed Convenience Class Claim agrees to a less favorable treatment, on or as soon as reasonably practicable following the Effective Date or the date that such Convenience Class Claim becomes Allowed, each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction, compromise, settlement, release and discharge of and in exchange for such Allowed Convenience Class Claim, Cash in an amount equal to 5% of the Allowed Convenience Class Claim.

- *Impairment and Voting*:  Class 8 is Impaired, and Holders of Allowed Class 8 Claims are entitled to vote to accept or reject the Plan.

9.      Class 9 – Intercompany Claims

- *Classification*:  Class 9 consists of the Intercompany Claims.

- *Treatment*:  On the Effective Date, all Class 9 Intercompany Claims shall be, at the option of the Company with the consent of the Required Supporting Noteholders, either:  (a) Reinstated, (b) converted into equity, or (c) cancelled, and may be compromised, extinguished, or settled after the Effective Date.

- *Impairment and Voting*:  Holders of Class 9 Intercompany Claims are either Unimpaired, and such Holders of Class 9 Intercompany Claims conclusively are (i) deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and such Holders of Class 9 Intercompany Claims shall receive nothing on account of such Claims and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of a Class 9 Intercompany Claim is not entitled to vote to accept or reject the Plan.

10.     Class 10 – Equity Interests in Gibson

- *Classification*:  Class 10 consists of the Equity Interests in Gibson.

- *Treatment*:  All Class 10 Equity Interests in Gibson will be deemed cancelled upon the Effective Date and will be of no further force or effect, whether surrendered for cancellation or otherwise, and the Holders of all Class 10 Equity Interests in Gibson shall neither retain nor receive any property under the Plan on account of such Equity Interests.

- *Impairment and Voting*:  Class 10 is Impaired and the Holders of Class 10 Equity Interests in Gibson are deemed to reject the Plan.

11.    Class 11 – Equity Interests in Subsidiaries (Other Than Excluded Debtor Subsidiaries)

- *Classification*:  Class 11 consists of the Equity Interests in Subsidiaries (Other Than Excluded Debtor Subsidiaries).

- *Treatment*:  On the Effective Date: Reorganized Gibson will own 100% of the Equity Interests in the other Debtors and its Non-Debtor Subsidiaries, except for (a) the Excluded Debtor Subsidiaries, and (b) the Excluded Non-Debtor Subsidiaries.

- *Impairment and Voting*:  Class 11 is Unimpaired, and the Holders of Class 11 Equity Interests are not entitled to vote to accept or reject the Plan, and are deemed to accept the Plan.

12.    Class 12– Equity Interests in Excluded Debtor Subsidiaries

- *Classification*:  Class 12 consists of the Equity Interests in Excluded Debtor Subsidiaries.

- *Treatment*:  On the Effective Date the Debtors' Equity Interests in the Excluded Debtor Subsidiaries shall be, and shall be deemed to be, cancelled and will be of no further force or effect.  The Debtors' shall neither receive nor retain any property on account of their cancelled Equity Interests in the Excluded Debtor Subsidiaries.

- *Impairment and Voting*:  Class 12 is Impaired, and the Holders of Class 12 Equity Interests are not entitled to vote to accept or reject the Plan, and are deemed to reject the Plan.

**F.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to cure any arrears or defaults that may exist with respect to contracts to be assumed under the Plan.

**G.**     **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to, and the Plan hereby implements in all respects, the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors, with the consent of the Required Supporting Noteholders, reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## ACCEPTANCE OR REJECTION OF THE PLAN

**A.**     **Voting Classes**

Each Holder of an Allowed Claim as of the applicable voting record date in the Voting Classes (Classes 4 (to the extent not previously refinanced in accordance with the DIP Orders), 5, 6, 7 and 8) will be entitled to vote to accept or reject the Plan.

**B.**     **Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

**C.**     **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors (subject to the terms of the Restructuring Support Agreement) reserve the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all Impaired Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and within the range of reasonableness.  All distributions made to Holders of Allowed Claims and Allowed Equity Interests in any Class are intended to be and shall be final.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.**     **General Settlement of Claims**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

## B.    Corporate Existence

The Debtors (except for the Excluded Debtor Subsidiaries) and the Non-Debtor Subsidiaries (except for the Excluded Non-Debtor Subsidiaries) will continue to exist after the Effective Date as separate legal entities, with all of the powers of corporations, limited liability companies, memberships and partnerships pursuant to the applicable law in their states of incorporation or organization and, with respect to Gibson and Gibson Holdings, pursuant to the Amended Organizational Documents.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may take such action not inconsistent with the Restructuring Transactions, the Restructuring Support Agreement or the Plan and as permitted by applicable law and such organizational documents, as the Reorganized Debtors and the Non-Debtor Subsidiaries may determine is reasonable and appropriate, including causing any of them to:  (i) be merged into another; (ii) be dissolved; (iii) change its legal name; or (iv) close a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

From and after the Effective Date, the Excluded Debtor Subsidiaries, and the Excluded Non-Debtor Debtor Subsidiaries shall cease to exist and shall be deemed to be dissolved and liquidated without further action, filing or approval.  Claims against, and Equity Interests in, the Excluded Debtor Subsidiaries are classified, and shall receive such treatment as provided for in Article III of the Plan.  Any property of the Excluded Debtor Subsidiaries shall revest in the Reorganized Debtors as they may determine, free and clear of all Claims, Equity Interests and Liens, except as otherwise set forth in this Plan.  The assets of the Excluded Non-Debtor Subsidiaries will be abandoned as provided for in the Plan.  The liabilities of the Excluded Non-Debtor Subsidiaries are not affected by this Plan.

On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan and that is consistent with the Restructuring Support Agreement, including, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation and amendments thereto; (iv) reincorporation (including, consistent with the Restructuring Support Agreement, reincorporating, merger, consolidation, or conversion pursuant to applicable law); (v) the Restructuring Transactions; and (vi) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

## C.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and Assets of the Estates (including Causes of Action, but excluding: (i) the Equity Interests in the Excluded Debtor Subsidiaries; (ii) the Equity Interests in, or assets of, the Excluded Non-Debtor Subsidiaries; and (iii) the Litigation Trust Claims) and any property and Assets acquired by the Debtors pursuant to the Plan will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances.  Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation

of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

On the Effective Date, (A) the Equity Interests in the Excluded Debtor Subsidiaries and the Equity Interests in the Excluded Non-Debtor Subsidiaries: (i) shall be cancelled, eliminated, extinguished and of no further force or effect; (ii) shall be finally and forever relinquished and waived by the Holder thereof; and (iii) shall not revest in the Reorganized Debtors; and (B) any assets owned by such (i) Excluded Debtor Subsidiaries shall vest in the Reorganized Debtors as determined by the Reorganized Debtors and (ii) Excluded Non-Debtor Subsidiaries shall be abandoned in accordance with section 554 of the Bankruptcy Code or otherwise to the creditors of such Excluded Non-Debtor Subsidiaries and shall be deemed assigned to and for the benefit of the creditors of such Excluded Non-Debtor Subsidiaries or otherwise liquidated for the benefit of such creditors.

**D.    The New Exit ABL Facility and the New Take-Out Facility**

The Debtors shall use their best efforts to enter into the New Exit ABL Facility on or before the Effective Date.  The New Exit ABL Facility, if applicable, shall be generally described in the New Exit ABL Term Sheet and the New Exit ABL Facility Documents, if applicable, shall be in form and substance acceptable to the Required Supporting Noteholders.  The Confirmation Order shall be deemed approval of the New Exit ABL Facility and the New Exit ABL Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New Exit ABL Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Exit ABL Facility.  If the Debtors enter into the New Exit ABL Facility on the Effective Date, then, on the Effective Date, all of the Liens and security interests to be granted in accordance with the New Exit ABL Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Exit ABL Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Exit ABL Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

At the option of the Required Lenders and subject to the Take-Out Equity Option, the DIP Facility may be refinanced with the New Take-Out Facility. The New Take-Out Facility, if applicable, shall be generally described in the New Take-Out Facility Term Sheet and the New Take-Out Facility Documents, if applicable, will be in form and substance acceptable to the Required Supporting Noteholders.  The Confirmation Order shall be deemed approval of the New Take-Out Facility and the New Take-Out Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New Take-Out Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Take-Out Facility. If the Debtors enter into the New Take-Out Facility on the Effective Date, then, on the Effective Date, all of the Liens and security interests to be granted in accordance with the New Take-Out Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted thereunder in accordance with the terms of the New Take-Out Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Take-Out Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

The New Exit ABL Facility and the New Take-Out Facility, as applicable, shall provide, as of the Effective Date, sufficient funding, together with the Debtors' Cash on hand and their future revenues, to satisfy the DIP Facility Claims on the Effective Date in accordance with the Plan and the Restructuring Support Agreement, fund the treatment provided to Allowed Claims under the Plan, and fund the Debtors' ongoing operations.

## E.    Authorized Financing

On the Effective Date, the applicable Reorganized Debtors shall be and are authorized to execute and deliver, as applicable, the New Exit ABL Facility Documents and the New Take-Out Facility Documents (each, as applicable), and any related loan documents, and shall be and are authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, security agreements, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity, subject to the lien limitations set forth herein.

Except as otherwise provided in the Plan or the Confirmation Order, all Cash and financing necessary for the Reorganized Debtors to make payments and distributions required pursuant to the Plan will be obtained from the New Exit ABL Facility and the New Take-Out Facility Documents (each, as applicable), and the Reorganized Debtors' Cash balances, including Cash from operations.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

## F.    Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under Article III.B of this Plan shall receive no Plan Distribution.

## G.    Management Incentive Plan

On the Effective Date, Reorganized Gibson will adopt and implement the Management Incentive Plan, which will provide for grants of options and/or restricted units/New Common Stock reserved for management, directors, and employees in an amount of up to 12% of the New Common Stock outstanding as of the Effective Date.  The primary participants of the Management Incentive Plan, and its terms, including the amount, form, exercise price, allocation and vesting of such equity-based awards with respect to such primary participants, shall be determined by the New Board.  The form and substance of any documentation with respect to the Management Incentive Plan shall be in form and substance (i) consistent with the terms of the Restructuring Support Agreement and (ii) acceptable to the Required Supporting Noteholders.

## H.    Management Employment and Consulting Agreements

As of the Effective Date, Reorganized Gibson and Messrs. Juszkiewicz and Berryman will enter into the Management Employment and Consulting Agreements, which shall be Filed as part of the Plan Supplement.

## I.    Sources of Consideration for Plan Distributions

### 1. Issuance of New Common Stock, New Warrants and Related Documentation

From and after the Effective Date as set forth in this Plan, Reorganized Gibson will be authorized to and will issue the New Common Stock to certain Holders of Allowed Claims, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  It is anticipated that, from and after the Effective Date,

Reorganized Gibson will remain a private company.  All Holders of Claims that receive New Common Stock under the Plan, and any Person receiving any rights exercisable into New Common Stock, in the form of the New Warrants, or pursuant to the Management Incentive Plan, or otherwise, and all transferees of such Persons (including transferees of transferees) shall be required to become parties to the New Common Stock Agreement.

The New Common Stock in Reorganized Gibson issued pursuant to the Plan in exchange for the DIP Facility Claims, the DIP Backstop Premium, the Exit Premium, and the Allowed Class 5 Prepetition Secured Notes Claim, shall be exempt from any registration requirements under any securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder and by Section 1145 of the Bankruptcy Code.  The New Common Stock and New Warrants issued to officers, employees and consultants of the Reorganized Debtors pursuant to the Management Employment and Consulting Agreements and the Management Incentive Plan shall be exempt from any registration requirements under any securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.  Without limiting the effects of section 3(a)(9) and section 4(a)(2) of the Securities Act, Rules 506 and 701 under the Securities Act, and section 1145 of the Bankruptcy Code, all financing documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including the New Exit ABL Facility Documents, the New Take-Out Facility Documents, the New Common Stock, and any other agreement or document related to or entered into in connection with any of the foregoing, will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

The New Common Stock shall constitute a single class of Equity Securities in Reorganized Gibson and, other than as contemplated by the DIP Facility, DIP Backstop Premium, the Exit Premium, the Management Employee and Consulting Agreements, and the Management Incentive Plan, there shall exist no other Equity Securities, warrants, options, or other agreements to acquire any equity interest in Reorganized Gibson as of the Effective Date.  From and after the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of Reorganized Gibson will be that number of shares of New Common Stock as may be designated in the Amended Organizational Documents.

In connection with the distribution of New Common Stock and New Warrants, the Reorganized Debtors will take all actions reasonably necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations, including, when applicable, withholding from distributions a portion of the New Common Stock, selling such securities, or requiring Holders of such securities to contribute the Cash necessary to satisfy tax withholding obligations including income, social security and Medicare taxes, and Reorganized Gibson shall pay such withheld taxes to the appropriate Governmental Unit.

2. Intercompany Claims.

On the Effective Date, all intercompany claims of any of the Debtors against Gibson Innovations Limited or any of Gibson Innovations Limited's direct or indirect Non-Debtor Subsidiaries shall be transferred to Reorganized Gibson.

**J.**      **Non-Debtor Subsidiaries**

To the extent necessary to implement the Plan, the Debtors may designate one or more of the Non-Debtor Subsidiaries to be deemed substantively consolidated with the Debtors without having to commence a chapter 11 case, solely for purposes of:  (i) determining Plan Value and allocating such Plan Value in accordance with the Plan and the classification of Claims and Equity Interests and their

treatment under the Plan, and (ii) implementing the Plan; *provided, however*, that no Holder of a Claim against any Non-Debtor Subsidiary that does not otherwise have a Claim against the Debtors shall be affected or impaired in any manner by such deemed substantive consolidation and, to the extent required, all such Holders shall be deemed classified in a separate Class that is Unimpaired under the Plan.  The Debtors reserve the right to commence a chapter 11 case for any of its Non-Debtor Subsidiaries, in each case as may be necessary and appropriate solely to implement the Plan.

**K.      ITLA Guaranty Claims Against Certain Non-Debtor Subsidiaries**

In connection with confirmation of the Plan, the Debtors (with the consent of the Required Supporting Noteholders) shall provide Holders of ITLA Unsecured Guaranty Claims with an instrument providing for deferred cash payments that have a present value as of the Effective Date equal to the value established by the Bankruptcy Court at the Confirmation Hearing of such Holders' guaranty claims arising under the ITLA against the following Non-Debtor Subsidiaries of Gibson that have guaranteed the ITLA Debt:  (i) China Guitar, (ii) EQ and (iii) Gibson Japan (such instrument, the "ITLA Non-Debtor Guaranty Release Funding").  The proposed amount of ITLA Non-Debtor Guaranty Release Funding shall be disclosed in the Plan Supplement.  **In exchange for the ITLA Non-Debtor Guaranty Release Funding, Holders of ITLA Unsecured Guaranty Claims shall be permanently enjoined and barred from enforcing, in any respect, any ITLA Unsecured Guaranty Claim against China Guitar, EQ, Gibson Japan, the Debtors, the Reorganized Debtors, or any of their respective Affiliates (the "ITLA Injunction").**   In the event that (x) the Bankruptcy Court does not grant the ITLA Injunction or (y) the Debtors and the Required Supporting Noteholders determine not to fund the ITLA Non-Debtor Guaranty Release Funding, the Debtors shall have the option to elect (with the consent of the Required Supporting Noteholders) any of the following actions:  (i) causing China Guitar and/or Gibson Japan to become Excluded Non-Debtor Subsidiaries under the Plan, resulting in the cancellation of Gibson's equity interests in such Entities and the liquidation of such Entities under applicable local laws, or (ii) taking no action with respect to China Guitar or Gibson Japan under the Plan, which would preserve all parties' respective rights, including the rights (A) of the Holders of the ITLA Unsecured Guaranty Claims against China Guitar and Gibson Japan to seek to enforce such guaranty claims under applicable law and (B) the rights of China Guitar and Gibson Japan to cease operations and liquidate under applicable non-bankruptcy law, and/or to commence bankruptcy proceedings with respect to such entities under the Bankruptcy Code or applicable foreign law.

**L.      Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the commencement of distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors, at the sole cost and expense of the Reorganized Debtors.

**M.      Certificate of Incorporation and Bylaws**

The Amended Organizational Documents shall amend or succeed the certificates or articles of incorporation, by-laws and other organizational documents of the Debtors that are Reorganized Debtors to satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii)

authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation and by-laws, and other applicable organizational documents, as permitted by applicable law.  Further, Holders of New Common Stock and the New Warrants and their transferees shall be required to become parties to the New Common Stock Agreement.  To the extent required under this Plan or applicable non-bankruptcy law, the Reorganized Debtors shall file their respective Amended Organizational Documents with the applicable Secretaries of State or other applicable authorities in their respective states, provinces or countries of incorporation or formation in accordance with the corporate laws of the respective states, provinces or countries of incorporation or formation.

**N.      Directors and Officers of Reorganized Gibson**

The New Board shall consist of such number of directors, and such initial directors, as determined by the Required Supporting Noteholders in their sole and absolute discretion, which determination will be disclosed in a Plan Document Filed on or before five (5) days prior to the commencement of the Confirmation Hearing.

As of the Effective Date, the initial officers of the Reorganized Debtors will be the officers identified in the Plan Supplement, which shall include a new chief executive officer approved by the New Board and the Required Supporting Noteholders.  Except as set forth in the Plan and the Plan Supplement, any other directors or officers of the Debtors shall be deemed removed as of the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors and the Non-Debtor Subsidiaries and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such director and each officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors and the Non-Debtor Subsidiaries.  The existing board of directors of the Debtors will be deemed to have resigned and been removed from the board of directors of the Debtors and the board of directors of any applicable Non-Debtor Subsidiaries on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

**O.      Corporate Action**

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or the Non-Debtor Subsidiaries and as applicable or by any other Person (except for those expressly required pursuant to the Plan or the Restructuring Support Agreement).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, managers or members of any Debtor will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the

stockholders, directors, managers or members of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person (except as expressly required pursuant to the Restructuring Support Agreement).

All matters provided for in the Plan involving the legal or corporate structure of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, or Excluded Non-Debtor Subsidiary, as applicable, and any legal or corporate action required by each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary or Excluded Non-Debtor Subsidiary, as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, or Excluded Non-Debtor Subsidiary, as applicable, or by any other Person (except as expressly required pursuant to the Restructuring Support Agreement). On the Effective Date, the appropriate officers of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, and Excluded Non-Debtor Subsidiary, as applicable, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, and Excluded Non-Debtor Subsidiary, as applicable, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person (except as expressly required pursuant to the Restructuring Support Agreement). The secretary and any assistant secretary, or other authorized person, of each Debtor, Reorganized Debtor, Excluded Debtor Subsidiary, Non-Debtor Subsidiary, and Excluded Non-Debtor Subsidiary, as applicable, will be authorized to certify or attest to any of the foregoing actions.

**P.     Cancellation of Documents; Prepetition ABL/Term Loan Agreement; DIP Facility; Prepetition Indenture**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect, including any relating to the Equity Interests in Gibson. The Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan and the obligations of the Debtors and the Non-Debtor Subsidiaries thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. Notwithstanding such cancellation and discharge, the DIP Facility Documents, the Prepetition Indenture, and the Prepetition ABL/Term Loan Agreement, to the extent the Domestic Term Loan Claims are not paid in full in Cash prior to the Effective Date, shall continue in effect to the extent necessary to: (1) allow Holders of DIP Facility Claims, Allowed Prepetition Secured Notes Claims, and Domestic Term Loan Claims, respectively, to receive Plan Distributions under this Plan as provided herein and for enforcing any rights hereunder or thereunder against parties other than the Debtors, the Reorganized Debtors or their Related Persons; (2) allow the Reorganized Debtors, the DIP Agent, the Prepetition Indenture Trustee, and the Prepetition ABL/Term Loan Agent, as applicable, to make distributions pursuant to the Plan; (3) allow the DIP Agent, the Prepetition Indenture Trustee, and the Prepetition ABL/Term Loan Agent, as applicable, to receive distributions under the Plan on account of the DIP Facility Claims, the Allowed Prepetition Secured Notes Claims, and the Domestic Term Loan Claims, respectively, for further distribution in accordance with the DIP Facility Documents, the Prepetition Indenture, and the Prepetition ABL/Term Loan Agreement, respectively; (4) allow the DIP Agent, the Prepetition Indenture Trustee, and the Prepetition

ABL/Term Loan Agent to enforce any obligations owed to each of them under this Plan or the Confirmation order and to seek compensation and/or reimbursement of fees and expenses in accordance with the Plan; (5) permit the DIP Agent, the Prepetition Indenture Trustee, and the Prepetition ABL/Term Loan Agent, as applicable to appear before the Bankruptcy Court or any other court; (6) permit the DIP Agent, the Prepetition Indenture Trustee, and the Prepetition ABL/Term Loan Agent, as applicable, to exercise rights and obligations relating to the interests of the DIP Lenders, the Prepetition Secured Noteholders, and the Domestic Term Loan Lenders, as applicable, to the extent consistent with this Plan and the Confirmation Order; (7) except as otherwise provided for in the Plan, preserve any rights of the DIP Agent, the Prepetition Indenture Trustee and the Prepetition ABL/Term Loan Agent, as applicable, to payment of fees, expenses, and indemnification obligations as against any parties other than the Debtors or the Reorganized Debtors, and any money or property distributable to the beneficial Holders under the relevant instrument, including any rights to priority of payment or to exercise charging liens; and (8) permit the DIP Agent, the Prepetition Indenture Trustee, and the Prepetition ABL/Term Loan Agent to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, *however*, that the preceding provisos shall not affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or this Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan; *provided*, *further*, *however*, that nothing in this section shall effect a cancellation of any New Common Stock or New Warrants.

Except as provided pursuant to this Plan and the Confirmation Order, the DIP Agent, the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, and their respective agents, successors, and assigns, as applicable, shall be discharged of all of their obligations associated with the DIP Facility, the Prepetition Indenture, and the Prepetition ABL/Term Loan Agreement, respectively.

### Q.    **Cancellation of Existing Instruments Governing Security Interests**

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim shall promptly deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents; *provided* that a Holder of an Allowed Other Secured Claim shall only be required to deliver such Collateral and provide such termination statements, instruments or other releases to the Debtors or Reorganized Debtors, as applicable, to the extent that such Holder's Allowed Other Secured Claim is not otherwise satisfied by the surrender of such Collateral to such Holder pursuant to Article III.E.2 of this Plan.

### R.    **Equity Interests in Subsidiaries; Corporate Reorganization**

On the Effective Date and without the need for any further corporate action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, (i) the certificates and all other documents representing the Equity Interests in the Subsidiaries (other than the Excluded Debtor Subsidiaries) and the Non-Debtor Subsidiaries (other than the Excluded Non-Debtor Subsidiaries) shall be deemed to be in full force and effect, and (ii) the certificates and all other documents representing the Equity Interests in the Excluded Debtor Subsidiaries and the Excluded Non-Debtor Subsidiaries shall be deemed to be cancelled, terminated and of no further force or effect.

### S.    **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors (with the consent of the Required Supporting Noteholders) or Reorganized Debtors, as applicable, may take all actions consistent with this Plan and the Restructuring Support Agreement as may be necessary or

appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan.

**T.      Plan Supplement, Other Documents and Orders and Consents Required Under the Restructuring Support Agreement**

So long as the Restructuring Support Agreement has not been terminated, the documents to be Filed as part of the Plan Supplement and the other documents and orders referenced herein, or otherwise to be executed in connection with the transactions contemplated hereunder, shall be subject to the consents and the approval rights, as applicable, set forth in the Restructuring Support Agreement.  To the extent that there is any inconsistency between the Restructuring Support Agreement, on the one hand, and the Plan, on the other hand, as to such consents and the approval rights and the Restructuring Support Agreement has not been terminated, then the consents and the approval rights required in the Restructuring Support Agreement shall govern.  For the avoidance of doubt, the consent rights set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, the Plan Supplement, the other Plan Documents, and any other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein.

**U.      Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the New Board are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan, and the Securities issued pursuant to this Plan.

**V.      Transaction Expenses**

The fees and expenses incurred by the Ad Hoc Committee of Secured Notes, the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, the Prepetition ABL/Term Loan Lenders, and the Supporting Principals will be paid pursuant to the terms hereof and of the Restructuring Support Agreement or any applicable orders entered by the Bankruptcy Court on or before the Effective Date; *provided that*, for the avoidance of doubt, the fees and expenses payable to the Supporting Principals and their professionals will be subject to an aggregate cap of $100,000.00 (unless otherwise agreed to by the Required Supporting Noteholders).  Nothing herein shall require such professionals (or the Prepetition Indenture Trustee, the Prepetition ABL/Term Loan Agent, the Ad Hoc Committee of Secured Notes, the Prepetition ABL/Term Loan Lenders, or the Supporting Principals) to file applications with, or otherwise seek approval of, the Bankruptcy Court as a condition to the payment of such fees and expenses.

**W.      Litigation Trust**

1.      ***Formation of Litigation Trust***

On the Effective Date, the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purpose of prosecuting the Litigation Trust Claims and making distributions (if any) to Holders of Allowed Class 6 General Unsecured Claims, in accordance with the terms of the Plan.  The Litigation Trust shall have a separate existence from the Reorganized Debtors.  The Litigation Trust's prosecution of any of the Litigation Trust Claims will be on behalf of and for the benefit of the Litigation Trust Beneficiaries.

On the Effective Date, the Debtors and the Litigation Trustee shall execute the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan.

Also on the Effective Date, the Debtors and the Committee (as applicable) shall be deemed to have irrevocably transferred to the Litigation Trust all rights, title, and interest in and to all of the Litigation Trust Claims, and in accordance with Bankruptcy Code section 1141, the Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests (other than the Litigation Trust Beneficial Interests), as provided for in the Litigation Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, or other transfer, mortgage reporting, sales, use, or other similar tax. For the avoidance of doubt, on the Effective Date, standing to commence, prosecute and compromise all Litigation Trust Claims shall transfer to the Litigation Trustee and/or the Litigation Trust; *provided however*, that no Claims released under the Plan shall be transferred or issued to the Litigation Trust.

Subject to, and to the extent set forth in, the Plan, the Confirmation Order, and the Litigation Trust Agreement (or any other order of the Bankruptcy Court entered pursuant to, or in furtherance of the Plan), the Litigation Trust and the Litigation Trustee, together with its agents, representatives and professionals, will be empowered to take the following actions, and any other actions, as the Litigation Trustee determines to be necessary or appropriate to implement the Litigation Trust, all without further order of the Bankruptcy Court:

(i)     Adopt, execute, deliver or file all plans, agreements, certificates and other documents and instruments necessary or appropriate to implement the Litigation Trust;

(ii)    Accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the Litigation Trust Claims (acting at the direction of the Litigation Trustee); *provided that* (i) any settlement of any Litigation Trust Claim having a value of at least $1 million shall require the consent of the Required Supporting Litigation Trust Beneficiaries and (ii) the Required Supporting Litigation Trust Beneficiaries shall have the right to direct the Litigation Trustee, on behalf of the Litigation Trust, to accept any offered settlement of a Litigation Trust Claim having a value of at least $1 million;

(iii)   Object to, and prosecute objections to, Disputed Class 6 General Unsecured Claims;

(iv)    Calculate and make distributions to Litigation Trust Beneficiaries;

(v)     Establish reserves consistent with the Plan and Litigation Trust Agreement and invest Cash;

(vi)    Retain and pay distribution agents and professionals and other Entities;

(vii)   Establish reserves and invest Cash out of the Litigation Trust Funds, the proceeds of the Litigation Trust Claims, (including but not limited to establishing a reasonable reserve the purpose of paying all expenses of the Litigation Trust), including but not limited to, professionals to (a) prosecute, settle and collect the Litigation Trust Claims *provided that* (i) any settlement of any Litigation Trust Claim having a value of at least $1 million shall require the consent of the Required Supporting Litigation Trust Beneficiaries and (ii) the Required Supporting Litigation Trust Beneficiaries shall have the right to direct the Litigation Trustee, on behalf of the Litigation Trust, to accept any offered settlement of a Litigation Trust Claim having a value of at least $1 million; (b) prepare and file the Litigation Trust's tax returns for two years following the Effective Date, (c) administer distributions of the proceeds of the Litigation Trust Claims to the Litigation Trust Beneficiaries; and (d) obtain ordinary and customary insurance coverage (collectively, the "Litigation Trust Expenses");

(viii)     Abandon, in any commercially reasonable manner, any Litigation Trust Claims that in the Litigation Trustee's reasonable judgment cannot be commercially reasonably prosecuted or that the Litigation Trustee reasonably believes to have inconsequential value to the Litigation Trust;

(ix)      File appropriate tax returns and other reports on behalf of the Litigation Trust and pay taxes (if any) or other obligations owed by the Litigation Trust; and

(x)       Wind-up the affairs of and dissolve the Litigation Trust.

The Litigation Trust has no objective to, and will not, engage in a trade or business and will conduct its activities consistent with the Plan and the Litigation Trust Agreement.

On the Effective Date, the Committee's counsel and professionals, will provide to the Litigation Trustee (or such professionals designated by the Litigation Trustee) documents and other information gathered, and relevant work product developed, if any, during the Chapter 11 Cases in connection with their investigation of the Litigation Trust Claims, *provided* that the provision of any such documents and information will be without waiver of any evidentiary privileges, including without limitation the attorney-client privilege, work-product privilege or other privilege or immunity attaching to any such documents or information (whether written or oral).  The Plan will be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief.

The Litigation Trust and the Litigation Trustee will each be a "representative" of the Estates under section 1123(b)(3)(B) of the Bankruptcy Code solely as related to the Litigation Trust Assets, and the Litigation Trustee will be the trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), and, as such, the Litigation Trustee succeeds to all of the rights, powers and obligations of a trustee in bankruptcy with respect to collecting, maintaining, administering and liquidating the Litigation Trust Assets.  Without limiting such rights, powers, and obligations, on the Effective Date, (i) the Committee will transfer, and will be deemed to have irrevocably transferred, to the Litigation Trust and shall vest in the Litigation Trust and the Litigation Trustee, the Committee's evidentiary privileges including the attorney-client privilege, work product privilege and other privileges and immunities that they possessed, to the extent related to the Litigation Trust Assets; and (ii) the Litigation Trust, Litigation Trustee and Reorganized Debtors all shall be vested with and share the Debtors' evidentiary privileges including the attorney client privilege, work product privilege and other privileges and immunities the Debtors possessed, to the extent related to the Litigation Trust Assets.  The Committee and its financial advisors, and the Debtors and their financial advisors upon reasonable request, will provide to the Litigation Trustee (or such professionals designated by the Litigation Trustee) originals or copies of documents, other information, and work product relating to the Litigation Trust Claims, *provided* that the provision of any such documents and information will be without waiver of any evidentiary privileges or immunity.  Without limiting the foregoing, the Reorganized Debtors shall be vested with and retain all evidentiary privileges, including the attorney-client privilege, work product privilege and other privileges and immunities the Debtors possessed, relating to all Causes of Action that are not Litigation Trust Claims and other property of the Estates vesting in the Reorganized Debtors. To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by the Debtors or the Reorganized Debtors, as the case may be, and the Litigation Trustee shall be deemed, solely with respect to such Litigation Trust Assets, to have been designated as a representative of the Debtors, the Reorganized Debtors, or the Estates, as the case may be, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Debtors, the Reorganized Debtors, or the Estates, as the case may be.

42

2.      *__Litigation Trustee__*

The Litigation Trustee shall be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), and solely with respect to the Litigation Trust Assets, the representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified more fully in the Litigation Trust Agreement. The Litigation Trust shall hold and distribute the Litigation Trust Assets in accordance with the provisions of the Plan and the Litigation Trust Agreement. Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.  After the Effective Date, the Reorganized Debtors shall have no interest in the Litigation Trust Assets other than as set forth in the Plan.  The Litigation Trustee shall periodically report on activities of the Litigation Trust to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement.

3.      *__Fees and Expenses of the Litigation Trust__*

On the Effective Date, the Debtors shall fund the Litigation Trust with the Litigation Trust Funding Amount.  All Litigation Trust Expenses  shall be paid from the Litigation Trust Funding Amount and the proceeds of the Litigation Trust Claims.  For the avoidance of doubt, none of the Debtors, the Estates, or the Reorganized Debtors shall have any liability for the fees and expenses of the Litigation Trust beyond the Litigation Trust Funding Amount.

4.      *__Proceeds of the Litigation Trust__*

Litigation Proceeds shall be allocated <u>first</u> to pay any adequate protection claims payable pursuant to the terms of the DIP Orders and this Plan in full in Cash to the extent not otherwise paid in full in accordance with the DIP Orders prior to the Effective Date or thereafter, and <u>second,</u> paid to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement and the Plan.

5.      *__Limitation of Liability__*

Neither the Litigation Trustee, nor any of its Related Persons, shall be liable for the act or omission of any other member, designee, agent, advisor, representative or professional, nor shall the Litigation Trustee be liable for any act or omission taken or omitted to be taken in the capacity as Litigation Trustee, other than for specific actions or omissions resulting from the Litigation Trustee's or its Related Persons' respective willful misconduct, gross negligence, or fraud.  The Litigation Trustee may, in connection with the performance of its functions, in its sole and absolute discretion, consult with its attorneys, accountants, advisors and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such persons, regardless of whether or not such advice or opinions are in writing.  Notwithstanding such authority, the Litigation Trustee shall not be under any obligation to consult with any such attorneys, accountants, advisors or agents, and its determination not to do so shall not result in the imposition of liability on the Litigation Trustee or any of its members, designees, agents, advisors, representatives or professionals unless such determination is based on willful misconduct, gross negligence or fraud.  Persons dealing with the Litigation Trustee shall look only to the Litigation Trust Assets to satisfy any liability incurred by the Litigation Trustee to such person in carrying out the terms of the Plan or the Litigation Trust Agreement, and the Litigation Trustee shall have no personal obligation to satisfy such liability.

6.      *__Indemnification__*

The Litigation Trust shall indemnify the Litigation Trust Indemnified Parties for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expense of their respective professionals), incurred

without gross negligence, willful misconduct, or fraud on the part of the Litigation Trust Indemnified Parties (which gross negligence, willful misconduct, or fraud, if any, must be determined by a Final Order or a court of competent jurisdiction), for any action taken, suffered, or omitted to be taken by the Litigation Trust Indemnified Parties in connection with the acceptance, administration, exercise and performance of their duties under the Plan or the Litigation Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence or willful misconduct.

7. ***Tax Treatment***

The Litigation Trust generally is intended to be treated, for federal income Tax purposes, as a grantor trust that is a liquidating trust within the meaning of Treasury Regulations section 301.7701- 4(d), with no objective to continue or engage in the conduct of a trade or business. This section assumes that all claims held by the Liquidation Trust Beneficiaries are held as "capital assets" within the meaning of Tax Code Section 1221 (generally, property held for investment). For U.S. federal income tax purposes, the transfer of the Litigation Trust Assets to the Litigation Trust will be treated as a transfer of the Litigation Trust Assets from the Debtors to the Litigation Trust Beneficiaries, followed by the Litigation Trust Beneficiaries' transfer of the Litigation Trust Assets to the Litigation Trust in exchange for their beneficial interests in the Litigation Trust. Such exchange should be treated as a taxable exchange under Section 1001 of the Tax Code for each Litigation Trust Beneficiary. Each Litigation Trust Beneficiary should recognize capital gain or loss equal to the difference between (i) the fair market value of the Litigation Trust Beneficiary's allocable share of the Litigation Trust Assets received (other than the value received for "Accrued Interest", as defined and discussed in Article XI of the Disclosure Statement) and (ii) the Litigation Trust Beneficiary's adjusted tax basis in its claim. The fair market value of the Litigation Trust Beneficiary's allocable share of the Litigation Trust Assets may be uncertain at the time received, and each Litigation Trust Beneficiary should consult its own tax advisor regarding the determination of gain or loss in connection with the receipt of an interest in the Litigation Trust Assets and any future payments in respect of such interest in the Litigation Trust Assets.

The Litigation Trust Beneficiaries will thereafter be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the Litigation Trust Assets. The Litigation Trust Beneficiaries shall include in their annual taxable incomes, and pay tax to the extent due on, their allocable shares of each item of income, gain, deduction, loss and credit, and all other such items shall be allocated by the Litigation Trustee to the Litigation Trust Beneficiaries using any reasonable allocation method. The Litigation Trustee will be required by the Litigation Trust Agreement to file income Tax returns for the Litigation Trust as a grantor trust of the Litigation Trust Beneficiaries. In addition, the Litigation Trust Agreement will require consistent valuation by all parties, including the Debtors, the Reorganized Debtor, the Litigation Trustee and the Litigation Trust Beneficiaries, for all federal income Tax and reporting purposes, of any property held by the Litigation Trust. The Litigation Trust Agreement will provide that termination of the trust will occur no later than five years after the Effective Date, unless the Bankruptcy Court approves an extension based upon a finding that such an extension is necessary for the Litigation Trust to complete its liquidating purpose. The Litigation Trust Agreement also will limit the investment powers of the Litigation Trustee in accordance with IRS Rev. Proc. 94-45 and will require the Litigation Trust to distribute at least annually to the Litigation Trust Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for Taxes), except for Creditor Recoveries retained as reasonably necessary to maintain the value of the Litigation Trust Assets.

## X.  **No Revesting of Litigation Trust Assets**

No Litigation Trust Asset will revest in the Reorganized Debtors on or after the date such Litigation Trust Asset is transferred to the Litigation Trust, but irrevocably and automatically will vest in the Litigation Trust on the Effective Date, to be administered by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement.

**Y.**    **Books and Records Retention; Cooperation and Access to Books and Records**

Until a final order of judgment or settlement has been entered with respect to the Litigation Trust Claims and any other litigation or contested matter initiated within two years after the Effective Date with respect to other Causes of Action, and until the deadline to object to Claims, the Reorganized Debtors, the Litigation Trust and/or any transferee of the Debtors' or the Reorganized Debtor's books, records, documents, files, electronic data (in whatever format, including native format), or any tangible objects shall preserve and maintain such books and records relevant or potentially relevant to the Litigation Trust Claims, other Causes of Action and the Disputed Class 6 Claims, within the provisions of the Federal Rules of Civil Procedure, as if the Debtors or the Reorganized Debtors were parties to the applicable litigation or contested matter.  Notwithstanding the foregoing, if the Reorganized Debtors determines that it no longer has any need for such books and records, it may destroy or abandon such books and records only if permitted to do so as a result of a final, non-appealable order of the Bankruptcy Court, entered after a hearing on reasonable notice to parties-in-interest, including the Litigation Trustee and counsel of record for all plaintiffs and defendants in such actions. The Reorganized Debtors shall use commercially reasonable efforts to cooperate with the Litigation Trustee, at the Litigation Trustee's expense, in connection with its prosecution of the Litigation Trust Claims, other Causes of Action, as well as objections to Disputed Class 6 Claims, including with respect to promptly providing information as requested by the Litigation Trustee (including, reasonable access to the Debtors' and Reorganized Debtor's books and records).

# ARTICLE VI.
# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**    **Assumption and Rejection of Executory Contracts and Unexpired Leases**

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure amounts, all Executory Contracts and Unexpired Leases of the Debtors that are Reorganized Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including employment agreements) and Unexpired Leases that:

- have previously expired or terminated pursuant to their own terms or by agreement of the parties thereto;

- have been previously assumed or rejected by order of the Bankruptcy Court;

- are the subject of a separate motion Filed by the Debtors under section 365 of the Bankruptcy Code before the Confirmation Date for assumption or rejection; or

- are identified  in the Rejected Executory Contract/Unexpired Lease List.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

Except with respect to Executory Contracts or Unexpired Leases that are the subject of Cure Objections, any applicable Cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Notwithstanding any other provision in the Plan or Confirmation Order, with respect to any Unexpired Lease of nonresidential real property assumed by the Debtors or the Reorganized Debtors, nothing in the Plan or in the Confirmation Order shall modify the Debtors' or Reorganized Debtors' obligation to pay:  (1) amounts owed under the assumed Unexpired Lease of non-residential real property that are not accrued for the period prior to the Confirmation Date, including for common area maintenance, insurance, taxes, and similar charges; and any regular or periodic ordinary course year-end adjustments and reconciliations of such charges provided for under the terms of the Unexpired Lease, any percentage rent, any other obligations, including indemnification obligations (if any) that arise from third-party claims asserted with respect to or arising from the Debtors' use and occupancy of the premises prior to the Effective Date for which the Debtors had a duty to indemnify such Landlord pursuant to any Unexpired Lease, or (2) any unpaid Cure amounts (including post-assumption obligations under such assumed Unexpired Lease) as determined by the Bankruptcy Court.

### B.  <u>Notice of Cure Amounts</u>

No later than ten (10) calendar days before the Confirmation Hearing (unless otherwise ordered by the Bankruptcy Court), the Debtors will serve upon counterparties to Executory Contracts and Unexpired Leases a notice (the "**Assumption Notice**") stating that the Debtors may potentially assume the Executory Contracts and Unexpired Leases identified therein in connection with the Plan.  The Assumption Notice will: (a) include a schedule of all Executory Contracts and Unexpired Leases, and the applicable Cure amount, if any, for each Executory Contract and Unexpired Lease; (b) describe the procedures for filing objections to the assumption of, or the proposed Cure amount for, an Executory Contract or Unexpired Lease; and (c) describe the process by which related disputes will be resolved by the Bankruptcy Court.

Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption of such Executory Contract or Unexpired Lease or to the Cure amount set forth in the Assumption Notice will be deemed to have consented and forever released and waived any objection to the assumption of the Executory Contract or Unexpired Lease and the Cure amount set forth on the Assumption Notice.

The Bankruptcy Court will hear and determine any objections to the assumption of Executory Contracts and Unexpired Leases at the Confirmation Hearing, except for objections solely as to Cure amounts ("**Cure Objections**").  The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases (including Executory Contracts or Unexpired Leases that are the subject of Cure Objections) pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  To the extent a Cure Objection is not resolved consensually prior to the Confirmation Hearing, the Debtors or the Reorganized Debtors, as the case may be, shall schedule a hearing to determine such Cure amount within 60 days following the Confirmation Hearing, or such later date as may be agreed to with the counterparty.  Within ten (10) days following the Bankruptcy Court's entry of an Order determining any Cure amounts for such Executory Contract or Unexpired Leases, the Debtors or the Reorganized Debtors, as the case may be, may elect to reject such Executory Contract or Unexpired Lease by filing with the Bankruptcy Court a notice of such rejection (a "**Rejection Notice**").  For the avoidance of doubt, if a Rejection Notice is not Filed within such ten (10) day period, such Executory Contract or Unexpired Lease will be deemed to have been assumed.  Any applicable Cure payments with respect to Executory Contracts or Unexpired Leases that are the subject of Cure Objections shall be made within ten (10) days following the assumption of such Executory Contract or Unexpired Lease.

### C.   Rejection of Executory Contracts or Unexpired Leases

Executory Contracts and Unexpired Leases identified in the Rejected Executory Contract/Unexpired Lease List shall be deemed rejected as of the Effective Date.  Executory Contracts and Unexpired Leases that are the subject of a Rejection Notice shall be deemed rejected as of the date on which the Rejection Notice is filed. The Confirmation Order will constitute an order of the Bankruptcy Court pursuant to sections 365 and 1123 of the Bankruptcy Code approving the rejection of the Executory Contracts and Unexpired Leases (a) identified in the Rejected Executory Contract/Unexpired Lease List, as of the Effective Date; (b) that are the subject of a Rejection Notice, as of the date on which such Rejection Notice is Filed.

### D.   Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed in the manner set forth in the Claims Bar Date Order within thirty (30) days after (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; or (b) with respect to Executory Contracts and Unexpired Leases that are the subject of a Rejection Notice, the date on which such Rejection Notice was served on the counterparty.

Any Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.  All Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

### E.   Director and Officer Insurance Policies

Upon the Effective Date, the Reorganized Debtors shall have in full force and effect D&O Liability Insurance Policies for all current and former directors and officers of the Debtors and the Non-Debtor Subsidiaries materially consistent with the Debtors' D&O Liability Insurance Policies as in effect immediately prior to the Petition Date.  To the extent, and as permitted by applicable law, as required to implement the preceding sentence, the Reorganized Debtors will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code in effect as of immediately prior to the Petition Date.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors or current and former directors and officers of the Debtors and the Non-Debtor Subsidiaries (including the Supporting Principals) under the D&O Liability Insurance Policies.

Further, on or as soon as practicable before the Effective Date, the Debtors shall purchase tail coverage for all current and former directors and officers (including the Supporting Principals) with a term of six (6) years from the Effective Date, which tail coverage shall be materially consistent with the D&O Liability Insurance Policies prior to the Petition Date (the "**Tail Policy**").

### F.    Indemnification Provisions

All indemnification provisions existing as of the Petition Date (whether in the by-laws, certificate of incorporation, board resolutions, contracts, or otherwise) shall be extinguished and discharged pursuant to the Plan except to the extent necessary to preserve coverage under the D&O Liability Insurance Policies for the Supporting Principals, to the extent of such D&O Liability Insurance Policies required by Article VI.E of the Plan and notwithstanding anything in Article XI.C and D of the Plan to the contrary.

### G.    Compensation and Benefit Programs

Except as otherwise provided in the Plan, the Rejected  Executory Contract/Unexpired Lease List, or a separate Final Order of the Bankruptcy Court, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to its employees, retirees, and non-employee directors and the employees and retirees of its subsidiaries, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans (other than equity incentive plans that will be replaced by the Management Incentive Plan and any benefits, severance and change in control provisions that are modified by the Management Employment and Consulting Agreements), life, and accidental death and dismemberment insurance plans (other than equity incentive plans that will be replaced by the Management Incentive Plan and any benefits, severance and change in control provisions that are modified by the Management Employment and Consulting Agreements), are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Any payment obligations under any assumed employment contracts and benefit plans that have been or purport to have been accelerated as a result of the commencement of the Chapter 11 Cases or the consummation of any transactions contemplated by the Plan will be Reinstated and such acceleration will be rescinded and deemed not to have occurred.

For the avoidance of doubt, notwithstanding the foregoing, the Existing Executive Compensation Agreements shall be included in the Rejected Executory Contract/Unexpired Lease List and rejected by the Reorganized Debtors, and except for the indemnity obligations assumed pursuant to Article VI.F of the Plan, the counterparties to such Existing Executive Compensation Agreements shall be deemed to waive and release any and all Claims they may have against the Debtors pursuant to the terms of such Existing Executive Compensation Agreements.

### H.    Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Reorganized Debtors will continue to honor their obligations under:  (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Reorganized Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance.  All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

### I.    Insurance Policies

Other than the insurance policies otherwise discussed herein, all other insurance policies to which any Debtor that is a Reorganized Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and

shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.  __Dates of Distributions__

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions provided in the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Reorganized Debtors shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Reorganized Debtors.

At the close of business on the Distribution Record Date, the transfer ledgers for the Equity Interests in Gibson, the DIP Facility Claims, and the Prepetition Secured Notes shall be closed, and there shall be no further changes in the record Holders of such Claims or Equity Interests.  The Reorganized Debtors, the Distribution Agent, the DIP Agent, the Prepetition Indenture Trustee, and each of their respective agents, successors, and assigns shall have no obligation to recognize the Transfer of any Equity Interests in Gibson, DIP Facility Claims, or Prepetition Secured Note Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

B.  __Distribution Agent__

Except as provided herein, all distributions under the Plan shall be made by the Reorganized Debtors as Distribution Agent, or by such other Entity designated by the Debtors as a Distribution Agent herein, on the Effective Date or thereafter.  The Reorganized Debtors, or such other Entity designated by the Debtors to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents that are necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

Upon the Effective Date, the Equity Interests that are cancelled and extinguished under the Plan, and the Equity Interests that remain outstanding under the Plan, shall be so cancelled and extinguished, or remain outstanding, as applicable, automatically, without further act, distribution or Filing of the Debtors or the Reorganized Debtors.

## C.      Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## D.      Rounding of Payments

Whenever the Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar or distribution of a fraction of a share of New Common Stock or New Warrants, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar or share of New Common Stock or New Warrants, as applicable (with a half share or greater rounded up and less than a half share rounded down).  The total number of shares of New Common Stock and New Warrants to be distributed in connection with this Plan shall be adjusted as necessary to account for the rounding provided for in this Article VII.D.  No consideration shall be provided in lieu of fractional shares or warrants.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock or one (1) New Warrant.  New Common Stock and New Warrants that are not distributed in accordance with this Article VII.D shall be returned to, and ownership thereof shall vest in, the Reorganized Debtors.

## E.      *De Minimis* Distribution

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer or the Distribution Agent shall have any obligation to make any Plan Distributions in Cash with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in Article XIII.O hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim.  *De minimis* distributions for which no such request is timely received shall revert to Reorganized Gibson.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer or any Distribution Agent shall have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## F.      Distributions on Account of Claims Allowed After the Effective Date

Except as otherwise agreed by the Holder of a particular Claim or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order.  Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**G.**    **General Distribution Procedures**

The Reorganized Debtors, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

**H.**    **Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims to the extent provided for under the Plan, shall be made: (1) at the address set forth on any Proofs of Claim Filed by such Holders (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address change delivered to the Debtors; (3) at the addresses in the Debtors' books and records; or (4) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Notwithstanding the foregoing, distributions to the DIP Lenders and beneficial holders of Prepetition Secured Notes shall be made to the DIP Agent and the Prepetition Indenture Trustee, respectively.

**I.**    **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtors as undeliverable, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder, unless and until the Reorganized Debtors is notified in writing of such Holder's then current address within one (1) year from the date of the distribution.

Any Entity that fails to claim any Cash or New Common Stock within one (1) year from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

**J.**    **Withholding Taxes**

In connection with the Plan, to the extent applicable, any party issuing any instrument or making any distribution described in the Plan shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. The Debtors and the Reorganized Debtors shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

As a condition to receiving any distribution under the Plan, the Debtors and the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Debtors and the Reorganized Debtors to comply with applicable tax reporting and withholding laws. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. In connection with the distribution of the New Common Stock and the New Warrants, the Reorganized Debtors may take whatever actions are reasonably necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations, including withholding from distributions a portion of the New Common Stock or the New Warrants, selling such securities or requiring such Holders to contribute the Cash necessary to satisfy the tax withholding obligations.

K.    **Setoffs**

The Debtors and the Reorganized Debtors, as applicable, or such entity's designee (including the Disbursing Agent) may, but shall not be required to, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and Causes of Action of any nature that the Debtors and Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, rights and Causes of Action that the Debtors or the Reorganized Debtors possess against such Holder.

L.    **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such Holder and certifying that they have been lost), to the Debtors, Reorganized Gibson or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.  The DIP Agent will send such notices and take such other actions as are reasonably requested by the Debtors or the Reorganized Debtors to effect the cancellation of the DIP Facility and to implement the Plan Distributions on account of the DIP Facility Claims to the DIP Lenders. The Prepetition Indenture Trustee will send such notices and take such other actions as are reasonably requested by the Debtors or the Reorganized Debtors to effect the cancellation of the Prepetition Secured Notes held by DTC, and to implement the Plan Distributions on account of the Allowed Prepetition Secured Notes Claims.  To the extent that the Domestic Term Loan Claims are not paid in full in Cash prior to the Effective Date, the Prepetition ABL/Term Loan Agent will send such notices and take such other actions as are reasonably requested by the Debtors or the Reorganized Debtors to implement the Plan Distributions on account of the Domestic Term Loan Claims.

Notwithstanding anything in this Plan to the contrary, in connection with any distribution under this Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, will be entitled to recognize and deal for all purposes under this Plan with Holders of New Common Stock in a manner consistent with the customary practices of DTC used in connection with such distributions.  All New Common Stock to be distributed under this Plan shall be issued in the names of such Holders or their nominees in accordance with DTC's book-entry exchange procedures; *provided*, that such New Common Stock is permitted to be held through DTC's book-entry system; and *provided, further*, that to the extent the New Common Stock is not eligible for distribution in accordance with DTC's customary practices, Reorganized Gibson will take all such reasonable actions as may be required to cause distributions of the New Common Stock under this Plan.

M.    **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to Reorganized Gibson or any other applicable Distribution Agent:  (x) evidence reasonably satisfactory to Reorganized Gibson and any other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by Reorganized Gibson or any other applicable Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest.  Upon compliance with Article VII.L of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or

Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to Reorganized Gibson and other applicable Distribution Agent.

# ARTICLE VIII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

**A.      Filing of Proofs of Claim**

Except as otherwise provided for in the Plan, in accordance with the Bankruptcy Code, the Bankruptcy Rules and orders of the Bankruptcy Court, including the Claims Bar Date Order, Holders of Claims shall be required to file a Proof of Claim on or prior to the Claims Bar Date, including with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases or as otherwise provided under the Plan.

**B.      Disputed Claims and Equity Interests**

The Debtors, in consultation with counsel to the Ad Hoc Committee of Secured Notes, or the Reorganized Debtors and the Litigation Trustee (with respect to Disputed Class 6 Claims), as the case may be, may file with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Equity Interest or any other appropriate motion or adversary proceeding with respect thereto.  All such objections shall be litigated to Final Order, *provided, however,* that other than (after the Effective Date) with respect to the Litigation Trust Claims, the Reorganized Debtors may compromise, settle, withdraw or resolve any objections to Claims or Equity Interests, subject to approval by the Bankruptcy Court.

**C.      Procedures Regarding Disputed Claims**

No payment or other distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by a Final Order or by stipulation among the Debtors and the Required Supporting Noteholders, or the Reorganized Debtors, as applicable, and the Holder of the Claim.

**D.      Allowance of Claims**

Following the date on which a Disputed Claim becomes an Allowed Claim after the Distribution Date, the Debtors, the Reorganized Debtors or the Distribution Agent, as applicable, shall pay directly to the Holder of such Allowed Claim the amount provided for under the Plan, as applicable, and in accordance therewith.

1.    ***Allowance of Claims***

Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtors and the Reorganized Debtors will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan by orders of the Bankruptcy Court.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order and the DIP Orders), no Claim will become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

2.      ***Prosecution of Objections to Claims***

After the Confirmation Date but before the Effective Date, the Debtors and, after the Effective Date, the Debtors the Reorganized Debtors will have the authority, to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise. From and after the Effective Date, the Debtors (subject to the prior written consent of the Required Supporting Noteholders) or the Reorganized Debtors and, with respect to Disputed Class 6 Claims, the Litigation Trustee, as the case may be, may settle or compromise any Disputed Claim with approval of the Bankruptcy Court provided that (i) any settlement of any Litigation Trust Claim having a value of at least [$•] shall require the consent of the Required Supporting Litigation Trust Beneficiaries and (ii) the Required Supporting Litigation Trust Beneficiaries shall have the right to direct the Litigation Trustee, on behalf of the Litigation Trust, to accept any offered settlement of a Litigation Trust Claim having a value of at least [$•]. The Debtors and the Reorganized Debtors will have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises approved by the Bankruptcy Court.

3.      ***Estimation***

After the Confirmation Date but before the Effective Date, the Debtors and, after the Effective Date, the Debtors and the Reorganized Debtors may (but are not required to), at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      **Conditions Precedent to Confirmation of the Plan**

Confirmation of the Plan will be conditioned upon the satisfaction or waiver pursuant to the provisions of <u>Article IX.C</u> of the Plan of the following:

- the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect in accordance with its terms;

- the Bankruptcy Court will have entered a Final Order approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, which order shall be in form and substance consistent with the terms of the Restructuring Support Agreement;

- all outstanding Transaction Expenses due and owing as of the Confirmation Hearing shall have been paid in full, in Cash; and

- there shall be no event of default under the DIP Facility or the DIP Orders.

**B.**    **Conditions Precedent to Consummation of the Plan**

Consummation of the Plan will be conditioned upon the satisfaction or waiver pursuant to the provisions of Article IX.C of the Plan of the following:

- the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect in accordance with its terms;

- all outstanding Transaction Expenses due and owing as of the Effective Date shall have been paid in full, in Cash;

- there shall be no event of default under the DIP Facility or the DIP Orders;

- the Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order, and shall be in form and substance consistent with the Restructuring Support Agreement;

- all Definitive Documents, Plan Documents, Plan Schedules, Exhibits, and related schedules, documents, and supplements in connection with the Plan, shall have been Filed, and shall each be in form and substance consistent with the terms of the Restructuring Support Agreement and shall otherwise be acceptable to the parties with consent rights in respect thereof pursuant to the terms of the Restructuring Support Agreement;

- all actions, documents and agreements necessary to implement and consummate the Plan, including without limitation, entry into the Definitive Documents and the Amended Organizational Documents, and the transactions and other matters contemplated thereby, shall have been effected or executed

- the New Exit ABL Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the New Exit ABL Facility Documents shall have occurred;

- the New Take-Out Facility Documents, if applicable, shall been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the New Take-Out Facility Documents shall have occurred;

- the Amended Organizational Documents shall have been filed with the appropriate governmental authority, as applicable;

- all authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement the Plan, including the Amended Organizational Documents, will have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent Consummation of the Restructuring Transactions;

- the Tail Policy shall be in full force and effect; and

- the Professional Fee Reserve Account shall have been established and funded in Cash in accordance with Article II.C.1 of this Plan.

**C.**     **Waiver of Conditions**

The conditions to Confirmation and Consummation of the Plan set forth in this Article IX may be waived in accordance with the Restructuring Support Agreement without notice, leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.  The failure of the Debtors or Reorganized Debtors, the Required Supporting Noteholders or the Supporting Principals to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

**D.**     **Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**E.**     **Effect of Non-Occurrence of Conditions to Confirmation and Consummation**

If the Confirmation or Consummation of the Plan does not occur prior to termination of the Restructuring Support Agreement, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Person or Entity; (c) constitute an Allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Person or Entity in any respect.

# ARTICLE X.
## RELEASE, INJUNCTION AND RELATED PROVISIONS

**A.**     **General**

Except as otherwise provided for in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date the Reorganized Debtors may (other than with respect to the ITLA Unsecured Guaranty Claim) (1) compromise and settle Claims against them and (2) compromise and settle Causes of Action against other Entities, subject to the consent of the Required Supporting Noteholders.

**B.**     **Release by Debtors**

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, including the preserved Causes of Action, except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates and their Related Parties from any and all Claims, Equity Interests or Causes of Action whatsoever, including any derivative Claims asserted or that could have been asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part,**

directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the DIP Orders, this Plan, the Restructuring Support Agreement and the term sheet attached thereto, the Definitive Documents, or any related agreements, instruments, or other documents,  or  the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; **provided** **that** nothing in the Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; **provided**, **further**, **that** this Article X.B. shall not be deemed to release any Cause of Action of the Debtors, the Debtors' Estates or the Litigation Trust arising from, related to, or connected with:  (i) the ITLA, any ITLA Unsecured Guaranty Claims, or against any Holder of ITLA Unsecured Guaranty Claims, the administrative agent for the ITLA, and any other party that is not a Released Party; or (ii) the Prepetition ABL/Term Loan Agreement, any Prepetition ABL/Term Loan Secured Claims, or against any Prepetition ABL/Term Loan Lender, the Prepetition ABL/Term Loan Agent, and any other Person that is not a Released Party.

C.      **Release by Holders of Claims and Equity Interests**

As of the Effective Date, for good and valuable consideration, except as specifically set forth elsewhere in the Plan, the Releasing Parties conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties and their respective property from any and all Claims, Equity Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or Equity Interest or that any Holder of a Claim or an Equity Interest would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Restructuring, the Chapter 11 Cases, or the Restructuring Support Agreement, the purchase, sale, transfer or rescission of any debt, security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Equity Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the negotiation, formulation, or preparation of the Restructuring documents or related agreements, instruments or other documents, including the DIP Orders, this Plan, the Restructuring Support Agreement and the term sheet attached thereto, the Definitive Documents, or any related agreements or instruments, or the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, **provided** **that** nothing in the Plan shall be construed to release the Released Parties from any claims based upon willful misconduct or intentional fraud as determined by a Final Order.

D.      **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtors or any of their Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## E.    **Exculpation**

Except as otherwise provided in this Plan or the Confirmation Order, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement, the Restructuring Support Agreement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.

## F.    **Preservation of Rights of Action**

1.    Maintenance of Causes of Action

Except as otherwise provided in this Article X or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including in an adversary proceeding Filed in the Chapter 11 Cases. The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court.

2.    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action or Litigation Claim against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Cause of Action or Litigation Claim for later adjudication by the Debtors or the Reorganized Debtors (including Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action or Litigation Claims upon or after the confirmation of the Plan or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action or Litigation Claims have been expressly released in the Plan (including and for the avoidance of doubt, the releases contained in this Article X) or any other Final Order (including the Confirmation Order). In addition, the Debtors and the Reorganized Debtors expressly reserve the

right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

**G.**     **Injunction**

**Upon entry of the Confirmation Order, all Holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim or Equity Interest extinguished, discharged, or released pursuant to the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as may be agreed to by the Debtors and a Holder of a Claim against or Equity Interest in a Debtor, all Entities that have held, hold, or may hold Claims against or Equity Interests in the Debtors whether or not such parties have voted to accept or reject the Plan and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Equity Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions in this Article X.G of the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

## ARTICLE XI.
## BINDING NATURE OF PLAN

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including jurisdiction to:

(i)      allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim;

(ii)     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Confirmation Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

(iii)    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including (a) Cure amounts; (b) those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(iv)    resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

(v)     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(vi)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, *provided* that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

(vii)   enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

(viii)  resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan; *provided*, *however*, that any dispute arising under or in connection with the New Exit ABL Facility Documents, or the New Take-Out Facility Documents, shall be dealt with in accordance with the provisions of the applicable document;

(ix)    hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

(x)     issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan, except as otherwise provided in this Plan;

(xi)    adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(xii)    enter and enforce any order for the sale of property pursuant to section 363, 1123 or 1146(a) of the Bankruptcy Code;

(xiii)   resolve any cases, controversies, suits, disputes or Causes of Action with respect to the allowance and/or payment of Claims pursuant to the Plan;

(xiv)   consider any modifications of this Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(xv)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xvi)   enforce the terms and conditions of this Plan and the Confirmation Order;

(xvii)  enforce all orders previously entered by the Bankruptcy Court;

(xviii) resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

(xix)   enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xx)    resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; *provided*, *however*, that any dispute arising under or in connection with the New Exit ABL Facility Documents, or the New Take-Out Facility Documents, shall be dealt with in accordance with the provisions of the applicable document; and

(xxi)   hear and determine any matter related to the Litigation Trust or the Litigation Trust Claims;

(xxii)  hear any other matter not inconsistent with the Bankruptcy Code; and

(xxiii) enter an order concluding or closing the Chapter 11 Cases.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

**A.    Dissolution of the Committee**

On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.

**B.    Payment of Statutory Fees**

All outstanding fees payable pursuant to 28 U.S.C. § 1930 shall be paid on the Effective Date. All such fees payable after the Effective Date shall be paid prior to the closing of the Chapter 11 Cases when due or as soon thereafter as reasonably practicable.

C.    **Modification of Plan**

Subject to the terms of the Restructuring Support Agreement:  (a) the Debtors reserve the right in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim of such Holder.

D.    **Revocation of Plan**

Subject to the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw this Plan, or if confirmation of this Plan or Consummation of this Plan does not occur, then:  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

E.    **Entire Agreement**

Except as otherwise described herein, and without limiting the effectiveness of the Restructuring Support Agreement and any related agreements thereto, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

F.    **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their Related Persons will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan, and, therefore, such parties, individuals, and the Reorganized Debtors will not have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan.

G.    **Terms of Injunctions or Stays**

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**H.**    **Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The Debtors and all Holders of Allowed Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

**I.**    **Notice of Effective Date**

On the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

**J.**    **Closing of Chapter 11 Cases**

On the Effective Date, all of the Debtors' Chapter 11 Cases shall be closed other than the lead case of *In re Gibson Brands, Inc.* (Case No. 18-11025 (CSS)), and Gibson Brands, Inc. shall be entitled to prosecute claims and defenses, make distributions, and attend to other wind-down affairs on behalf of each of the other prior Debtors as if such Debtors' estates continued to exist solely for that purpose.  From and after the Effective Date, Debtor Gibson Brands, Inc. shall be entitled to change its name to Guitar Liquidation Corporation or any similar name, and the caption of its Chapter 11 Case shall be adjusted accordingly upon the filing of notice of such corporate name change on the Bankruptcy Court's docket. The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case of Gibson Brands, Inc.

**K.**    **Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including the Reorganized Debtors.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**L.**    **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and Consummation of the Plan.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, will constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## M.      **Further Assurances**

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtors shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## N.      **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted, *provided*, *however*, that any such altered form must be consistent with the Restructuring Support Agreement.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## O.      **Service of Documents**

All notices, requests, and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors:

Gibson Brands, Inc.
309 Plus Park Blvd.
Nashville, TN 37217
Fax: 615-469-3429
E-mail:          Bruce.Mitchell@gibson.com

Attention:       General Counsel

With copies to:

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Fax: 212-355-3333
Email:        mgoldstein@goodwinlaw.com
                gfox@goodwinlaw.com
                bbazian@goodwinlaw.com

Attention:     Michael H. Goldstein
                Gregory W. Fox
                Barry Z. Bazian

       - and -

Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Fax: 302-421-8390
Email:          fournied@pepperlaw.com
                custerm@pepperlaw.com
                mclaughm@pepperlaw.com

Attention:     David M. Fournier
                Michael J. Custer
                Marcy J. McLaughlin

If to the Ad Hoc Committee of Secured Notes or the Reorganized Debtors:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Fax: 212-492-0545
E-mail:        bhermann@paulweiss.com
                bbritton@paulweiss.com
                kcairns@paulweiss.com

Attention:     Brian S. Hermann
                Robert Britton
                Kellie A. Cairns

       - and -

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Fax: 302-571-6600
E-mail:        pmorgan@ycst.com

Attention:       Pauline K. Morgan

**P.**     **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan, including the New Exit ABL Facility Documents or the New Take-Out Facility Documents, as applicable; (ii) the issuance of the New Common Stock and the New Warrants; (iii) the maintenance or creation of security or any Lien as contemplated by the New Exit ABL Facility Documents or the New Take-Out Facility Documents, as applicable; and (iv) assignments executed in connection with any transaction occurring under the Plan.

**Q.**     **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, including the New Exit ABL Facility Documents and the New Take-Out Facility Documents, as applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of New York, without giving effect to the principles of conflicts of law of such jurisdiction; *provided* that corporate governance matters relating to the Debtors or Reorganized Debtors, as applicable, shall be governed by the laws of the state of organization of the applicable Debtor or Reorganized Debtor, as applicable.

**R.**     **Tax Reporting and Compliance**

The Reorganized Debtors are hereby authorized, on behalf of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors are for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**S.**     **Schedules**

All Exhibits, Plan Schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.  After any Exhibits, Plan Schedules, or the Plan Supplement is Filed, copies of such documents shall be available upon written request to the Debtors' counsel or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.primeclerk.com/gibson or the Bankruptcy Court's website at http://www.ded.uscourts.gov/.

**T.**     **No Strict Construction**

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Supporting Noteholders and the Supporting Principals, and their respective professionals. Each of the foregoing was represented by counsel of its choice that either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, Exhibits and Plan Schedules, and the agreements and documents ancillary or related thereto.  Accordingly, unless explicitly indicated otherwise, the general rule of contract

construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, Exhibits and Plan Schedules, and the documents ancillary and related thereto.

**U.**     **Controlling Document**

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.


[Remainder of Page Intentionally Blank]

Dated:  July 12, 2018
         Nashville, Tennessee

Respectfully submitted,

Gibson Brands, Inc.
and each of its Debtor Subsidiaries

By: ___ */s/ Brian J. Fox* _____
        Name:  Brian J. Fox
        Title:    Chief Restructuring Officer

**[Signature Page to Debtors' First Amended Joint Chapter 11 Plan of Reorganization]**