## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                  :
In re:                                                            :   Chapter 11
                                                                  :
GIBSON BRANDS, INC., et al.,                                      :   Case No. 18-11025 (CSS)
                                                                  :
          Debtors.¹                                               :   Jointly Administered
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   Related Docket Nos. 302, 426
```

## NOTICE OF FILING OF BLACKLINE REGARDING
## DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT
## CHAPTER 11 PLAN OF REORGANIZATION

**PLEASE TAKE NOTICE** that on June 20, 2018, the above-captioned debtors (the "Debtors") filed the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 302] (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that on July 12, 2018, the Debtors filed the *Disclosure Statement for Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 426] (the "Amended Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** is a blackline comparing the Amended Disclosure Statement against the Disclosure Statement.

Dated: July 12, 2018     PEPPER HAMILTON LLP
Wilmington, Delaware

          */s/  Marcy J. McLaughlin*
          David M. Fournier (DE 2812)
          Marcy J. McLaughlin (DE 6184)
          Hercules Plaza, Suite 5100
          1313 Market Street

---

¹ The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Gibson Brands, Inc. (4520); Cakewalk, Inc. (2455); Consolidated Musical Instruments, LLC (4695); Gibson Café & Gallery, LLC (0434); Gibson International Sales LLC (1754); Gibson Pro Audio Corp. (3042), Neat Audio Acquisition Corp. (3784); Gibson Innovations USA, Inc. (4620); Gibson Holdings, Inc. (8455); Baldwin Piano, Inc. (0371); Wurlitzer Corp. (0031); and Gibson Europe B.V. (Foreign).  The Debtors' corporate headquarters is located at 309 Plus Park Blvd., Nashville, TN 37217.

P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302) 777-6500
Email: fournied@pepperlaw.com
        mclaughlinm@pepperlaw.com

- and -

GOODWIN PROCTER LLP
Michael H. Goldstein *(admitted pro hac vice)*
Gregory W. Fox *(admitted pro hac vice)*
Barry Z. Bazian *(admitted pro hac vice)*
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 813-8800
Email: mgoldstein@goodwinlaw.com
        gfox@goodwinlaw.com
        bbazian@goodwinlaw.com

*Counsel for Debtors and Debtors in Possession*

#49398923 v1

# Exhibit A

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GIBSON BRANDS, INC., *et al.*, | Case No. 18-11025 (CSS) |
| Debtors.[1] | Jointly Administered |

### DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED ~~DEBTORS'~~ JOINT CHAPTER 11 PLAN OF REORGANIZATION

Dated: ~~June 20~~ July 12, 2018

GOODWIN PROCTER LLP
Michael H. Goldstein (admitted *pro hac vice*)
Gregory W. Fox (admitted *pro hac vice*)
Barry Z. Bazian (admitted *pro hac vice*)
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Telephone: (212) 813-8800
Email: mgoldstein@goodwinlaw.com
    gfox@goodwinlaw.com
    bbazian@goodwinlaw.com

PEPPER HAMILTON LLP
David M. Fournier (DE 2812)
Michael J. Custer (DE 4843)
Marcy J. McLaughlin (DE 6184)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302) 777-6500
Email: fournierd@pepperlaw.com
    custerm@pepperlaw.com
    mclaughlinm@pepperlaw.com

*Counsel for the Debtors and Debtors in Possession*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Gibson Brands, Inc. (4520); Cakewalk, Inc. (2455); Consolidated Musical Instruments, LLC (4695); Gibson Café & Gallery, LLC (0434); Gibson International Sales LLC (1754); Gibson Pro Audio Corp. (3042), Neat Audio Acquisition Corp. (3784); Gibson Innovations USA, Inc. (4620); Gibson Holdings, Inc. (8455); Baldwin Piano, Inc. (0371); Wurlitzer Corp. (0031); and Gibson Europe B.V. (Foreign). The Debtors' corporate headquarters is located at 309 Plus Park Blvd., Nashville, TN 37217.

**TABLE OF CONTENTS**

**Page**

**ARTICLE I.** EXECUTIVE SUMMARY ............................................................... 10

    A.    THE CHAPTER 11 PROCESS – CONFIRMATION OF A PLAN OF
            REORGANIZATION .............................................................................. 12
    B.    PURPOSE AND EFFECT OF THE PLAN ......................................... 12
    C.    SUMMARY OF THE PLAN AND THE FINANCIAL
            RESTRUCTURING IN CONNECTION THEREWITH .................... 12
    D.    PLAN OVERVIEW .............................................................................. 16
**ARTICLE II.** VOTING, SOLICITATION, AND CONFIRMATION PROCESS ..... ~~17~~18

    A.    WHO MAY VOTE ON THE PLAN ..................................................... ~~17~~18
    B.    SUMMARY OF SOLICITATION PACKAGE AND VOTING
            INSTRUCTIONS .................................................................................. 18
    C.    CONFIRMATION OF THE PLAN ..................................................... ~~19~~20
    D.    CONFIRMING THE PLAN ................................................................. 20
    E.    THE VOTING RECORD DATE ......................................................... 20
    F.    OTHER RESTRUCTURING DOCUMENTS ..................................... 20
    G.    DISTRIBUTION OF CONFIRMATION HEARING NOTICE TO
            HOLDERS OF CLAIMS AND EQUITY INTERESTS IN NON-
            VOTING CLASSES AND HOLDERS OF DISPUTED CLAIMS ...... ~~20~~21
    H.    FILING OF THE PLAN SUPPLEMENT ........................................... 21
    I.    THE CONFIRMATION HEARING ................................................... 21
    J.    THE DEADLINE FOR OBJECTING TO CONFIRMATION OF THE
            PLAN ..................................................................................................... 21
    K.    NOTICE PARTIES .............................................................................. 22
    L.    EFFECT OF CONFIRMATION OF THE PLAN .............................. 23
    M.    CONSUMMATION OF THE PLAN ................................................... 23
    N.    RISK FACTORS .................................................................................. 23
**ARTICLE III.** BACKGROUND TO THE CHAPTER 11 CASES ......................... 23

    A.    THE DEBTORS' ORGANIZATIONAL STRUCTURE ................... 23
    B.    OVERVIEW OF THE DEBTORS' BUSINESSES ........................... 24
    C.    SUMMARY OF THE DEBTORS' PREPETITION DEBT ............... ~~26~~28
    D.    COMMENCEMENT OF THE DEBTORS' CHAPTER 11 CASES ... ~~29~~31
    E.    RESTRUCTURING SUPPORT AGREEMENT ............................... ~~32~~33
**ARTICLE IV.** SIGNIFICANT EVENTS IN THE CHAPTER 11 CASES .............. ~~33~~35

    A.    FIRST AND SECOND DAY MOTIONS ........................................... ~~33~~35
    B.    DEBTOR IN POSSESSION FINANCING / USE OF CASH
            COLLATERAL ..................................................................................... ~~34~~36
    C.    EMPLOYMENT AND COMPENSATION OF PROFESSIONALS ... ~~36~~38
    D.    THE COMMITTEE AND MEETING OF CREDITORS .................. ~~36~~38
    E.    CLAIMS BAR DATE AND SCHEDULES ........................................ ~~37~~38
    F.    EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING

VOTES ........................................................................................................ ~~37~~39

G.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................ ~~37~~39

H.    ASSET SALES ........................................................................................ ~~37~~39

**ARTICLE V.** SUMMARY OF THE PLAN ......................................................... **~~38~~40**

A.    ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX
      CLAIMS ................................................................................................. **~~38~~40**

B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
      AND EQUITY INTERESTS ...................................................................... ~~40~~42

C.    ELIMINATION OF VACANT CLASSES .................................................. ~~42~~43

D.    VOTING; PRESUMPTIONS; SOLICITATION IN GOOD FAITH ........... ~~42~~44

E.    CRAMDOWN ......................................................................................... ~~42~~44

F.    SPECIAL PROVISION GOVERNING UNIMPAIRED CLAIMS .............. ~~42~~44

G.    SUBORDINATED CLAIMS .................................................................... ~~43~~44

H.    ACCEPTANCE OR REJECTION OF THE PLAN ..................................... ~~43~~45

**ARTICLE VI. MEANS FOR IMPLEMENTING THE PLAN** ......................... **~~44~~45**

A.    DIRECTORS AND OFFICERS OF REORGANIZED GIBSON ................. ~~44~~46

B.    LITIGATION TRUST .............................................................................. ~~45~~47

C.    REVESTING OF ASSETS ....................................................................... ~~49~~51

D.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
      LEASES ................................................................................................. ~~50~~52

E.    SUMMARY OF NEW EXIT ABL FACILITY, **~~NEW EXIT TERM
      LOAN FACILITY,~~** AND NEW TAKE-OUT FACILITY ...................... ~~52~~54

F.    SUMMARY OF MANAGEMENT INCENTIVE PLAN ............................ ~~52~~54

G.    SUMMARY OF MANAGEMENT EMPLOYMENT AND
      CONSULTING AGREEMENTS ............................................................... ~~52~~55

H.    SUMMARY OF THE NEW COMMON STOCK IN REORGANIZED
      GIBSON ................................................................................................. ~~53~~55

I.    ITLA GUARANTY CLAIMS AGAINST CERTAIN NON-DEBTOR
      SUBSIDIARIES ...................................................................................... ~~53~~55

**ARTICLE VII.** RELEASE, EXCULPATION, INJUNCTION AND RELATED
      PROVISIONS .......................................................................................... ~~54~~56

A.    GENERAL ............................................................................................. ~~54~~56

B.    BINDING NATURE OF PLAN ................................................................ ~~58~~60

**ARTICLE VIII.** STATUTORY REQUIREMENTS FOR CONFIRMATION OF
      THE PLAN ............................................................................................. ~~58~~60

A.    BEST INTERESTS OF CREDITORS TEST/LIQUIDATION
      ANALYSIS ............................................................................................. ~~59~~62

B.    FEASIBILITY ......................................................................................... ~~60~~63

C.    VALUATION .......................................................................................... ~~61~~63

D.    ACCEPTANCE BY IMPAIRED CLASSES .............................................. ~~61~~64

E.    CONFIRMATION WITHOUT ACCEPTANCE BY IMPAIRED
      CLASSES ............................................................................................... ~~62~~65

F.    NO UNFAIR DISCRIMINATION ............................................................ ~~63~~65

G.    FAIR AND EQUITABLE TEST ............................................................... ~~63~~65

H.    CONSUMMATION OF THE PLAN .......................................................... ~~64~~66

**ARTICLE IX.** ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........................................ ~~64~~66

    A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE ........................................ ~~64~~66

    B.    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION ...... ~~64~~66

**ARTICLE X.** SEURITIES LAW ISSUES WITH RESPECT TO ISSUANCE AND RESALE OF NEW COMMON STOCK ........................ ~~65~~67

    A.    EXEMPTION FROM REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND BLUE SKY LAWS ........................ ~~65~~67

    B.    RESALES OF SHARES OF NEW COMMON STOCK ...................... ~~66~~69

**ARTICLE XI.** SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................ ~~68~~71

    A.    DEFINITION OF U.S. PERSON AND NON-U.S. PERSON ............ ~~69~~72

    B.    TREATMENT OF A DEBT INSTRUMENT AS A "SECURITY" ...... ~~70~~72

    C.    TAX CONSEQUENCES FOR U.S. PERSONS HOLDING ALLOWED CLAIMS ........................ ~~71~~73

    D.    TAX CONSEQUENCES FOR NON-U.S. PERSONS HOLDING ALLOWED CLAIMS ........................ ~~79~~81

    E.    INFORMATION REPORTING AND BACKUP WITHHOLDING ...... ~~82~~85

    F.    TAX CONSEQUENCES FOR THE DEBTORS AND REORGANIZED GIBSON ........................ ~~83~~86

    G.    TAXABLE SALE TRANSACTION ........................ ~~87~~89

    H.    GENERAL DISCLAIMER ........................ ~~88~~90

**ARTICLE XII.** RISK FACTORS ........................ ~~88~~91

    A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS ................ ~~89~~91

    B.    RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN ........................ ~~92~~95

    C.    MARKET AND OPERATIONAL RISKS ........................ ~~95~~97

    D.    RISKS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS ~~98~~100

    E.    DISCLOSURE STATEMENT DISCLAIMER ........................ ~~99~~101

**ARTICLE XIII.** RECOMMENDATION ........................ ~~101~~103

    **A.**    **VALUATION METHODOLOGY** ........................ **III**

    **B.**    **VALUATION CONSIDERATIONS** ........................ **V**

GIBSON BRANDS, INC. ("Gibson") and each of its debtor affiliates in the above-captioned cases (collectively, the "Debtors" and, together with the Non-Debtor Subsidiaries, the "Company"), are sending you this document and the accompanying materials (the "Disclosure Statement") in connection with soliciting votes to approve the *Debtors' **First Amended** Joint Chapter 11 Plan of Reorganization* dated ~~June 20~~July [___], 2018, as the same may be amended from time to time (the "Plan").[2]  The Debtors are soliciting votes to approve the Plan (the "Solicitation") in these cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code") pursuant to the order of the Bankruptcy Court entered on July [___], 2018:  (I) approving this Disclosure Statement as containing adequate information, and (II) approving procedures for the solicitation of votes in compliance with sections 1125 and 1126(b) of the Bankruptcy Code [Docket No. [___]] (the "Disclosure Statement Order").

If you are a creditor of the Debtors entitled to vote on the Plan you should read this Disclosure Statement, make a decision on how you want to vote on the Plan, and follow exactly the voting instructions.

A copy of the Plan is attached hereto as **Exhibit A**.  The Plan has the support of the Supporting Noteholders and the Supporting Principals pursuant to the terms of the Restructuring Support Agreement attached hereto as **Exhibit B**.

**THE PLAN CLASSIFIES VARIOUS CLASSES OF CREDITORS.  ONLY HOLDERS OF CLAIMS CLASSIFIED AS: (I) DOMESTIC TERM LOAN CLAIMS (CLASS 4) (TO THE EXTENT NOT PREVIOUSLY REFINANCED IN ACCORDANCE WITH THE DIP ORDERS), (II) ALLOWED PREPETITION SECURED NOTES CLAIMS (CLASS 5), (III) GENERAL  UNSECURED CLAIMS (OTHER THAN CLASS 7, 8 AND 9 CLAIMS) (CLASS 6), (IV) GENERAL UNSECURED CLAIMS AGAINST GIBSON HOLDINGS~~, INC.~~ (CLASS 7), AND (V) CONVENIENCE CLASS CLAIMS (CLASS 8) ARE ENTITLED TO VOTE ON THE PLAN.  IF YOU ARE A CREDITOR WITH A CLAIM IN ONE OF THESE CLASSES AND ARE ENTITLED TO VOTE YOU ARE BEING SOLICITED UNDER THIS DISCLOSURE STATEMENT.**

**THE PLAN IS SUPPORTED BY THE DEBTORS, SUPPORTING NOTEHOLDERS REPRESENTING APPROXIMATELY 99% OF THE PRINCIPAL AMOUNT OF THE ALLOWED PREPETITION SECURED NOTES CLAIMS, AND THE SUPPORTING PRINCIPALS.  THE DEBTORS RECOMMEND THAT ALL CREDITORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.**

The Debtors believe that the Plan provides the best restructuring alternative available to these estates and their creditors.  Through the Plan, the Debtors expect to substantially deleverage their balance sheet and reduce their interest expenses through the consummation of a change of control from the Debtors' existing Holders of Equity Interests to the Prepetition Secured Noteholders to emerge from chapter 11 as a sustainable and recapitalized business uniquely positioned for success.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

**THE VOTING DEADLINE IS 4:00 P.M. PREVAILING EASTERN TIME ON [____], 2018
(UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE IN ACCORDANCE WITH THE RESTRUCTURING SUPPORT AGREEMENT).**

**BENEFICIAL HOLDERS THAT HOLD THEIR CLAIMS THROUGH NOMINEES MUST RETURN SUCH BENEFICIAL HOLDER BALLOTS TO THEIR RESPECTIVE INTERMEDIARY RECORD OWNERS AS SOON AS POSSIBLE TO ALLOW SUFFICIENT TIME FOR INTERMEDIARY RECORD OWNERS TO VALIDATE AND INCLUDE THEIR VOTES ON A MASTER BALLOT AND RETURN SUCH MASTER BALLOTS TO THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THE MASTER BALLOT SUBMITTED ON YOUR BEHALF TO YOUR NOMINEE MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.**

**IF YOU HOLD YOUR CLAIMS DIRECTLY, YOU MUST RETURN YOUR COMPLETED BALLOT TO THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.**

> **IMPORTANT DISCLAIMERS AND INFORMATION ABOUT THIS DISCLOSURE STATEMENT FOR YOU TO READ**

**VOTING PURPOSE**

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XII HEREIN.**

**SECURITIES NOT REGISTERED**

**UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A-77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER FEDERAL AND STATE SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, THE SECURITIES ACT OR APPLICABLE FEDERAL OR STATE SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT IN A TRANSACTION REGISTERED UNDER THE SECURITIES ACT.**

**NO REGULATORY APPROVAL**

**NO SECURITIES TO BE ISSUED PURSUANT TO THE PLAN HAVE BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL OR REGULATORY AUTHORITY. THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED FOR APPROVAL WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. NEITHER THIS SOLICITATION NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.**

## EXEMPTIONS UNDER APPLICABLE LAW

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.**

**ALL SECURITIES DESCRIBED HEREIN ARE EXPECTED TO BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAWS ("BLUE SKY LAWS").  THE DEBTORS INTEND TO RELY ON THE FOLLOWING EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAWS:**

- **SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 3(A)(9) OF THE SECURITIES ACT AND SECTION 4(A)(2) OF THE SECURITIES ACT (AND/OR REGULATION D PROMULGATED THEREUNDER), TO EXEMPT FROM SUCH REGISTRATION THE OFFER AND ISSUANCE OF THE NEW COMMON STOCK IN REORGANIZED GIBSON TO HOLDERS OF ALLOWED PREPETITION SECURED NOTES CLAIMS AND DIP FACILITY CLAIMS.**

- **SECTION 4(A)(2) OF THE SECURITIES ACT AND RULE 506 OF REGULATION D AND/OR RULE 701 PROMULGATED THEREUNDER TO EXEMPT FROM SUCH REGISTRATION THE OFFER AND THE ISSUANCE OF NEW COMMON STOCK AND NEW WARRANTS TO OFFICERS AND OTHER KEY EMPLOYEES OF THE DEBTORS PURSUANT TO THE MANAGEMENT EMPLOYMENT AND CONSULTING AGREEMENTS AND MANAGEMENT INCENTIVE PLAN.**

## FORWARD LOOKING INFORMATION – SAFE HARBOR

**THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.**

**THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND**

UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

### CONSULT OWN ADVISORS

THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SHARES OF NEW COMMON STOCK PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SHARES OF NEW COMMON STOCK.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN OR A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

GOODWIN PROCTER LLP ("GOODWIN") AND PEPPER HAMILTON LLP ("PEPPER") ARE GENERAL INSOLVENCY COUNSEL TO THE DEBTORS. GOODWIN AND PEPPER RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT.  GOODWIN AND PEPPER HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN.

### REVIEW ALL DOCUMENTS

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND EXHIBITS AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE OR THAT MAY BE FILED LATER WITH THE PLAN SUPPLEMENT.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN

OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

### NO REPRESENTATION OF ACCURACY OF INFORMATION

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.  THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS OTHERWISE EXPRESSLY PROVIDED HEREIN) AND NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND ITS FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

NOTWITHSTANDING ANY RIGHTS OF APPROVAL PURSUANT TO THE RESTRUCTURING SUPPORT AGREEMENT OR OTHERWISE AS TO THE FORM OR SUBSTANCE OF THIS DISCLOSURE STATEMENT, THE PLAN OR ANY OTHER DOCUMENT RELATING TO THE TRANSACTIONS CONTEMPLATED THEREUNDER, NEITHER THE SUPPORTING NOTEHOLDERS, NOR THEIR RESPECTIVE REPRESENTATIVES, MEMBERS, FINANCIAL OR LEGAL ADVISORS OR AGENTS, HAS INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN OR TAKES ANY RESPONSIBILITY THEREFOR  AND NONE OF THE FOREGOING ENTITIES OR PERSONS MAKES ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING THE INFORMATION CONTAINED HEREIN.

### NO ADMISSION

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL CONTESTED MATTERS, POTENTIAL ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

### NO RELIANCE

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM OR EQUITY INTEREST IS, OR IS NOT, IDENTIFIED IN

**THE DISCLOSURE STATEMENT.  EXCEPT AS PROVIDED UNDER THE PLAN, THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS OR EQUITY INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR EQUITY INTERESTS OR OBJECTIONS TO CLAIMS OR EQUITY INTERESTS ON THE TERMS SPECIFIED IN THE PLAN.**

**HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN ARTICLE XII HEREIN, "RISK FACTORS."**

<u>**NO UPDATES**</u>

**THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE OF THE DISCLOSURE STATEMENT.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT.**

<u>**SOLE SOURCE OF INFORMATION FOR VOTING**</u>

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

<u>**DEADLINE**</u>

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (EASTERN TIME) ON [_____], 2018, UNLESS EXTENDED BY THE DEBTORS IN THEIR DISCRETION, SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT.**

## PLAN AS CONFIRMED IS BINDING

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN THE DEBTORS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN), WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO BECOME EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

## **EXHIBITS**

EXHIBIT A – Plan of Reorganization

EXHIBIT B – Restructuring Support Agreement (with amendments and exhibits)

EXHIBIT C – Organizational Chart

EXHIBIT D – **Hypothetical** Liquidation Analysis

EXHIBIT E – Financial **Information and** Projections

EXHIBIT F – Valuation Analysis

> THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT
> ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE
> AS THOUGH FULLY SET FORTH HEREIN.

## ARTICLE I.
## EXECUTIVE SUMMARY

**Only Holders of Domestic Term Loan Claims (Class 4) (to the extent not previously refinanced in accordance with the DIP Orders), Allowed Prepetition Secured Notes Claims (Class 5), General Unsecured Claims (other than Classes 7, 8, and 9) (Class 6), General Unsecured Claims Against Gibson Holdings, Inc. (Class 7), and Convenience Class Claims (Class 8), are entitled to vote on the Plan and are being solicited under this Disclosure Statement.**

**In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result from a liquidation under chapter 7 of the Bankruptcy Code and will allow the Reorganized Debtors to emerge from these chapter 11 cases as a sustainable and recapitalized business positioned for future success. The Plan will provide an efficient, expeditious change-of-control restructuring through the chapter 11 process, which is designed to significantly reduce the Company's interest expense, minimize disruption to the Company's business endeavors, recapitalize the Company's balance sheet, and provide a platform for renewed success. Any delay in confirmation of the Plan could result in significant administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan. Accordingly, the Debtors recommend that all Holders of Impaired Claims support confirmation of the Plan and vote to accept the Plan.**

**Holders of approximately 99% in outstanding principal amount of the Allowed Prepetition Secured Notes Claims have already agreed, subject to the terms and conditions of the Restructuring Support Agreement, to vote in favor of the Plan.**

This Executive Summary is being provided as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all Exhibits attached hereto and to the Plan and the Plan Supplement), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan. Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization. As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement includes information about:

- the Debtors' operating and financial history;

- the significant events that have occurred to date;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of Confirmation of the Plan, certain risk factors relating to the Debtors or the Reorganized Debtors, the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan;

- the means for implementing the Plan, including the assumption of executory contracts, the establishment of a Litigation Trust to pursue certain causes of action, the proposed organization of the Debtors and their subsidiaries, operations and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective; and

- the releases, exculpations and injunctions set forth in the Plan.

The classification and treatment of Claims against, and Equity Interests in, the Debtors and the Plan Distribution under the Plan are on a Debtor by Debtor basis. To the extent Claims against, and Equity Interests in, more than one Debtor are classified in one Class, the Class shall be deemed to include sub-classes for each such Debtor. If the Plan cannot be confirmed as to some or all of the Debtors, then, without prejudice to the respective parties' rights under the Restructuring Support Agreement, and subject to the terms set forth herein and therein, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor and confirm the Plan as to the remaining Debtors. The Debtors reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims or Equity Interests as set forth in Article III of the Plan.

In connection with developing the Plan, the Company reviewed its current business operations and compared its prospects as an ongoing business enterprise with the estimated recoveries in various liquidation scenarios. As a result, the Company concluded that the Company's enterprise value would be maximized by continuing to operate as a going concern. The Company believes that its ongoing business and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the liquidation analysis described herein, the value of the Debtors' assets will be considerably greater if the Debtors operate as a going concern instead of liquidating. Moreover, the Debtors believe that any alternative to Confirmation of the Plan, such as an out-of-court restructuring, liquidation, or attempts by another party in interest to file a plan of reorganization, would result in significant delays, litigation, and additional costs, and ultimately would diminish the Debtors' enterprise value. **Accordingly, the Debtors strongly recommend that all Holders of Domestic Term Loan Claims (Class 4) (to the extent not previously refinanced in accordance with the DIP Orders), Allowed Prepetition Secured Notes Claims (Class 5), General Unsecured Claims (other than Classes 7, 8, and 9) (Class 6), General Unsecured Claims Against Gibson Holdings, ~~Inc.~~ (Class 7), and Convenience Class Claims (Class 8) vote to accept the Plan.**

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or Exhibit, whether or not filed, shall mean such document, schedule, or Exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to Exhibits are references to Exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy

Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

## A.   THE CHAPTER 11 PROCESS – CONFIRMATION OF A PLAN OF REORGANIZATION

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11 of the Bankruptcy Code, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors and other parties in interest.

The commencement of a reorganization case creates an estate comprised of all of the legal and equitable interests of a debtor in property as of the date that the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession," unless the bankruptcy court orders the appointment of a trustee. The filing of a bankruptcy petition also triggers the automatic stay provisions of section 362 of the Bankruptcy Code that provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the effective date of a plan of reorganization, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a chapter 11 case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation.

Upon the commencement of a chapter 11 case, all creditors and equity interest holders have standing to be heard on any issue in the chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan of reorganization is the principal objective of a chapter 11 case. The plan of reorganization sets forth the means of satisfying the claims against and equity interests in the debtor.

## B.   PURPOSE AND EFFECT OF THE PLAN

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their business going forward and does not mean that the Debtors will be liquidated or forced to go out of business. Additionally, a bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such entity voted on the plan or affirmatively voted to reject the plan.

## C.   SUMMARY OF THE PLAN AND THE FINANCIAL RESTRUCTURING IN CONNECTION THEREWITH

After good faith, active, and arm's-length negotiations, the Debtors, in consultation with their advisors, reached agreement on the terms of the Plan with (a) the Supporting Noteholders, which represent in the aggregate approximately 99% of the principal amount of Prepetition Secured Notes Claims, and (b) the Supporting Principals. The Company believes that the Plan is the best restructuring alternative reasonably available to its estates.

Through Confirmation of the Plan, the Debtors will restructure through a consensual change of control from Gibson's existing equity holders to the Holders of Allowed Prepetition Secured Notes Claims; substantially deleverage their balance sheet; satisfy in full all claims under the Debtors' DIP Facility and Prepetition ABL/Term Loan Agreement; reduce their Cash interest expense to a level that is aligned with their expected future Cash flows; and retain additional flexibility to invest in growth initiatives to maximize enterprise value.  The Debtors believe that they will have sufficient liquidity during the course of the Chapter 11 Cases and will be well-positioned post-emergence.

The Debtors have outstanding secured debt in the principal amount of over $518 million, consisting of $375 million of principal amount of Prepetition Secured Notes (plus accrued and unpaid prepetition interest of $8,227,865.00) and, following the satisfaction of the Prepetition ABL/Term Loan Secured Claims through exercise of the Purchase Option or the ABL Refinancing (each as defined in the Final DIP Order), will have $135 million to $139 million of principal amount of outstanding DIP Financing (depending on whether the ABL Refinancing Increment is borrowed under the DIP Facility).[3]  To the extent the Purchase Option or the ABL Refinancing is implemented as of the Effective Date to repay the remaining obligations due under the Prepetition ABL/Term Loan Agreement, Allowed Class 4 Domestic Term Loan Claims shall be paid in full and Unimpaired under the Plan and Holders of such Claims shall not be entitled to vote to accept or reject the Plan and, regardless of any votes in fact cast, shall be deemed to accept the Plan.  To the extent the Purchase Option or the ABL Refinancing is not implemented as of the Effective Date to repay the remaining obligations due under the Prepetition ABL/Term Loan Agreement, (i) the amount of DIP Financing as of the Effective Date may be in an amount equal to the draws thereunder used for working capital purposes and to fund Administrative Expense Claims during these Chapter 11 Cases and (ii) Allowed Class 4 Domestic Term Loan Claims may be Impaired under the Plan and Holders of such Claims shall be entitled to vote to accept or reject the Plan, and votes actually cast shall be counted as described herein and in accordance with the Bankruptcy Code.  In either case, all ABL Revolver Claims have been repaid as of the date hereof and Class 3 shall be Unimpaired under the Plan and the Holders of such Claims shall not be entitled to vote to accept or reject the Plan and shall instead be deemed to accept the Plan

~~Upon~~The Plan provides that upon emergence from these Chapter 11 Cases, the ~~Reorganized Debtors expect to have outstanding funded debt consisting of obligations under a contemplated New Exit ABL Facility expected to be undrawn at emergence and a New Exit Term Loan Facility in an aggregate initial principal amount necessary to repay the Debtors' DIP Facility.  The New Exit Term Loan Facility, however, may be less than~~Debtors will satisfy the $135 million to $139 million of DIP Facility Claims that may be outstanding under the DIP Facility as of the Effective Date through a conversion to equity or "takeback paper".  Specifically, ~~at the election of the Required Lenders, or if the Debtors are unable to obtain a New Exit Term Loan Facility in an amount sufficient to repay the DIP Facility Claims in full in Cash on terms and conditions reasonably acceptable to the Debtors and the Required Lenders,~~pursuant to the Restructuring Support Agreement ~~provides that,~~ the Required Lenders shall elect, in their sole discretion after consulting with the Debtors, to either (i) ~~refinance all of the remaining DIP Facility Claims with "takeback paper" in the form of a New Take-Out Facility secured by liens junior to the New Exit ABL Facility and the New Exit Term Loan Facility, (ii)~~convert all of the remaining DIP Facility Claims to New

---

[3] Pursuant to the Final DIP Order, the Debtors were authorized to borrow up to an additional $4 million of DIP Loans to effectuate the ABL Refinancing because, pursuant the Prepetition ABL/Term Loan Agreement, such refinancing would require payment of an approximately $4 million Termination Fee (defined below) upon the repayment of the Domestic Term Loans (such incremental borrowings, the "ABL Refinancing Increment").

Common Stock at a price per share equal to 80% of Plan Value (subject to dilution as described below), **(ii)** refinance all of the remaining DIP Facility Claims with "takeback paper" in the form of a New Take-Out Facility secured by liens junior to the New Exit ABL Facility, or (iii) satisfy the remaining DIP Facility Claims through a combination of (i) and (ii).[4]  Accordingly, upon emergence from chapter 11 the Reorganized Debtors will have a significantly deleveraged capital structure better aligned with their current and projected Cash flows.[45]

Pursuant to the Restructuring Support Agreement, subject to the terms and conditions set forth therein, the Debtors have obtained the agreement of Holders of approximately 99% in principal amount of the Allowed Prepetition Secured Notes Claims to vote in support of the Plan. Under the Plan, each Holder of Allowed Prepetition Secured Notes Claims will receive its Pro Rata share of 100% of New Common Stock in Reorganized Gibson, subject to dilution by New Common Stock issued (if any):  (i) upon exercise of the New Warrants contemplated by the Plan and Management Employment and Consulting Agreements, (ii) in accordance with the terms of the Management Incentive Plan, and (iii) in satisfaction of any DIP Facility Claims as described above (including those DIP Lenders receiving certain fees to which they are entitled under the DIP Facility in the form of New Common Stock in Reorganized Gibson).

Pursuant to the Restructuring Support Agreement, the Plan provides for the payment in full of administrative Claims and secured Claims, payment of unsecured Claims in accordance with law, and the cancellation of Equity Interests of Gibson. More specifically:

- All Other Priority Claims will receive, at the election of the Debtors (with the consent of the Required Supporting Noteholders) or the Reorganized Debtors which election shall be consistent with the Restructuring Support Agreement either:  (A) payment in full in Cash; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Claim will have agreed upon in writing; or (C) other treatment rendering such Claims Unimpaired.

- All Other Secured Claims will receive, at the election of the Debtors (with the consent of Required Supporting Noteholders) or Reorganized Debtors which election shall be consistent with the Restructuring Support Agreement:  (A) payment in full in Cash; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Claim will have agreed upon in writing; (C) return of the Collateral securing such Allowed Claim; or (D) such other treatment rendering such Claim Unimpaired.  Except with respect to Claims that are treated in accordance with the preceding clause (C), each Holder of such Allowed Claim will retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein.

- All ABL Revolver Claims that are Secured shall have been paid in full in Cash prior to the Confirmation Hearing or have been Cash collateralized and thus shall be Allowed in the amount of $0.

---

[4] **Subject to their rights under the Restructuring Support Agreement, all of which are fully preserved, currently, the Required Lenders contemplate equitizing the DIP Facility Claims rather than entering into a New Take-Out Facility.**

[45] The definitive documents for the New Exit ABL ~~Facility, New Exit Term Loan~~ Facility, New Take-Out Facility, Management Incentive Plan, Management Employment and Consulting Agreements, and other Plan-related documentation will be filed with the Bankruptcy Court, as described  in the Plan.

- Domestic Term Loan Claims will receive either (i) payment in full in Cash on or prior to the Effective Date through the exercise of the Purchase Option or the ABL Refinancing, **or** (ii) other treatment rendering such Claims Unimpaired (including a Cure pursuant to Section 1124(2) of the Bankruptcy Code~~, or (iii) other treatment as provided for in Section 1129(b)(2)(A) of the Bankruptcy Code~~.

- Unsecured Claims are Impaired under the Plan and Holders of such Claims are entitled to vote on the Plan.  There are four (4) separate Classes of unsecured Claims under the Plan:

  1) Holders of Allowed General Unsecured Claims against all Debtors (except for Claims against Gibson Holdings~~, Inc.~~) (Class 6), to the extent (a) such Holder does not elect to be treated as a Convenience Class Claim or agrees to different treatment and (b) such Holder has not otherwise been paid during the pendency of the Chapter 11 Cases pursuant to a Bankruptcy Court order, will receive ~~(i)~~ a Pro Rata Litigation Trust Beneficial Interest~~; and (ii) a Pro Rata distribution of the Class 6 Liquidation Amount~~**benefit from the $500,000 Litigation Trust Funding Amount contributed by Reorganized Gibson to fund Litigation Trust Expenses**;

  2) Holders of Allowed General Unsecured Claims against Gibson Holdings~~, Inc.~~ (Class 7) are separately classified and, such Allowed Claims shall have the right, after the entry of a Final Order Allowing such Class 7 Gibson Holdings Claim (if applicable), to receive a Profits Interest **in a number** of **TEAC Shares having** a value ~~as of~~**on** the date of ~~Distribution~~**distribution** equal to such Holder's Pro Rata share of the **aggregate** value of ~~Gibson Holdings, Inc.~~**the TEAC Shares** as of the Effective Date **(based on the last trading value of shares in TEAC on the Effective Date)**, plus interest at the Post-Petition Rate from the Effective Date until the date of ~~Distribution;~~**distribution, which distribution shall be made upon the earlier to occur of:  (x) the Effective Date, if such Gibson Holdings Claim is not Disputed; (y) entry of a Final Order Allowing the Class 7 Gibson Holdings Claim if such Gibson Holdings Claim is Disputed, and (z) the five year anniversary of the Effective Date; provided, however, that** at the election of the Required **Supporting Noteholders, the Holders of Gibson Holdings Claims based upon the Prepetition Secured Notes Claims may, prior to or after the Effective Date, elect to waive their recovery in Class 7 and instead treat their recovery in Class 5 as being also on account of their Gibson Holdings Claims in Class 7;**

  3) The Plan also contemplates a Convenience Class of General Unsecured Claims (Class 8) that are not more than up to an amount equal to $~~[•]~~**25,000** per Claim (either by the nature of such Claim or as a result of the Holder of such Claim voluntarily reducing its Claim to such amount).  Subject to an aggregate Convenience Class Cap of $~~[•]~~**100,000**, Holders of Convenience Claims shall be paid in Cash in an amount equal to ~~[•]~~**5**% of the Allowed Convenience Class Claim; and

  4) Intercompany Claims (Class 9) shall be either Impaired or Unimpaired and, at the Debtors' option, with the consent of the Required Supporting Noteholders, such Claims will be (i) reinstated, (ii) converted into equity, or (iii) cancelled (and may be compromised, extinguished or settled after the Effective Date).

- 15 -

In either case, Holders of Intercompany Claims shall not be entitled to vote on the Plan.

- Equity Interests in Gibson (Class 10) and Gibson's Equity Interests in Excluded Subsidiaries (Class 12) will be extinguished for no consideration under the Plan and, accordingly, the Holders of such Equity Interests are not entitled to vote on the Plan. Gibson's Equity Interests in Subsidiaries other than Excluded Subsidiaries (Class 11) will be reinstated in full and are deemed to have voted in favor of the Plan.

Although their Equity Interests in Gibson will be cancelled for no consideration under the Plan, the Restructuring Support Agreement and the Plan contemplate that the Supporting Principals will be retained by the Reorganized Debtors to provide post-Effective Date services pursuant to one (1) year Management Employment and Consulting Agreements to aid the new owners of the Reorganized Debtors position the business for growth. Under the Management Employment and Consulting Agreement, the Supporting Principals will receive (i) in the case of Mr. Berryman, a salary and bonus totaling $3.35 million and New Warrants exercisable for up to 2.25% of the Equity Interests in Reorganized Gibson plus ongoing health benefits, and (ii) in the case of Mr. ~~Juszciewicz~~**Juszkiewicz**, (a) $2.1 million in consulting fees payable in quarterly installments and New Warrants exercisable for up to 2.25% of the Equity Interests in Reorganized Gibson plus ongoing health benefits and (b) in consideration for future assistance in monetizing the Reorganized Debtors' interest in TEAC, a profits interest in the TEAC Shares owned by Gibson Holdings**~~, Inc~~**. The Plan also provides for a Management Incentive Plan to be put in place that will provide for grants of options and/or restricted units of New Common Stock reserved for management, directors, officers, and other key employees of the Debtors in an amount of up to **~~[•]~~12**% of the New Common Stock, which shall be in form and substance consistent with the terms of the Restructuring Support Agreement (as amended, modified, waived, or supplemented from time to time in accordance with its terms). The primary participants in and the structure of the Management Incentive Plan, including the amount, form, exercise price, allocation and vesting of such equity-based awards with respect to such primary participants, shall be determined by the New Board of Reorganized Gibson.

## D.    PLAN OVERVIEW

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtors. For classification and treatment of Claims and Equity Interests, the Plan designates Classes of Claims and Classes of Equity Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

The following chart briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.[56] Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for twelve (12) Classes of Claims against and/or Equity Interests in the Debtors.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES COULD BE SIGNIFICANTLY DIFFERENT FROM THESE ESTIMATES. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS OR EQUITY**

---

[56] This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description.

**INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE XII BELOW.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

| Class | Type of Claim or Interest | Estimated Allowed Claim Amount | Impairment | Entitled to Vote | Estimated Recovery Under Plan |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | $0 | No | No | 100% |
| 2 | Other Secured Claims | $0 | No | No | 100% |
| 3 | ABL Revolver Claims | $0 | No | No | 100% |
| 4 | Domestic Term Loan Claims | $[77,400,000] | [Yes/No] | [Yes/No] | [100% or [•]%][67] |
| 5 | Allowed Prepetition Secured Notes Claims | $383,227,865 | Yes | Yes | [•]55.5% (approx.) [78] |
| 6. | General Unsecured Claims (other than Class 7, 8 and 9 Claims) | $[•]230.0 million - $[•]300.1 million (approx.) | Yes | Yes | [•]0.2% (approx.)[9] |
| 7. | General Unsecured Claims Against Gibson Holdings, Inc. | $[•]407.7 million - $[•]412.8 million (approx.) | Yes | Yes | [•]15.0% (approx.) |
| 8. | Convenience Claims | $[•]1 million - $[•]1.75 million (approx.) | Yes | Yes | [•]5% (approx.) |
| 9. | Intercompany Claims | N/A | No/Yes | No | 100% or 0% |
| 10. | Equity Interests in Gibson | N/A | Yes | No | 0% |
| 11. | Equity Interests in Subsidiaries Other than Excluded Subsidiaries | N/A | No | No | 100% |
| 12. | Equity Interests in Excluded Subsidiaries | N/A | Yes | No | 0% |

---

[67] Treatment of Class 4 Domestic Term Loan Claims depends on whether the Prepetition ABL/Term Loan Agreement is refinanced prior to the Effective Date. Accordingly, to the extent such refinancing has not occurred prior to the date votes on the Plan are solicited, Holders of Class 4 Domestic Term Loan Claims shall receive ballots and be entitled to vote on the Plan. To the extent the Purchase Option or the ABL Refinancing is implemented prior to the Confirmation Date to repay the remaining obligations due under the Prepetition ABL/Term Loan Agreement, Allowed Class 4 Domestic Term Loan Claims shall be paid in full and Unimpaired under the Plan and any votes cast by Holders of such Claims shall not be counted and Class 4 shall instead be deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

[78] Estimated recovery is based upon the New Common Stock to be issued under the Plan, subject to dilution as set forth in the Plan, and does not include recovery on account of the TEAC Shares owned by Gibson Holdings, which value is accounted for in Class 7.

[9] Estimated recovery does not include recovery to those creditors with Claims against Gibson Holdings, which Claims are accounted for in Class 7.

## ARTICLE II.
## VOTING, SOLICITATION, AND CONFIRMATION PROCESS

### A.    WHO MAY VOTE ON THE PLAN

Each Holder of an Allowed Claim in Classes 4 **(to the extent not previously refinanced in accordance with the DIP Orders)**, 5, 6, 7 and 8 is entitled to vote either to accept or to reject the Plan.  Only those votes cast by Holders of Allowed Claims in Classes 4 **(to the extent not previously refinanced in accordance with the DIP Orders)**, 5, 6, 7 and 8 shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.  An Impaired Class of Claims shall have accepted the Plan if:  (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Classes 1, 2, 3, and 9 (in certain instances) and 11 are Unimpaired under the Plan, are each deemed to accept the Plan by operation of law, and are not entitled to vote on the Plan.  Classes 9 (in certain instances), 10 and 12 are Impaired under the Plan and deemed to reject the Plan by operation of law, and are not entitled to vote on the Plan. Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended subject to the Restructuring Support Agreement and, in any event, the Debtors reserve the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

### B.    SUMMARY OF SOLICITATION PACKAGE AND VOTING INSTRUCTIONS

The following materials constitute the solicitation package with respect to the Plan enclosed herewith (the "Solicitation Package"):

- the Disclosure Statement, as approved by the Court, with all exhibits thereto, including the Plan and the exhibit to the Plan;

- the solicitation procedures;

- the Confirmation Hearing Notice;

- a solicitation cover letter from the Debtors addressed to the voting creditor;

- the appropriate form of Ballot and instructions for completing the Ballot; and

- any supplemental documents the Debtors file with the Court and any documents that the Court orders to be included in the Solicitation Package.

As noted above, only Holders of Domestic Term Loan Claims (Class 4) (to the extent not previously refinanced in accordance with the DIP Orders), Allowed Prepetition Secured Notes Claims (Class 5), General Unsecured Claims (other than Class 7, 8, and 9 Claims) (Class 6), General Unsecured Claims Against Gibson Holdings, Inc. (Class 7), and Convenience Class Claims (Class 8), are entitled to vote to accept or reject the Plan.  All parties entitled to vote to accept or reject the Plan shall receive copies of the Solicitation Package (including an appropriate Ballot) by email or regular mail.  Any party who desires additional paper copies of these documents may request copies from Prime Clerk LLC (the "Voting Agent") at no charge by: (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/gibson;

- 19 -

(ii) calling the Voting Agent at (844) 240-1258 or, if calling from outside the United States or Canada, at (929) 477-8085; or (iii) emailing gibsonballots@primeclerk.com.  The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.  Voting instructions are attached to each Ballot.  **To be counted, Ballots cast by Holders of such Classes of Claims must be received by the Voting Agent by 4:00 p.m. (prevailing Eastern Time) on [___], 2018, the Voting Deadline**.

**If you are a Beneficial Holder of an Allowed Prepetition Secured Notes Claim held through a broker, bank, dealer, agent, or other nominee (each of the foregoing, a "Nominee"), please return your Ballot to your Nominee in order to allow for sufficient time to permit your Nominee to deliver a Master Ballot including your vote to the Debtors' Voting Agent by the Voting Deadline.**

**Any Ballot that is properly executed by the Holder of a Claim but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**All Ballots are accompanied by voting instructions.  It is important to follow the specific instructions provided with the Ballot.  Voting tabulation procedures are set forth in the Ballots.**

Unless the Debtors in their discretion decides otherwise, any Ballot received after the Voting Deadline shall not be counted.  The Voting Agent will process and tabulate received Ballots and will File a voting report as soon as practicable on or after the Petition Date.

Parties may contact the Voting Agent with any questions related to the solicitation procedures applicable to their Claims.

The Plan Supplement will be filed by the Debtors no later than ten (10) calendar days before the Confirmation Hearing (unless otherwise ordered by the Bankruptcy Court).  When Filed, the Plan Supplement will be available in both electronic and hard copy form.

**The Debtors intend to rely on section 1145 of the Bankruptcy Code and Section 3(a)(9) of the Securities Act to exempt from registration under the Securities Act and Blue Sky Laws the offer and issuance under the Plan of New Common Stock in Reorganized Gibson to Holders of Allowed Prepetition Secured Notes Claims, Holders of DIP Facility Claims.**

**The Debtors may also rely on section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder to exempt from registration under the Securities Act and Blue Sky Laws the offer and issuance of New Common Stock in Reorganized Gibson.**

**The Debtors intend to rely on section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 under the Securities Act to exempt from registration under the Securities Act and Blue Sky Laws the offer and the issuance of New Common Stock in Reorganized Gibson to the Supporting Principals and officers and other key employees of the Company pursuant to the Management Employment and Consulting Agreements and the Management Incentive Plan.**

## C.    CONFIRMATION OF THE PLAN

### 1.    Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

The confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### 2.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Debtors intend to schedule a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

## D.    CONFIRMING THE PLAN

It is a condition to Confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and Required Supporting Noteholders.  Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of the Plan as a condition to Confirmation of the Plan.

## E.    THE VOTING RECORD DATE

**The Voting Record Date is [——July 25], 2018**.  Only Holders of Allowed Claims in the Voting Classes on the Voting Record Date received the Solicitation Package and are allowed to vote to accept or reject the Plan.

## F.    OTHER RESTRUCTURING DOCUMENTS

Holders of Domestic Term Loan Claims (Class 4) (to the extent not previously refinanced in accordance with the DIP Orders), Allowed Prepetition Secured Notes Claims (Class 5), General Unsecured Claims (other than Class 7, 8 and 9) (Class 6), General Unsecured Claims Against Gibson Holdings, Inc. (Class 7), and Convenience Class Claims (Class 8) on the Voting Record Date will receive the Solicitation Package, which will be delivered by the Debtors via their Voting Agent.

In addition to the Solicitation Package, Holders of Claims in the Voting Classes on the Voting Record Date will receive, after the commencement of the Chapter 11 Cases and as

ordered by the Bankruptcy Court, the following supplemental materials (the "Supplemental Materials"):

> (i) a notice of the Confirmation Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest (the "Confirmation Hearing Notice"); and

> (ii) such other materials as the Bankruptcy Court may direct.

## G. DISTRIBUTION OF CONFIRMATION HEARING NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS IN NON-VOTING CLASSES AND HOLDERS OF DISPUTED CLAIMS

As set forth above, certain Holders of Claims and Equity Interests are not entitled to vote on the Plan. As a result, such parties will not receive Solicitation Packages or Supplemental Materials but, instead, will receive the Confirmation Hearing Notice that explains, among other things, (i) that Classes 1, 2, 3, 4, 9 (in certain instances) and 11 are Unimpaired under the Plan, and therefore, are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, (ii) that Holders of Claims or Equity Interests in Classes 9 (in certain instances), 10 and 12 are Impaired and shall receive no distribution under the Plan and are therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, (iii) instructions for Holders of Claims and Equity Interests on how they may obtain a copy of the Plan and this Disclosure Statement, (iv) the deadline by which to object to confirmation of the Plan; and (v) the Confirmation Hearing date and time.

Contract and Lease Counterparties. Parties to certain of the Debtors' executory contracts and unexpired leases may not have Claims pending the disposition of their contracts or leases by assumption or rejection under the Plan. Such parties nevertheless will receive the Confirmation Hearing Notice as well as notice of the projected disposition of their contracts and/or lease in advance of the Confirmation Hearing.

## H. FILING OF THE PLAN SUPPLEMENT

The Debtors will file the Plan Supplement no later than ten (10) calendar days before the Confirmation Hearing. Parties may request a copy of the Plan Supplement at no charge by: (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/gibson; (ii) calling the Voting Agent at (844)240-1258 or, if calling from outside the United States or Canada, at (929) 477-8085; or (iii) emailing gibsonballots@primeclerk.com.

## I. THE CONFIRMATION HEARING

**The Bankruptcy Court has not yet scheduled a Confirmation Hearing Date.** Once scheduled, the Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

## J. THE DEADLINE FOR OBJECTING TO CONFIRMATION OF THE PLAN

**The Bankruptcy Court has not yet scheduled a Confirmation Objection Deadline**. Subject to order of the Bankruptcy Court, any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the

applicable Debtor, the name of the objecting party and the amount and nature of the Claim of such Entity in each applicable Chapter 11 Case or the amount of Equity Interests held by such Entity in each applicable Chapter 11 Case; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "Notice Parties").

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.  INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING TO BE APPROVED BY THE BANKRUPTCY COURT.

**K.**    **NOTICE PARTIES**

(a)    The Debtors:
Gibson Brands Inc., 309 Plus Park Blvd., Nashville, TN 37217
Attn: Bruce A. Mitchell and Brian J. Fox (Bruce.Mitchell@gibson.com; bfox@alvarezandmarsal.com);

(b)    Counsel to the Debtors:
Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018-1405
Attn: Michael H. Goldstein, Gregory W. Fox, and Barry Z. Bazian (mgoldstein@goodwinlaw.com; gfox@goodwinlaw.com; bbazian@goodwinlaw.com), and Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 Market Street, P.O. Box 1709, Wilmington, DE 19899-1709 Attn: David M. Fournier (fournierd@pepperlaw.com);

(c)    Counsel to the Ad Hoc Committee of Secured Notes:
Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019-6064 Attn: Brian S. Hermann and Robert Britton (bhermann@paulweiss.com; rbritton@paulweiss.com), and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 Attn: Pauline K. Morgan (pmorgan@ycst.com);

(d)    Counsel to the DIP Agent
Arnold & Porter Kaye Scholer LLP, 70 W. Madison St., Suite 4200, Chicago, Illinois 60602 Attn: D. Tyler Nurnberg and Steven Fruchter (tyler.nurnberg@arnoldporter.com; steven.fruchter@arnoldporter.com);

(e)    Counsel to the Prepetition Trustee:
Pryor Cashman LLP, 7 Times Square, New York, NY 10036, Attn: Seth H. Lieberman and Patrick Sibley (slieberman@pryorcashman.com; psibley@pryorcashman.com), and Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, DE 19899-2306, Attn: Eric J. Monzo (emonzo@morrisjames.com);

(f)     Counsel to the Committee:
        Lowenstein Sandler LLP, 1251 Avenue of the Americas New York, NY 10020
        Attn: Jeffrey L. Cohen and Wojciech F. Jung (jcohen@lowenstein.com;
        wjung@lowenstein.com), and Landis Rath & Cobb LLP, 919 Market Street,
        Suite 1800 Wilmington, DE 19801 (Attn: Adam G. Landis (landis@lrclaw.com);

(g)     Counsel to the Prepetition ABL/Term Loan Agent:
        Winston & Strawn LLP, 16th Floor, 300 South Tryon Street, Charlotte, NC
        28202 Attn: Jason E. Bennett and Christina M. Wheaton
        (jbennett@winston.com; cwheaton@winston.com); and

(h)     The Office of the United States Trustee for the District of Delaware:
        844 King St., Suite 2207, Wilmington, DE 19801
        Attn: Linda J. Casey (Linda.Casey@usdoj.gov).

## L.     EFFECT OF CONFIRMATION OF THE PLAN

The Plan contains certain provisions relating to (a) the compromise and settlement of
Claims and Equity Interests, (b) the release of the Released Parties by the Debtors and the
Holders of Claims or Equity Interests, and each of their respective Related Persons, and
(c) exculpation of certain parties.

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND
EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED
BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER
(A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY
UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11
CASES, OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED
TO REJECT THE PLAN.

## M.     CONSUMMATION OF THE PLAN

It will be a condition to confirmation of the Plan that all provisions, terms and conditions
of the Plan are approved in the Confirmation Order as well as all other conditions precedent set
forth in Article IX of the Plan (unless such conditions are otherwise satisfied or waived pursuant
to the provisions of Article IX of the Plan).  Following confirmation, the Plan will be
consummated on the Effective Date.

## N.      RISK FACTORS

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS HAS BEEN URGED TO CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XII HEREIN TITLED, "RISK FACTORS."**

### ARTICLE III.
### BACKGROUND TO THE CHAPTER 11 CASES

## A.      THE DEBTORS' ORGANIZATIONAL STRUCTURE

An organizational chart showing the Debtors and their non-Debtor Affiliates is attached hereto as **Exhibit C**.  Debtor Gibson is the principal operating entity of the Debtors and is organized as a Delaware corporation.  Gibson is the parent and sole owner of the remaining Debtors, and also has direct and indirect interests in various domestic and foreign subsidiaries that are not debtors in these Chapter 11 Cases.

The following Debtors are each organized in Delaware:  Baldwin Piano, Inc., Consolidated Musical Instruments, LLC, Gibson Café & Gallery, LLC, Gibson International Sales LLC, Neat Audio Acquisition Corp., Gibson Innovations USA, Inc., Gibson Holdings, Inc., Baldwin Piano, Inc., and Wurlitzer Corp.  Debtor Gibson Pro Audio Corp. is a corporation organized in California and Debtor Cakewalk, Inc. is a corporation organized in Massachusetts.  Debtor Gibson Europe B.V. is organized under the laws of the Netherlands.

## B.      OVERVIEW OF THE DEBTORS' BUSINESSES

### 1.      The MI Business

Founded in 1894 and headquartered in Nashville, Tennessee, the Debtors are widely recognized as one of the world's leading designers and manufacturers of guitars and other fretted instruments.  Gibson's brands and its proprietary guitar designs, which include the *Les Paul*, *SG*, *Flying V*, *Explorer*, *J-45*, *Hummingbird*, and *ES-335*, are among the most respected in the music industry and enjoy exceptional market share, particularly in premium price segments.

The Debtors' businesses also include the design, manufacture and worldwide distribution of various other musical instruments, accessories, and audio equipment.  The Debtors' "Pro Audio" segment, including the *KRK*, *Cerwin Vega*, and *Stanton* brands, markets a collection of studio monitors, headphones, loud speakers, and turntables that specifically target amateur and professional musicians and sound engineers.[10]

In addition, Gibson (through its wholly-owned subsidiary Gibson Holdings, Inc.) owns a 54% equity interest in TEAC Corp. ("TEAC"), a publicly traded Japanese manufacturer of premium audio electronic products for the home and professional segments, and industrial

---

[10] Prior to the commencement of these Chapter 11 Cases, certain MI Business brands were discontinued or of minimal productions (including *NEAT*, *Wurlitzer* and *Slingerland*) or were sold prior to the Petition Date, including the *Cakewalk* brand, which was sold in February 2018.

electronic products for the aerospace and healthcare industries.[911]

The Debtors' MI Business (excluding TEAC) employs over 875 people. In addition to its Nashville headquarters and manufacturing facilities, the Debtors operate from a handful of warehouse and distribution centers in the U.S. and abroad as well as several "Entertainment Relations" locations in certain large, musically-important markets, which provide musicians exclusive access to lounge and recording studio space, test outlets for new products, and "by appointment" retail points of purchase for Gibson instruments and equipment.

The Debtors' MI Business products are sold at more than 3,000 music retailer locations as well as through e-commerce channels and third party distributors. The Debtors manufacture all of their *Gibson*-brand guitars in the United States through a custom manufacturing process utilizing precision tooling equipment and the finest artistry in the country. The Debtors operate manufacturing facilities for electric guitars in Nashville and Memphis, Tennessee, and a facility for acoustic guitars in Bozeman, Montana.

The Debtors also manufacture and distribute some of their musical instrument products in China through certain foreign Non-Debtor Subsidiaries, including *Epiphone* guitars and *Baldwin* pianos.

The Company purchases approximately 35-40% of its *Epiphone*-branded instruments from Qingdao Gibson Musical Instrument Co., Ltd. ("China Guitar"),[1012] a Gibson wholly-owned subsidiary organized under the laws of the People's Republic of China ("PRC"). China Guitar operates a manufacturing facility that is leased by Gibson (not China Guitar) in Qingdao, which is in the Shandong Province of the PRC. The intellectual property associated with the *Epiphone* brand is owned by Gibson, not China Guitar. Approximately 65% of China Guitar's sales are to the Debtors with the other 35% as a distributor of Gibson products in the PRC. Gibson Brands also owns 100% of the Equity of Qingdao Epiphone Musical Instrument Co., Ltd. ("EQ"), which leased and operated a manufacturing facility for *Epiphone* guitars prior to November 2017. The EQ entity, however, no longer operates and its operations and equipment were reintegrated into the China Guitar facility. It is anticipated that EQ will dissolve under PRC law upon payment of all taxes, duties, severance and other trade payables. China Guitar and EQ are both guarantors of the ITLA Debt and Gibson has pledged 65% of its Equity Interests in China Guitar and EQ to the Prepetition ABL/Term Loan Agent and the Prepetition Indenture Trustee.

Gibson also owns majority interests in two PRC entities associated with the manufacture of *Baldwin* pianos: a 67% interest in Baldwin (Zhongshan) Piano & Musical Instrument Co., Ltd. PRC ("Baldwin Zhongshan") and an 88% interest in Baldwin (Dongbei) Piano & Musical Instrument Co., Ltd. ("Baldwin Dongbei").[1113] Baldwin Zhongshan manufactures pianos in a facility it owns in Guangdong, PRC and its workers are represented by a union. Approximately 90% of Baldwin Zhongshan's sales are within the PRC. Baldwin Zhongshan has approximately $1.6 million in debt **and other obligations senior to equity** outstanding as of March 31, 2018. Baldwin Dongbei historically sold pianos manufactured by third-party manufacturers to a small number of customers. During the fiscal quarter ended June 30, 2017, the PRC local government issued an executive order to transfer a large portion of Baldwin Dongbei's land use rights to its

---

[911] The Debtors' musical instruments and Pro Audio businesses shall be referred to herein as the "MI Business".

[1012] The Company purchases the rest of its *Epiphone* finished goods inventory from third party vendors.

[1113] Most of the global intellectual property associated with the *Baldwin* brand is owned by Debtors Gibson and Baldwin Pianos, Inc. A small number of the local PRC trademarks are owned by Baldwin Zhongshan.

minority shareholders to settle litigation and the remaining land use rights and other property are expected to be confiscated by the local government for past due taxes and penalties. Baldwin Dongbei is in the process of winding down and dissolving under PRC law. None of Baldwin Dongbei's business is expected to be recaptured by Baldwin Zhongshan. Neither Baldwin Zhongshan nor Baldwin Dongbei is an obligor or guarantor with respect to any of the Company's funded debt facilities and Gibson's Equity Interests in these entities have not been pledged.

Gibson also owns 100% of the equity of Ji Sheng Bo Yun Musical Instrument Trading Co. ("Ji Sheng"), a PRC entity that operates a sales office for China Guitar and Baldwin Zhongshan sales within the PRC. Ji Sheng owns no assets and receives financial support from China Guitar and Baldwin Zhongshan. Ji Sheng is not an obligor or guarantor with respect to any of the Company's funded debt facilities and Gibson's Equity Interests in Ji Sheng has not been pledged.

Debtor Gibson Europe B.V. is the Company's distribution center for MI Business products in the European, Middle East and African markets and operates a sales and marketing office out of the Netherlands. Pursuant to the Debtors' pre-bankruptcy intercompany protocols and Cash management/accounting system (which has been maintained post-bankruptcy on authorization of the Bankruptcy Court), when MI Business inventory is shipped from the United States, such inventory is transferred on an accounting basis from Gibson to Gibson International Sales LLC. When such inventory is sold by Gibson Europe B.V., the transaction is "back-to-back" such that the inventory is never owned by Gibson Europe BV. Accounts receivable are held by Gibson Europe B.V. and collections on such receivables are swept daily to Gibson International Sales LLC. Gibson Europe B.V. is a guarantor of the Debtors' obligations under the DIP Facility (including the related Pledge and Security Agreement), the Prepetition ABL/Term Loan Agreement, the ITLA, and the Prepetition Indenture and has granted security interests on its assets to the DIP Agent, the Prepetition ABL/Term Loan Agent and the Prepetition Indenture Trustee.

Non-Debtor Kabushiki Kaisha Gibson Guitar Corporation Japan ("Gibson Japan") operates a marketing, sales, and distribution center in Japan. Similar to Gibson Europe B.V., Gibson Japan never owns inventory transferred to it from Gibson and Gibson International Sales LLC. Unlike Gibson Europe B.V., however, Gibson Japan never holds accounts receivable as such receivables are owed directly by the customer to Gibson International Sales LLC. Excess cash is swept on a monthly basis from Gibson Japan to Gibson International Sales LLC. Gibson Japan is a guarantor of the ITLA Debt and Gibson has pledged 65% of its Equity Interests in Gibson Japan to the DIP Agent (under the DIP Facility and the related the Pledge and Security Agreement), the Prepetition ABL/Term Loan Agreement and the Prepetition Indenture Trustee.[14]

2.     **The GI Business**

In addition to the MI Business, Gibson owns directly and indirectly the equity of certain subsidiaries that previously operated a consumer electronics business referred to as "Gibson Innovations" (the "GI Business"), which Gibson acquired in June 2014 from Koninklijke Philips ("Philips") in a leveraged transaction. Headquartered in Hong Kong, the GI Business sold (pursuant to a licensing agreement with Philips) *Philips*-branded consumer electronics such as headphones, speakers, accessories, and other electronic devices, operating in numerous jurisdictions throughout Asia, Europe, and Latin America. Except for Debtor Gibson

---

[14] The other Non-Debtor Subsidiaries that are part of the MI Business reflected on the organizational chart attached hereto as Exhibit D are non-operating, function as mere intermediaries, or hold assets of *de minimis* value.

Innovations USA, Inc. ("GI USA"), each of the entities comprising the GI Business is a foreign, Non-Debtor Subsidiary of Gibson.

Declining sales, liquidity constraints, and a precipitous loss of credit insurance, coupled with an inability of the GI Business to further pay down its secured credit facility to obtain forbearance or waivers with respect to financial covenant defaults, necessitated the commencement of liquidation proceedings for the Gibson foreign Non-Debtor Subsidiaries comprising the GI Business.  Specifically, beginning on April 30, 2018, Gibson Innovations Limited (the top level Hong Kong-based operating company for the GI Business) ("GI HK") initiated the process to commence formal liquidation proceedings under Hong Kong law.  The other entities comprising the GI Business are also being wound down under the laws of their local jurisdictions, including in most cases through formal insolvency proceedings (including in Hong Kong, France, Italy, Germany, Netherlands, Poland, Singapore, the United Kingdom, Spain, Turkey, Russia, Peru and the PRC).[~~14~~15]

Gibson Brands and certain other Debtors have significant intercompany Claims against various entities within the GI Business and are in the process of monitoring and, to the extent appropriate, asserting such Claims in the foreign liquidation proceedings of such entities.  As of the date hereof, the Debtors do not know what the recovery on such intercompany Claims will be but, in light of the secured Claims against the assets of the GI Business and the other claims against the various entities within the GI Business, the Debtors do not expect such recovery, if any, to be material.

**3.    Foreign Non-Debtor Subsidiaries Value Assumptions**

**Substantially all of the Debtors' assets are subject to valid and perfected Liens held by the DIP Lenders  and the Prepetition Secured Noteholders, which require payment in full prior to the Debtors making any distributions to Holders of General Unsecured Claims.[16]  Thus, on a going-concern basis, because the obligations owed by the Debtors to the DIP Lenders and the Prepetition Secured Noteholders significantly exceeds the value of the Reorganized Debtors, only minimal (if any) going-concern value is available for allocation to Holders of Claims against the Debtors other than the DIP Lenders and the Prepetition Secured Noteholders[17] absent consummation of the proposed Plan.[18]  Further, as set forth in the Liquidation Analysis attached hereto as Exhibit D, outside of the proposed allocation of value to the Holders of General Unsecured Claims under the Plan,**

---

[~~14~~15] In conjunction with the wind down of the GI Business, Debtor GI USA is being liquidated as well.  ~~The Debtors actively solicited offers for and have been negotiating with interested parties with respect to a~~ sale of ~~the remaining inventory of GI USA.  The Debtors anticipate filing a motion with the~~**As discussed below in Article IV.H, on July 9, 2018, the Debtors obtained** Bankruptcy Court ~~in the near term seeking~~ approval **for** a "bulk sale" of such inventory pursuant to section 363 of the Bankruptcy Code.

[16] **The Prepetition ABL/Term Loan Lenders also have Liens on substantially all of the Debtors' assets.  This analysis, however, assumes that the Debtors' obligations under the Prepetition ABL/Term Loan are refinanced through borrowings under the DIP Facility pursuant to the Purchase Option or the ABL Refinancing (as permitted under the Final DIP Order).**

[17] **Excluding intercompany claims of Gibson GI Holding B.V. and its subsidiaries.**

[18] **This does not include Claims against Gibson Holdings, which are treated separately under the Plan as only the ITLA Lenders, the Prepetition Secured Noteholders, and the DIP Lenders hold Claims against Gibson Holdings.**

such Holders of General Unsecured Claims would receive no distribution in a liquidation of the Debtors' estates.

The Plan does not allocate all the distributable value of the Reorganized Debtors to the DIP Lenders and the Prepetition Secured Noteholders.  These estates include unencumbered assets which consist primarily of the unpledged portion of equity interests in the Debtors' first-tier foreign subsidiaries, China Guitar and Baldwin Zhongshan.  As to these assets, the Plan proposes an allocation of such value among the various unsecured creditor constituencies of the Debtors.[19]

A going-concern valuation of China Guitar and Baldwin Zhongshan was not performed by Gibson or its advisors.  However, for the purposes of the Plan, the Debtors believe, based upon the facts and input from its advisors, that a range of $1 to $3 million with a mid-point of $2 million for the value of China Guitar is fair and reasonable.  The Required Supporting Noteholders, however, believe that the going-concern value of China Guitar is considerably lower.  This range was determined based on a number of factors, including but not limited to:  (i) China Guitar's reliance on Gibson for its intellectual property, products, and customer relationships, which are owned by Gibson, (ii) the limited, if any, value to a third party given the likely discontinuation of  the business relationship with Gibson and potential risk of loss of its business license under Chinese law following a transfer of ownership to a third-party, (iii) the ability to minimize costs and business disruption that would be incurred by Gibson in the event it were to shift production and services from China Guitar to a third party, and (iv) the financial performance of China Guitar.

For the purposes of the Plan, the Debtors believe, based upon the facts and input from their advisors, that a range of value of $300 thousand to $1.4 million with a mid-point of $850 thousand for the unpledged 67% equity interests of Baldwin Zhongshan is fair and reasonable.  This range was determined based on a number of factors, including but not limited to (i) the financial performance and assets of Baldwin Zhongshan, (ii) the size of Baldwin Zhongshan's operations and limitations on potential growth, (iii) restrictions on the use of its intellectual property including the ability to conduct business outside of China, and (iv) $1.6 million in debt and other obligations senior to equity as of March 31, 2018.

After taking into account the amount of any unencumbered value allocable to the Prepetition Secured Noteholders on account of their unsecured deficiency Claims and potential for both the ITLA Unsecured Guaranty Claims and Claims under the Intercompany Protocol, the Debtors believe that the distributable value remaining for all other Holders of non-priority General Unsecured Claims is minimal (if any).

Notwithstanding the foregoing, under the Plan, Holders of General Unsecured Claims in Classes 6 and 8 stand to recover a material premium over what they would otherwise be entitled to receive under a strict waterfall recovery analysis, even after ascribing the assumed value above to Gibson Brands' ownership interests in China Guitar

---

[19] This analysis also excludes the other foreign Non-Debtor Subsidiaries of Gibson as they are non-operating or have immaterial value.

**and Baldwin Zhongshan. The Required Supporting Noteholders, however, believe the going-concern value of such entities is considerably lower.**

## C. SUMMARY OF THE DEBTORS' PREPETITION DEBT

The Debtors are parties to certain financing arrangements, as summarized below:

### 1. Prepetition ABL Loan Agreement

Gibson, Gibson International Sales LLC, Gibson Pro Audio Corp., and Gibson Innovations USA, Inc. as borrowers; the remaining Debtors, as guarantors; Bank of America, N.A. as administrative and collateral agent; and certain lenders thereto, entered into a certain *Amended and Restated Loan Agreement*, dated February 15, 2017, as amended (the "Prepetition ABL/Term Loan Agreement").

As of the Petition Date, there was an outstanding principal balance of approximately $100 million under the Prepetition ABL Loan Agreement, comprised of (i) $17.5 million owed to Bank of America, N.A. (the "Prepetition ABL Lender") under a "first out" revolving loan facility (the "Prepetition ABL Loans") and $2.176 million as issuing bank for certain letters of credit, and (ii) $77.4 million of "last out" term loans (the "Prepetition Term Loans") owed to GSO Capital Solutions Fund II AIV-I LP and GSO Capital Solutions Fund II AIV-IV LP (together, "GSO", and in the capacity as lender under the Prepetition ABL/Term Loan Agreement, the "Prepetition Term Loan Lenders" and collectively with the Prepetition ABL Lender, the "Prepetition ABL/Term Loan Lenders"). Interest on the Prepetition ABL Loans accrued at the non-default rate of approximately 5.9% and interest on the Prepetition Term Loans accrued at the non-default rate of approximately 14.6% (each subject to fluctuation due to LIBOR).

The obligations under the Prepetition ABL/Term Loan Agreement were guaranteed by each of the Debtors. Pursuant to that certain Intercreditor Agreement dated as of July 31, 2013, by and among the Debtors, the Prepetition ABL/Term Loan Agent and the Prepetition Indenture Trustee (the "Intercreditor Agreement"), the obligations under the Prepetition ABL/Term Loan Agreement were secured by a first priority lien on the "ABL Priority Collateral" (*i.e.*, the Debtors' working capital assets such as Cash, accounts receivable, inventory, etc.) and a second priority lien on the "Notes Priority Collateral" (*i.e.*, the Debtors' fixed assets such as intellectual property, real property, equipment, etc.)[20], each subject to customary exceptions. The Prepetition Term Loans also were subject to a "call protection" provision, which provided for a 5.0% premium to be applied to any Prepetition Term Loans paid prior to February 15, 2019 and a 2.5% premium to be applied to any Prepetition Term Loans paid prior to February 15, 2020 (the "Termination Fees").

### 2. Prepetition Secured Notes

The Debtors entered into that certain Indenture, dated as of July 31, 2013 (the "Prepetition Indenture"), by and among Gibson as borrower, each of the other Debtors (except

---

[20] "ABL Priority Collateral" and "Notes Priority Collateral", each as defined in the Intercreditor Agreement. A copy of the Intercreditor Agreement is attached to the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 107, 361, 362, 363, 364 and 507 and Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure, (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Super-Priority Claims; (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion") [Docket No. 22] and the Declaration of Brian J. Fox filed in support of the DIP Motion [Docket No. 32].

for Baldwin Piano, Inc. and Wurlitzer Corp.) as guarantors and/or grantors thereunder, and Wilmington Trust, National Association as successor to Wells Fargo Bank, National Association, a national banking association, as trustee and collateral agent (the "Prepetition Indenture Trustee").  Pursuant to the Prepetition Indenture, Gibson issued secured notes in the principal amount of $375 million (the "Prepetition Secured Notes" and the Holders of such Prepetition Secured Notes, the "Prepetition Secured Noteholders").  Interest accrues on the Prepetition Secured Notes at 8.875% per annum and Gibson made each of the semi-annual coupon payments due to the Prepetition Secured Noteholders.  As of the Petition Date, approximately $8.2 million of interest had accrued on the Prepetition Secured Notes.   Prior to acceleration due to these Chapter 11 Cases, the Prepetition Secured Notes were to mature on August 1, 2018.  Pursuant to the Intercreditor Agreement, the Prepetition Secured Notes are secured by a first priority lien on the "Notes Priority Collateral" and a second priority lien on the "ABL Priority Collateral."

>        3.        **Guaranty Obligations**

The Debtors (as well as certain of Gibson's foreign Non-Debtor Subsidiaries) have guaranteed the obligations due under that certain International Term Loan Agreement, dated as of February 15, 2017 (as amended, supplemented, or otherwise modified, the "ITLA" and the obligations thereunder, the "ITLA Debt") by and among GI HK, as borrower, Gibson and the other subsidiaries of Gibson that are guarantors and grantors thereunder, Elavon Financial Services DAC, UK Branch, as agent, and GSO as lender.  The ITLA Debt was in the original amount of $60 million and was secured by a first lien security interest in the assets of certain foreign Non-Debtor Subsidiaries of Gibson comprising the GI Business.  As of the Petition Date the principal amount of the obligations due under the ITLA was approximately $24 million.  The reduction in the ITLA Debt in the months preceding the Chapter 11 Cases is described in Article III.D below.

Gibson has also guaranteed on an unsecured basis certain of GI HK's obligations to (i) Philips under an Amended and Restated Trademark License Agreement, dated as of November 3, 2013 (as amended and restated, the "Philips License Agreement")[21] and (ii) IBM China/Hong Kong Limited under a Master Services Agreement, dated as of June 30, 2014 (as amended, the "IBM Agreement"), each relating to the GI Business.

As of the date hereof, the Debtors' guaranty obligations with respect to the ITLA, the Philips License Agreement, and the IBM Agreement remain unliquidated and disputed because, *inter alia*, creditor recoveries from the foreign liquidations of the entities comprising the GI Business are not yet known.

Pursuant to the Plan, the Debtors reserve all rights to contest or seek to estimate, subordinate or disallow any Claims filed by, or assert any Causes of Action against, any purported creditor or Holder of an Equity Interest, including any guaranty Claims asserted by GSO, Philips or IBM.

---

[21] The Debtors understand that that Philips has relicensed the *Philips* trademark to TPV Technology Limited.  *See* https://www.philips.com/a-w/about/news/archive/standard/news/press/2018/20180523-philips-and-tpv-to-enter-global-brand-license-agreement-for-audio-and-video-products-and-accessories.html (last visited June 13, 2018). The Debtors are assessing the impact of such relicensing on any guaranty claims Philips may assert in these Chapter 11 Cases.

4.      **Other Prepetition Obligations**

The Debtors incur general unsecured trade debt in the ordinary course of business.  In addition, the Debtors are the subject of various litigation Claims, which are disputed.  The Debtors are also lessees of certain non-residential real property and counterparties to certain other executory contracts (including certain endorsement contracts).  As of the date hereof, except for those unexpired leases and executory contracts with respect to which the Debtors have already filed motions to reject, the Debtors have not yet determined whether to assume or reject any of their prepetition leases or executory contracts.  The Debtors do not have any material capital lease obligations or other secured debt.

5.      **Litigation Claims**

The Company is periodically involved in various claims and litigation arising principally in the ordinary course of business.  These claims generally concern contract and intellectual property disputes, employment actions, and product liability matters.

Of note, Gibson is party to litigation with Tronical GmbH ("Tronical") related to a contract for Tronical to supply Gibson with robotic guitar tuners.  In 2017, Gibson sued Tronical in the United States District Court for the Middle District of Tennessee seeking damages in excess of $4 million for breach of contract and fraud related to Tronical's failure to fulfill its contractual obligations.  *See Gibson Brands Inc. v. Tronical Components GmbH, Tronical Solutions GmbH, Tronical GmbH, and Chris Adams*, 3:17-cv-08084 (M.D. Tenn.).  Prior to the Petition Date, Tronical commenced litigation against Gibson in Germany seeking approximately $50 million in damages for unpaid royalties and/or fees.  Gibson denies any liability and will oppose payment of any Claims to Tronical as part of these Chapter 11 Cases and will seek damages against Tronical.[16][22]

Gibson is also party to a dispute with respect to a sale of certain Gibson-owned property located at 1117 Church Street, Nashville, Tennessee (the "Church Street Property").  Before the Petition Date, Gibson entered into a contract to sell the Church Street Property to Starguitar LLC for approximately $12 million.  Prior to the closing of that sale, Somera Road, Inc. filed litigation against Gibson claiming that it had a contract to purchase the Church Street Property and filed a *lis pendens* with respect to the Church Street Property.  Subsequently, Starguitar LLC commenced litigation against Gibson seeking to enforce its contract.  ~~As of the date hereof,~~**On July 9, 2018, the Bankruptcy Court granted** the Debtors ~~have filed a~~' motion to reject the purported contract with Somera Road, Inc. **[Docket No. 407].**  Gibson's contract with Starguitar LLC remains under review.

---

[16][22] The Debtors **and Tronical** have **each** commenced discovery with respect to ~~Tronical's purported Claims~~**the disputes between Gibson and Tronical**.  *See Debtors' Motion for Entry of Order Pursuant to Fed. R. Bankr. P. 2004 and Del. L.R. 2004-1 Directing Tronical GmbH, Tronical Components GmbH, and Christopher Adams to Produce Documents and to Appear for Depositions Upon Oral Examination* [Docket No. 276]**; *Motion for 2004 Examination Motion of Tronical GMBH, Tronical Components GMBH, Tronical Solutions GMBH, and Christopher Adams for Entry of Order Pursuant to Fed. R. Bankr. P. 2004 and Del. Bankr. L.R. 2004-1 Directing the Debtors to Produce Documents and to Appear for Depositions Upon Oral Examination* [Docket No. 311].  The Bankruptcy Court stated at a hearing on July 9, 2018 that it would grant both the Debtors and Tronical the opportunity to take discovery and instructed the parties to meet and confer with respect to the scope of such discovery**.

6.    **Equity Interests and Governance**

Gibson's current majority shareholders – Henry Juszkiewicz and David Berryman (the "Supporting Principals") – acquired Gibson in 1986.  The Supporting Principals are actively engaged and immersed in the Company's domestic and international operations; Mr. Juszkiewicz currently serves as Gibson's CEO and Mr. Berryman serves as President and oversees the entire *Epiphone* brand.  Both Messrs. ~~Juszkewicz~~Juszkiewicz and Berryman serve on Gibson's board of directors along with Messrs.  Alan Carr and Sol Picciotto, as independent directors.

## D.    **COMMENCEMENT OF THE DEBTORS' CHAPTER 11 CASES**

While the Debtors' MI Business has performed well and is experiencing positive Cash flow,[17][23] the GI Business experienced significant declines in sales in recent years due to foreign exchange rate dynamics, tightening credit terms, and various other operational factors.  Over the past year, sales at the GI Business dropped dramatically due to a loss of credit insurance overseas, which, in turn, caused significant liquidity constraints and supply issues.  In particular, during the period between October and December 2017, the GI Business precipitously lost approximately $100 million of vendor credit terms when a credit rating downgrade caused it to lose insurance from three government-sponsored trade credit insurance providers.  As a direct result, the GI Business was forced to radically reduce purchases of inventory to preserve liquidity.

Another strong force working against the GI Business was its inability to "right-size" its overhead to a level commensurate with its sales.  Specifically, the GI Business had an infrastructure that was not commensurate with its revenues; however, it lacked the funds to pay the severance costs associated with downsizing an employee base (including many legacy Philips employees) under the employment laws in the European, Asian, and Latin American jurisdictions in which the GI Business operated.  GI HK also has a contractual obligation to pay a minimum royalty of €23.5 million under its license agreement with Philips, which obligation is guaranteed by Gibson on an unsecured basis.  This obligation proved to be a further drain on liquidity at the GI Business.

All these factors culminated in severe financial distress at the GI Business.  For the fourth quarter of fiscal year 2018 (ending March 31, 2018), while revenues for the MI Business were $71 million, and revenues at the GI Business were $95 million, EBITDA for that same period was $26 million for the MI Business and negative $8 million for the GI Business and Adjusted EBITDA was $11 million and negative $7 million for the MI Business and GI Business, respectively.

Since mid-2017, due to the downturn at the GI Business, the Debtors have been out of compliance with the financial (Consolidated EBITDA) covenants contained in the Prepetition ABL/Term Loan Agreement and the ITLA.  To avoid an Event of Default and exercise of secured creditor remedies, the Company was required to negotiate a series of amendments with

---

[17][23] The Debtors' MI Business has also been negatively impacted by the Convention on International Trade in Endangered Species, ("CITES"), an international agreement between governments of 183 "Parties" aimed at protecting endangered or threatened plants and wildlife.  In October 2016, the CITES Parties elected to expand CITES protections to include rosewood, which is used in the production of the most Gibson and Epiphone guitars. This change has subjected nearly all of the Debtors' shipments of product into and out of the United States to a bureaucratic permitting system.  The Debtors have been implementing operational adjustments to mitigate and minimize the CITES impact on the MI Business.

the ITLA Lenders and Prepetition ABL/Term Loan Lenders, which required (among other things) substantial paydowns of the ITLA. Specifically, following the occurrence of the aforementioned covenant defaults, beginning in the fall of 2017, the ITLA Lenders required significant paydowns of the ITLA Debt, reducing the amount owed from an original principal amount of $60 million to approximately $24 million as of the Petition Date. GI HK made the majority of these paydowns on the ITLA Debt from its own capital; however, such payments strained liquidity at the GI Business. While the GI Business sought to maximize its Cash position, including by downsizing operations as it could, selling its assets and rationalizing product orders, to further address working capital needs at the GI Business, GI USA would from time to time make prepayments to GI HK for inventory purchases. Further, pursuant to an amendment to the ITLA and the Prepetition ABL/Term Loan Agreement entered on October 27, 2017, Gibson was required to and did incur $6.65 million of additional Prepetition Term Loans under the Prepetition ABL/Term Loan Agreement and invested the proceeds of that new Prepetition Term Loan in GI HK to make a corresponding paydown of the ITLA Debt. Gibson agreed to these amendments and paydowns because, at the time, it was in the market for a refinancing, recapitalization, or sale of its GI Business that would create more value than a liquidation.

These transactions are the subject of an ongoing investigation **and may be subject to an Avoidance Action or other Challenge (as defined in the Final DIP Order) prior to the expiration of the Challenge Period (as defined in the DIP Orders).[24]** Depending on the result of that investigation, the Debtors, the Reorganized Debtors, the Committee (to the extent standing has been granted), and/or the Litigation Trustee (to the extent of the Litigation Trust Claims) may pursue any and all rights and remedies available to them. Such rights and remedies include seeking to (i) disallow or subordinate any Filed Claims with respect to the ITLA, (ii) designate votes related to such Claims, (iv) pursue Avoidance Actions and other Causes of Action, (v) commence bankruptcy proceedings pursuant to the Bankruptcy Code or foreign law for Non-Debtor Affiliates that have provided guaranties with respect to the ITLA Debt, and (vi) and obtain non-consensual third-party releases of such Claims on behalf of such Non-Debtor Subsidiaries that provided guaranties with respect to the ITLA Debt, any of which actions could have a material impact on recoveries by other creditors.

However, without the liquidity to make additional paydowns on the ITLA Debt that the ITLA Lenders required to obtain a further waiver/extension past April 30, 2018, the Debtors defaulted under the ITLA and the Prepetition ABL Loan Agreement as of May 1, 2018.

Having defaulted on the ITLA, on or around the Petition Date, the foreign non-Debtor Gibson subsidiaries comprising the GI Business began the process of winding down their operations, with many of those entities eventually entering into formal liquidation proceedings under the laws of their local jurisdictions. The commencement of these foreign insolvency proceedings resulted in defaults under the Prepetition Indenture and the Prepetition ABL/Term Loan Agreement.

Anticipating the possibility of needing to liquidate the GI Business and the resulting defaults under the Debtors' funded debt facilities, prior to the Petition Date (among exploring

---

[24] **The Committee and Philips have propounded discovery with respect to (among other things) potential Challenges, including with respect to the repayments of the ITLA Debt prior to the Petition Date. [Docket Nos. 287, 288, 318 and 329]. Philips has separately sought an extension until September 6, 2018, of the Challenge Period, which was originally set to expire on July 16, 2018 but has since been extended by agreement among the parties to August 1, 2018.** *See Motion of Koninklijke Philips N.V. for Entry of an Order Extending the Challenge Period* **[Docket No. 333] (the "Challenge Extension Motion"). The Challenge Extension Motion is scheduled to be heard on July 25, 2018.**

alternative sale and financing transactions), the Debtors and the Supporting Principals entered into good faith negotiations with an ad hoc group representing Holders of more than 69% of the principal amount of the Prepetition Secured Notes (the "Ad Hoc Committee of Secured Notes") regarding a consensual change-of-control transaction through a chapter 11 plan of reorganization.

As a result of these negotiations, the Debtors, the Ad Hoc Committee of Secured Notes, and the Supporting Principals entered into a *Restructuring Support Agreement* dated as of April 30, 2018 (as amended, modified, waived, or supplemented from time to time in accordance with its terms, the "Restructuring Support Agreement"). The terms of the Restructuring Support Agreement are summarized below and have been incorporated in the Plan.

On May 1, 2018, the Debtors each filed voluntary petitions for chapter 11 bankruptcy protection in order to effectuate the orderly restructuring of the Debtors' capital structure contemplated under the Restructuring Support Agreement.

Following the commencement of these Chapter 11 Cases, additional Holders of Prepetition Secured Notes executed joinders to the Restructuring Support Agreement. Accordingly, as of the date hereof, Holders of approximately 99% of the principal amount of Prepetition Secured Notes are parties to the Restructuring Support Agreement and have contractually agreed to support the restructuring and recapitalization of the Debtors contemplated under the Plan.

The Debtors intend to move promptly towards confirmation of the Plan, consistent with the terms of the Restructuring Support Agreement, and to exit bankruptcy as quickly as possible in order to minimize any potential adverse impact of the bankruptcy filing on the Debtors' business. The Debtors believe that the proposed Plan is in the best interests of the Debtors' creditors and will maximize the value of these estates.

## E.    RESTRUCTURING SUPPORT AGREEMENT[1825]

The Restructuring Support Agreement among the Debtors, the Supporting Noteholders, and the Supporting Principals provides for: (i) the material terms of a confirmable plan of reorganization, which is embodied in a term sheet attached as Exhibit A to the Restructuring Support Agreement (the "Plan Term Sheet"), (ii) a DIP Facility sufficient to refinance the Debtors' obligations under the Prepetition ABL/Term Loan Agreement and finance these Chapter 11 Cases, which is embodied in a term sheet attached as Exhibit B to the Restructuring Support Agreement (the "DIP Term Sheet"), and (iii) the continued services of the Supporting Principals necessary to transition the MI Business and aid the new owners of the business (*i.e.*, the Prepetition Secured Noteholders) to maximize value after the Effective Date of the Plan.[1926]

Pursuant to the Restructuring Support Agreement, each Supporting Noteholder agreed (subject to receipt of the Solicitation Package, including this Disclosure Statement and the other terms and conditions set forth in the Restructuring Support Agreement) to timely vote all of its

---

[1825] This summary is qualified in all respects by the actual terms of the Restructuring Support Agreement, attached hereto as **Exhibit B**. In the event of an inconsistency or discrepancy between a description in this summary and the terms and provisions of the Restructuring Support Agreement, the terms and provisions of the Restructuring Support Agreement shall govern.

[1926] The Restructuring Support Agreement has been amended twice, once on May 4, 2018 and again on June 12, 2018. The June 12th amendments to the Restructuring Support Agreement (i) extended certain milestones and (ii) addressed the modifications incorporated into the Final DIP Order with respect to the exercise of the Purchase Option or the ABL Refinancing.

Claims to accept the Plan. While the Restructuring Support Agreement is in effect, each Supporting Noteholder also agreed, among other things and subject to certain exceptions, (i) not to transfer any Claims held by it that are subject to the Restructuring Support Agreement, except to a transferee who agrees to be bound by the Restructuring Support Agreement, (ii) not to support, negotiate, or vote for an Alternative Transaction (as defined in the Restructuring Support Agreement), and (iii) not to take any actions inconsistent with or that could reasonably be expected to prevent, interfere with, delay, or impede the implementation or consummation of the restructuring contemplated under the Restructuring Support Agreement (the "Restructuring").

Under the Restructuring Support Agreement, the Debtors agreed, among other things, to support and consummate the Restructuring in a timely manner and comply with the other covenants and commitments set forth in the Restructuring Support Agreement and to use commercially reasonable efforts to seek approval of the Plan and to complete the Restructuring (including prosecuting and defending any appeals relating to the Plan). Under the Restructuring Support Agreement, the Debtors also agreed to consult with the Ad Hoc Committee of Secured Notes with respect to the Restructuring and notify them of certain events, including (i) the receipt of any third party proposal for an Alternative Transaction,[2027] governmental notices, or notices of pending or threatened litigation, (ii) the assertion of certain third party approval rights, (iii) anticipated failures of a covenant or condition under the Restructuring Support Agreement, and (iv) any failure by the Debtors to comply with the Restructuring Support Agreement.

The Restructuring Support Agreement also requires the Debtors to (i) comply with the milestones set forth in the Restructuring Support Agreement, (ii) provide the Ad Hoc Committee of Secured Notes with draft copies of all definitive documents with respect to the Restructuring and other material documents that the Debtors intend to file with the Bankruptcy Court at least three (3) business days prior to the date when the Debtors intend to file such document, (iii) timely object to any motion seeking relief that would frustrate the purposes of the Restructuring (*e.g.*, appointment of a trustee or examiner with expanded powers, dismissal or conversion of the Chapter 11 Cases, termination of exclusivity), (iv) cooperate with the Ad Hoc Committee of Secured Notes in connection with their exercise of the "Purchase Option" (if any), (v) use commercially reasonable efforts to obtain any required third party or governmental approvals of the Restructuring, (vi) consult with the Supporting Noteholders with respect to the assumption or rejection of executory contracts and unexpired leases, (vii) pay certain transaction expenses of the Ad Hoc Committee of Secured Notes, (viii) operate in the ordinary course in a manner consistent with past practice in all material respects (other than any changes resulting from or relating to the Chapter 11 Cases), (ix) confer with the Supporting Noteholders on operational matters, (x) maintain good standing and legal existence, (xi) appoint Alan Carr as an independent director with approval rights with respect to certain Specified Actions (as defined in the Restructuring Support Agreement), (xii) retain Brian Fox of Alvarez & Marsal as Gibson's chief restructuring officer, (xiii) retain an operations consultant if requested by the Required Supporting Noteholders, (xiv) not default under the DIP Facility or DIP Orders, (xv) use commercially reasonable efforts to obtain commitments for exit financing, (xvi) consult with the advisors to the Ad Hoc Committee of Secured Notes regarding strategic planning, discussions, negotiations, proposals, or agreements with respect to the Restructuring, (xvii) in connection with Plan confirmation, seek to treat the Claims under the ITLA in a manner acceptable to the Ad Hoc Committee of Secured Notes, (xviii) subject to confidentiality obligations, to timely respond to reasonable information requests by the Ad Hoc Committee of Secured Notes and

---

[2027] Nothing in the Restructuring Support Agreement requires the Debtors or their directors, officers or members to take any action inconsistent with their fiduciary duties; however, the Debtors are obligated to inform counsel to the Ad Hoc Committee of Secured Notes within one day of board approval of a material action related to an Alternative Transaction.

provide reasonable access to the Debtors' books, records, facilities, management and advisors for purposes of the Restructuring, and (xix) consult in good faith with the Ad Hoc Committee of Secured Notes regarding the potential for filing chapter 11 cases for certain foreign non-Debtor subsidiaries, including China Guitar.

Under the Restructuring Support Agreement, the Supporting Principals are also required to support and take actions to document and effectuate the Restructuring and the transactions contemplated thereby.

The Restructuring Support Agreement provides for customary conditions to the obligations of the parties and for termination by each party upon the occurrence of certain events, including among others, the failure of the Debtors to achieve certain milestones.

## ARTICLE IV.
## SIGNIFICANT EVENTS IN THE CHAPTER 11 CASES

### A.    FIRST AND SECOND DAY MOTIONS

On the Petition Date, in addition to filing voluntary petitions for relief, the Debtors also filed a number of motions (the "First Day Motions") with the Bankruptcy Court seeking relief designed to, among other things, prevent interruptions to the Debtors' business, maintain the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers, provide access to much-needed working capital, and allow the Debtors to retain certain advisors to assist them with the administration of the Chapter 11 Cases.

At the first day hearing conducted on May 2, 2018 and in the days that followed, the Bankruptcy Court entered several orders approving the First Day Motions.  An additional hearing was scheduled on May 23, 2018, in connection with which the Bankruptcy Court considered the approval of the First Day Motions on a final basis and certain additional relief requested by the Debtors.

1.    **Procedural Motions**

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" orders, by which the Bankruptcy Court (a) approved the joint administration of the Debtors' Chapter 11 Cases [Docket No. 60], (b) authorized the Debtors to prepare a list of creditors and file a consolidated list of their 30 largest unsecured creditors [Docket No. 64]; (c) approved an extension of time to file their Schedules [Docket No. 161]; and (d) extended the Debtors' time to seek to assume or reject contracts and leases [Docket No. 160].

2.    **Stabilizing Operations**

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations, customer relationships, revenue and profits, and to facilitate a stabilization of their businesses and effectuate a smooth transition into operating as debtors in possession, the Debtors sought and obtained orders authorizing them to:

- maintain and administer customer programs and honor obligations arising under or relating to those customer programs [Docket Nos. 70 and 164];

- 37 -

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses, and employee medical and similar benefits [Docket Nos. 68 and 162];[28]

- pay the prepetition Claims of certain domestic and international critical vendors, service providers, shippers and warehousemen [Docket Nos. 69 and 200];

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance [Docket Nos. 61 and 158];

- continue insurance coverage, including performance under their self-insurance programs, and enter into new insurance policies, if necessary [Docket Nos. 65 and 157];

- maintain their existing Cash management system and business forms [Docket Nos. 67 and 190]; and

- remit and pay certain taxes [Docket Nos. 66 and 165].

**B.    DEBTOR IN POSSESSION FINANCING / USE OF CASH COLLATERAL**

A critical element of the Restructuring is the agreement between the Debtors and the Ad Hoc Committee of Secured Notes with respect to (i) a DIP ~~Financing~~financing facility in the amount up to $139 million (the "DIP Facility")[21][29] agented by Cortland Capital Market Services, LLC (the "DIP Agent"), and (ii) consensual use of Cash collateral.  Following syndication to the Prepetition Secured Noteholders, Holders of approximately 99% of the Prepetition Secured Notes opted to participate in the DIP Facility and join the Restructuring Support Agreement.  The purposes of the DIP Facility were to refinance the Prepetition ABL Loan Agreement with lower cost debt, streamline the Debtors' secured creditor base to facilitate Plan confirmation, and provide the Debtors with the liquidity needed to maintain normal operations during and fund the costs of the Chapter 11 Cases.  Accordingly, on the Petition Date, the Debtors filed the DIP Motion seeking approval of the DIP Facility and continued authorization for the Debtors to use Cash collateral.[22][30]

The Bankruptcy Court entered an interim order approving the DIP Motion on May 2, 2018 [Docket No. 71] (the "Interim DIP Order") and a final order approving the DIP Motion on May 31, 2018 [Docket No. 220] (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders").  Pursuant to the Interim DIP Order, prior to the entry of the Final DIP Order, the Debtors used Cash collateral to fully pay down the ABL Revolver Claims and Cash collateralize all letters of credit under the Prepetition ABL/Term Loan Agreement.  Following entry of the Final DIP Order, the Debtors used Cash collateral for working capital purposes

---

[28] On June 20, 2018, the Debtors filed a supplemental motion seeking authority to make additional payments on account of certain prepetition employee obligations, which obligations were not covered by the employee/wage motion the Debtors filed on the Petition Date [Docket No. 295], which motion was granted at a hearing held on July 9, 2018.

[21][29] All Prepetition Secured Noteholders were given the opportunity to participate on a Pro Rata basis in the DIP Facility, which facility was backstopped by the members of the Ad Hoc Committee of Secured Notes.

[22][30] The DIP Motion was supplemented two times to address certain issues relating to, among other things, the process and timing of the refinancing of the Prepetition ABL/Term Loan Agreement through the Purchase Option or the ABL Refinancing and the Debtors' use of Cash collateral prior to such refinancing.  [Docket Nos. 129 and 208]

(subject to adequate protection and other terms of the Final DIP Order) rather than further paying down their obligations under the Prepetition ABL/Term Loan Agreement.

The DIP Facility was structured to be funded in multiple draws.  First, upon the Bankruptcy Court's entry of the Interim DIP Order, an initial $25 million draw was made available to the Debtors for working capital purposes.  Following entry of the Interim DIP Order, the Debtors made additional draws under the DIP Facility for working capital purposes (including payment of certain administrative expenses of these Chapter 11 Cases).

In addition to providing working capital, the DIP Facility was meant to refinance the Debtors' obligations under the Prepetition ABL/Term Loan Agreement in order to simplify the Debtors' capital structure, facilitate the Restructuring, and reduce interest costs. As originally contemplated, the refinancing was to be accomplished through the exercise of the "Purchase Option" pursuant to section 8.21 of the Intercreditor Agreement, whereby the Prepetition Secured Noteholders would acquire from the Prepetition Lenders the obligations under the Prepetition ABL/Term Loan Agreement (but without payment of an approximately $4 million Termination Fee that would otherwise be due to the Prepetition Term Loan Lenders) and refinance those obligations with a "Deemed Draw" under the DIP Facility.  Following entry of the Interim Order, certain issues arose that caused the parties to defer the exercise of the Purchase Option.  Accordingly, the Debtors sought and obtained Bankruptcy Court authorization under the Final DIP Order to refinance the Prepetition ABL/Term Loan Agreement either (i) through exercise of the Purchase Option as originally contemplated or (ii) through a direct refinancing by the Debtors without utilization of the Purchase Option (the "ABL Refinancing"). Because the ABL Refinancing would require payment of the approximately $4 million Termination Fee to the Prepetition Term Loan Lenders, the Final DIP Order also authorized (but did not require) the Debtors to borrow an additional $4 million under the DIP Facility to make such payment if the Debtors were to exercise the ABL Refinancing rather than the Purchase Option.  As of the date hereof, the Prepetition ABL/Term Loan has not yet been refinanced and the Debtors have so far borrowed $40 million under the DIP Facility for working capital purposes.

The DIP Facility matures nine (9) months from the Petition Date unless terminated earlier pursuant to its terms.  The DIP Obligations accrue interest at the rate of L+9.0% (with a 2% LIBOR floor) and pursuant to the DIP Orders, the Bankruptcy Court has approved the payment of certain fees associated with the DIP Facility.  Availability under the DIP Facility and use of the Debtors' Cash collateral are projected to provide the Debtors with liquidity sufficient to, among other things:  (a) continue to operate their business in an orderly manner; (b) maintain their valuable relationships with vendors, shippers, suppliers, customers and employees; (c) pay various administrative professionals' fees to be incurred in the Chapter 11 Cases; and (d) support the Debtors' working capital, general corporate and overall operational needs – all of which are necessary to preserve and maintain the going concern value of the Debtors' business and, ultimately, help ensure a successful reorganization under the Plan.

The DIP provides for the payment of certain fees to the DIP Lenders and the DIP Agent, including (i) the 5% DIP Backstop Premium to be paid Pro Rata on account of the DIP Facility commitments provided by the DIP Backstop Parties, (ii) a 3% Upfront Premium (as defined in the DIP Facility) to be paid Pro Rata on account of the DIP Facility commitments of the DIP Lenders, and (iii) the 2% Exit Premium to be paid Pro Rata on account of the DIP Loans or DIP Commitment repaid, reduced or satisfied in Cash on the Effective Date.  The DIP Lenders/DIP Backstop Parties may elect to receive the Exit Premium and/or Backstop Premium in the form of New Common Stock at a price per share equal to 80% of Plan Value (subject to dilution as described herein).  The DIP Facility also provides for certain fees to be paid to the DIP Agent.

## C.    EMPLOYMENT AND COMPENSATION OF PROFESSIONALS

The Debtors have been authorized to retain and have retained the following professional advisors to assist them in carrying out their duties as debtors in possession and to represent their interest in the Chapter 11 Cases:  (a) Goodwin Procter LLP, as restructuring counsel [Docket No. 268], (b) Pepper Hamilton LLP, as local counsel [Docket No. 250], (b) Jefferies LLC ("Jefferies"), as investment banker [Docket No. 257], ~~and~~ (c) Alvarez & Marsal North America, LLC ("A&M"), as financial and operational restructuring advisor, which ~~provided~~**provides** the Debtors with a Chief Restructuring Officer (Brian J. Fox of A&M) and certain additional personnel [Docket No. 262]~~.~~**,** ~~The Debtors also have also sought to retain PricewaterhouseCoopers LLP ("PWC") as tax services provider~~ **(d)** Bates & Bates as special intellectual property counsel [Docket No. ~~181~~**254**], ~~and~~**(e)** KPMG LLP ("KPMG") as independent auditors and tax consultants [Docket No. ~~178].²³~~ ~~The Debtors also obtained approval to retain~~ Bates & Bates as special intellectual property counsel **326], (f)** PricewaterhouseCoopers LLP as tax services provider** [Docket No. ~~254~~**[409]],** and~~, on June 20, 2018, filed an application to retain~~ **(g)** Dentons US LLP as special counsel to represent the Debtors as creditors and parties in interest in the various international liquidation proceedings pending for the GI Business [Docket No. ~~294~~**[388]**].

The Debtors also sought and received approval of Prime Clerk LLC as the Noticing and Claims Agent [Docket No. 62] and as administrative advisor in these Chapter 11 Cases and solicitation agent with respect to the Plan [Docket No. 253].

## D.    THE COMMITTEE AND MEETING OF CREDITORS

On May 9, 2018, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 106].  As of the date hereof, the Committee consists of (a) TKL Products Corp., (b) Grover Musical Products, Inc., (c) EDC, Inc., (d) Advance Plating, Inc., (e) Philips, (f) Guoguang Electronic Co., Ltd., and (g) Tronical.  The Committee has been authorized to retain and has retained Lowenstein Sandler LLP as lead counsel [Docket No. 249], Landis Rath & Cobb LLP as local counsel [Docket No. 251], and FTI Consulting, Inc. as financial advisor [Docket No. 256].

The initial meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on June 11, 2018 and has been continued to a later date to be determined [Docket No. 266].  In accordance with Bankruptcy Rule 9001(5), one representative of the Debtors as well as counsel to the Debtors attended the meeting and answered questions posed by the United States Trustee and other parties in interest present.

## E.    CLAIMS BAR DATE AND SCHEDULES

On June 8, 2018, the Bankruptcy Court entered an order approving the *Debtors' Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 255], and established (i) August 20, 2018 at 5:00 p.m. (prevailing Eastern time), as the deadline by which all persons and entities must file and serve proofs of claim asserting claims that arose on or prior to the Petition Date, including claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code, against the Debtors in these Chapter 11 Cases (the "Claims Bar Date") and (ii) October 29, 2018, as the deadline by which

---

~~²³ As of the date hereof, the applications to retain PWC and KPMG remain pending.~~

all governmental units must file and serve proofs of claim asserting prepetition claims against any of the Debtors in these Chapter 11 Cases (the "Government Bar Date").

The Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs on June [——]30, 2018 [Docket Nos. ——336-359].

## F.    EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief.  If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances to the plan.  During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

## G.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtors must assume or reject unexpired leases of nonresidential real property is 120 days from the Petition Date, unless extended by order of the Bankruptcy Court.  On May 4, 2018, the Debtors filed a *Motion for Entry of an Order Extending the Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to Section 365(d)(4) of the Bankruptcy Code* [Docket No. 92], seeking a ninety (90) day extension of this deadline through and including November 27, 2018.

On May 21, 2018, the Debtors filed a first omnibus motion seeking authority to reject certain unexpired leases and a certain executory contracts [Docket No. 186].  On June 20, 2018, the Debtors filed a second omnibus motion seeking authority to reject certain executory contracts [Docket No. 297].  On June 20,Further, on July 3, 2018 the Debtors also filed a motion to assume certain employee separation or "garden leave" agreements (and related relief) seeking approval of an agreement with a landlord to terminate Gibson's lease of a property located at 9350 Civic Center Drive, Beverly Hills, California, which agreement provides (among other things) for:  (a) the lease to be terminated as of July 31, 2018, (b) the return of Gibson's $42,032 security deposit, (c) a $250,000 payment of $250,000 by the landlord to Gibson, and (d) the reimbursement of up to $50,000 of Gibson's moving expenses [Docket No. 295382].[31]  The Debtors may seek authority to assume or, reject or terminate additional unexpired leases and executory contracts prior to the Effective Date.

## H.    ASSET SALES

During the course of these Chapter 11 Cases, the Debtors may seek Bankruptcy Court approval to sell certain non-core assets outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code.  In addition, on June 11, 2018, the obtained Bankruptcy Court approval of procedures for the sale of assets of *de minimis* value [Docket No. 269].

In addition, on June 20, 2018, the Debtors filed a motion for approval of an inventory purchase agreement providing for a bulk sale of the remaining inventory of GI

---

[31] On June 20, the Debtors filed a motion to assume certain employee separation or "garden leave" agreements (and related relief) [Docket No. 295], which motion was denied without prejudice on July 10, 2018 [Docket No. 413].

USA **to JAAXC pursuant to section 363(b) of the Bankruptcy Code [Docket No. 300], which motion was granted on July 9, 2018 [Docket No. 408].**

**ARTICLE V.**
**SUMMARY OF THE PLAN**

THIS ARTICLE V IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE
MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO
THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT
BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO
THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS
BETWEEN THIS ARTICLE V AND THE PLAN, THE TERMS AND CONDITIONS
SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.

**A.    ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS**

1.    **Administrative Expense Claims**

On the later of the Effective Date, or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each case, as soon as reasonably practicable thereafter, and in the case of an Allowed Professional Fee Claim subject to the provisions of Article II. B. of the Plan, each Holder of an Allowed Administrative Expense Claim will receive, in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as may be agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; *provided, however*, that Administrative Expense Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

2.    **Professional Fee Claims**

(a)    Professional Fee Reserve Account

On the Effective Date, the Debtors will establish the Professional Fee Reserve Account and fund into the Professional Fee Reserve Account Cash equal to the Professional Fee Claim Reserve Amount for the benefit of the Professionals.  The Professional Fee Reserve Account shall only be available to satisfy the Allowed Professional Fee Claims.  The DIP Agent, the DIP Lenders, the Prepetition Indenture Trustee, the Prepetition Secured Noteholders, the Prepetition ABL/Term Loan Agent and the Prepetition ABL/Term Loan Lenders: (i) shall not preclude the use of the Debtors' Cash to fund the Professional Fee Reserve Account in the amount of the Professional Fee Claim Reserve Amount, (ii) shall not foreclose on the Professional Fee Reserve Account; (iii) shall subordinate their security interests, Liens, and Claims (including any superpriority Claim) in the Professional Fee Reserve Account to the payment of the Allowed Professional Fee Claims, (iv) shall only have a security interest, Lien and superpriority Claim upon and to, and the right of enforcement against, such remaining amount in the Professional Fee Reserve Account after payment of the Allowed Professional Fees, and (v) waive, and shall have not right to seek, disgorgement with respect to the payment of any Allowed Professional Fees; *provided*, *however*, that the Reorganized Debtors shall have a reversionary interest in the

excess, if any, of the amount of the Professional Fee Reserve Account over the aggregate Allowed Professional Fee Claims of the Professionals.

(b)     Final Fee Applications and Payment of Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must File, within sixty (60) days after the Effective Date, and serve on the Debtors, the Reorganized Debtors, the U.S. Trustee, and counsel to the Ad Hoc Committee of Secured Notes, an application for final allowance of such Professional Fee Claim; and *provided* that the Reorganized Debtors will pay Professionals in the ordinary course of business, for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court in full in Cash; and *provided further*, that any professional that may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.

Objections to any Professional Fee Claim must be Filed and served on the Debtors, the Reorganized Debtors, the U.S. Trustee, counsel to the Ad Hoc Committee of Secured Notes, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, the Ad Hoc Committee of Secured Notes and the party requesting payment of a Professional Fee Claim).

After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals when such Claims are Allowed by a Final Order by the Reorganized Debtors, including from the Professional Fee Reserve Account in the case of the Debtors' Professionals.

The Professionals shall reasonably estimate their Professional Fee Claims before and as of the Effective Date, and shall deliver such estimate to the Debtors and counsel to the Ad Hoc Committee of Secured Notes no later than ten (10) calendar days prior to the Effective Date; provided, however, that such estimate shall not be considered a representation with respect to the fees and expenses of such Professional, and such Professionals are not bound to any extent by the estimates.  If any of the Debtors' Professionals fails to provide an estimate or does not provide a timely estimate, the Debtors may estimate the unbilled fees and expenses of such Professional, in consultation with the Ad Hoc Committee of Secured Notes.  The total amount so estimated shall be utilized by the Debtors to determine the Professional Fee Reserve Amount , but the Professional Fee Reserve Amount shall not limit the amount of Professional Fees that may be Allowed by the Bankruptcy Court or limit the obligation of the Reorganized Debtors to pay Professional Fees in the amounts Allowed by the Bankruptcy Court.

3.     **DIP Facility Claims**

On the Effective Date in full and final satisfaction, settlement, discharge and release of, and in exchange for, all DIP Facility Claims, the DIP Facility Claims shall be:

~~(i) indefeasibly paid, in full in Cash, from the proceeds of the New Exit Term Loan Facility;~~

      **(i)**      ~~(ii) to the extent that the DIP Facility Claims cannot be paid in full in Cash in accordance with clause (i) of Article II.D of the Plan,~~ at the election of the Required Lenders, refinanced in whole or in part with the proceeds of the New Take-Out Facility;

      **(ii)**      ~~(iii)~~ to the extent that the DIP Facility Claims are not ~~(i) paid in full in Cash in accordance with clause (i) of Article II.D of the Plan and/or (ii)~~ refinanced in full with the proceeds from a New Take-Out Facility in accordance with clause (~~iii~~) of **this** Article II.D ~~of the Plan~~, at the election of the Required Lenders, exchanged in full for New Common Stock at a price per share equal to 80% of Plan Value, subject to dilution for any New Common Stock issued: (A) to the DIP Backstop Parties on account of the DIP Backstop Premium; (B) in accordance with the Management Incentive Plan; (C) on account of the Exit Premium; and (D) upon the exercise of the New Warrants (collectively, the "**Take-Out Equity Option**"); or

      **(iii)**      ~~(iv)~~ indefeasibly paid, in full, from a combination of some or all of: ~~(x) the proceeds of the New Exit Term Loan Facility, (y~~**A**) the proceeds of the New Take-Out Facility; and/or (~~z~~**B**) the Take-Out Equity Option,[32]

and, in any case, the DIP Facility Loan Agreement and all related loan documents, and all Liens and security interests granted to secure the DIP Facility Claims, will be deemed to be terminated, extinguished and released, and the DIP Agent will promptly execute and deliver to the Reorganized Debtors, at the Reorganized Debtors' sole cost and expense, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors to effectuate the foregoing. Notwithstanding the foregoing, the DIP Facility Loan Agreement shall continue in effect solely for the purpose of preserving the DIP Agent's and the DIP Lenders' right to any contingent or indemnification obligations of the Debtors pursuant and subject to the terms of the DIP Facility Loan Agreement or DIP Orders.

    4.    **Priority Tax Claims**

      On or as soon as reasonably practicable after the earlier of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (b) such other treatment as is consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code and acceptable to the Required Supporting Noteholders. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree.

---

[32] **As noted above, subject to their rights under the Restructuring Support Agreement, all of which are fully preserved, the Required Lenders currently contemplate exercising the Take-Out Equity Option rather than entering into a New-Take Out Facility.**

**B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**

All Claims and Equity Interests, except Administrative Expense Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for purposes of classification, voting, confirmation, treatment and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The classification and treatment of Claims and Equity Interests in Article III of the Plan does not limit or impair the releases, injunctions or exculpations provided for in Article X of the Plan, or any right or remedy of a Holder of a Claim or Equity Interest to enforce the terms and provisions of the Plan or any of the Plan Documents.

The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

The classification and treatment of Claims against, and Equity Interests in, the Debtors are on a Debtor by Debtor basis.  To the extent Claims against, and Equity Interests in, more than one Debtor are classified in one Class, the Class shall be deemed to include sub-classes for each such Debtor.

**Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | ABL Revolver Claims | Unimpaired | Deemed to Accept |
| 4 | Domestic Term Loan Claims | Impaired/ Unimpaired | Entitled to Vote/ Deemed to Accept[2433] |
| 5 | Allowed Prepetition Secured Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims – (Other than Class 7, 8 and 9 Claims) | Impaired | Entitled to Vote |

---

[24 Treatment33 The treatment] of Class 4 Domestic Term Loan Claims depends on whether the Prepetition ABL/Term Loan Agreement is refinanced prior to the Effective Date.  Accordingly, to the extent such refinancing has not occurred prior to the date votes on the Plan are solicited, Holders of Class 4 Domestic Term Loan Claims shall receive ballots and be entitled to vote on the Plan.  To the extent the Purchase Option or the ABL Refinancing is implemented prior to the Confirmation Date to repay the remaining obligations due under the Prepetition ABL/Term Loan Agreement, Allowed Class 4 Domestic Term Loan Claims shall be paid in full and Unimpaired under the Plan and any votes cast by Holders of such Claims shall not be counted and Class 4 shall instead be deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 7 | General Unsecured Claims Against Gibson Holdings, Inc. | Impaired | Entitled to Vote |
| 8 | Convenience Class Claims | Impaired | Entitled to Vote |
| 9 | Intercompany Claims | Impaired/Unimpaired | Deemed to Accept/ Deemed to Reject |
| 10 | Equity Interests in Gibson | Impaired | Deemed to Reject |
| 11 | Equity Interests in Subsidiaries (Other than Excluded Debtor Subsidiaries) | Unimpaired | Deemed to Accept |
| 12 | Equity Interests in Excluded Debtor Subsidiaries | Impaired | Deemed to Reject |

## C.    ELIMINATION OF VACANT CLASSES

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

## D.    VOTING; PRESUMPTIONS; SOLICITATION IN GOOD FAITH

Only Holders of Allowed Claims in Classes 4 **(to the extent not previously refinanced in accordance with the DIP Orders)**, 5, 6, 7 and 8 are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Holders of Claims in Classes 4 **(to the extent not previously refinanced in accordance with the DIP Orders)**, 5, 6, 7, and 8 will receive ballots containing detailed voting instructions.

Holders of Allowed Claims or Equity Interests in Classes 1, 2, 3, and 11 are Unimpaired under the Plan and accordingly are deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Allowed Claims in Class 9 are either Impaired by reason of neither receiving nor retaining any property under the Plan, or Unimpaired under the Plan, and accordingly are either deemed to reject the Plan or accept the Plan, respectively.  Therefore, each Holder of a Class 9 Claim is not entitled to vote to accept or reject the Plan.

Holders of Allowed Equity Interests in Classes 10 and 12 shall neither receive nor retain any property under the Plan and accordingly are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

The Debtors have, and upon the Effective Date the Reorganized Debtors shall be deemed to have, solicited votes on the Plan from the Voting Classes in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  Accordingly, the Debtors and the Reorganized Debtors and each of their respective Related Persons shall be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

**E.    CRAMDOWN**

If any Class of Claims or Equity Interests is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may, subject to the terms of the Restructuring Support Agreement, (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**F.    SPECIAL PROVISION GOVERNING UNIMPAIRED CLAIMS**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to cure any arrears or defaults that may exist with respect to contracts to be assumed under the Plan.

**G.    SUBORDINATED CLAIMS**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to, and the Plan hereby implements in all respects, the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code and other applicable law, the Reorganized Debtors, with the consent of the Required Supporting Noteholders, reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**H.    ACCEPTANCE OR REJECTION OF THE PLAN**

1.    **Presumed Acceptance of Plan**

Classes 1, 2, 3, 4 **(to the extent not previously refinanced in accordance with the DIP Orders)**, 9 (in certain instances) and 11 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.    **Presumed Rejection of Plan**

Classes 9 (in certain instances), 10 and 12 are Impaired and Holders of Equity Interests in such Classes shall receive no distribution under the Plan on account of such Equity Interests and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

3.    **Voting Classes**

Each Holder of an Allowed Claim as of the applicable voting record date in the Voting Classes (Classes 4 **(to the extent not previously refinanced in accordance with the DIP Orders)**, 5, 6, 7 and 8) will be entitled to vote to accept or reject the Plan.

4.        **Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

5.        **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors (subject to the terms of the Restructuring Support Agreement) reserve the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and within the range of reasonableness.  All distributions made to Holders of Allowed Claims and Allowed Equity Interests in any Class are intended to be and shall be final.

**ARTICLE VI.**
**MEANS FOR IMPLEMENTING THE PLAN**

The Plan contemplates that Gibson and certain of its Subsidiaries will continue to operate as Reorganized Debtors while the Excluded Debtor Subsidiaries and Excluded Non-Debtor Subsidiaries,[2534] whose businesses are dormant or have been sold, will be wound down and Gibson's equity interests in such Subsidiaries will be cancelled.  The Reorganized Debtors will be governed by a New Board, and management will have in place Management Employment and Consulting Agreements and the Management Incentive Plan.

The balance sheet of the Reorganized Debtors will be significantly deleveraged through the Plan, and new lending facilities will be put in place to provide the Reorganized Debtors with working capital.

The Debtors' ongoing contracts and leases that have not been rejected as part of these Chapter 11 Cases will be assumed by the Reorganized Debtors under the Plan.

As the Plan will operate to satisfy and discharge all Claims against the Reorganized Debtors, the Plan includes release, exculpation and injunction provisions to provide the Reorganized Debtors with a "fresh start."

The Plan provisions detailing the mechanics for implementing the Plan are set forth in Article V of the Plan.  Below is a general summary of some of the more significant components.

---

[2534] The Excluded Debtor Subsidiaries are (i) Gibson Innovations USA, Inc., (ii) Cakewalk, Inc., (iii) Baldwin Piano, Inc., and (iv) Wurlitzer Corp.  The Excluded Non-Debtor Subsidiaries are (i) Gibson GI Holdings B.V. and its direct and indirect subsidiaries, (ii) EQ, and (iii) Baldwin Dongbei.

A.    **DIRECTORS AND OFFICERS OF REORGANIZED GIBSON**

The New Board shall consist of such number of directors, and such initial directors, as determined by the Required Supporting Noteholders in their sole and absolute discretion, which determination will be disclosed in a Plan Document Filed on or before five (5) days prior to the commencement of the Confirmation Hearing.

As of the Effective Date, the initial officers of the Reorganized Debtors will be the officers identified in the Plan Supplement**, which shall include a new chief executive officer approved by the Required Supporting Noteholders**.  Except as set forth in the Plan and the Plan Supplement, any other directors or officers of the Debtors shall be deemed removed as of the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, prior to the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors and the Non-Debtor Subsidiaries and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person. Each such director and each officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors and the Non-Debtor Subsidiaries.  The existing board of directors of the Debtors will be deemed to have resigned and been removed from the board of directors of the Debtors and the board of directors of any applicable Non-Debtor Subsidiaries on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

B.    **LITIGATION TRUST**

The Plan contemplates the establishment and funding of a Litigation Trust for the benefit of Holders of Allowed Claims in Classes 6 and 7.  On the Effective Date, subject to the releases and exculpation set forth in the Plan, the following causes of action of indeterminate value shall be preserved and contributed to the Litigation Trust:  (i) all Avoidance Actions, and (ii) all Causes of Action arising out of, or related to, the Prepetition ABL Term Loan Agreement and/or the ITLA against the Prepetition ABL/Term Loan Agent, the Prepetition ABL/Term Loan Lenders, the ITLA Lenders and each of their Related Persons.

1.    **Formation of Litigation Trust**

On the Effective Date, the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purpose of prosecuting the Litigation Trust Claims and making distributions (if any) to Holders of Allowed Class 6 General Unsecured Claims, in accordance with the terms of the Plan.  The Litigation Trust shall have a separate existence from the Reorganized Debtors.  The Litigation Trust's prosecution of any of the Litigation Trust Claims will be on behalf of and for the benefit of the Litigation Trust Beneficiaries.

On the Effective Date, the Debtors and the Litigation Trustee shall execute the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan. Also on the Effective Date, the Debtors and the Committee (as applicable) shall be deemed to have irrevocably transferred to the Litigation Trust all rights, title, and interest in and to all of the Litigation Trust Claims, and in accordance with Bankruptcy Code section 1141, the Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests (other than the Litigation Trust Beneficial Interests),

as provided for in the Litigation Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, or other transfer, mortgage reporting, sales, use, or other similar tax. For the avoidance of doubt, on the Effective Date, standing to commence, prosecute and compromise all Litigation Trust Claims shall transfer to the Litigation Trustee and/or the Litigation Trust; provided however, that no Claims released under the Plan shall be transferred or issued to the Litigation Trust.

Subject to, and to the extent set forth in, the Plan, the Confirmation Order, and the Litigation Trust Agreement (or any other order of the Bankruptcy Court entered pursuant to, or in furtherance of the Plan), the Litigation Trust and the Litigation Trustee, together with its agents, representatives and professionals, will be empowered to take the following actions, and any other actions, as the Litigation Trustee determines to be necessary or appropriate to implement the Litigation Trust, all without further order of the Bankruptcy Court:

(i)    Adopt, execute, deliver or file all plans, agreements, certificates and other documents and instruments necessary or appropriate to implement the Litigation Trust;

(ii)   Accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the Litigation Trust Claims (acting at the direction of the Litigation Trustee); *provided that* (i) any settlement of any Litigation Trust Claim having a value of at least [$•]1 million shall require the consent of the Required Supporting Litigation Trust Beneficiaries and (ii) the Required Supporting Litigation Trust Beneficiaries shall have the right to direct the Litigation Trustee, on behalf of the Litigation Trust, to accept any offered settlement of a Litigation Trust Claim having a value of at least [$•]1 million;

(iii)  Object to, and prosecute objections to, Disputed Class 6 General Unsecured Claims;

(iv)   Calculate and make distributions to Litigation Trust Beneficiaries;

(v)    Establish reserves consistent with the Plan and Litigation Trust Agreement and invest Cash;

(vi)   Retain and pay distribution agents and professionals and other Entities;

(vii)  Establish reserves and invest Cash out of the Litigation Trust Funds, the proceeds of the Litigation Trust Claims, (including but not limited to establishing a reasonable reserve the purpose of paying all expenses of the Litigation Trust), including but not limited to, professionals to (a) prosecute, settle and collect the Litigation Trust Claims *provided that* (i) any settlement of any Litigation Trust Claim having a value of at least [$•]1 million shall require the consent of the Required Supporting Litigation Trust Beneficiaries and (ii) the Required Supporting Litigation Trust Beneficiaries shall have the right to direct the Litigation Trustee, on behalf of the Litigation Trust, to accept any offered settlement of a Litigation Trust Claim having a value of at least [$•]1 million; (b) prepare and file the Litigation Trust's tax returns for two years following the Effective Date, (c) administer distributions of the proceeds of the Litigation Trust

Claims to the Litigation Trust Beneficiaries; and (d) obtain ordinary and customary insurance coverage  (collectively, the "Litigation Trust Expenses");

(viii)    Abandon, in any commercially reasonable manner, any Litigation Trust Claims that in the Litigation Trustee's reasonable judgment cannot be commercially reasonably prosecuted or that the Litigation Trustee reasonably believes to have inconsequential value to the Litigation Trust;

(ix)    File appropriate tax returns and other reports on behalf of the Litigation Trust and pay taxes (if any) or other obligations owed by the Litigation Trust; and

(x)    Wind-up the affairs of and dissolve the Litigation Trust.

The Litigation Trust has no objective to, and will not, engage in a trade or business and will conduct its activities consistent with the Plan and the Litigation Trust Agreement.

On the Effective Date, the Committee's counsel and professionals, will provide to the Litigation Trustee (or such professionals designated by the Litigation Trustee) documents and other information gathered, and relevant work product developed, if any, during the Chapter 11 Cases in connection with their investigation of the Litigation Trust Claims, provided that the provision of any such documents and information will be without waiver of any evidentiary privileges, including without limitation the attorney-client privilege, work-product privilege or other privilege or immunity attaching to any such documents or information (whether written or oral).  The Plan will be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief.

The Litigation Trust and the Litigation Trustee will each be a "representative" of the Estates under section 1123(b)(3)(B) of the Bankruptcy Code solely as related to the Litigation Trust Assets, and the Litigation Trustee will be the trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), and, as such, the Litigation Trustee succeeds to all of the rights, powers and obligations of a trustee in bankruptcy with respect to collecting, maintaining, administering and liquidating the Litigation Trust Assets.  Without limiting such rights, powers, and obligations, on the Effective Date, (i) the Committee will transfer, and will be deemed to have irrevocably transferred, to the Litigation Trust and shall vest in the Litigation Trust and the Litigation Trustee, the Committee's evidentiary privileges including the attorney-client privilege, work product privilege and other privileges and immunities that they possessed, to the extents related to the Litigation Trust Assets; and (ii) the Litigation Trust, Litigation Trustee and Reorganized Debtors all shall be vested with and share the Debtors' evidentiary privileges including the attorney client privilege, work product privilege and other privileges and immunities the Debtors possessed, to the extent related to the Litigation Trust Assets.  The Committee and its financial advisors, and the Debtors and their financial advisors upon reasonable request, will provide to the Litigation Trustee (or such professionals designated by the Litigation Trustee) originals or copies of documents, other information, and work product relating to the Litigation Trust Claims, *provided* that the provision of any such documents and information will be without waiver of any evidentiary privileges or immunity. Without limiting the foregoing, the Reorganized Debtors shall be vested with and retain all evidentiary privileges, including the attorney-client privilege, work product privilege and other privileges and immunities the Debtors possessed, relating to all Causes of Action that are not Litigation Trust Claims and other property of the Estates vesting in the Reorganized Debtors. To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy

Code, such Litigation Trust Assets shall be deemed to have been retained by the Debtors or the Reorganized Debtors, as the case may be, and the Litigation Trustee shall be deemed, solely with respect to such Litigation Trust Assets, to have been designated as a representative of the Debtors, the Reorganized Debtors, or the Estates, as the case may be, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Debtors, the Reorganized Debtors, or the Estates, as the case may be.

### 2.       Litigation Trustee

The Litigation Trustee shall be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), and solely with respect to the Litigation Trust Assets, the representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified more fully in the Litigation Trust Agreement. The Litigation Trust shall hold and distribute the Litigation Trust Assets in accordance with the provisions of the Plan and the Litigation Trust Agreement. Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement. After the Effective Date, the Reorganized Debtors shall have no interest in the Litigation Trust Assets other than as set forth in the Plan. The Litigation Trustee shall periodically report on activities of the Litigation Trust to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement.

### 3.       Fees and Expenses of the Litigation Trust

On the Effective Date, the Debtors shall fund the Litigation Trust with the Litigation Trust Funding Amount. All Litigation Trust Expenses shall be paid from the Litigation Trust Funding Amount and the proceeds of the Litigation Trust Claims. For the avoidance of doubt, none of the Debtors, the Estates, or the Reorganized Debtors shall have any liability for the fees and expenses of the Litigation Trust beyond the Litigation Trust Funding Amount.

### 4.       Proceeds of the Litigation Trust

Litigation Proceeds shall be allocated first to pay any adequate protection claims payable pursuant to the terms of the DIP Orders and the Plan in full in Cash to the extent not otherwise paid in full prior to the Effective Date or thereafter in accordance with the DIP Orders, and second, paid to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement and the Plan.

### 5.       Limitation of Liability

Neither the Litigation Trustee, nor any of its Related Persons, shall be liable for the act or omission of any other member, designee, agent, advisor, representative or professional, nor shall the Litigation Trustee be liable for any act or omission taken or omitted to be taken in the capacity as Litigation Trustee, other than for specific actions or omissions resulting from the Litigation Trustee's or its Related Persons' respective willful misconduct, gross negligence, or fraud. The Litigation Trustee may, in connection with the performance of its functions, in its sole and absolute discretion, consult with its attorneys, accountants, advisors and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such persons, regardless of whether or not such advice or opinions are in writing. Notwithstanding such authority, the Litigation Trustee shall not be under any obligation to consult with any such attorneys, accountants, advisors or agents, and its determination not to do so shall not result in the imposition of liability on the Litigation Trustee or any of its members, designees, agents, advisors, representatives or professionals

unless such determination is based on willful misconduct, gross negligence or fraud. Persons dealing with the Litigation Trustee shall look only to the Litigation Trust Assets to satisfy any liability incurred by the Litigation Trustee to such person in carrying out the terms of the Plan or the Litigation Trust Agreement, and the Litigation Trustee shall have no personal obligation to satisfy such liability.

6.    **Indemnification**

The Litigation Trust shall indemnify the Litigation Trust Indemnified Parties for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expense of their respective professionals), incurred without gross negligence, willful misconduct, or fraud on the part of the Litigation Trust Indemnified Parties (which gross negligence, willful misconduct, or fraud, if any, must be determined by a Final Order or a court of competent jurisdiction), for any action taken, suffered, or omitted to be taken by the Litigation Trust Indemnified Parties in connection with the acceptance, administration, exercise and performance of their duties under the Plan or the Litigation Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence or willful misconduct.

7.    **Tax Treatment**

The Litigation Trust generally is intended to be treated, for federal income Tax purposes, as a grantor trust that is a liquidating trust within the meaning of Treasury Regulations section 301.7701- 4(d), with no objective to continue or engage in the conduct of a trade or business. This section assumes that all claims held by the Liquidation Trust Beneficiaries are held as "capital assets" within the meaning of Tax Code Section 1221 (generally, property held for investment). For U.S. federal income tax purposes, the transfer of the Litigation Trust Assets to the Litigation Trust will be treated as a transfer of the Litigation Trust Assets from the Debtors to the Litigation Trust Beneficiaries, followed by the Litigation Trust Beneficiaries' transfer of the Litigation Trust Assets to the Litigation Trust in exchange for their beneficial interests in the Litigation Trust. Such exchange should be treated as a taxable exchange under Section 1001 of the Tax Code for each Litigation Trust Beneficiary. Each Litigation Trust Beneficiary should recognize capital gain or loss equal to the difference between (i) the fair market value of the Litigation Trust Beneficiary's allocable share of the Litigation Trust Assets received (other than the value received for "Accrued Interest", as defined and discussed in Article XI below) and (ii) the Litigation Trust Beneficiary's adjusted tax basis in its claim. The fair market value of the Litigation Trust Beneficiary's allocable share of the Litigation Trust Assets may be uncertain at the time received, and each Litigation Trust Beneficiary should consult its own tax advisor regarding the determination of gain or loss in connection with the receipt of an interest in the Litigation Trust Assets and any future payments in respect of such interest in the Litigation Trust Assets.

The Litigation Trust Beneficiaries will thereafter be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the Litigation Trust Assets. The Litigation Trust Beneficiaries shall include in their annual taxable incomes, and pay tax to the extent due on, their allocable shares of each item of income, gain, deduction, loss and credit, and all other such items shall be allocated by the Litigation Trustee to the Litigation Trust Beneficiaries using any reasonable allocation method. The Litigation Trustee will be required by the Litigation Trust Agreement to file income Tax returns for the Litigation Trust as a grantor trust of the Litigation Trust Beneficiaries. In addition, the Litigation Trust Agreement will require consistent valuation by all parties, including the Debtors, the Reorganized Debtor, the Litigation Trustee and the Litigation Trust Beneficiaries, for all federal income Tax and reporting purposes, of any property held by the Litigation Trust. The Litigation Trust

Agreement will provide that termination of the trust will occur no later than five years after the Effective Date, unless the Bankruptcy Court approves an extension based upon a finding that such an extension is necessary for the Litigation Trust to complete its liquidating purpose. The Litigation Trust Agreement also will limit the investment powers of the Litigation Trustee in accordance with IRS Rev. Proc. 94-45 and will require the Litigation Trust to distribute at least annually to the Litigation Trust Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for Taxes), except for Creditor Recoveries retained as reasonably necessary to maintain the value of the Litigation Trust Assets.

## C.    REVESTING OF ASSETS

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and Assets of the Estates (including Causes of Action, but excluding: (i) the Equity Interests in the Excluded Debtor Subsidiaries; (ii) the Equity Interests in, or assets of, the Excluded Non-Debtor Subsidiaries; and (iii) the Litigation Trust Claims) and any property and Assets acquired by the Debtors pursuant to the Plan will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

On the Effective Date, (A) the Equity Interests in the Excluded Debtor Subsidiaries and the Equity Interests in the Excluded Non-Debtor Subsidiaries: (i) shall be cancelled, eliminated, extinguished and of no further force or effect; (ii) shall be finally and forever relinquished and waived by the Holder thereof; and (iii) shall not revest in the Reorganized Debtors; and (B) any assets owned by such (i) Excluded Debtor Subsidiaries shall vest in the Reorganized Debtors as determined by the Reorganized Debtors and (ii) Excluded Non-Debtor Subsidiaries shall  be abandoned in accordance with section 554 of the Bankruptcy Code to the creditors of such Excluded Non-Debtor Subsidiaries and shall be deemed assigned to and for the benefit of the creditors of such Excluded Non-Debtor Subsidiaries or otherwise liquidated for the benefit of such creditors.

For the avoidance of doubt, no Litigation Trust Asset will revest in the Reorganized Debtors on or after the date such Litigation Trust Asset is transferred to the Litigation Trust, but irrevocably and automatically will vest in the Litigation Trust on the Effective Date, to be administered by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement.

## D.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure amounts, all Executory Contracts and Unexpired Leases of the Debtors that are Reorganized Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including employment agreements) and Unexpired Leases that:

- have previously expired or terminated pursuant to their own terms or by agreement of the parties thereto;

- have been previously assumed or rejected by order of the Bankruptcy Court;

- are the subject of a separate motion Filed by the Debtors under section 365 of the Bankruptcy Code before the Confirmation Date for assumption or rejection; or

- are identified in the Rejected Executory Contract/Unexpired Lease List.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

Except with respect to Executory Contracts or Unexpired Leases that are the subject of Cure Objections, any applicable Cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

**Notwithstanding any other provision in the Plan or Confirmation Order, with respect to any Unexpired Lease of nonresidential real property assumed by the Debtors or the Reorganized Debtors, nothing in the Plan or in the Confirmation Order shall modify the Debtors' or Reorganized Debtors' obligation to pay: (1) amounts owed under the assumed Unexpired Lease of non-residential real property that are not accrued for the period prior to the Confirmation Date, including for common area maintenance, insurance, taxes, and similar charges; and any regular or periodic ordinary course year-end adjustments and reconciliations of such charges provided for under the terms of the Unexpired Lease, any percentage rent, any other obligations, including indemnification obligations (if any) that arise from third-party claims asserted with respect to or arising from the Debtors' use and occupancy of the premises prior to the Effective Date for which the Debtors had a duty to indemnify such Landlord pursuant to any Unexpired Lease, or (2) any unpaid Cure amounts (including post-assumption obligations under such assumed Unexpired Lease) as determined by the Bankruptcy Court.**

2.  **Notice of Cure Amounts**

~~The~~**No later than ten (10) calendar days before the Confirmation Hearing (unless otherwise ordered by the Bankruptcy Court), the** Debtors will serve upon counterparties to Executory Contracts and Unexpired Leases a notice (the "<u>Assumption Notice</u>") stating that the Debtors may potentially assume the Executory Contracts and Unexpired Leases identified

therein in connection with the Plan.  The Assumption Notice will:  (a) include a schedule of all Executory Contracts and Unexpired Leases, and the applicable Cure amount, if any, for each Executory Contract and Unexpired Lease; (b) describe the procedures for filing objections to the assumption of, or the proposed Cure amount for, an Executory Contract or Unexpired Lease; and (c) describe the process by which related disputes will be resolved by the Bankruptcy Court.

Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption of such Executory Contract or Unexpired Lease or to the Cure amount set forth in the Assumption Notice will be deemed to have consented and forever released and waived any objection to the assumption of the Executory Contract or Unexpired Lease and the Cure amount set forth on the Assumption Notice.

The Bankruptcy Court will hear and determine any objections to the assumption of Executory Contracts and Unexpired Leases at the Confirmation Hearing, except for objections solely as to Cure amounts ("Cure Objections").  The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases (including Executory Contracts or Unexpired Leases that are the subject of Cure Objections) pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. To the extent a Cure Objection is not resolved consensually prior to the Confirmation Hearing, the Debtors or the Reorganized Debtors, as the case may be, shall schedule a hearing to determine such Cure amount within 60 days following the Confirmation Hearing, or such later date as may be agreed to with the counterparty.  Within ten (10) days following the Bankruptcy Court's entry of an Order determining any Cure amounts for such Executory Contract or Unexpired Leases, the Debtors or the Reorganized Debtors, as the case may be, may elect to reject such Executory Contract or Unexpired Lease by filing with the Bankruptcy Court a notice of such rejection (a "Rejection Notice").  For the avoidance of doubt, if a Rejection Notice is not Filed within such ten (10) day period, such Executory Contract or Unexpired Lease will be deemed to have been assumed.  Any applicable Cure payments with respect to Executory Contracts or Unexpired Leases that are the subject of Cure Objections shall be made within ten (10) days following the assumption of such Executory Contract or Unexpired Lease.

3.    **Rejection of Executory Contracts or Unexpired Leases**

Executory Contracts and Unexpired Leases identified in the Rejected Executory Contract/Unexpired Lease List shall be deemed rejected as of the Effective Date.  Executory Contracts and Unexpired Leases that are the subject of a Rejection Notice shall be deemed rejected as of the date on which the Rejection Notice is filed. The Confirmation Order will constitute an order of the Bankruptcy Court pursuant to sections 365 and 1123 of the Bankruptcy Code approving the rejection of the Executory Contracts and Unexpired Leases (a) identified in the Rejected Executory Contract/Unexpired Lease List, as of the Effective Date; (b) that are the subject of a Rejection Notice, as of the date on which such Rejection Notice is Filed.

4.    **Claims on Account of the Rejection of Executory Contracts or Unexpired Leases**

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed in the manner set forth in the Claims Bar Date Order within thirty (30) days after (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; or (b) with respect to Executory Contracts and Unexpired Leases that are the subject of a Rejection Notice, the date on which such Rejection Notice was served on the counterparty.

Any Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.  All Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

## E.   SUMMARY OF NEW EXIT ABL FACILITY, ~~NEW EXIT TERM LOAN FACILITY,~~ AND NEW TAKE-OUT FACILITY

As described above, under the Plan, at the election of the Required Lenders, the DIP Facility Claims will either be converted to New Common Stock in Reorganized Gibson or will be satisfied through ~~New Exit Term Loan Facility or~~ "take-back" paper in the form of a New Take-Out Facility (or a combination of any of the foregoing).[35]

## F.   SUMMARY OF MANAGEMENT INCENTIVE PLAN

On the Effective Date, Reorganized Gibson will adopt and implement the Management Incentive Plan, which will provide for grants of options and/or restricted units/New Common Stock reserved for management, directors, and employees in an amount of up to ~~[●]~~12% of the New Common Stock outstanding as of the Effective Date.  The primary participants of the Management Incentive Plan, and its terms, including the amount, form, exercise price, allocation and vesting of such equity-based awards with respect to such primary participants, shall be determined by the New Board.  The form and substance of any documentation with respect to the Management Incentive Plan shall be in form and substance (i) consistent with the terms of the Restructuring Support Agreement and (ii) acceptable to the Required Supporting Noteholders.

## G.   SUMMARY OF MANAGEMENT EMPLOYMENT AND CONSULTING AGREEMENTS

As of the Effective Date, Reorganized Gibson will enter into separate Management Employment and Consulting Agreements with each of the Supporting Principals.  Consistent with Annex C to the Restructuring Term Sheet, under those Management Employment and Consulting Agreement, the Supporting Principals will receive (i) in the case of Mr. Berryman, a salary and bonus totaling $3.35 million and New Warrants exercisable for up to 2.25% of the Equity Interests in Reorganized Gibson plus ongoing health benefits, and (ii) in the case of Mr. ~~Juszciewicz~~Juszkiewicz, (a) $2.1 million in consulting fees payable in quarterly installments and New Warrants exercisable for up to 2.25% of the Equity Interests in Reorganized Gibson plus ongoing health benefits and (b) in consideration for future assistance in monetizing the Reorganized Debtors' interest in TEAC, a Profits Interest in the TEAC shares owned by the Reorganized Debtors.  On the Effective Date, Reorganized Gibson shall provide a guaranty with respect to the Profits Interest.  The definitive documents with respect to the Management Employment and Consulting Agreements are to be in form and substance acceptable to the Ad

---

[35] **As noted above, subject to their rights under the Restructuring Support Agreement, all of which are fully preserved, the Required Lenders currently contemplate exercising the Take-Out Equity Option rather than entering into a New-Take Out Facility.**

Hoc Committee of Secured Notes and the Supporting Principals and will be attached to the Plan Supplement.

## H.     SUMMARY OF THE NEW COMMON STOCK IN REORGANIZED GIBSON

The New Common Stock in Reorganized Gibson shall constitute a single class of Equity Interest in Reorganized Gibson and shall be issued (i) to Holders of Allowed Prepetition Secured Notes Claims under the Plan, (ii) upon exercise of the New Warrants contemplated by the Plan and Management Employment and Consulting Agreements, (iii) in accordance with the terms of the Management Incentive Plan, (iv) to the extent elected by the Required Lenders, in satisfaction of any DIP Facility Claims, and (v) to those DIP Lenders that elect to receive certain fees to which they are entitled under the DIP Facility in the form of New Common Stock.  Other than these categories, there shall exist no other Equity Interests, warrants, options, or other agreements to acquire any equity interest in Reorganized Gibson.  All Holders of New Common Stock shall be parties to the New Common Stock Agreement, which shall provide for reasonable and customary protections of minority shareholders as negotiated in accordance with the Restructuring Support Agreement and substantially in the form that will be filed as an amendment to the Plan Supplement (as amended, modified, waived, or supplemented from time to time in accordance with its terms).

## I.     ITLA GUARANTY CLAIMS AGAINST CERTAIN NON-DEBTOR SUBSIDIARIES

In connection with confirmation of the Plan, the Debtors (with the consent of the Required Supporting Noteholders) shall provide Holders of ITLA Unsecured Guaranty Claims with an instrument providing for deferred cash payments that have a present value as of the Effective Date equal to the value established by the Bankruptcy Court at the Confirmation Hearing of such Holders' guaranty claims arising under the ITLA against the following Non-Debtor Subsidiaries of Gibson that have guaranteed the ITLA Debt:  (i) China Guitar, (ii) EQ and (iii) Gibson Japan (such instrument, the "ITLA Non-Debtor Guaranty Release Funding").  **The proposed amount of ITLA Non-Debtor Guaranty Release Funding shall be disclosed in the Plan Supplement.  In exchange for the ITLA Non-Debtor Guaranty Release Funding, Holders of ITLA Unsecured Guaranty Claims shall be permanently enjoined and barred from enforcing, in any respect, any ITLA Unsecured Guaranty Claim against China Guitar, EQ, Gibson Japan, the Debtors, the Reorganized Debtors, or any of their respective Affiliates (the "ITLA Injunction")**.   In the event that (x) the Bankruptcy Court does not grant the ITLA Injunction or (y) the Debtors and the Required Supporting Noteholders determine not to fund the ITLA Non-Debtor Guaranty Release Funding, the Debtors shall have the option to elect (with the consent of the Required Supporting Noteholders) any of the following actions:  (i) causing China Guitar and/or Gibson Japan to become Excluded Non-Debtor Subsidiaries under the Plan, resulting in the cancellation of Gibson's equity interests in such Entities and the liquidation of such Entities under applicable local laws, or (ii) taking no action with respect to China Guitar or Gibson Japan under the Plan, which would preserve all parties' respective rights, including the rights (A) of the Holders of the ITLA Unsecured Guaranty Claims against China Guitar and Gibson Japan to seek to exercise such rights under applicable law and (B) the rights of China Guitar and Gibson Japan to cease operations and liquidate under applicable non-bankruptcy law, and/or to commence bankruptcy proceedings with respect to such entities under the Bankruptcy Code or applicable foreign law.

**ARTICLE VII.**
**RELEASE, EXCULPATION, INJUNCTION AND RELATED PROVISIONS**

**A.    GENERAL**

Except as otherwise provided for in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date the Reorganized Debtors may (1) compromise and settle Claims against them and (2) compromise and settle Causes of Action against other Entities (other than any Causes of Action that have been transferred to the Litigation Trust), subject to the consent of the Required Supporting Noteholders.

For purposes of the following release and exculpation provisions certain defined terms from the Plan are copied below:

"Exculpated Parties" means, collectively, each in its capacity as such:  (a) the Debtors, (b) the Reorganized Debtors, (c) the DIP Agent, (d) the DIP Lenders, (e) the DIP Backstop Parties, (f) the Prepetition Indenture Trustee (and any of its predecessor trustees under the Prepetition Indenture), (g) the Committee and each of its members (but solely in their capacity as members of the Committee and not in any other capacity), (h) the Ad Hoc Committee of Secured Notes and each of its members, (i) each of the Supporting Noteholders, (j) the Supporting Principals, (k) the New Exit ABL Facility Lenders, (l) the New ~~Exit Term Facility Lenders (if any), (m) the New~~ Take-Out Facility Lenders (if any), (n) the New Exit ABL Facility Agent, (o) the New ~~Exit Term Loan Facility Agent (if any), (p) the New~~ Take-Out Facility Agent (if any), and (~~q~~**p**) the Related Persons of each of the foregoing (a) through (~~p~~**o**).

"Related Persons" means, with respect to any Person, such Person's Affiliates and each of such Person's and its Affiliates' predecessors, successors, assigns, Affiliates, subsidiaries, managed accounts or funds, and all of their respective current and former officers, directors, principals, employees, shareholders, members, partners, agents, managers, managing members, investment advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case, acting in such capacity, and any Person claiming by or through any of them, and each of such Person's respective heirs, executors, estates, servants and nominees.

"Released Parties" means, collectively, each in its capacity as such:  (a) the Debtors, (b) the Reorganized Debtors, (c) the DIP Agent, (d) the DIP Lenders, (e) the DIP Backstop Parties, (f) the Prepetition Indenture Trustee (and any of its predecessor trustees under the Prepetition Indenture), (g) the Ad Hoc Committee of Secured Notes and each of its members, (h) each of the Supporting Noteholders, (i) the Supporting Principals, (j) the New Exit ABL Facility Lenders, (k) the New ~~Exit Term~~**Take-Out** Facility Lenders (if any), (l) the New ~~Take-Out Facility Lenders (if any), (m) the New~~ Exit ABL Facility Agent, (~~n) the New Exit Term Loan Facility Agent (if any), (o~~**m**) the New Take-Out Facility Agent (if any), (~~p~~**n**) the Litigation Trust Trustee, and (~~q~~**o**) the Related Persons of each of the foregoing (a) through (~~p~~**n**).

"Releasing Parties" means, collectively, each in its capacity as such: (a) the Debtors, (b) the Reorganized Debtors, (c) Holders of Claims that vote to accept the Plan, (d) Holders of Claims that are Unimpaired under the Plan, (e) Holders of Claims or Equity Interests that are deemed to reject the Plan and do not opt out of granting the releases set forth in Article X, (f) Holders of Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and that, if entitled to do so, do not indicate that they opt out of granting the releases set forth in Article X, (g) Holders of Claims that vote to reject the Plan but do not indicate that they opt out of granting the releases set forth in Article X, (h) the DIP Agent, (i) the DIP Lenders, (j) the DIP Backstop Parties, (k) the Prepetition Indenture Trustee (and any of its predecessor trustees under the Prepetition Indenture), (l) the Ad Hoc Committee of Secured Notes and each of its members, (m) the Committee and each of its members (but solely in their capacity as members of the Committee and not in any other capacity), (n) the Supporting Principals, (o) the New Exit ABL Facility Lenders, (p) the New ~~Exit Term Facility Lenders (if any), (q) the New~~ Take-Out Facility Lenders (if any); (~~r~~q) the New Exit ABL Facility Agent; (~~s~~r) the ~~New Exit Term Loan Facility Agent (if any), (t) the~~ New Take-Out Facility Agent (if any), (~~u~~s) the Litigation Trust Trustee, and (~~v~~t) the Related Persons of each of the foregoing (a) through (~~u~~s).

1.    **Release by Debtors**

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, including the preserved Causes of Action, except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates and their Related Parties from any and all Claims, Equity Interests or Causes of Action whatsoever, including any derivative Claims asserted or that could have been asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the DIP Orders, this Plan, the Restructuring Support Agreement and the term sheet attached thereto, the Definitive Documents, or any related agreements, instruments, or other documents, or  the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided that nothing in the Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; provided, further, that Article X.B of the Plan shall not be deemed to release any Cause of Action of the Debtors, the Debtors' Estates or the Litigation Trust arising from, related to, or connected with:  (i) the ITLA, any ITLA Unsecured Guaranty Claims, or against any Holder of ITLA Unsecured Guaranty Claims, the administrative agent for the ITLA, and any other party that is not a Released Party; or (ii) the Prepetition ABL/Term Loan Agreement, any Prepetition ABL/Term Loan Secured Claims, or against any Prepetition ABL/Term Loan Lender, the Prepetition ABL/Term Loan Agent, and any other Person that is not a Released Party.**

2.    **Release by Holders of Claims and Equity Interests**

**As of the Effective Date, for good and valuable consideration, the Releasing Parties conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties and their respective property from any and all Claims, Equity Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or Equity Interest or that any Holder of a Claim or an Equity Interest would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Restructuring, the Chapter 11 Cases, or the Restructuring Support Agreement, the purchase, sale, transfer or rescission of any debt, security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Equity Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the negotiation, formulation, or preparation of the Restructuring documents or related agreements, instruments or other documents, including the DIP Orders, the Plan, the Restructuring Support Agreement and the term sheet attached thereto, the Definitive Documents, or any related agreements or instruments, or the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, _provided_ _that_ nothing in the Plan shall be construed to release the Released Parties from any claims based upon willful misconduct or intentional fraud as determined by a Final Order.**

3.    **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtors or any of their Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

4.    **Exculpation**

Except as otherwise provided in the Plan or the Confirmation Order, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for any Claim in connection

with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement, the Restructuring Support Agreement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.

5.    **Preservation of Rights of Action**

(a)    Maintenance of Causes of Action

Except as otherwise provided in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including in an adversary proceeding Filed in the Chapter 11 Cases. The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court.

(b)    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action or Litigation Claim against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Cause of Action or Litigation Claim for later adjudication by the Debtors or the Reorganized Debtors (including Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action or Litigation Claims upon or after the confirmation of the Plan or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action or Litigation Claims have been expressly released in the Plan (including and for the avoidance of doubt, the releases contained in Article X of the Plan) or any other Final Order (including the Confirmation Order).  In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

6.    **Injunction**

**Upon entry of the Confirmation Order, all Holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim or Equity Interest extinguished, discharged, or released pursuant to the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as may be agreed to by the Debtors and a Holder of a**

**Claim against or Equity Interest in a Debtor, all Entities that have held, hold, or may hold Claims against or Equity Interests in the Debtors whether or not such parties have voted to accept or reject the Plan and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Equity Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions in Article X.G of the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

## B.  <u>BINDING NATURE OF PLAN</u>

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## ARTICLE VIII.
## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors have complied and will comply with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (a) made before the confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan;

- The Debtors will have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in the plan with the Debtors, or a successor to the Debtors under the Plan.  The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim against the Debtors or Equity Interest in the Parent will (A) have accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, or (B) if section 1111(b)(2) applies to such Claim, receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such Holder's interest in the estate's interest in the property that secures such Claim;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan;

- The Debtors have paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits.

## A.    BEST INTERESTS OF CREDITORS TEST/LIQUIDATION ANALYSIS

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that each

holder of a claim or equity interest in each Impaired class:  (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if each of the debtors were liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the Bankruptcy Court must:  (1) estimate the Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (2) determine the distribution (the "Liquidation Distribution") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code, the Debtors prepared a Liquidation Analysis, a copy of which is attached hereto as **Exhibit D**.

The Liquidation Analysis presents "High" and "Low" estimates of Liquidation Proceeds, thus representing a range of the Debtors' assumptions relating to the costs incurred during a liquidation and the proceeds realized as a result thereof.  The "High" and "Low" estimates of Liquidation Proceeds are ~~$[•] million and $[•] million, respectively, which are~~ substantially less than the value to be realized by stakeholders under the Plan.  For additional detail with respect to such estimates, refer to the Liquidation Analysis attached hereto as **Exhibit D**.  It is assumed that the liquidation would occur over a period of ~~[___] to [___]~~ **nine (9)** months.  The projected date of conversion to a hypothetical chapter 7 liquidation (the "Assumed Effective Date") is ~~[_____]~~ **September 30**, 2018.  In each case, it is assumed that the chapter 7 trustee would enter into an agreement with the Debtors' secured creditors to wind-down operations and sell the remainder of the Debtors' assets on a piecemeal basis.

THE STATEMENTS IN THE LIQUIDATION ANALYSIS, INCLUDING ESTIMATES OF ALLOWED CLAIMS, WERE PREPARED SOLELY TO ASSIST THE BANKRUPTCY COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) AND MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE.  NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

## B.    FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the plan contemplates such liquidation.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have

analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtors developed a business plan and prepared financial projections for fiscal years 2019 through 2023 (the "Financial Projections").  The Financial Projections, together with the assumptions on which they are based, are attached hereto as **Exhibit E**.

The Debtors believe that with the deleveraged capital structure provided for under the Plan and the added funding availability under the New Exit ABL Facility, ~~New Exit Term Loan Facility~~ and New Take-Out Facility (if any) to be issued, the Reorganized Debtors should have sufficient Cash flow and Cash on hand to make all payments required pursuant to the Plan while conducting ongoing business operations.  The Debtors believe that confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE THE DEBTORS BELIEVE THAT THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.  THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The Financial Projections have not been examined or compiled by independent accountants.  The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results.  Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the five-year period of the Financial Projections may vary from the projected results and the variations may be material.  All Holders of Claims and Equity Interests that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

## C.    VALUATION

In conjunction with formulating the Plan and satisfying their obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors and to address certain related matters. Accordingly, the Debtors, with the assistance of Jefferies, produced the Valuation Analysis that is set forth in **Exhibit F** attached hereto and incorporated herein by reference.  As set forth in the Valuation Analysis, the Debtors' going-concern value is substantially less than the aggregate amount of their prepetition funded obligations.  Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

D.    **ACCEPTANCE BY IMPAIRED CLASSES**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is Impaired under a plan, accept the plan.  A class that is not "Impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "Impaired" unless the plan:  (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default— (A) cures any such default that occurred before or after the commencement of the Chapter 11 Cases, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of Impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of allowed claims actually voting cast their ballots in favor of acceptance.  Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of Impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed equity interests in that class actually voting to accept or to reject the plan.

Claims in Classes 1, 2, 3, 9 (in certain instances) and 11 are Unimpaired under the Plan, and, as a result, the Holders of such Claims and Equity Interests are deemed to have accepted the Plan.

Claims in Classes 4 (to the extent not previously refinanced in accordance with the DIP Orders), 5, 6, 7, and 8 are Impaired under the Plan, and as a result, the Holders of Claims in such Class are entitled to vote on the Plan.  Classes 9 (in certain instances), 10 and 12 are Impaired, but deemed to reject.

Pursuant to section 1129 of the Bankruptcy Code, each Voting Class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Class, and without considering whether the Plan "discriminates unfairly" with respect to such Class, as both standards are described herein.  As stated above, Classes 4, 5, 6, 7 and 8 will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Allowed Claims of such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

## E.   CONFIRMATION WITHOUT ACCEPTANCE BY IMPAIRED CLASSES

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all Impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one Impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an Impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is Impaired under, and has not accepted, the Plan.

## F.   NO UNFAIR DISCRIMINATION

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, for example, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

## G.   FAIR AND EQUITABLE TEST

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtors or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non-accepting Class of Equity Interests includes the requirements that either:  (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests either reject the Plan or are deemed to have rejected the Plan, the Debtors reserve the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.C of the Plan.

Notwithstanding the rejection of any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

## H.    CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date. For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see Article IX of the Plan.

## ARTICLE IX.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

## A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

If no chapter 11 plan can be confirmed, some or all of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets. In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims and Equity Interests will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. The Debtors believe that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

## B.    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets. During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan will enable the Debtors to emerge from chapter 11 successfully and expeditiously, preserves the Debtors' business and allows creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors and Equity Interest Holders than the Plan because the Plan provides for a greater return to creditors and Equity Interest Holders.

Moreover, the prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' business and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  Prolonged continuation of the Chapter 11 Cases also will make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business.  In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.  Further, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.  The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing in order to service their debt and other obligations.  It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all.  If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

## ARTICLE X.
## SEURITIES LAW ISSUES WITH RESPECT TO ISSUANCE AND RESALE OF NEW COMMON STOCK

**A.    EXEMPTION FROM REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND BLUE SKY LAWS**

1.    **Section 1145 of the Bankruptcy Code (Offer and Issuance of New Common Stock to Holders of Allowed Prepetition Secured Notes Claims and DIP Facility Claims)**

The Debtors are relying on the exemption provided by section 1145(a)(1) of the Bankruptcy Code from the registration requirements of the Securities Act to exempt the offer and issuance of New Common Stock in Reorganized Gibson to Holders of Allowed Prepetition Secured Notes Claims, DIP Facility Claims.  Section 1145(a)(1) of the Bankruptcy Code provides that the registration requirements of Section 5 of the Securities Act and any applicable Blue Sky Laws will not apply to the offer or sale of stock, warrants or other securities by a debtor under a plan of reorganization if (i) the offer or sale occurs under a plan of reorganization, (ii) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor and (iii) the securities are issued in exchange for a claim against or interest in a debtor or are reissued principally in such exchange and partly for Cash and property.

2.    **Section 4(a)(2) of the Securities Act and Regulation D Promulgated Thereunder (Offer and Issuance of New Common Stock)**

The Debtors may also rely on exemptions from the registration requirements of the Securities Act including section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, to exempt the offer and issuance of the New Common Stock.

Section 4(a)(2) of the Securities Act exempts transactions by an issuer not involving any public offering, and Regulation D provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements, including that investors participating therein qualify as "accredited investors" within the meaning of U.S. securities laws.  The Debtors believe that all Holders of the Allowed Prepetition Secured Notes Claims that are entitled to receive New Common Stock under the Plan are qualified institutional buyers or accredited investors.

3.    **Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D, and Rule 701 Under the Securities Act (Offer and Issuance of Securities Under Management Incentive Plan and Pursuant to Management Employment and Consulting Agreements)**

The Debtors are relying on the exemptions provided by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act and/or Rule 701 promulgated under the Securities Act from the registration requirements of the Securities Act to exempt the offer and issuance of shares of New Common Stock to officers of the Debtors pursuant to the Management Incentive Plan and the New Warrants to the Supporting Noteholders pursuant to the Management Employment and Consulting Agreements (the "Management Securities").  As stated in Article X.A.1. above, section 4(a)(2) of the Securities Act exempts transactions by an issuer not involving any public offering, and Regulation D provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements, including that officers and other key employees of the Debtors qualify as "accredited investors" within the meaning of U.S. securities laws.  The Debtors believe that each of the officers of the Debtors receiving the Management Securities will be an accredited investor.

Rule 701 under the Securities Act provides a safe harbor exemption from registration under the Securities Act for equity securities issued as employee compensation.  Accordingly, the Debtors believe that Management Securities issued to directors, officers, and other key employees of the Debtors will be exempt from registration under the Securities Act and Blue Sky Laws.

In reliance upon the exemptions provided by section 4(a)(2) of the Securities Act, Rule 506 of Regulation D, Rule 701 under the Securities Act, as discussed in the preceding paragraphs, the Debtors believe that the offer and issuance of the New Common Stock under the Plan, including the issuance of New Common Stock upon exercise of the New Warrants, will be exempt from registration under the Securities Act and Blue Sky Laws.

## B.    **RESALES OF SHARES OF NEW COMMON STOCK**

### 1.    **Resales of the 1145 Securities**

As discussed in Article X.A.2, the New Common Stock issued on the Effective Date to under the Plan (collectively, the "Section 1145 Securities"), is anticipated to be exempt under Section 1145 of the Bankruptcy Code from registration under the Securities Act and applicable Blue Sky Laws.  To the extent that the issuance of the Section 1145 Securities pursuant to the Plan is covered by section 1145 of the Bankruptcy Code, the Section 1145 Securities generally may be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined.  In addition, the Section 1145 Securities governed by section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act pursuant to an exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" (as such term is defined in Section 1145(b) of the Bankruptcy Code) with respect to the Section 1145 Securities.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who, except with respect to ordinary trading transactions of an entity that is not an issuer, (i) purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if such purchase is with a view to distributing any security received or to be received in exchange for such a claim or interest; (ii) offers to sell securities offered or sold under a plan of reorganization for the holders of those securities; (iii) offers to buy securities offered or sold under a plan of reorganization from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with such plan of reorganization, with the consummation of such plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or (iv) is an "issuer" (as the term is defined in section 2(a)(11) of the Securities Act) with respect to such securities.

The definition of an "issuer" for purposes of whether a person is an "underwriter" under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as so-called "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover the entity issuing the securities and "control persons" of such issuer of the securities.  "Control" (as defined in Rule 405 under the Securities Act) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person" and, therefore, an underwriter.

Resales of the Section 1145 Securities by persons deemed to be "underwriters" (including "control persons") (collectively, the "Restricted Holders") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  However, Restricted Holders may be eligible to sell their Section 1145 Securities without registration under the Securities Act if they are able to comply with the provisions of Rule 144 promulgated under the Securities Act (as discussed below).  The Debtors

express no view as to whether any Person or Entity would be deemed an "underwriter" with respect to the Section 1145 Securities and, in turn, whether any recipient of Section 1145 Securities may resell such securities without compliance with registration or other requirements or limitations under federal securities laws and Blue Sky Laws.

**The Debtors recommend that potential recipients of the Section 1145 Securities consult their own counsel concerning their ability to freely trade their Section 1145 Securities without registration under applicable federal securities laws and Blue Sky Laws.**

2.     **Resales of the Management Securities**

The offer and issuance of the Management Securities is covered by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder and will not be exempt under section 1145 of the Bankruptcy Code. Therefore, such shares of New Common Stock will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act and may not be sold except pursuant to an effective registration statement or pursuant to an applicable exemption from the registration requirements of the Securities Act, such as the resale provisions of Rule 144. Rule 144 of the Securities Act provides a safe harbor exemption from registration under the Securities Act for the resale of "restricted securities" and "control securities." "Restricted securities" are securities acquired in unregistered, private offerings from an issuer or an "Affiliate" of the issuer. An Affiliate of an issuer is any Person or Entity that "directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." "Control securities" are securities held by an Affiliate of the issuer regardless of how such securities were acquired (including in the open market).

The Rule 144 exemption, provides for special limitations with respect to the resale of securities held by an Affiliate, including (i) availability of current information concerning the issuer; (ii) a minimum holding period; (iii) volume limitations; (iv) manner of sale restrictions; and (v) filing requirements. A non-Affiliate of the issuer is eligible to resell "restricted securities" under the Rule 144 if the non-Affiliate meets (i) the applicable holding period requirement and (ii) if the issuer is subject to ongoing filing requirements under the federal securities laws, it has made available current public information. The Debtors express no view as to whether any Person or Entity would be deemed an Affiliate.

**The Debtors recommend that potential recipients of the Management Securities consult their own counsel concerning their ability to freely trade the Management Securities without registration under applicable federal securities laws and Blue Sky Laws and the availability of Rule 144 for exempt resales.**

**The Debtors recommend that potential recipients of securities under the Plan consult their own counsel concerning their ability to freely trade such securities without registration under applicable federal securities laws and Blue Sky Laws.**

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SHARES OF NEW COMMON STOCK TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF THE REORGANIZED DEBTOR WOULD DEPEND UPON A VARIETY OF FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTOR EXPRESSES NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE**

**RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF THE REORGANIZED DEBTORS. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SHARES OF NEW COMMON STOCK TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SHARES OF NEW COMMON STOCK.**

## ARTICLE XI.
## SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following disclosure (the "Tax Disclosure") summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, Reorganized Gibson and a Holder of an Allowed Claim pursuant to the transactions contemplated by the Plan. The Debtors have not requested, and will not request, a ruling from the Internal Revenue Service (the "IRS") or an opinion of counsel with respect to any of the tax aspects of the Plan, and the discussion below is not binding upon the IRS or the courts. Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

The Tax Disclosure summarizes only certain of the U.S. federal income tax consequences associated with the Plan's implementation and does not address state, local or non-U.S. tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, expatriates, and investors in partnerships and other pass-through entities, subchapter S corporations, real estate investment trusts, retirement accounts and/or pension plans, persons who hold Claims or who will hold the New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investments, persons using mark-to-market method of accounting, those who hold a Claim as an ordinary asset, Holders who are themselves in bankruptcy and Holders subject to Tax Code Section 1061). In addition, the Tax Disclosure does not attempt to consider whether the particular circumstances of any Holder of an Equity Interest or a Claim may modify or alter the consequences described below, and assumes, solely for purposes of this Tax Disclosure (such that no inference is intended as to the character of any Equity Interests or Claims for U.S. federal income tax purposes), that all Claims are held as "capital assets" within the meaning of Tax Code Section 1221 (generally, property held for investment). This Tax Disclosure also assumes that the various debt and other arrangements to which any of the Debtors are a party **generally** will be respected for U.S. federal income tax purposes in accordance with their form. This Tax Disclosure does not address the specific U.S. federal income tax consequences that might be relevant to particular Holders in light of their personal circumstances. Furthermore, except as expressly addressed herein, this Tax Disclosure assumes that the transaction will be structured as an exchange of interests in the indebtedness of Gibson for equity or debt instruments of Reorganized Gibson and not as a fully taxable transfer of the assets of Reorganized Gibson, as contemplated in the definition of "Restructuring Transactions." If that is not the case, U.S. federal income tax consequences of the transaction would be materially different to Reorganized Gibson and Holders. The remainder of the Claims and Equity Interests addressed by the Plan are unimpaired or deemed to reject and hence not specifically addressed herein.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the regulations promulgated thereunder by the U.S. Department of the Treasury ("Treasury Regulations"), judicial decisions, and published administrative rules and

pronouncements of the IRS in effect on the date hereof.  Changes in, or new interpretations of, such rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF AN EQUITY INTEREST OR A CLAIM.  EACH HOLDER OF AN EQUITY INTEREST OR A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

## A.    DEFINITION OF U.S. PERSON AND NON-U.S. PERSON

In this Tax Disclosure, a "U.S. Person" is any Person that is

- an individual that is a citizen or resident of the United States for U.S. federal income tax purposes;

- a corporation (or entity treated as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the United States, or of any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if (1) one or more U.S. Persons have the authority to control all substantial decisions of the trust, and a United States court is able to exercise primary supervision over the administration of the trust; or (2) the trust is of a certain type, was in existence on August 20, 1996, was treated as a United States person on August 19, 1996 under the then-applicable Tax Code, and has made a valid election to be treated as a U.S. Person under the Tax Code.

A "Non-U.S. Person" is any Person that is not a U.S. Person and is not a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a Holder of an Allowed Prepetition Secured Note Claim or DIP Facility Claim is a partnership (including any entity treated as a partnership for U.S. federal income tax purposes), the treatment of a partner in the partnership will depend on the status of the partner and activities of the partnership.

## B.    TREATMENT OF A DEBT INSTRUMENT AS A "SECURITY"

The U.S. federal income tax consequences of the Plan to a Holder of an Allowed Prepetition Secured Note Claim, DIP Facility Claim,[2636] or ~~Allowed~~ Gibson Holdings Claim depend, in part, on whether the Holder's notes or instruments, which are the basis of such Claim, constitute a "security" for U.S. federal income tax purposes.  If such interest, note or instrument

---

[2636] In this Article XI, the term DIP Facility Claim shall not refer to the Backstop Premium, which is addressed separately.

constitutes a security, then the receipt of an interest in the New Take-Out Facility (if any) or New Common Stock, in accordance with the Plan, could be treated as part of a tax "reorganization" for U.S. federal income tax purposes.  If, on the other hand, such interest, note or instrument does not constitute a security for U.S. federal income tax purposes, then the receipt of an interest in the New Take-Out Facility (if any) or New Common Stock in exchange therefor would be treated as a fully taxable transaction.

The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" for U.S. federal income tax purposes depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not.  One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term.  In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities.

Because of the inherently factual nature of this determination, Holders of Claims are urged to consult their tax advisors regarding the proper characterization as a security of their notes or instruments, which are the basis of Claims, and the characterization as a security of the New Take-Out Facility (if any) or New Common Stock, as the case may be, received in exchange for their Claims and the resulting U.S. federal income tax consequences to them in light of their particular circumstances.  References to "Claims" in this Article XI shall, where appropriate, refer to the notes or instruments that are the basis of a Holder's Claims.

## C.    TAX CONSEQUENCES FOR U.S. PERSONS HOLDING ALLOWED CLAIMS

The Plan provides, in relevant part, for:  (i) the Debtors to refinance the $135 million principal amount of DIP Facility Claims ~~with the proceeds of a New Exit Term Loan Facility or, at the election of the Required DIP Lenders, the Debtors may refinance a portion of or all of the DIP Facility Claims~~ either with (a) ~~a New Take-Out Facility secured by liens junior to the New Exit ABL Facility and the New Exit Term Loan Facility, (b)~~ conversion of all of the remaining DIP Facility Claims to New Common Stock in Reorganized Gibson at a price per share equal to 80% of Plan Value (subject to dilution as described above), **(b)** a New Take-Out Facility secured by liens junior to the New Exit ABL Facility**,** or (c) through a combination of the foregoing, (ii) Reorganized Gibson to issue New Common Stock to Holders of Allowed Prepetition Secured Notes Claims in cancellation of such Claims, and (iii) DIP Backstop Parties to receive the Backstop Premium.

### 1.    Satisfaction of DIP Facility Claims for Cash or for Interests in the New Take-Out Facility

Pursuant to the Plan, at the option of the Required DIP Lenders, a U.S. Person that is a Holder of DIP Facility Claims (including claims of the DIP Backstop Parties for DIP Backstop Fees) may receive in exchange for the full and final satisfaction, release and discharge of such DIP Facility Claims, a combination of ~~any of~~ the following:  (i) ~~payment in Cash from proceeds of the New Exit Term Loan Facility, (ii)an~~ interest in a New Take-Out Facility secured by liens junior to the New Exit ABL Facility ~~and the New Exit Term Loan Facility~~, or (~~iii~~ii) New Common Stock in Reorganized Gibson at a price per share equal to 80% of Plan Value (subject to dilution as described above).

~~If a U.S. Person that is a Holder of such a Claim receives payment in full in Cash, the U.S. Person should recognize taxable gain or loss equal to the difference between (1) the~~

~~amount of Cash received (other than the value received for Accrued Interest, as discussed below) and (2) the U.S. Person's adjusted tax basis in its DIP Facility Claim (other than basis attributable to accrued but unpaid interest previously included in such U.S. Person's taxable income).~~ Generally, the adjusted tax basis in a Claim, including in a DIP Facility Claim, will be equal to the amount paid or deemed paid to acquire the note or instruments to which such Claim relates by such Holder that is a U.S. Person, increased by any original issue discount previously included in income. If applicable, the tax basis in a Claim also will be (i) increased by any market discount previously included in income by such Holder that is a U.S. Person pursuant to an election to include market discount in gross income currently as it accrues, and (ii) reduced by any ~~Cash payments received on the Claim other than payments of qualified stated interest, and by any~~ amortizable bond premium that the U.S. Person has previously deducted. ~~The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Person, the nature of the Claim in such U.S. Person's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Person previously has claimed a bad debt deduction with respect to~~ its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Person held its DIP Facility Claim for more than one year at the time of the exchange. ~~The deductibility of capital losses is subject to certain limitations, as discussed below. To the extent that Cash received in exchange for its DIP Facility Claim is allocable to market discount or Accrued Interest, the U.S. Person may recognize ordinary income, as discussed below.~~

Whether and the extent to which a Holder of such a Claim recognizes gain or loss as a result of the exchange of its ~~claim~~**Claim** for ~~Cash and~~ its pro rata interest in the New Take-Out Facility or New Common Stock (if applicable) depends on whether the debt underlying the Claim surrendered is treated as a "security" (as discussed above) for purposes of the reorganization provisions of the Tax Code.

    (a)    <u>Fully Taxable Exchange</u>

If a **note or instrument underlying a** DIP Facility Claim is not a security for U.S. federal income tax purposes, the Holder of such Claim should be treated as exchanging such Claim for its pro rata interest in the New Take-Out Facility~~,~~ **or** New Common Stock ~~and Cash~~, in a taxable exchange under Section 1001 of the Tax Code. In that case, each U.S. Person holding DIP Facility Claims should generally recognize gain or loss equal to the difference between (1) the issue price of the New Take-Out Facility interests received (determined as described below, "Issue Price of the New Take-Out Facility Interests")~~,~~ **and** the value of the New Common Stock received ~~and the amount of Cash received~~ (other than the value received for Accrued Interest, as discussed below) and (2) the U.S. Person's adjusted tax basis in its Claim, as described above.

Generally, the adjusted tax basis in a Claim, including in a DIP Facility Claim, will be equal to the amount paid or deemed paid to acquire the note or instruments to which such Claim relates by such Holder that is a U.S. Person, increased by any original issue discount previously included in income. If applicable, the tax basis in a Claim also will be (i) increased by any market discount previously included in income by such Holder that is a U.S. Person pursuant to an election to include market discount in gross income currently as it accrues, and (ii) reduced by any amortizable bond premium that the U.S. Person has previously deducted. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Person, the nature of the **note or instrument underlying the** Claim in such U.S. Person's hands, whether the **note or instrument underlying the** Claim was purchased at a discount (as discussed below), and whether and to what extent the U.S. Person previously has claimed a bad debt deduction with respect to ~~its Claim~~**the note or instrument underlying** its Claim. If recognized gain is capital gain, it

generally would be long-term capital gain if the U.S. Person held its DIP Facility Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  A U.S. Person's initial tax basis in its pro rata interest in the New Take-Out Facility interests and/or New Common Stock acquired in exchange for its DIP Facility Claims should equal the issue price of such New Take-Out Facility interests (determined as described below, "Issue Price of the New Take-Out Facility Interests") or the fair market value of such stock received on the Effective Date, and its holding period in such New Take-Out Facility interests and New Common Stock should begin the day following the Effective Date.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain recognized by a U.S. Person holding a DIP Facility Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued market discount on **the note or instrument underlying** such Claim, unless such U.S. Person previously elected to include market discount in income as it accrued for U.S. federal income tax purposes. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Person's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (generally equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Person on a taxable disposition of ~~an Allowed Prepetition Secured Notes~~**a DIP Facility** Claim that was acquired with a market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while **the notes or instruments underlying** such Claims were considered to be held by the U.S. Person, unless the U.S. Person elected to include the market discount in income as it accrued.  If a U.S. Person did not elect to include market discount in income as accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry **the notes or instruments underlying** its Claims, such deferred amounts would become deductible at the time of the exchange.

(b)    Reorganization Treatment

If the **notes or instruments underlying the** DIP Facility Claims, on the one hand, and the New Take-Out Facility interests and New Common Stock, on the other hand, are each treated as a "security" for U.S. federal income tax purposes, the exchange of each such Claim for a pro rata share of the New Take-Out Facility interests and New Common Stock should be treated as a reorganization for U.S. federal income tax purposes under the applicable provisions of the Tax Code and Treasury Regulations (a "Reorganization"), and a U.S. Person holding DIP Facility Claims should not recognize loss with respect to the exchange and generally should not recognize gain (subject to "Accrued Interest," as discussed below).  Such Holder would, however, be required to recognize any gain (but not loss) to the extent of the lesser of (a) the amount of gain realized from the exchange (calculated as discussed above) or (b) the Cash and the fair market value of "other property" received in the distribution that is not permitted to be received under sections 354 and 356 of the Tax Code without the recognition of gain (other than the value received for Accrued Interest, as discussed below).

In a Reorganization, a U.S. Person's aggregate initial tax basis in the pro rata interest in the New Take-Out Facility interests and New Common Stock acquired in exchange for DIP Facility Claims should be equal to such U.S. Person's aggregate adjusted basis in **the notes or instruments underlying** such Claims, increased by any gain or interest income, if any, recognized from the exchange.  A U.S. Person's holding period in such pro rata interest in the New Take-Out Facility interests and New Common Stock should include the holding period of

the exchanged **notes or instruments underlying the** DIP Facility Claims, except to the extent of any exchange consideration received in respect of Accrued Interest.  To the extent that **notes or instruments underlying the** DIP Facility Claims acquired with market discount are exchanged in a tax-free reorganization for other property, any market discount that accrued on ~~such~~**the notes or instruments underlying such** Claims (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Person is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

2.      **Receipt of Backstop Premium**

The parties to the DIP Facility have agreed to treat the Backstop Premium for U.S. federal income tax purposes as received in exchange for the DIP Backstop Parties' issuance of a put option to Gibson granting Gibson the right to put a portion of the DIP Facility to the DIP Backstop Parties.  If such put option is exercised, the Backstop Premium should reduce the DIP Backstop Parties' basis in the DIP Facility. If the Backstop Premium is allowed to lapse unexercised, the DIP Backstop Parties should recognize capital gain in an amount equal to the Backstop Premium.

3.      **Exchange of Allowed Prepetition Secured Notes for New Common Stock**

Whether and the extent to which a Holder of an Allowed Prepetition Secured Notes Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock depends on whether the New Common Stock and the debt underlying the Claim surrendered are treated as "securities" (as discussed above) for purposes of the reorganization provisions of the Tax Code.

(a)      Fully Taxable Exchange

If **a note or instrument underlying** an Allowed Prepetition Secured Notes Claim is not a security for U.S. federal income tax purposes, the Holder of such Claim should be treated as exchanging such Claim for New Common Stock, in a taxable exchange under Section 1001 of the Tax Code.  In that case, each U.S. Person holding an Allowed Prepetition Secured Notes Claim should generally recognize gain or loss equal to the difference between (1) the fair market value of the New Common Stock (other than the value received for Accrued Interest, as discussed below), and (2) the U.S. Person's adjusted tax basis in its Claim, as described above. For a Holder of an Allowed Prepetition Secured Notes Claim that is also a Holder of ~~an Allowed~~**a** Gibson Holdings Claim, such gain or loss should be computed by also taking into account the fair market value of the Profits Interest received in exchange for ~~Such~~**such** Gibson Holdings Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Person, the nature of the **note or instrument underlying the** Claim in such U.S. Person's hands, whether the **note or instrument underlying the** Claim was purchased at a discount (as discussed below), and whether and to what extent the U.S. Person previously has claimed a bad debt deduction with respect to **the note or instrument underlying** its Claim.  The deductibility of capital losses is subject to certain limitations as discussed below.  A U.S. Person's initial tax basis in the New Common Stock acquired in exchange for a Claim should equal the fair market value of such New Common Stock on the Effective Date, and its holding period in such New Common Stock should begin the day following the Effective Date.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain recognized by a U.S. Person holding an Allowed Prepetition Secured Notes Claim or Gibson Holdings Claim (as applicable) may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued market discount on **the note or**

- 79 -

**instrument underlying** such Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Person's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (generally equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Person on a taxable disposition of an Allowed Prepetition Secured Notes Claim that was acquired with a market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while **the notes or instruments underlying** such Claims were considered to be held by the U.S. Person, unless the U.S. Person elected to include the market discount in income as it accrued.  If a U.S. Person did not elect to include market discount in income as accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry **the notes or instruments underlying** its Claims, such deferred amounts would become deductible at the time of the exchange.

(b)    Reorganization Treatment

If **the note or instrument underlying** the Allowed Prepetition Secured Notes Claim, on the one hand, and the New Common Stock, on the other hand, are treated as securities for U.S. federal income tax purposes, the exchange of such Claim for New Common Stock should be treated as a Reorganization for U.S. federal income tax purposes, and a U.S. Person holding an Allowed Prepetition Secured Notes Claim should not recognize loss with respect to the exchange and generally should not recognize gain (subject to "Accrued Interest," as discussed below).  Such Holder would, however, be required to recognize any gain (but not loss) to the extent of the lesser of (a) the amount of gain realized from the exchange (calculated as discussed above) or (b) the ~~Cash and the~~ fair market value of "other property" received in the distribution that is not permitted to be received under sections 354 and 356 of the Tax Code without the recognition of gain (other than the value received for Accrued Interest, as discussed below).  For a Holder of an Allowed Prepetition Secured Notes Claim that is also a Holder of a Gibson Holdings Claim relating to the same underlying note or instrument giving rise to the Allowed Prepetition Secured Notes Claim, such "other property" is expected to include the Profits Interest received in exchange for the Holder's Gibson Holdings Claim.

In a Reorganization, a U.S. Person's aggregate initial tax basis in New Common Stock acquired in exchange for Allowed Prepetition Secured Notes Claim should be equal to such U.S. Person's aggregate adjusted basis in **the notes or instruments underlying** such Claims, increased by any gain or interest income, if any, realized from the exchange.  A U.S. Person's holding period in such notes and shares should include the holding period of the exchanged **notes or instruments underlying the** Allowed Prepetition Secured Notes Claim, except to the extent of any exchange consideration received in respect of Accrued Interest.  To the extent that Prepetition Secured Notes acquired with a market discount are exchanged in a tax-free reorganization for other property, any market discount that accrued on such ~~Claims~~**notes** (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Person is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

    (c)     Issue Price of New Take-Out Facility Interests

Although not free from doubt, we intend to take the position that the "issue price" of the New Take-Out Facility interests will depend on whether the New Take-Out Facility interests or the **notes or instruments underlying the** Claims are deemed to be "publicly traded" for U.S. federal income tax purposes. If the New Take-Out Facility interests are considered to be publicly traded, the issue price of the New Take-Out Facility interests would be equal to their fair market value on the date of the Exchange. If the New Take-Out Facility interests are not considered "publicly traded" but the **notes or instruments underlying the** Claims are considered "publicly traded," the issue price of the New Take-Out Facility interests would be equal to the fair market value of the **notes or instruments underlying the** Claims for which the New Take-Out Facility interests are exchanged. If neither the **notes or instruments underlying the** Claims nor the New Take-Out Facility interests are publicly traded, the issue price of New Take-Out Facility interests should equal their stated principal amount. In the event the New Take-Out Facility interests or **the notes or instruments underlying the** Claims are publicly traded, we will provide investors with information regarding our determination of the issue price of the New Take-Out Facility interests in a manner consistent with applicable Treasury Regulations. However, we can provide no assurance as to whether the New Take-Out Facility interests will be treated as publicly traded, the issue price of the New Take-Out Facility interests, the tax treatment of the New Take-Out Facility interests as a new issue, or whether the New Take-Out Facility interests will be issued with original issue discount, as discussed below under "Original Issue Discount on the New Take-Out Facility." The rules regarding the "issue price" determination are complex and highly detailed, and U.S. Persons are urged to consult their tax advisors regarding the determination of the issue price of the New Take-Out Facility interests and, if the New Take-Out Facility interests are not treated as a new issue for U.S. federal income tax purposes, how the issue price of the New Take-Out Facility interests would be determined and the tax consequences of holding such New Take-Out Facility interests in such circumstance.

    4.    **Original Issue Discount on the New Take-Out Facility**

It is possible that the New Take-Out Facility could be treated as issued with original issue discount, or OID, for U.S. federal income tax purposes. A debt instrument will be treated as issued with OID if the stated redemption price at maturity of such debt instrument exceeds its issue price by more than the *de minimis* amount (generally, ¼ of 1 percent of the stated redemption price at maturity multiplied by the number of complete years from the issue date of the debt instrument to its maturity). The "issue price" of a New Take-Out Facility Interest is determined as described above under "Issue Price of the New Take-Out Facility Interests". The "stated redemption price at maturity" of a debt instrument is the total of all payments provided by the debt instrument that are not payments of "qualified stated interest." Generally, an interest payment on a debt instrument is "qualified stated interest" if it is one of a series of stated interest payments on such debt instrument that are unconditionally payable at least annually at a single fixed rate. The New Take-Out Facility could be treated as issued with OID if **the** issue price of the interests thereunder is expected to be less than the stated redemption price at maturity by more than a *de minimis* amount. In such case, a U.S. Person that is a Holder of an interest in the New Take-Out Facility would generally be required to include OID in gross income (as ordinary income) as it accrues (on a constant yield to maturity basis) over the term of the New Take-Out Facility in advance of the receipt of cash payments attributable to that income.

Under the OID rules, the amount of OID required to be included in income would generally equal the sum of the "daily portions" of OID with respect to the New Take-Out Facility for each day during the taxable year or portion of the taxable year in which the Holder held such interest in the New Take-Out Facility ("accrued OID"). The daily portion is

- 81 -

determined by allocating to each day in each "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for the interest in such New Take-Out Facility may be of any length and may vary in length over the term of such interest in the New Take-Out Facility, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period other than the final accrual period would be an amount equal to the excess, if any, of (i) the product of the New Take-Out Facility's adjusted issue price, as the case may be, at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (ii) the aggregate of all qualified stated interest allocable to the accrual period. OID allocable to a final accrual period is the difference between the amount payable at maturity (other than a payment of qualified stated interest) and the adjusted issue price of the New Take-Out Facility, at the beginning of the final accrual period. The adjusted issue price of the New Take-Out Facility at the beginning of any accrual period is equal to its issue price, increased by the accrued OID for each prior accrual period, and reduced by any payments previously made on the New Take-Out Facility (other than a payment of qualified stated interest). Under these rules, Holders of the New Take-Out Facility generally would include in income increasingly greater amounts of OID in successive accrual periods. A Holder's tax basis in the New Take-Out Facility, as the case may be, will be increased by the amount of OID included in the Holder's gross income and will be decreased by the amount of any payments (other than payments of qualified stated interest) received by the Holder with respect to such interest in the New Take-Out Facility.

5.      **Distributions in Discharge of Accrued Interest**

A U.S. Person holding an Allowed Claim who, under its accounting method, did not previously include in its income accrued but unpaid interest ("Accrued Interest") attributable to **the note or instrument underlying** that Allowed Claim, and who exchanges such an Allowed Claim for ~~Cash or other~~ property (including an interest in the New Take-Out Facility, or New Common Stock, as the case may be) pursuant to the Plan, should be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such Accrued Interest, regardless of whether that U.S. Person realizes an overall gain or loss as a result of the exchange of its Allowed Claim, and regardless of whether the Person's Allowed Claim is a capital asset in its hands.

A U.S. Person holding an Allowed Claim generally should be able to recognize a deductible loss to the extent any Accrued Interest claimed was previously included in its gross income and is not paid in full by the applicable Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributed to accrued interest on the debts constituting the surrendered Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.

Pursuant to the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of **the debtors constituting** such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the **debts constituting such** Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

- 82 -

**U.S. PERSONS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE U.S. FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

6. **Litigation Trust**

For a discussion of certain tax consequences with respect to the Litigation Trust, see Section VI.B.7.

7. **Holders of Allowed Claims Consisting of Convenience Class Claims**

Pursuant to the Plan, each Holder of an Allowed Claim consisting of a Convenience Class Claim shall have the right to receive Cash. Such exchange should be treated as a taxable exchange under Section 1001 of the Tax Code. The Holder should recognize capital gain or loss equal to the difference between (i) the Cash received and (ii) the Holder's adjusted tax basis in its ~~claim.~~**Claim.** Such gain or loss should be capital in nature (subject to any "market discount") and should be long-term capital gain or loss if the debts constituting the surrendered Convenience Class Claim were held for more than one year. To the extent that a portion of the Convenience Class Claim is allocable to accrued but untaxed interest, the Holder may recognize ordinary interest income. *See* "Distributions in Discharge of Accrued Interest" above.

8. **Holders of Allowed Claims Consisting of General Unsecured Claims Against Gibson Holdings, Inc.**

Pursuant to the Plan, each Holder of a Gibson Holdings Claim shall have the right to receive a Profits Interest in ~~the~~**a number of** TEAC Shares ~~owned by Gibson Holdings, Inc. of~~**having** a value ~~as of~~**on** the date of ~~Distribution~~**distribution** equal to such Holder's Pro Rata share of the **aggregate** value of ~~Gibson Holdings, Inc.~~**the TEAC Shares** as of the Effective Date **(based on the last trading value of shares in TEAC on the Effective Date)**.

A Holder of a Gibson Holdings Claim that is also a Holder of an Allowed Prepetition Secured Notes Claim should see the discussion in "Exchange of Prepetition Secured Notes for New Common Stock" above regarding certain consequences in connection with the receipt of the Profits Interest.

~~For~~**Although the U.S. tax treatment of the Profits Interest is unclear, for** a Holder of a Gibson Holdings Claim that is not also a Holder of an Allowed Prepetition Secured Notes Claim, the exchange of a Gibson Holdings Claim for the Profits Interest is expected be treated as a taxable exchange under Section 1001 of the Tax Code. The Holder should recognize capital gain or loss equal to the difference between (i) the fair market value of the Profits Interest **on the date of receipt** plus any other amounts received in respect of the applicable underlying note or instrument relating to such Claim and (ii) the Holder's adjusted tax basis in such underlying note or instrument. Such gain or loss should be capital in nature (subject to any "market discount") and should be long-term capital gain or loss if the debts constituting the surrendered Gibson Holdings Claim were held for more than one year. To the extent that a portion of the Gibson Holdings Claim is allocable to accrued but untaxed interest, the Holder may recognize ordinary interest income. *See* "Distributions in Discharge of Accrued Interest" above. Each Holder of a Gibson Holdings Claim should consult their own tax advisor regarding the tax treatment of the exchange of the Gibson Holdings Claim for a Profits Interest.

9.    **Limitations on the Use of Capital Losses**

A U.S. Person who recognizes capital losses as a result of the distribution under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Person, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of all the U.S. Person's capital losses over all the U.S. Person's capital gains.  A non-corporate U.S. Person may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Persons, capital losses may only be used to offset capital gains.  A corporate U.S. Person that has more capital losses than may be used in a tax year may generally carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

10.    **Installment Method**

Because certain Holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the Tax Code may apply to treat a portion of the subsequent distributions as imputed interest. Additionally, because a Holder may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the Holder may be deferred. All Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their ~~claims~~**Claims**.

11.    **Tax Consequences for U.S. Person Holding Stock of Reorganized Gibson**

(a)    <u>Dividends Distributed to U.S. Persons</u>

Distributions with respect to New Common Stock that is issued or received pursuant to the Plan generally will be dividends to the extent of Reorganized Gibson's current and accumulated earnings and profits allocable to such shares as determined under the Tax Code as of the end of the taxable year in which the distribution is made.  Any portion of a distribution that exceeds Reorganized Gibson's current and accumulated earnings and profits would first be treated as a non-taxable return of capital reducing the Holder's tax basis (but not below zero) in its shares, and any excess would then be treated as gain from the disposition of the shares, the tax treatment of which is discussed below under "U.S. Person's Sale, Exchange or Other Disposition of New Common Stock".

Dividends paid to Holders who are U.S. Persons that are corporations generally will be eligible for the dividends-received deduction so long as Reorganized Gibson has sufficient earnings and profits.  However, the dividends-received deduction is only available if certain holding period and ownership requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

(b)    U.S. Person's Sale, Exchange or Other Disposition of New Common Stock

Upon a U.S. Person's subsequent sale, exchange or other taxable disposition of the New Common Stock, such U.S. Person should recognize capital gain or loss in an amount equal to the difference between the amount realized and its adjusted tax basis in the transferred shares. Such capital gain will be long-term capital gain if at the time of the sale, exchange or other disposition, the U.S. Person held the New Common Stock for more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to significant limitations as described above. If the U.S. Person took a bad debt deduction with respect to **the note or instrument underlying** its Claim or recognized an ordinary loss on the exchange of its Claim for New Common Stock, a U.S. Person may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income under the recapture rules of Section 108(e)(7) of the Tax Code.

12.    **Medicare Tax**

Certain U.S. Persons who are Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, dividends and gains from the sale or other disposition of capital assets. Such Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of New Common Stock.

D.    **TAX CONSEQUENCES FOR NON-U.S. PERSONS HOLDING ALLOWED CLAIMS**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Persons that hold Allowed Claims. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Persons are complex. Each non-U.S. Person should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Persons and the ownership and disposition of an interest in the New Take-Out Facility (if any) or New Common Stock, as the case may be.

Whether a Non-U.S. Person realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Persons.

1.    **Gain Recognition**

Any gain realized by a Non-U.S. Person on the exchange of its Claim for an interest in the New Take-Out Facility (if any) or New Common Stock, as the case may be, generally should not be subject to U.S. federal income tax unless (1) such gain is effectively connected with the conduct by such Non-U.S. Person of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Person in the United States) or (2) in the case of U.S. source gains or losses derived by an individual Non-U.S. Person, such individual is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met.

If the first exception applies, the Non-U.S. Person generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Person's conduct of a trade or business within the United States in the same manner as a U.S. Person. In addition, if such a Non-U.S. Person is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an

applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.  If the second exception applies, to the extent that any gain is taxable and does not qualify for deferral pursuant to a Reorganization as described above, the Non-U.S. Person generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Person's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.

2. **Distributions in Discharge of Accrued Interest**

A Non-U.S. Person holding an Allowed Claim, including a DIP Facility Claim or Allowed Prepetition Secured Notes Claim exchanged for an interest in the New Take-Out Facility (if any) or New Common Stock pursuant to the Plan, should be treated as receiving interest income to the extent of any consideration so received allocable to Accrued Interest that was not previously taken into account for U.S. federal income tax purposes, regardless of whether such Non-U.S. Person realizes an overall gain or loss as a result of the exchange of its Allowed Claim, and regardless of whether the Non-U.S. Person's Allowed Claim is a capital asset in its hands.

Under the Plan, except as otherwise specified, distributions in respect of Allowed Claims will be allocated first to the stated principal amount of **the debts constituting** such Claims, with any excess allocated to Accrued Interest.  Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.

Subject to the discussion in "Backup Withholding" below, the payment to a Non-U.S. Person of interest, including Accrued Interest attributable to the Allowed Claims, should not be subject to U.S. federal withholding tax pursuant to the "portfolio interest exception," provided that the Non-U.S. Person (1) provides Reorganized Gibson with the appropriate (and validly executed) IRS Form W-8, (2) does not actually or constructively own 10% or more of stock of Reorganized Gibson, as measured by voting power, (3) is not a "controlled foreign corporation" that is related to Reorganized Gibson within the meaning of the Tax Code, and (4) is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code.

If a Non-U.S. Person cannot satisfy the requirements of the portfolio interest exception described above, payments of interest, including Accrued Interest, made to such Non-U.S. Person, should be subject to a withholding tax at a rate of 30%, provided, however, that a Non-U.S. Person may be eligible to claim an exemption from or reduction in the rate of withholding under an applicable income tax treaty.

If payments of accrued untaxed interest are effectively connected with a Non-U.S. Person's trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment or fixed base) and such Non-U.S. Person provides Reorganized Gibson with an IRS Form W-8ECI (or successor form), such Non-U.S. Person should generally not be subject to withholding tax but will be subject to U.S. federal income tax in the same manner as a U.S. Person (unless an applicable income tax treaty provides otherwise).  A Non-U.S. Person that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Person's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or a reduced rate or exemption from tax under an applicable income tax treaty).

3.    **Non-U.S. Person Holding Interests in the New Take-Out Facility or New Common Stock**

(a)    <u>Dividends Received by a Non-U.S. Person</u>

Distributions with respect to shares of New Common Stock that are received pursuant to the Plan generally will be dividends for U.S. federal income tax purposes to the extent of Reorganized Gibson's current and accumulated earnings and profits allocable to such shares as determined under U.S. federal income tax principles as of the end of the taxable year in which the distribution is made.  Any portion of a distribution that exceeds Reorganized Gibson's current and accumulated earnings and profits would first be treated as a non-taxable return of capital reducing the Non-U.S. Person's tax basis (but not below zero) in its shares, and any excess would then be treated as gain from the disposition of the shares, the tax treatment of which is discussed below under "Non-U.S. Person's Sale, Exchange or Other Disposition of Interests in the New Take-Out Facility or New Common Stock".

*Dividend Withholding*.  Dividends paid to a Non-U.S. Person holding New Common Stock should generally be subject to withholding of U.S. federal income tax at the rate of 30% (unless an applicable income tax treaty reduces or eliminates such withholding).  A Non-U.S. Person generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by delivering IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Person certifies, under penalties of perjury, its status as a Non-U.S. Person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends that are effectively connected with the conduct of a trade or business by a Non-U.S. Person within the United States are not subject to the withholding tax, provided certain certification and disclosure requirements are satisfied, including completing IRS Form W-8ECI (or other applicable form).  Instead, such dividends are subject to U.S. federal income tax on a net income basis in the same manner as if the Non-U.S. Person were a U. S. Person, unless (in the case of a Non-U.S. Person which does not have a permanent establishment in the United States) an applicable income tax treaty provides otherwise.  A Non-U.S. Person that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Person's effectively connected earnings and profits that are attributable to dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).  Special withholding rules apply to distributions from a "United States real property holding corporation" (a "<u>USRPHC</u>") for U.S. federal income tax purposes. As discussed below, Gibson does not believe that it is, and does not currently anticipate that Reorganized Gibson will be, a USRPHC for U.S. federal income tax purposes.

(b)    <u>Payment of Interest on the New Take-Out Facility</u>

Generally, payments of interest (including for this purpose original issue discount) to a Non-U.S. Person are subject to U.S. federal withholding tax at a 30% rate (or such lower rate as is specified by an applicable income tax treaty) unless (i) the interest is effectively connected with a U.S. trade or business (and, if an income tax treaty with the United States so requires, is attributable to a U.S. permanent establishment of the Non-U.S. Person), in which case it is subject to U.S. net income tax or (ii) the "portfolio interest" exemption applies, as described above. Payments of interest that qualify for the "portfolio interest" exemption will not be subject to U.S. federal withholding tax.

A Non-U.S. Person that is not exempt from tax under the portfolio interest rules will be subject to U.S. federal income tax withholding at a rate of 30% on payments of interest, unless the Non-U.S. Person delivers to us or an applicable withholding agent a properly executed (1)

IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, claiming an exemption from or reduction in withholding under an applicable U.S. income tax treaty or (2) IRS Form W-8ECI stating that interest paid on the New Take-Out Facility is not subject to withholding tax because it is effectively connected with the conduct of a U.S. trade or business. If the interest is effectively connected with the conduct of a U.S. trade or business by a Non-U.S. Person (and, if required by an income tax treaty, is attributable to a U.S. permanent establishment of the Non-U.S. Person), the Non-U.S. Person generally will be taxed in the same manner as a U.S. Holder on such interest. If the Non-U.S. Person is a foreign corporation, it may also be subject to U.S. branch profits tax on the "dividend equivalent amount" of its effectively connected earnings and profits at a 30% rate (or such lower rate as may be specified by an applicable income tax treaty). Non-U.S. Persons should consult their tax advisors regarding the applicability of an income tax treaty.

<blockquote>(c)    <u>Non-U.S. Person's Sale, Exchange or Other Disposition of Interests in the New Take-Out Facility or New Common Stock</u></blockquote>

Subject to the discussion below regarding backup withholding, if a Non-U.S. Person owns an interest in the New Take-Out Facility (if any) or New Common Stock, the Non-U.S. Person generally will not be subject to U.S. federal income tax with respect to any gain or loss realized on the sale, exchange or other taxable disposition, for U.S. federal income tax purposes, of such New Take-Out Facility or New Common Stock unless: (1) such gain or loss is effectively connected with the conduct by such Non-U.S. Person of a trade or business in the United States; (2) in the case of U.S. source gains or losses derived by an individual Non-U.S. Person, such individual is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met; or (3) in the case of New Common Stock, Reorganized Gibson is a USRPHC for U.S. federal income tax purposes during the shorter of the Non-U.S Person's holding period of the five year period ending on the date of disposition of the New Common Stock, unless certain exceptions apply.  Gibson does not believe that it is, and does not currently anticipate that Reorganized Gibson will be, a USRPHC for U.S. federal income tax purposes.

Gain on a disposition of Interests in the New Take-Out Facility generally will not include amounts received in respect of accrued but unpaid interest not previously included in income. Such amounts are subject to the rules regarding interest described above in "Payment of Interest on the New Take-Out Facility."

(d)    <u>FATCA</u>

Under the Foreign Account Tax Compliance Act ("<u>FATCA</u>"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments."  Such foreign entities may avoid withholding if (1) the foreign financial institution enters into an agreement with the U.S. Treasury Department to collect and disclose information regarding U.S. account holders of that foreign financial institution (including certain account holders that are foreign entities that have U.S. owners) and satisfies other requirements; or (2) with respect to certain specified other foreign entities, if such entity certifies that it does not have any substantial U.S. owner and such entity satisfies other specified requirements.  For purposes of this paragraph, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Stock, and interest on the New Take-Out Facility, as applicable), and also include gross proceeds from the sale or disposition of any property of a type which can produce U.S. source interest or dividends (which would include New Common Stock and the New Take-Out Facility, as applicable) if such sale or other disposition occurs after

December 31, 2018.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

## E.    INFORMATION REPORTING AND BACKUP WITHHOLDING

### 1.    Information Reporting

*Reporting by Reorganized Gibson.*  Reorganized Gibson must report annually to the IRS and to each Non-U.S. Person holding its stock the amount of dividends paid to such Non-U.S. Person and the tax withheld with respect to such dividends, regardless of whether withholding was required.  Copies of the information returns reporting such dividends and withholding may also be made available to the tax authorities in the country in which the Non-U.S. Person resides under the provisions of an applicable treaty.

*Loss Reporting.*  The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders of Claims are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

### 2.    Backup Withholding

Backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Person, such U.S. Person provides a properly executed IRS Form W-9 and, in the case of a Non-U.S. Person, such Non-U.S. Person provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Person's eligibility for an exemption).

U.S. backup withholding tax is not an additional tax.  Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Non-U.S. Person's U.S. federal income tax liability provided the required information is timely furnished to the IRS.

Depending on the circumstances, information reporting and backup withholding may apply to the proceeds received from a sale or other disposition of New Take-Out Facility interests and New Common Stock, as applicable, unless the beneficial owner certifies under penalty of perjury that it is a Non-U.S. Person (and the payor does not have actual knowledge or reason to know that the beneficial owner is a United States person as defined under the Tax Code), or such owner otherwise establishes an exemption.

## F.    TAX CONSEQUENCES FOR THE DEBTORS AND REORGANIZED GIBSON

### 1.    Cancellation of Debt

In general, absent an exception, a debtor recognizes cancellation of debt income ("COD Income"), for U.S. federal income tax purposes, upon the satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness issued by the debtor, and (ii) the fair market value of any other new consideration (including stock of the debtor or a party related to the debtor) given in satisfaction of such

indebtedness at the time of the exchange.  Moreover, no COD Income would be realized to the extent that the payment of the debt being discharged would have given rise to a deduction.  For example, no COD Income should arise from the cancellation of interest that has accrued but has not yet been taken into account for tax purposes by the applicable Debtor under its method of accounting.

The Plan provides, in relevant part, for:  (i) the Debtors to refinance the $135 million principal amount of DIP Facility Claims ~~with the proceeds of a New Exit Term Loan Facility or, at the election of the Required DIP Lenders, the Debtors may refinance a portion of or all of the DIP Facility Claims~~ either with (a) ~~a New Take-Out Facility secured by liens junior to the New Exit ABL Facility~~ ~~and the New Exit Term Loan Facility, (b~~) conversion of all of the remaining DIP Facility Claims to New Common Stock in Reorganized Gibson at a price per share equal to 80% of Plan Value (subject to dilution as described above), **(b**) a New Take-Out Facility secured by liens junior to the New Exit ABL Facility**,** or (c) through a combination of the foregoing and (ii) Reorganized Gibson to issue New Common Stock to Holders of Allowed Prepetition Secured Notes Claims in cancellation of such Claims.  Because it is anticipated the interests in the New Take-Out Facility (to the extent the Company incurs such facility) and New Common Stock distributed to the Holders of DIP Facility Claims and Allowed Prepetition Secured Notes Claims, respectively, should be treated as having an aggregate value that is less than the adjusted issue price of such refinanced or cancelled debt, Reorganized Gibson should generally realize COD Income from the cancellation.  The Debtors expect that the consummation of the Plan will produce a significant amount of COD income, however the amount of such income cannot be known with certainty at this time.

Although Section 61 of the Tax Code generally requires COD Income to be included in gross income in the taxable year of discharge, under the "Bankruptcy Exception" provided in Section 108 of the Tax Code, COD Income is specifically excluded from gross income when the debtor is in a case under the Bankruptcy Code and its indebtedness is cancelled pursuant to a confirmed plan.  Accordingly, the Debtors believe that they should not be required to include in income any COD Income that results from the Plan in their gross income.

Section 108(b) of the Tax Code, however, requires that certain tax attributes of the Debtors be reduced by the amount of COD Income they exclude from income under the Bankruptcy Exception.  Tax attributes are reduced in the following order of priority: (a)  net operating losses and net operating loss carryovers; (b) general business credits; (c) minimum tax credits; (d) capital loss carryovers; (e) basis of property of the taxpayer; (f) passive activity loss or credit carryovers; and (g) foreign tax credit carryovers.  Tax attributes are generally reduced by one dollar for each dollar excluded from gross income, except that general tax credits, minimum tax credits, and foreign tax credits are reduced by 33.3 cents for each dollar excluded from gross income.  In general, any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact.

Under Section 108(b)(5) of the Tax Code, a debtor may elect to first reduce its basis in depreciable property held by the taxpayer in an amount not to exceed the aggregate adjusted basis of such property.  When debtors are members of a consolidated group, different elections under Section 108(b)(5) of the Tax Code can be made with respect to different members with COD Income excluded under the Bankruptcy Exception.  The Debtors have not yet made a determination regarding whether to make this election for any member of their consolidated group.  If this decision were to change, the deadline for making such election is the due date (including extensions) of their consolidated U.S. federal income tax return for the taxable year in which the COD Income arises under the Plan and is excludable under the Bankruptcy Exception.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations filing a consolidated return for U.S. federal income tax purposes. Under these Treasury Regulations, the tax attributes of each member of an affiliated group that is excluding COD Income is first subject to reduction. To the extent that the debtor member's tax basis in stock of a lower-tier member of an affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

2. **Exchange of Gibson Holdings Claims for Profits Interests**

The consequences to Gibson and Gibson Holdings, Inc. in connection with the exchange of Gibson Holdings Claims for Profits Interests is unclear. It is possible that the exchange could result in the Gibson Brands, Inc. consolidated group recognizing **income or** capital gain ~~equal to the excess of the fair market value of the TEAC Shares over the adjusted basis of the TEAC Shares~~. In such case, net operating losses ("NOLs") or other tax attributes of the Gibson Brands, Inc. consolidated group may be available to offset some or all of the tax cost, but it is possible that the exchange could nonetheless result in adverse tax consequences to Gibson. Gibson Holdings, Inc. may also realize COD Income in connection with the exchange, and certain tax attributes of Gibson Holdings, Inc. may be reduced by the amount of COD Income in the same manner as discussed above in relation to the Debtors generally. **Additionally, when the TEAC Shares are sold in the future and the proceeds are used, in whole or in part, to make payments in respect of the Profits Interests, there could be additional taxes for the Gibson Brands, Inc. consolidated group, and the amount of any such taxes would not reduce the obligations to the holders of the Profits Interests.** The Debtors are continuing to evaluate the U.S. federal income tax consequences of the exchange.

3. **Net Operating Losses**

As of March 31, 2017, the Debtors' consolidated group had approximately $130 million of U.S. federal NOLs. NOLs generated in the Debtors' taxable years beginning prior to January 1, 2018 if not reduced as a result of the recognition of COD Income or used, may be carried forward for twenty years following the taxable year of the loss, and NOLs generated in the Debtors' taxable years beginning after December 31, 2017, if not reduced as a result of the recognition of COD Income or used, may be carried forward indefinitely, but may only be used to offset eighty percent (80%) of taxable income in a given year, and generally may not be carried back. A significant portion of the Debtors' U.S. federal NOLs is expected to be limited by Section 382 of the Tax Code; however, at this time that amount has not been quantified. In addition to certain U.S. federal NOLs, the Debtors had, as of March 31, 2017, approximately $160 million of state NOLs, which are also likely subject to significant limitation under applicable law. However, as discussed above, this Tax Disclosure summarizes only certain of the U.S. federal income tax consequences associated with the Plan's implementation and does not address state, local or non-U.S. tax consequences of the Plan, such as the amount of, or the Debtors' ability to utilize, any state, local or non-U.S. NOLs.

The NOL amounts reported in tax returns are subject to examination, and possible significant adjustment, upon such examination, by the IRS and other taxing authorities. In addition, estimates of Reorganized Gibson's' NOLs are subject to legal and factual uncertainty. As a result of the consummation of the Plan, the Debtors expect that there will be material reductions in, or eliminations of, their NOL carryforwards and certain other tax attributes.

Various limitations could apply to Reorganized Gibson's use of NOLs to offset taxable income arising in tax years ending after the Effective Date. Such limitations could arise under the alternative minimum tax rules (for taxable years of the Debtors beginning before January 1, 2018) or the current or future suspension of NOL carryforwards for state or federal purposes. Moreover, the Debtors expect that Tax Code Section 382 may limit their use of NOL carryforwards, as discussed in the next section.

4.     **Section 382 Limitation**

Following the Effective Date, the Debtors anticipate that any remaining NOL carryover, capital loss carryover, tax credit carryovers, and certain other tax attributes, including any interest deductions disallowed under Tax Code Section 163(j) and losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of Reorganized Gibson allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation or elimination under Tax Code sections 382 and 383 as a result of an "ownership change" of Reorganized Gibson by reason of the transactions consummated pursuant to the Plan. Under Tax Code section 382 (and section 383), if a corporation undergoes an "ownership change," the amount of such corporation's Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation (the "Section 382 Limitation"). The rules of the Section 382 Limitation are complicated, but, as a general matter, the Debtors anticipate that the distribution of the New Common Stock pursuant to the Plan will result in an "ownership change" of Reorganized Gibson for these purposes, and that Reorganized Gibson's use of their Pre-Change Losses will be subject to the Section 382 Limitation unless an exception (as described below) to the general rules of section 382 of the Tax Code applies. As discussed above, a significant portion of the Debtors' U.S. federal NOLs is expected to be subject to a Section 382 Limitation; however, at this time that amount has not been quantified.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors are currently working to estimate whether the Company has a net unrealized built-in gain or loss.

In general, the amount of the annual limitation applicable to a corporation that undergoes an "ownership change" is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs; the adjusted federal long-term rate in effect for June 2018 is 2.31%). The Section 382 Limitation may be increased to the extent that Reorganized Gibson recognizes or is treated as recognizing certain built-in gains in its assets during the five-year period following the ownership change. Tax Code Section 383 applies a similar limitation to capital loss carry-forwards and tax credits. Any unused portion of the limitation may be carried forward, which would increase the annual limitation in the subsequent taxable year. However, as discussed below, special rules may apply since the anticipated ownership change would result from a bankruptcy proceeding.

- 92 -

Tax Code Section 382(l)(5), if applicable and not affirmatively elected out of, allows a corporation in bankruptcy to elect to undergo an ownership change without being subject to the Section 382 Limitation. To be eligible for this exception, former shareholders and "qualified creditors" of a debtor corporation in chapter 11 bankruptcy must receive, in respect of their equity interests or claims (as applicable), at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "Section 382(l)(5) Exception"). A "qualified creditor" is a party that has either held the debt for at least eighteen (18) months before filing of the bankruptcy or holds ordinary course of business debt. In the event the Section 382(l)(5) Exception applies, Reorganized Gibson's Pre-Change Losses would not be subject to the Section 382 Limitation, but their NOL carryforwards would be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the date of the chapter reorganization, and the portion of the taxable year up to and including the date of the chapter 11 reorganization, in respect of all debt converted into stock in the chapter 11 reorganization. If the 382(l)(5) Exception applies and Reorganized Gibson undergoes another "ownership change" within two years after the Effective Date, then Reorganized Gibson's Pre-Change Losses, as of the date of the subsequent "ownership change," would be effectively eliminated. Even if however, Reorganized Gibson qualifies for the Section 382(l)(5) Exception, the Debtors or Reorganized Gibson may decide to elect out of the Section 382(l)(5) Exception, particularly if it appears likely that another ownership change will occur within two years after emergence.

If the Section 382(l)(5) Exception is not applicable to a corporation in bankruptcy (because it is not eligible or otherwise elects out of its application), a second special rule will generally apply (the "Section 382(l)(6) Exception"). Under the Section 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The Section 382(l)(6) Exception also differs from the Section 382(l)(5) Exception because, under the Section 382(l)(6) Exception, the debtor corporation is not required to reduce its NOL carry forwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

Regardless of whether Reorganized Gibson takes advantage of the Section 382(l)(6) Exception or the Section 382(l)(5) Exception, Reorganized Gibson's use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

## G.      TAXABLE SALE TRANSACTION

The U.S. federal income tax consequences of the implementation of the Plan to the Debtors will depend on, among other things, whether the Restructuring Transactions are structured in whole or in part as a taxable sale of the Debtors' assets and/or equity (such structure, a "Taxable Sale Transaction"). For example, the Debtors may structure the Restructuring Transactions as a transfer of substantially all or some of the Debtors' assets (including equity in subsidiaries) in a Taxable Sale Transaction to a newly formed entity (or an affiliate or subsidiary of such entity) formed and controlled by certain Holders of Claims against the Debtors, and in such case, some or all of the New Common Stock (and/or other interests) issued to Holders of Claims pursuant to the Plan may be comprised of the stock (and/or other interests) of such new entity (or an affiliate or subsidiary of such entity) and such new entity (or an affiliate or subsidiary of such entity) shall be Reorganized Gibson.

If the transactions undertaken pursuant to the Plan are structured in whole or in part as a Taxable Sale Transaction with respect to the assets of any Debtor, the Debtors would recognize taxable gain or loss upon the transfer in an amount equal to the difference between (a) the sum of any cash and the fair market value of any property received by the Debtors plus the amount of any of the Debtors' liabilities assumed by the acquiror in exchange for the assets treated as sold in the Taxable Sale Transaction (which amount should equal the fair market value of the assets treated as sold in the Taxable Sale Transaction), and (b) the applicable Debtor's adjusted tax basis in such assets. It is possible the Debtors will recognize a substantial amount of taxable income or gain in connection with a Taxable Sale Transaction and may not have sufficient net operating loss carryforwards or other tax attributes to apply to fully offset the amount of gain recognized, in which case the Debtors will be required to pay cash federal income taxes with respect to the net amount of taxable income. In addition, any NOL carryover, capital loss carryover, tax credit carryovers, and certain other tax attributes, including any interest deductions disallowed under Tax Code Section 163(j) and losses and deductions that are not utilized to offset gain from a Taxable Sale Transaction could be eliminated if the applicable Debtor is liquidated following the Taxable Sale Transaction.

If Reorganized Gibson purchases assets or equity of any Debtor pursuant to a Taxable Sale Transaction, it will take a fair market value basis in the transferred assets or equity. However, if a Taxable Sale Transaction involves a purchase of equity of a Debtor treated as a corporation for income tax purposes, the Debtor whose equity is transferred would retain its basis in its assets (unless the seller of such equity and Reorganized Gibson purchasing such equity, in the case of an election under section 338(h)(10) of the Tax Code) is a corporation for U.S. federal income tax purposes and the seller and/or purchaser, as applicable, make an election under section 338(h)(10) or 336(e) of the Tax Code to treat the transaction as a taxable sale of the underlying assets), subject to reduction due to COD Income.

If the Debtors structure the Restructuring Transactions, in whole or in part, as a Taxable Sale Transaction (as discussed below), then U.S. Holders of Claims will be treated as exchanging such ~~claims~~**Claims** in a taxable exchange under section 1001 of the Tax Code. The determination of gain or loss and a U.S. ~~Holder's~~**Holder's** tax basis in any stock (and/or other interests) of such new entity (or an affiliate or subsidiary of such entity) will depend on the particular nature of the Restructuring Transactions. ~~The Debtors have not yet determined if it is desirable to structure~~**While the Debtors are still evaluating, the Debtors do not currently anticipate structuring** the Restructuring Transactions as a Taxable Sale Transaction. U.S. Holders of Claims should consult their own tax advisors regarding the determination of such consequences to them in the event of a Taxable Sale Transaction.

## H.    GENERAL DISCLAIMER

THE FOREGOING U.S. FEDERAL INCOME TAX SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE XII.
## RISK FACTORS

> PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

1.    **Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    **The Conditions Precedent to Confirmation and the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are each subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Confirmation and/or the Effective Date will not take place.

3.    **The Debtors May Fail to Satisfy the Vote Requirement.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims or Equity Interests as those proposed in the Plan.

4.    **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims

within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims or Equity Interests would receive with respect to their Allowed Claims or Equity Interests.

The Debtors, subject to the terms and conditions of the Plan and Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan. Section 1127 of the Bankruptcy permits the Debtors to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation. The Debtors or the Reorganized Debtors may, subject to the Restructuring Support Agreement, modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation. The Debtors will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan. Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

5.     **Non-Consensual Confirmation of the Plan May Be Necessary.**

In the event that any Impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one Impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class) and, as to each Impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that a Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

6.        **Continued Risk Upon Confirmation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as deterioration or other changes in economic conditions, changes in the Debtors' industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' products, foreign exchange rate fluctuations, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  As of the date hereof, the Debtors have retained the exclusive right to propose the Plan.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Further, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms

7.        **The Debtors May Object to the Amount or Classification of a Claim or Equity Interest.**

Except as otherwise provided in the Plan, the Debtors and Reorganized Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is or may become subject to an objection, counterclaim or other suit by the Debtors.  Any Holder of a Claim or Equity Interest that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

8.        **The Effective Date May Not Occur.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

9.        **The Method of Refinancing the DIP Facility Will Impact the Capital Structure of Reorganized Gibson**

Under the Restructuring Support Agreement and the Plan, the ~~DIP~~**Required** Lenders have the option to refinance their claims through a combination of some or all of:  (x) the proceeds of the New ~~Exit Term Loan Facility, (y) the proceeds of the New~~ Take-Out Facility; and/or (~~z~~**y**) the Take-Out Equity Option.  The method (or combination of methods) used to refinance the DIP Facility will impact the capital structure of Reorganized Gibson.  ~~As~~**Subject to their rights under the Restructuring Support Agreement, all of which are fully preserved, as** of the date hereof, ~~there is no certainty about which option the DIP Lenders will choose.~~**it is contemplated that the Required Lenders will exercise the Take-Out Equity**

**Option rather than entering into a New Take-Out Facility, however, that decision is subject to change prior to the Effective Date.**

10.    **The Restructuring Support Agreement May Terminate.**

As set forth herein, the Restructuring Support Agreement may terminate if, among other things, the deadlines set forth in such agreement are not met or if the conditions precedent to the respective party's obligations to support the Plan or to confirm the Plan are not satisfied in accordance with the terms of such agreement. If the Restructuring Support Agreement terminates, the Debtors may not be able to obtain the support of the Holders of Claims required to adopt the Plan or any other chapter 11 plan of reorganization.

11.    **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

12.    **Risks Relating to the Litigation Trust**

Pursuant to the Plan, the Litigation Trust shall be formed on the Effective Date. The Litigation Trust Assets shall consist of: (i) to the extent not resolved as of the Effective Date, the Litigation Trust Claims, (ii) to the extent the Litigation Trust Claims are not resolved as of the Effective Date, the Litigation Funding Amount, and (iv) the Litigation Trust Funds. There is no assurance that the Litigation Trust will have any proceeds for distribution to the Litigation Trust Beneficiaries from the Litigation Trust Claims. In particular, there is no assurance that the Litigation Trust Claims will be successfully prosecuted and result in any proceeds distributable to the Litigation Trust. To the extent the Litigation Trust realizes or obtains any Cash proceeds from the Litigation Trust Claims distributable to the Litigation Trust Beneficiaries, the timing of any such ~~Distribution~~distribution is uncertain. Moreover, there is no assurance that the Litigation Trust assets will be sufficient to fund the Litigation Trust Expenses to enable the Litigation Trust to operate as envisioned under the Plan and the Litigation Trust Agreement and to make distributions. Accordingly, there is no assurance of the amount that the Litigation Trust will distribute to Litigation Trust Beneficiaries under the Plan, the timing on which any Distributions will be made, or that the Litigation Trust will make any Distributions to the Litigation Trust Beneficiaries.

13.    **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan may not be approved. If the releases are not approved, certain

Released Parties may withdraw their support for the Plan. The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and the significant deleveraging and financial benefits embodied in the Plan.

**B.      RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN**

> 1.      **There May Be a Lack of a Trading Market for the New Common Stock and There is No Assurance the New Common Stock Will be Listed on a Nationally Recognized Exchange.**

The New Common Stock to be issued under the Plan may be subject to certain restrictions on transferability, and as of the Effective Date will not, and may not ever, be listed on a nationally recognized exchange.

There can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such securities.

> 2.      **The Value of the TEAC Shares is Uncertain.**

Recoveries in Class 7 depend on the value of the TEAC Shares. There can be no assurance that the TEAC Shares will not decline in value after the date of this Disclosure Statement. Further, although the TEAC Shares currently trade on a public securities exchange, there can be no assurance that such TEAC Shares will not be delisted in the future or become subject to legal or practical trading impediments.

> 3.      **To Service the Reorganized Debtors' Indebtedness and Meet Their Operational Needs, the Reorganized Debtors Will Require a Significant Amount of Cash. Their Ability to Generate Cash Depends on Many Factors Beyond Their Control.**

The Reorganized Debtors' ability to make payments on and to refinance their indebtedness and to fund planned capital expenditures will depend on their ability to generate Cash in the future. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory, and other factors that are beyond their control.

The Reorganized Debtors' business may not generate sufficient Cash flow from operations. Although the Financial Projections represent the Debtors' view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized. The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and Cash flows assumed in projecting future business prospects. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and Cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. A failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and Cash flows could lead to Cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek

additional working capital.  The Reorganized Debtors may not be able to obtain such working capital when it is required.

In addition, if the Reorganized Debtors' Cash flows and capital resources are insufficient to fund their debt service obligations, the Reorganized Debtors may be forced to reduce or delay capital expenditures, sell material assets or operations, obtain additional equity capital or refinance all or a portion of their indebtedness.  In the absence of such operating results and resources, the Reorganized Debtors could face substantial Cash flow problems and might be required to sell material assets or operations to meet their debt service and other obligations.  The Reorganized Debtors will be unable to predict the timing of such asset sales or the proceeds that they could realize from such sales and that they will be able to refinance any of their indebtedness, including the New Exit ABL Facility, ~~the New Exit Term Loan Facility,~~ and any New Take-Out Facility on commercially reasonable terms or at all.

4. **The Estimated Valuation of the Reorganized Debtors and the New Equity Interests and the Estimated Recoveries to Holders of Allowed Claims Are Not Necessarily Representative of the Private or Public Sale Values of the New Equity Interests.**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private or public sale values of Reorganized Gibson's securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which are beyond the control of the Reorganized Debtors), including:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.

5. **Large Holders of the Prepetition Secured Notes May Control Reorganized Gibson.**

Implementation of the Plan will result in a small number of Holders or their assignees owning a significant percentage of the shares of outstanding New Common Stock in Reorganized Gibson.  A small number of Holders of the Prepetition Secured Noteholders or their assignees could hold a controlling percentage of the New Common Stock.  These Holders or their assignees could, among other things, exercise a controlling influence over the business and affairs of Reorganized Gibson and the other Reorganized Debtors.

6. **The Issuance of New Common Stock to Reorganized Gibson's Management and the Supporting Principals May Dilute the Equity Ownership Interest of Other Holders of the New Common Stock.**

The Management Employment and Consulting Agreements and Management Incentive Plan will be implemented on the Effective Date.  Pursuant to the Management Employment and Consulting Agreements and Management Incentive Plan, there may be issuances from time to time of shares of the New Common Stock in Reorganized Gibson.  If Reorganized Gibson issues equity interests, or options to acquire such equity interests, to directors or officers, it is contemplated that such distributions will dilute the New Common Stock issued on account of Claims under the Plan and the ownership percentage represented by the New Common Stock distributed under the Plan.  Moreover, if the Supporting Principals exercise the New Warrants issued to them under the Management and Consulting Agreements, the issuances of New Common Stock upon exercise of those New Warrants will dilute the New Common Stock issued on account of Claims under the Plan and the ownership percentage represented by the New Common Stock distributed under the Plan

7.    **It is Unlikely That Reorganized Gibson Will Pay Dividends in the Foreseeable Future.**

All of the Reorganized Debtors' projected Cash flow will be required to be used in the foreseeable future (a) to make payments under the New Exit ABL ~~Facility (if any or similar debt facilities entered into after the Effective Date), New Exit Term Loan~~ Facility (if any or similar debt facilities entered into after the Effective Date) or New Take-Out Facility (if any or similar debt facilities entered into after the Effective Date), (b) to fund Reorganized Gibson's other obligations under the Plan, and (c) for working capital and capital expenditure purposes. In addition, the New Exit ABL Facility (if any or similar debt facilities entered into after the Effective Date)~~, New Exit Term Loan Facility (if any or similar debt facilities entered into after the Effective Date)~~ or New Take-Out Facility (if any or similar debt facilities entered into after the Effective Date)**,** are expected to contain certain restrictions on Reorganized Gibson's ability to pay dividends.  Accordingly, the Debtors do not anticipate that Reorganized Gibson will pay Cash dividends on the New Common Stock in the foreseeable future.

8.    **Tax Implications of the Plan.**

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested and do not intend to seek any ruling from the IRS on the tax consequences of the Plan.  Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.  In addition, in such case, there still would be significant tax uncertainties, which would not be the subject of any ruling request.  Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the U.S. federal income tax treatment in the Plan, or that a court would not sustain such a challenge.  *See* "Summary of Certain U.S. Federal Income Tax Consequences of the Plan," at Article XI herein.  Each Holder of an Equity Interest or a Claim is urged to consult its own tax advisor for the U.S. federal, state, local, and non-U.S. income, estate and other tax consequences applicable under the Plan.

C.    **MARKET AND OPERATIONAL RISKS**

Many important factors could cause actual results or achievements to differ materially from any future results or achievements expressed in or implied by the Debtors' forward-looking statements, including the factors listed below.  Many of the factors that will determine future events or achievements are beyond the Debtors' ability to control or predict.  Certain of these are important factors that could cause actual results or achievements to differ materially from the results or achievements reflected in the Debtors' forward-looking statements, including, but not limited to risks related to:

- the potential for the subjective assumptions and estimates underlying the Financial Projections to be incorrect, many of which assumptions and estimates could change if any of the other risks described in this section were to materialize;

- general economic, business and financial conditions and anticipated trends and challenges in the industry and the markets in which the Company operates;

- the Company's ability to develop and expand its presence in the musical instruments and professional audio markets;

- in the MI Business (other than Pro Audio), the Company's ability to:

  - produce products to better address demand in multiple pricing baskets;

  - continue to focus on innovation;

  - increase focus on gaining market share in developing markets;

  - increase e-commerce sales; and

  - continue to implement other strategies designed to enhance the MI Business.

- in the Pro Audio business, the Company's ability to:

  - right-size operating costs;

  - continue to add new product lines;

  - realize on cross-sell opportunities to record guitar, bass, vocal and drum instrumentation; and

  - continue to implement other strategies designed to enhance our professional audio business.

- financial uncertainty in Europe, where the Company derives a substantial portion of its net sales;

- the Company's ability to maintain a competitive technological advantage through innovation and leading product designs and our understanding of our competition;

- the Company's expectations regarding consumer preferences and our ability to respond to changes in consumer preferences and to accurately forecast consumer demand;

- fluctuations in the price and supply of raw materials including wood, copper, steel, aluminum, titanium, synthetic resins, rare metals and rare-earth materials, or shortages of materials, parts and components;

- impacts on the Company's business relating to CITES;

- the ability of the Company's suppliers to deliver raw materials, parts, components or other products at the scheduled rate or time and disruptions or delays in the delivery of products to the Company's consumers arising in connection therewith;

- the Company's ability to maintain manufacturing relationships with original equipment manufacturers ("OEMs") with which it does business and to ensure OEMs manufacture products that are consistent with the Company standards;

- disruptions at the Company's manufacturing facilities, at the facilities of the OEMs who make some of the Company's existing products, or to the Company's distribution systems;

- availability of and ability to attract and retain qualified personnel;

- retention of a highly qualified senior management team;

- changes in the Company's business strategy;

- the Company's ability to identify and manage strategic acquisitions and distribution relationships successfully and to achieve expected benefits from such acquisitions and distribution relationships;

- the Company's ability to cost-effectively expand our businesses internationally;

- the Company's ability to maintain or enhance operational efficiencies;

- the loss of one or more significant customers or dealers;

- the Company's ability to expand *Gibson* and its other brand names beyond the traditional musical instruments category or to expand licensing and co-branding activities;

- the Company's ability to maintain and enhance the popularity and value of its brands or to create new, successful brands;

- existing relationships with signature artists, dealers, manufacturers, distributors and others and attract new artists to the Company's brands;

- fluctuations in currency exchange rates;

- the Company's ability to comply with applicable laws, rules and regulations;

- the effects of the Chapter 11 Cases on the Company's business and relationships with customers and suppliers;

- obsolescence of operating equipment and possible impairment of the Company's long-lived assets and manufacturing equipment;

- the Company's dependence on certain key employees;

- the Company's ability to maintain stable pricing;

- substantial capital requirements and availability and terms of capital;

- capital budget and spending constraints by the Company's customers and counterparty credit risks;

- the effectiveness of the Company's risk management activities;

- the effects of asset and property acquisitions or dispositions that the Company makes;

- the Company's ability to collect accounts receivable;

- the outcome of pending and future litigation;

- environmental liabilities;

- uncertainty regarding the Company's future operating results;

- the adequacy of the Company's capital resources and liquidity; and

- the Company's ability to satisfy future Cash obligations.

The risks included above are not exhaustive. Additional risks and uncertainties not presently known to the Debtors or that the Debtors currently deem immaterial may also materially impair the Reorganized Debtors' operations and could cause actual results to differ materially from those described herein.

## D.    RISKS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS

1.    **The Financial Information Contained Herein is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit was Performed.**

**The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement and, while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2.    **Financial Projections and Other Forward-Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward-looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including assumptions concerning:  (a) the timing of confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including the Debtors' ability to maintain or

increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support; and (f) customer preferences continuing to support the Debtors' business plan.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES.  WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

## E.    DISCLOSURE STATEMENT DISCLAIMER

### 1.    The Information Contained Herein is for Soliciting Votes Only.

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purposes.

### 2.    This Disclosure Statement was Not Approved by the Securities and Exchange Commission.

Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3.    The Debtors Relied on Certain Exemptions From Registration Under the Securities Act.

This Disclosure Statement has been prepared pursuant to sections 1125 and 1126, as applicable, of the Bankruptcy Code and Rule 3016(b) of the Bankruptcy Rules and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.  The offer and issuance of New Common Stock under the Plan has not been registered under the Securities Act or Blue Sky Laws.  To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the Solicitation, the issuance of the New Common Stock under the Plan will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, section 3(a)(9) of the Securities Act, section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated under the Securities Act.

### 4.    This Disclosure Statement Contains Forward-Looking Statements.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all ~~forwardlooking~~forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many

factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

     5.      **No Legal or Tax Advice is Provided to You by This Disclosure Statement.**

         <ins>**This Disclosure Statement is not legal or tax advice to You**</ins>.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

     6.      **No Admissions Are Made by This Disclosure Statement.**

         The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest.

         Notwithstanding any rights of approval, pursuant to the Restructuring Support Agreement or otherwise, as to the form of substance of this Disclosure Statement, the Plan or any other document relating to the transactions contemplated thereunder, neither the Supporting Noteholders, the Supporting Principals, nor their respective representatives, members, financial or legal advisors or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties whatsoever concerning the information contained herein.

     7.      **No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections.**

         No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute litigation rights and claims against any third parties and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims or Equity Interests.

     8.      **Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets.**

         The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified herein.

     9.      **The Information Used Herein was Provided by the Debtors and was Relied Upon by the Debtors' Advisors.**

         Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited

due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10.    **The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.    **No Representations Made Outside the Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in or included with this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the United States Trustee.

## ARTICLE XIII.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtors recommend that all Holders of Impaired Claims support confirmation of the Plan and vote to accept the Plan.

Holders of approximately 99% in outstanding principal amount of the Allowed Prepetition Secured Notes Claims have already agreed, subject to the terms and conditions of the Restructuring Support Agreement, to vote in favor of the Plan.

[Remainder of Page Intentionally Blank]

Dated:  ~~June 20~~**July 12**, 2018
Nashville, Tennessee

Respectfully submitted,

Gibson Brands, Inc.
and each of its Debtor Subsidiaries

By: _____
    Name:  Brian J. Fox
    Title:   Chief Restructuring Officer

## EXHIBIT A

**PLAN OF REORGANIZATION**

**EXHIBIT B**

**RESTRUCTURING SUPPORT AGREEMENT
(WITH AMENDMENTS AND EXHIBITS)**

**<u>EXHIBIT C</u>**

**ORGANIZATIONAL CHART**

## EXHIBIT D

## HYPOTHETICAL LIQUIDATION ANALYSIS

## [TO COME]

## EXHIBIT E

**FINANCIAL INFORMATION AND PROJECTIONS**

**[TO COME]**

**EXHIBIT F**

**VALUATION ANALYSIS**

**[TO COME]**

| Summary report: Litera® Change-Pro for Word 10.1.0.900 Document comparison done on 7/12/2018 12:59:51 AM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Inactive | |
| **Original DMS:** iw://GOODWINDMS/ACTIVE/95884594/1 | |
| **Modified DMS:** iw://GOODWINDMS/ACTIVE/95884594/9 | |
| **Changes:** | |
| **Add** | 340 |
| **Delete** | 296 |
| Move From | 10 |
| Move To | 10 |
| **Table Insert** | 0 |
| **Table Delete** | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 656 |