# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

GIBSON BRANDS, INC., *et al.*,

Debtors.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: Chapter 11

: Case No. 18-11025 (CSS)

: Jointly Administered

: **Relates to Docket Nos. 726, 728, 742, 774, 822, 830, 831, 835, 842, 843, 844, 845, 846, and 849**
**Hearing Date: October 2, 2018 at 1:00 p.m. (EST)**

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF ENTRY OF AN ORDER CONFIRMING THE DEBTORS' FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION AND OMNIBUS REPLY TO PLAN OBJECTIONS

GOODWIN PROCTER LLP
Michael H. Goldstein (admitted *pro hac vice*)
Gregory W. Fox (admitted *pro hac vice*)
Barry Z. Bazian (admitted *pro hac vice*)
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 813-8800
Email: mgoldstein@goodwinlaw.com
        gfox@goodwinlaw.com
        bbazian@goodwinlaw.com

PEPPER HAMILTON LLP
David M. Fournier (DE 2812)
Marcy J. McLaughlin (DE 6184)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302) 777-6500
Email: fournier@pepperlaw.com
        mclaughlinm@pepperlaw.com

*Counsel for Debtors and Debtors in Possession*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Gibson Brands, Inc. (4520); Cakewalk, Inc. (2455); Consolidated Musical Instruments, LLC (4695); Gibson Café & Gallery, LLC (0434); Gibson International Sales LLC (1754); Gibson Pro Audio Corp. (3042); Neat Audio Acquisition Corp. (3784); Gibson Innovations USA, Inc. (4620); Gibson Holdings, Inc. (8455); Baldwin Piano, Inc. (0371); Wurlitzer Corp. (0031); and Gibson Europe B.V. (Foreign).  The Debtors' corporate headquarters is located at 309 Plus Park Blvd., Nashville, TN 37217.

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ........................................................................................... 1

II.  BACKGROUND .......................................................................................... 3

A.  The Debtors' Businesses and Prepetition Corporate and Capital Structures ..................... 3

    1.  The Debtors' Businesses ................................................................. 3

B.  The Debtors' Prepetition Capital Structure .......................................................... 4

C.  Events Preceding the Chapter 11 Cases and Relevant Procedural History ...................... 5

D.  The Global Settlement and the Plan .................................................................... 8

E.  Solicitation, Voting Results, and Plan Supplement ................................................ 10

F.  Limited Confirmation Objections. ...................................................................... 13

III.  ARGUMENT ............................................................................................ 14

A.  The Plan Satisfies Each Requirement for Confirmation .......................................... 14

    1.  The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)) ................................................................................ 14

    2.  The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code ........................................................................... 14

    3.  The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code ........................................................................... 16

    4.  The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)) .................................................. 17

    5.  The Plan Has Been Proposed in Good Faith and Not By Any Means Forbidden By Law (Section 1129(a)(3)) ................................................. 19

    6.  The Plan Provides for Court Approval of Certain Administrative Payments (Section 1129(a)(4)) ....................................................................... 20

    7.  Post-Emergence Directors Have Been Disclosed and Their Appointment is Consistent with Public Policy; Insider Post-Emergence Employment Arrangements Have Been Disclosed (Section 1129(a)(5)) ........................... 21

    8.  The Plan Does Not Require Governmental Approval of Rate Changes (Section 1129(a)(6)) ....................................................................... 22

    9.  The Plan Is in the Best Interests of Creditors (Section 1129(a)(7)) ............... 22

    10.  The Plan Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8) ................................................................................... 23

    11.  The Plan Complies with Statutorily Mandated Treatment of Administrative Expense and Priority Tax Claims (Section 1129(a)(9)) ............................... 24

i

12.    At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptance of Insiders (Section 1129(a)(10)) ....................................................... 24

13.    The Plan is Feasible (Section 1129(a)(11)) ........................................................ 25

14.    The Plan Provides for All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).. 26

15.    Sections 1129(a)(13)-(16) Are Inapplicable (Sections 1129(a)(13)-(16)) ............ 26

16.    The Principal Purpose of the Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act (Section 1129(d)) ........................................................................... 27

B.    The Plan Satisfies the "Cramdown" Requirements (Section 1129(b)). ............................ 27

1.    The Plan Does Not Unfairly Discriminate with Respect to the Deemed Rejecting Classes (Section 1129(b)(1)) .................................................................................. 28

2.    The Plan Is Fair and Equitable with Respect to the Deemed Rejecting Classes (Section 1129(b)(2)) ............................................................................................... 29

C.    The Discretionary Contents of the Plan Are Appropriate and Should Be Approved (Section 1123(b)) ........................................................................................................... 30

1.    The Global Settlement Incorporated Into the Plan Is Reasonable and in the Best Interests of the Debtors' Estates. ........................................................................... 31

2.    The Debtor Release Is Appropriate and Should Be Approved. ............................ 33

3.    The Third Party Release Should Be Approved. ..................................................... 38

4.    The Exculpation Should Be Approved. .................................................................. 43

D.    The New Exit ABL Facility Should Be Approved. ......................................................... 45

E.    The Plan Complies with Section 1123(d) of the Bankruptcy Code. ............................... 46

F.    The Plan Fairly Allocates the Debtors' Enterprise Value ............................................... 47

1.    Jefferies Methodology ........................................................................................... 47

a.    Publicly Traded Company Analysis ......................................................... 47

b.    Precedent Transaction Analysis ............................................................... 47

c.    Discounted Cash Flow Analysis ............................................................... 48

2.    Jefferies Value Conclusion ................................................................................... 48

3.    The Absolute Priority Rule and The Allocation of Value Under the Plan ........... 49

G.    The Management Employment and Consulting Agreements ........................................... 50

H.    The Changes Embedded in The Fifth Amended Plan Do Not Require Resolicitation. .... 51

IV.    ALL OBJECTIONS TO CONFIRMATION HAVE BEEN RESOLVED, ADDRESSED OR SHOULD BE OVERRULED ....................................................................................... 52

A.    The UST Objection Should be Overruled. ....................................................................... 53

V.    CAUSE EXISTS TO WAIVE A STAY OF THE CONFIRMATION ORDER ............. 55

VI.    CONCLUSION ................................................................................................................ 57

*Counsel for Debtors and Debtors in Possession* ............................................................. 57

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of confirmation of the *Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 842] (the "Fifth Amended Plan", and as modified, amended, or supplemented from time to time, the "Plan"),[2] pursuant to sections 1125, 1126, 1129, 1145 and 1146 respectively, of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  In support of Confirmation of the Plan, the Debtors have filed contemporaneously herewith the (a) *Declaration of Brian J. Fox in Support of Confirmation of Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization* (the "Fox Declaration"), (b) *Declaration of Alan J. Carr in Support of Confirmation of Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization* (the "Carr Declaration"); (c) *Declaration of Jeffrey Finger in Support of Confirmation of Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization* (the "Finger Declaration"); and (d) *Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Joint Chapter 11 Plan of Reorganization* (the "Daloia Declaration" or the "Voting Report" and along with the Fox Declaration, the Carr Declaration, and the Finger Declaration, the "Plan Declarations").

## I.    INTRODUCTION

1.      The Debtors commenced these Chapter 11 Cases five months ago to implement a plan of reorganization based upon a Restructuring Support Agreement with the Ad Hoc

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or, if not defined therein, in the Fox Declaration.  The Fifth Amended Plan incorporates various technical changes in response to comments received from the Office of the United States Trustee (the "U.S. Trustee"), the objection filed by Somera Road-Gibson Memphis, LLC [Docket No. 742] (the "Somera Objection"), other changes negotiated among the parties and certain "clean up" changes.  As described in Section III.M below, these changes do not materially or adversely impact the treatment of any impaired Class under the Fifth Amended Plan and, as such, no resolicitation of votes is required.  With respect to any objections not resolved by the changes incorporated into the Fifth Amended Plan, they are discussed in Section IV below.

Committee of Secured Notes and the Supporting Principals. During the course of the Chapter 11
Cases, the Debtors responded to extensive diligence and document discovery requests from the
Committee and other parties in interest, while simultaneously engaging in extensive good-faith
and arm's-length negotiations with all of their key stakeholders to broaden support for their
financial restructuring. Those efforts to achieve consensus succeeded. The Debtors reached
compromises with respect to agreed transactions embodied in the Plan and related agreements,
which provide the basis for the Debtors to promptly emerge from chapter 11 on a fully
consensual basis, with each of their key stakeholders: the Supporting Noteholders, the
Committee, GSO, Philips, Tronical and the Supporting Principals.

2.      The Plan has been approved by all Voting Classes. Administrative creditors will
be paid in full and General Unsecured Creditors will receive a negotiated and meaningful
recovery, as a result of the compromises reached, the settlement of litigation claims, the
allocation of value from the secured creditors to the unsecured creditors, and the agreement of
the Holders of Prepetition Secured Notes and GSO to waive any recovery in the Class 6 General
Unsecured Claim Class. Ownership of the Reorganized Debtors will transfer to the Holders of
the Prepetition Secured Notes, and the Reorganized Debtors' capital structure will enable them to
operate and execute their business plan. With the releases negotiated under the global
settlement, the delay, costs and uncertainty that post-confirmation ligation would have had on
recoveries will not be visited upon the Estates, the Reorganized Debtors and creditors.

3.      The Plan Declarations detail the uncontroverted factual predicates supporting
confirmation of the Plan: (i) the Debtors' corporate structure, assets and liabilities; (ii) the events
leading to the Chapter 11 Cases; (iii) the actions taken during the Chapter 11 Cases; (iv) the
negotiations that occurred and the settlements reached that provide the foundation of the Plan;

2

(v) the Debtors' projections, liquidation analysis, valuation and the allocation of that value; (vi) the classification of Claims and Equity Interests, their treatment under the Plan, and the solicitation of votes and the results thereof; and (vii) the transactions contemplated to implement the Plan, including the New Exit ABL Facility, the newly appointed officers and directors of the Reorganized Debtors, the organizational documents for the Reorganized Debtors, and the payment of fees and expenses incident to the Chapter 11 Cases.  And, as detailed below, the Plan satisfies each of the Bankruptcy Code requirements for confirmation.

4.      The restructuring transactions under the Plan enable the Debtors to emerge from chapter 11 with new owners of the Reorganized Debtors, a deleveraged balance sheet, cash and liquidity to operate, a business plan for growth that will serve the Reorganized Debtors' employees, vendors and customers, and a consensual treatment of stakeholders.  Moreover, it ensures the continued production of the iconic Gibson guitar.  The Plan should be confirmed.

## II.     **BACKGROUND**

**A.      The Debtors' Businesses and Prepetition Corporate and Capital Structures**

5.      The following is an abbreviated factual summary.  More detailed descriptions are set forth in the Plan Declarations and the *Declaration of Brian J. Fox in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 4].

### 1.      *The Debtors' Businesses*

6.      Founded in 1894, the Debtors are widely recognized as one of the world's leading designers and manufacturers of guitars and other fretted instruments.  The Debtors' MI Business also includes the design, manufacture and worldwide distribution of various other musical instruments, accessories, and Pro Audio equipment.  In addition, Gibson Brands, Inc. ("Gibson"), through its wholly-owned subsidiary Gibson Holdings, Inc. ("Gibson Holdings"), owns a 54% equity interest in TEAC Corp. ("TEAC"), a publicly traded Japanese company.

7.      Gibson also owns the equity of certain subsidiaries referred to as "Gibson Innovations" (the "GI Business"), which Gibson acquired in June 2014 from Koninklijke Philips N.V. ("Philips") in a leveraged transaction.  Headquartered in Hong Kong, the GI Business sold *Philips*-branded consumer electronics.  Beginning on April 30, 2018, Gibson Innovations Limited (the top level Hong Kong-based operating company for the GI Business) ("GI HK") commenced formal liquidation proceedings under Hong Kong law.  The other entities comprising the GI Business are also being wound down.

**B.      The Debtors' Prepetition Capital Structure**

8.      As of the Petition Date, the Debtors had funded debt obligations in the aggregate principal amount of approximately $500 million:  (i) $383,227,865 of Prepetition Secured Notes; (ii) approximately $97 million of principal and letter of credit obligations owing under the Prepetition ABL/Term Loan Agreement (comprised of a $55 million ABL Revolving Loan and a $70 million Domestic Term Loan).  As of the Petition Date, approximately $17.5 million was drawn on the ABL Revolving Loan and $2.176 million of undrawn letters of credit were outstanding.  Pursuant to the DIP Orders, the ABL Revolving Loan has been paid in full and the letters of credit have been fully cash collateralized.

9.      Pursuant to the Final DIP Order, the Debtors were authorized to borrow from the DIP Lenders an aggregate principal amount necessary to finance the Purchase Option by the Holders of the Prepetition Secured Notes and fully refinance the obligations under the Domestic Term Loan.  The transaction closed on August 29, 2018.

10.      As of the Petition Date, the principal balance under the ITLA was approximately $24 million, which balance has since grown due to GSO's ITLA collection costs, interest on the ITLA and the waiver of the Make-Whole Premiums under the Domestic Term Loan through the exercise of the Purchase Option.  GSO timely filed a proof of claim against each of the Debtors

on account of is ITLA Guaranty Claim in the amount of approximately $29.9 million (claim #240).   As described in the Disclosure Statement Addendum, under the Global Settlement embedded in the Plan, GSO's ITLA Guaranty Claim is Allowed in the amount of $29,935,898.

## C.    Events Preceding the Chapter 11 Cases and Relevant Procedural History

11.    Starting in mid-2017, primarily due to the downturn at the GI Business, the Debtors were out of compliance with the financial covenants contained in the Prepetition ABL/Term Loan Agreement and the ITLA.   To avoid an Event of Default and exercise of secured creditor remedies, between July 2017 and March 2018, the Company negotiated a series of ten amendments with the ITLA Lenders and Prepetition ABL/Term Loan Lenders.

12.    Beginning in the fall of 2017, (i) with the assistance of Alvarez & Marsal North America, LLC ("A&M"), Gibson undertook a comprehensive analysis of its operations with a view to implementing an operational and financial restructuring and (ii) with the assistance of Jefferies LLC ("Jefferies"), Gibson actively ran a competitive marketing process to identify a refinancing of all of the Company's funded debt obligations, which process shifted to a stand-alone sale process for the GI Business and the MI Business in early February 2018.   A sale transaction did not materialize and ultimately GI HK and its subsidiaries were forced to liquidate.

13.    Commencing with an all-day meeting on April 26, 2018, and continuing through May 1, 2018, the Ad Hoc Committee of Secured Notes, the Debtors, and the Supporting Principals negotiated the terms of DIP Financing, the Restructuring Support Agreement and the related term sheets and other documents.   The Restructuring Support Agreement among the Debtors, the Supporting Noteholders, and the Supporting Principals set forth the financing of, and initial template for, the Debtors' restructuring and bound the Debtors, the Supporting Noteholders and the Supporting Principals to that framework, subject to the Debtors' fiduciary

duty out.[3]

14.    On May 1, 2018, the Debtors commenced these Chapter 11 Cases, sought approval of the DIP Financing and filed various other "first day" and "second day" pleadings. Soon after the Petition Date, the Debtors, the Committee, GSO, the Ad Hoc Committee of Secured Notes and Philips began to conduct formal and informal discovery, including with respect to:  (i) potential challenges to GSO's claims and avoidance actions relating to prepetition payments on account of the ITLA, (ii) threatened claims against the Debtors' directors and officers, and (iii) plan related issues, including valuation and its allocation among the stakeholders.  The Debtors filed (i) two motions with respect to GSO's asserted ITLA Guaranty Claims,[4] and (ii) objections to the proofs of claim filed by Philips [Docket No. 502] (the "Philips Claim Objection") and Tronical GmbH and certain of its affiliates (collectively "Tronical") [Docket No. 698] (the "Tronical Claims Objection").[5]

15.    On June 20, 2018, the Debtors filed their first proposed plan of reorganization, disclosure statement and the Disclosure Statement Motion.[6]

16.    To facilitate orderly discovery for the then-disputed issues related to the Plan, in July 2018 the parties negotiated a timeline for fact and expert discovery [Docket No. 470]. During July and August 2018, the Debtors and the key stakeholders expended a great deal of time, effort and money propounding and responding to discovery and preparing for a contested confirmation trial.  While this litigation was ongoing, however, the Debtors maintained open

---

[3] As reflected in the resolutions authorizing the Debtors' chapter 11 petitions, the terms of, and the Debtors' decision to enter into, the Restructuring Support Agreement were approved by Alan J. Carr and Solomon Picciotto, the two independent directors on the Debtors' board of directors.  See Carr Declaration at ¶¶ 12-16.

[4] See (i) Docket No. 489 (the "ITLA Gibson Holdings Motion"); and (ii) Docket No. 487 (the "ITLA Claim Estimation/Deferral Motion" and, together with the ITLA Gibson Holdings Motion, the "ITLA Claims Motions"). The Committee joined in the ITLA Claim Estimation/Deferral Motion (Docket No. 590).

[5] The ITLA Claims Motions, Philips Claim Objection, and Tronical Claims Objection have since been resolved.  See Docket Nos. 724-4 (Plan Modification Agreement) and 833 (the "Tronical Claims Stipulation/Order").

[6] See Docket No. 303 (the "Disclosure Statement Motion").

lines of settlement communications with the goal of building consensus around a plan of reorganization.

17.     Prior to the hearing on the Disclosure Statement Motion, on August 1, 2018, the Debtors filed the *Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 516]  (the "Third Amended Plan") and the *Disclosure Statement for Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 518]  (the "Third Amended Disclosure Statement"), reflecting an agreement among the Debtors, the Ad Hoc Committee of Secured Notes, and the Committee.  As a result of the agreements reached, the Committee supported the Third Amended Disclosure Statement and the Third Amended Plan, and on August 2, 2018, the Court entered the Disclosure Statement Order [Docket No 533].

18.     As of the approval of the Third Amended Disclosure Statement issues remained in dispute with various parties.  In particular, none of GSO, Philips or Tronical supported the Third Amended Plan and GSO and Philips were preparing to mount a full-scale challenge to confirmation that would require more than a dozen depositions, voluminous additional documentary discovery, expert reports, and a multi-day trial.

19.     After extensive negotiations, all of the major stakeholders in the Chapter 11 Cases—the Debtors, the Committee, the Ad Hoc Committee of Secured Notes, GSO, Philips and the Supporting Principals—reached a global settlement of all remaining disputes related to the Plan (the "Global Settlement").  The Global Settlement is set forth in a Plan Modification Agreement among the parties, has been embedded in the Plan, and is described in an addendum to the Third Amended Disclosure Statement (the "Disclosure Statement Addendum")[7], each of which were attached to the Amended Solicitation Procedures Motion filed on September 6, 2018

---

[7] The Third Amended Disclosure Statement and the Disclosure Statement Addendum are collectively referred to herein as the "Disclosure Statement".

[Docket No. 724].    Subsequently, a settlement was reached with Tronical, and Tronical now supports the Plan as well.[8]

## D.      The Global Settlement and the Plan

20.      Pursuant to the Global Settlement, the treatment of and recoveries for Class 6 General Unsecured Claims has substantially improved as compared to the Third Amended Plan. Under the Plan, Holders of Allowed Claims in Class 6 will receive (i) a Pro Rata share of $4.25 million of cash, and (ii) a $4 million Profits Interest in TEAC Shares.    GSO and the Holders of the Prepetition Secured Notes have waived any right to participate in such recoveries.    As a result, the current estimated recovery to Holders of Claims in Class 6 under the Plan is between approximately 5.1% to 10.8%, which approximately doubles the estimated 2.7% to 5.4% recoveries under the Third Amended Plan.    The Plan also provides GSO with an Allowed ITLA Guaranty Claim of $29,935,898 that will recover a $6,250,000 Profits Interest in Class 7.

21.      The Global Settlement did not change the proposed treatment of Claims in any other Classes:    (i) Classes 1, 2, 3, 4 and 11 remain unimpaired; (ii) Class 5 consists of the Allowed Claims of the Prepetition Secured Noteholders, which have consented to the Global Settlement; (iii) Class 8 will continue to receive up to a 50% distribution (subject to an aggregate $1,000,000 cap; and (iv) Classes 9 (to the extent impaired), 10 and 12 will not receive or retain any distribution under the Plan.

22.      In addition, under the Third Amended Plan, the Specified Persons,[9] Philips, GSO, the ITLA Agent, the Prepetition ABL/Term Loan Agent, and their respective Related Persons were not "Released Parties."    As part of the Global Settlement, each of these parties have been added to the definition of Released Parties under the Plan in recognition of their compromises

---

[8] *See* Tronical Claims Stipulation/Order.
[9] Under the Plan "Specified Persons" means the Supporting Principals, Alan Carr, and Solomon Picciotto.

and the consideration they are providing in connection therewith, as well as the Debtors' identity of interest with, and indemnity obligations to, these parties.[10]

23.    The Plan is supported by the Committee, the Ad Hoc Committee of Secured Notes, GSO, Philips, Tronical and the Supporting Principals.    As described in the Plan Declarations, the negotiations throughout these Chapter 11 Cases, including the Global Settlement and the related Plan Modification Agreement, were conducted by each of the parties in good faith and at arms' length.

24.    The Global Settlement under the Plan avoids costly, lengthy, and uncertain litigation over many complex issues:  (i) valuation and allocation of value, (ii) the allowance of GSO's and Philips' claims against the Debtors' Estates, and (iii) the claims against GSO and the Specified Persons that are being settled.  The Debtors' and their Estates' likelihood of success on each of these issues was not certain and their consensual resolution pursuant to the Global Settlement provides a significantly superior outcome to the Debtors and their stakeholders in the form of greater and more certain recoveries for creditors than would be the case if the Debtors bore the uncertainty, cost and delay of complex, difficult, and protracted litigation.

25.    Moreover, by settling with GSO in a manner that allows them to recover Profits Interests in Class 7 on account of claims against Gibson Holdings but without GSO asserting any claim in Class 6, GSO's recovery is not dilutive to creditors (other than the Holders of the Prepetition Secured Notes who are the only other creditors in Class 7 and are party to the Global Settlement).  Similarly, the agreement of the Holders of the Prepetition Secured Notes and GSO not to seek a distribution in Class 6 materially increases recoveries for all other Class 6 creditors.

26.    In addition, by resolving the threatened litigation that was preserved under the

---

[10]  Out of an abundance of caution, the Debtors sought and obtained approval to resolicit the votes of Classes 6 and 8, which resolicitation included specific bold language noting the changes in the release provisions in the Plan and the right to opt out of the releases. *See* Docket No. 767 (the "Amended Solicitation Procedures Order").

Third Amended Plan with respect to certain of the Debtors' directors, the Reorganized Debtors will benefit from not having the potential indemnity costs, insurance premium increases and distraction associated with such litigation claims. In addition, under the Restructuring Support Agreement, the Supporting Principals agreed to waive certain prepetition claims.

E.    **Solicitation, Voting Results, and Plan Supplement**

27.    The Disclosure Statement Order, among other things, approved the adequacy of the Third Amended Disclosure Statement, approved the form and manner of notice of the Confirmation Hearing Notice and Solicitation Packages (as defined in the Disclosure Statement Order) and authorized the Debtors to solicit acceptances or rejections of the Plan, approved procedures for the solicitation and tabulation of votes, and established various deadlines.

28.    On August 8, 2018, the Debtors caused Prime Clerk to serve the Confirmation Hearing Notice and Solicitation Packages in accordance with the terms of the Disclosure Statement Order.[11]    The Debtors also published Confirmation Hearing Notice (in a format modified for publication) in the national edition of the *New York Times* on August 10, 2018.[12]

29.    On September 13, 2018, the Court entered the Amended Solicitation Procedures Order (together with the Disclosure Statement Order, the "Solicitation Procedures Orders"). The Amended Solicitation Procedures Order approved, among other things, the adequacy of the Disclosure Statement Addendum, and the Amended Solicitation Procedures (as defined in the Amended Solicitation Procedures Order) with respect to the re-solicitation of votes to accept or reject the Plan solely with respect to Holders of Claims in Class 6 and Class 8. The Amended Solicitation Procedures Order also (a) extended the Voting Deadline for Holders of Claims in

---

[11]    *See Affidavit of Service of Solicitation Materials* [Docket No. 588]. The Debtors subsequently caused Prime Clerk to serve additional solicitation materials on parties that filed proofs of claim on or after the date on which the Disclosure Statement Order was entered. *See Supplemental Affidavit of Service of Solicitation Materials* [Docket No. 847].
[12]    *See Affidavit of Publication* [Docket No. 578].

Class 6 and Class 8 to September 27, 2018; (b) extended the deadline to object to the Plan to September 27, 2018, and (c) rescheduled the Confirmation Hearing to October 2, 2018.

30.    On September 14, 2018, the Debtors caused Prime Clerk to serve the Amended Solicitation Packages (as defined in the Amended Solicitation Procedures Order) on Holders of Claims in Class 6 (except for Holders of the Prepetition Secured Notes)[13] and Class 8, and the Amended Solicitation Procedures on all parties on the Debtors' creditor matrix, in accordance with the terms of the Disclosure Statement Order.[14]

31.    All Holders of Claims were informed in the Disclosure Statement, Disclosure Statement Addendum and Ballots that each Holder needed to submit its Ballot such that it was actually received by Prime Clerk by the Voting Deadline in order for it to be counted.  All Holders of Claims in Class 6 and Class 8 were also explicitly informed of the changes to the release provisions of the Plan (in conspicuous bold language), and that they (i) were permitted (but not required) to change any previously submitted vote and (ii) had another opportunity to opt-out of the releases.  In addition, Holders of Claims in Class 6 were provided another opportunity to treat their Class 6 Claims as Class 8 Convenience Claims under the Plan.

32.    The Debtors did not provide Solicitation Packages or Amended Solicitation Packages to Holders of Claims or Equity Interests that are either (a) Unimpaired under and conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code (Classes

---

[13] Pursuant to the Amended Solicitation Procedures Order, the Debtors did not mail the Amended Solicitation Packages or Class 6 Ballots to Holders of Prepetition Secured Notes.  Instead, the Debtors added to the data room maintained for Holders of Prepetition Secured Notes copies of (a) the Amended Solicitation Procedures, (b) the Solicitation Letter, and (c) the Disclosure Statement Addendum, including a blackline of the Fourth Amended Plan marked against the Third Amended Plan.  *See* Amended Solicitation Procedures Order ¶ 8; Fox Declaration ¶ 95.

[14]    *See Supplemental Affidavit of Service of Solicitation Materials* [Docket No. 814].  The original Ballots were inadvertently included in the Amended Solicitation Packages that were mailed on September 14, 2018. Accordingly, on September 17, 2018, Prime Clerk mailed the amended Ballots to all Holders of Claims in Class 6 and Class 8 via overnight mail.  *See Supplemental Affidavit of Service of Solicitation Materials* [Docket No. 814]. The various affidavits of service of the solicitation materials are collectively referred to herein as the "Solicitation Affidavits".

1, 2, 3, 4 and 11) (collectively, the "Unimpaired Classes"), or (b) Impaired, entitled to receive no distribution on account of such Claims or Equity Interests under the Plan and, therefore, deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code (Classes 9 (to the extent applicable), 10 and 12) (the "Deemed Rejecting Classes", and together with the Unimpaired Classes, the "Non-Voting Classes").

33.    Nevertheless, the Debtors caused Prime Clerk to serve Holders in the Non-Voting Classes with the Confirmation Hearing Notice, and Holders in the Unimpaired Classes were mailed a Deemed-to-Accept Notice (as defined in the Disclosure Statement Order).[15]  As Holders of Class 9 Intercompany Claims either are Unimpaired or deemed to reject the Plan, the Debtors caused Prime Clerk to serve such Holders with the Confirmation Hearing Notice, a Deemed-to-Accept Notice and a Deemed-to-Reject Notice.[16]  The Deemed-to-Reject Notice included a notice through which such Holders could elect to opt out of the third party releases in the Plan.[17]

34.    The Voting Deadline for all Classes other than Class 6 and Class 8 was September 14, 2018 at 5:00 p.m. (eastern) and the Voting Deadline for Class 6 and Class 8 was September 27, 2018 at 5:00 p.m. (eastern).[18]  The Debtors completed their final tabulation of the Ballots on September 30, 2018.    As reflected in the Voting Report, final voting results were overwhelmingly in favor of the Debtors' restructuring, and as a direct result of the Debtors' efforts to engage their key constituencies, the Debtors' primary stakeholders and all Voting Classes have voted to accept the Plan.

35.    On September 24, 2018, the Debtors filed with the Court the Plan Supplement

---

[15]    *See Affidavit of Service of Solicitation Materials* [Docket No. 588]; *Supplemental Affidavit of Service of Solicitation Materials* [Docket No. 847].
[16]    *See id.*
[17]    *See* Disclosure Statement Order, Exhibit 6.
[18]    Pursuant to the Solicitation Procedures Orders, the Debtors have deemed timely all ballots submitted on September 27, even if submitted after 5:00 p.m. (eastern).  For additional discussion about, and certification of, the solicitation and vote tabulation processes, *see* the Daloia Declaration.

[Docket No. 812], which includes drafts or summaries of certain of the material applicable Definitive Documents.[19] The Debtors anticipate entering into a commitment letter with Wells Fargo on October 1, 2018, which will attach a term sheet for the New Exit ABL Facility.  On October 1, 2018, the Debtors filed the Fifth Amended Plan, which incorporates various modifications to address informal comments from the U.S. Trustee and other parties and certain technical changes.  These modifications do not materially or adversely affect the treatment of any creditor.  Concurrently herewith, the Debtors have also submitted a proposed version of the order confirming the Plan (the "Confirmation Order").

**F.    Limited Confirmation Objections.**

36.    The Debtors received formal objections to the Plan from Somera Road-Gibson Memphis, LLC (the "Somera Objection") [Docket No. 742], Pacific Rim Tonewoods, Inc. (the "Pacific Rim Objection"), the U.S. Trustee [Docket No. 831] (the "UST Objection") and the United States, on behalf of its components, the Department of Homeland Security, Customs and Border Protection and the Internal Revenue Service [Docket No. 835] (the "United States Objection", and together with the UST Objection, the Somera Objection and the Pacific Rim Objection, the "Objections").  As discussed further below:  (1) language has been added to Article VI.A of the Plan to address the Somera Objection, language provided in large part by the United States has been added to the Confirmation Order that addresses the United States Objection, and the request from the U.S. Trustee for clarification regarding certain contracts has

---

[19]  The Plan Supplement includes the following exhibits: (a) a "highly confident" letter from Wells Fargo summarizing the proposed terms of the New Exit ABL Facility; (b) the Amended Organizational Documents; (c) the New Common Stock Agreement; (d) a disclosure of Reorganized Debtors' Directors and Officers, (e) the Management Incentive Plan; (f) the Profits Interest Anti-Dilution Provisions; (g) a notice that there will not be a New Take-out Facility and that the Holders of the Prepetition Secured Notes have elected to not take a distribution of TEAC Profits Interests in Class 7; and (h) the Rejected Executory Contract/Unexpired Lease List.  The Debtors anticipate filing (a) the New Exit ABL Facility Documents prior to the Effective Date; (b) the Plan definition of Change of Control prior to the Effective Date; and (c) the Management Employment and Consulting Agreements prior to the Effective Date.

been provided; (2) the UST Objection to the releases should be overruled as discussed in section IV below; and (3) the Pacific Rim Objection is a request for treatment of its claim, which will be either be resolved consensually or determined at a future hearing. Accordingly, the Debtors request that the Court overrule all unresolved Objections, as set forth in section IV herein.

## III.    ARGUMENT

### A.    The Plan Satisfies Each Requirement for Confirmation

37.    To confirm the Plan, the Court must find that the Plan satisfies the applicable provisions of section 1129 by a preponderance of the evidence.[20]  The Debtors submit that the Plan does.

#### 1.    *The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1))*

38.    Under section 1129(a)(1), a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]." The legislative history of section 1129(a)(1) explains that this provision also encompasses the requirements of sections 1122 (classification) and 1123 (contents of a plan of reorganization).[21]  The Plan complies with the Bankruptcy Code generally and, as set forth below, with sections 1122 and 1123 specifically.

##### a.    *The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code*

39.    Pursuant to section 1122(a), claims or interests designated to a particular class must be substantially similar to each other. Although section 1122 does not specify if or when similar claims may be separately classified—except with respect to unsecured claims that are

---

[20] *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119-20 (D. Del. 2006) (stating that a court must determine whether a plan meets the requirements of section 1129 in order to confirm such plan); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) (same); *In re Bally Total Fitness of Greater N.Y., Inc.*, No. 0712395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the Plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.").
[21] S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123.").

separately classified for administrative convenience—courts uniformly have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[22]  Courts have identified several grounds justifying the separate classification of claims, including: (a) where members of a class possess different legal rights; and (b) where sound business reasons support separate classification.

40.     The Plan's classification of Claims and Equity Interests satisfies the requirements of section 1122 because the Plan places Claims and Equity Interests into twelve separate Classes, with Claims and Equity Interests in each Class differing from the Claims and Equity Interests in each other Class in a legal or factual way or based on other relevant criteria.[23]

41.     In particular, Other Priority Claims and different Secured Claims are separately classified (Classes 1 through 5), General Unsecured Claims against each Debtor are separately classified (Classes 6 and 7) based upon the applicable Debtor, and Convenience Class Claims (Class 8) are separately classified to promote the efficient administration of these Chapter 11 Cases.  Class 8 includes approximately 600 separate creditors with claims equal to, less than, or reduced to $40,000.  Fixing a cash distribution to these creditors with relatively small claims is fair and equitable and classifying them separately from Class 6 is administratively efficient, as it eliminates hundreds of creditors from the potential participation in a distribution of Profits Interests and the multi-year administration of those interests that will require the maintenance of records of, and ultimate distribution on account of, such Profits Interests.[24]  Classes 9, 11, and 12

---

[22]  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158-59 (3d Cir. 1993) (as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes).

[23]  *See* Plan Art. III.

[24]  *See, e.g.*, *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995) (approving separate classification of approximately 800 relatively small claims to reduce expense and associated burdens of issuing new stock to holders of such claims).

contain inter-Debtor related Claims and Equity Interests, and Class 10 contains the Equity Interests in Gibson.

> b.     *The Plan Satisfies the Mandatory Requirements*
> *of Section 1123(a) of the Bankruptcy Code*

42.     Section 1123(a) sets forth seven mandatory requirements that a chapter 11 plan must satisfy.  The Plan satisfies each of these requirements.  Article III of the Plan satisfies the first four requirements by:  (a) properly designating Classes (1123(a)(1)); (b) specifying the Classes that are Unimpaired under the Plan (1123(a)(2)); (c) specifying the treatment of each Class that is Impaired (1123(a)(3)); and (d) specifying that the treatment of each Claim or Equity Interest within a Class is the same, unless the Holder of a Claim or Equity Interest consents to less favorable treatment on account of its Claim or Equity Interest (1123(a)(4)).

43.     Article V and various other provisions of the Plan provide adequate means for the Plan's implementation, including, among other things,:

- sources of consideration for Plan distributions, including Cash, proceeds of the New Exit ABL Facility, and issuance of the Profits Interests and New Common Stock;
- good-faith compromise and general settlement of Claims;
- the cancellation and discharge of all agreements, instruments, Securities and other documents evidencing any Claim or Equity Interest and any rights of any Holder in respect thereof;
- the release, termination, extinguishment and discharge of all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against or interests in property of the Estates;
- authorization for the Debtors or the Reorganized Debtors, as applicable, to take corporate actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan;
- authorization for the Debtors or the Reorganized Debtors, as applicable, to take all actions consistent with the Plan and the Restructuring Support Agreement as may be necessary or appropriate to effect any transaction contemplated by the Plan;
- the exemption of the New Common Stock, New Warrants and Profits Interests issued pursuant to the Plan from any registration requirements under any securities laws to the fullest extent permitted, including pursuant to section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder and by Section 1145 of the Bankruptcy Code;

- exemption from certain transfer taxes pursuant to section 1146(a); and
- appointment and selection of officers and directors of the Reorganized Debtors.

44.     Each of these and the other means for implementation of the Plan are necessary and appropriate.  Specifically, the exemptions of the New Common Stock, New Warrants, and Profits Interests to be issued pursuant to the Plan from any registration requirements are appropriate pursuant to applicable securities laws and section 1145 of the Bankruptcy Code, and such exemptions will reduce the costs and burdens on the Reorganized Debtors if they had to comply with such registration requirements.[25]  Similarly, the other means for implementation of the Plan will help to streamline the Debtors' emergence from chapter 11 and consummation of the transactions set forth in the Plan.  Accordingly, the proposed means for implementation of the Plan satisfy 1123(a)(5) and should be approved.

45.     Pursuant to Article V.N., the Amended Organizational Documents filed with the Plan Supplement prohibit the issuance of non-voting equity securities (other than Gibson Europe B.V., which is not a U.S. corporation and is subject to Dutch law), satisfying section 1123(a)(6). Finally, pursuant to Article V.O, the identity of the officers and directors of the Reorganized Debtors are disclosed in the Plan Supplement and are consistent with the interests of Holders of Claims and Equity Interests and with public policy satisfying section 1123(a)(7).

### 2.     The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2))

46.     Section 1129(a)(2) requires compliance with the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section

---

[25] *See In re Food City, Inc.*, 110 B.R. 808, 810 (Bankr. W.D. Tex. 1990) (Section 1145 of the Bankruptcy Code "[o]perates to excuse debtors from the cumbersome registration process that might otherwise be imposed by state and federal securities laws on proposed reorganization plans.").

1126.[26]  As described above, the Debtors have complied with these provisions, including section 1125, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through Prime Clerk, their noticing and claims agent and administrative advisor, in accordance with the Solicitation Procedures Orders.[27]

47.     Section 1126 provides that holders of claims and equity interests allowed under section 502 in impaired classes that will receive or retain property under a plan may vote to accept or reject a plan.  Accordingly, the Debtors solicited votes from Holders of Claims in Classes 5, 6, 7 and 8 because each of these Voting Classes is impaired and entitled to receive a distribution under the Plan.[28]

48.     In accordance with section 1126(f), the Debtors did not solicit votes from the Unimpaired Classes because they are statutorily presumed to have accepted the Plan.  In addition, in accordance with section 1126(g), the Debtors did not solicit votes on the Plan from the Deemed Rejecting Classes because they are deemed to have rejected the Plan.[29]

49.     The Voting Report reflects the results of the voting process in accordance with section 1126.  As set forth in the Voting Report, each of the four Voting Classes overwhelmingly voted to accept the Plan for each Debtor; Holders of "at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by [the Voting Classes], other than any entity designated under subsection (e) of [section 1126], … have accepted or rejected such

---

[26] *See In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (section 1129(a)(2) requires compliance with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code"); S. Rep. No. 989, 95th Cong., 2d Sess., at 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 412 (1977).
[27] *See* Solicitation Affidavits.
[28] *See* Plan, Art. III.A; *see generally* Solicitation Affidavits.
[29] Class 9 (Intercompany Claims) either are Unimpaired or Impaired and will not receive any distributions or retain any property under the Plan.  In either case, such Holders were not entitled to vote on the Plan.

plan."[30]    Further, as discussed below, the Debtors can "cramdown" the Deemed Rejecting

Classes – each of which arise from and relate to the Debtors' internal organizational structure –

under section 1129(b).  Based on the foregoing, the Debtors have satisfied the requirements of

section 1129(a)(2).[31]

### 3.  *The Plan Has Been Proposed in Good Faith and Not By Any Means Forbidden By Law (Section 1129(a)(3))*

50.    Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and

not by any means forbidden by law."  Where the plan proponent proposes the plan with the

legitimate and honest purpose to reorganize and has a reasonable hope of success, the plan

proponent satisfies the good faith requirement of section 1129(a)(3).[32]  Thus, "good faith" should

be evaluated in light of the totality of the circumstances in the development of the plan.[33]

51.    As described in the Plan Declarations, the Debtors negotiated, developed, and

proposed the Plan in good faith and no party asserts otherwise.  The Plan, and the transactions

incorporated therein are the result of intense arm's length negotiations and settlement discussions

among the Debtors, their largest secured and unsecured creditors, the Committee and the

Supporting Principals, and have been proposed in good faith and for a proper purpose.  During

these negotiations the Debtors' four member Board of Directors at all times included two

independent directors who were actively involved and led the negotiation sessions that

culminated in the Global Settlement.

52.    In particular, the Debtors (i) on the eve of the Petition Date, reached a settlement

---

[30] 11 U.S.C. § 1126(c).

[31] No Classes of Equity Interests were entitled to vote on the Plan.  *See* Plan, Art. III.A.  Therefore, section 1126(d) of the Bankruptcy Code is inapplicable.

[32] *See In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002) (concluding 1129(a)(3) is satisfied when "the Plan has been proposed with the legitimate purpose of reorganizing the business affairs of each of the debtors and maximizing the returns available to creditors of the Debtors.").

[33] *See Platinum Cap., Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002); *see also In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984) (court examines a plan for purposes of 1129(a)(3) "in light of the totality of the circumstances" surrounding confirmation).

19

with the Ad Hoc Committee of Secured Notes and the Supporting Principals on the terms of a Restructuring Support Agreement that provided the architecture for the Plan, (ii) worked constructively with the Committee and the Ad Hoc Committee of Secured Notes to gain the Committee's support for the Plan through increased recoveries for General Unsecured Creditors, accelerated payment of 503(b)(9) Administrative Expense Claims, and inclusion of the Committee in the Debtors' process for exploring alternative transactions, (iii) successfully refinanced nearly $100 million of secured obligations owing to GSO and BofA under the Prepetition ABL/Term Loan Agreement in a manner that saved the Estates an approximately $4 million Make-Whole Premium, (iv) reached a Global Settlement resulting in a Plan that has the support of all of the Debtors' key stakeholders (the Committee, the Ad Hoc Committee of Secured Notes, GSO, Philips and the Supporting Principals), and (v) recently reached agreement with Tronical on its asserted claims and potential objections to the Plan.

53.      Thus, the Plan has been proposed in good faith, with the legitimate and honest purposes of reorganizing the Debtors' MI Business and enhancing the financial viability of the Reorganized Debtors, while providing greater recovery to Debtors' creditors than would otherwise be available to them.  No party has asserted otherwise.[34]  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3).

**4.      *The Plan Provides for Court Approval of Certain Administrative Payments (Section 1129(a)(4))***

54.      Section 1129(a)(4) requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the

---

[34] *See* Bankruptcy Rule 3020(b)(2) ("The court shall rule on confirmation of the plan after notice and hearing as provided in Rule 2002.  If no objection is timely filed, the court may determine that the plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues.").

plan, be subject to approval of the Court as reasonable.[35]

55.    Here, all payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.  Article II.B.2 of the Plan provides that all final requests for payment of Professional Fee Claims for services rendered through the Effective Date shall be filed and served no later than 30 days after the Effective Date for determination by the Court, after notice and a hearing, in accordance with the procedures established by the Bankruptcy Code and prior Court orders.[36]  The fees and expenses payable under the DIP Orders are subject to pre-existing review procedures, pursuant to which the Debtors, the Committee and the U.S. Trustee are provided notice of such fees and expenses and an opportunity to review and object to the payment of such fees.[37]  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4).

### 5.    *Post-Emergence Directors Have Been Disclosed and Their Appointment is Consistent with Public Policy; Insider Post-Emergence Employment Arrangements Have Been Disclosed (Section 1129(a)(5))*

56.    Section 1129(a)(5)(A)(i) requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.  Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.  In this case, the Plan satisfies section 1129(a)(5)(A)(i) because the Debtors have disclosed in the Plan Supplement the identities and affiliations of all persons proposed by the Reorganized Debtors to serve on the New Board and as officers (to the extent

---

[35] *See In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").
[36] *Id.*
[37] *See* Final DIP Order ¶ 16(d).

known) and there has been no argument made or evidence presented that any of those appointments are inconsistent with the interests of stakeholders or public policy.

57.    In addition, section 1129(a)(5)(B) requires disclosure of the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.    Here, the Plan satisfies section 1129(a)(5)(B) because, in the case of the Supporting Principals (each of whom are insiders who will either be an employee of or consultant to the Reorganized Debtors, at the expense of the Reorganized Debtors, not the Debtors or their Estates) the nature and amount of their compensation under their Management Employment and Consulting Agreements and the post-Effective Date services to be provided to the Reorganized Debtors have been disclosed and described in the Carr and Fox Declarations.

### 6.    *The Plan Does Not Require Governmental Approval of Rate Changes (Section 1129(a)(6))*

58.    Section 1129(a)(6) permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.  The Plan does not provide for any rate changes, therefore section 1129(a)(6) is inapplicable here.

### 7.    *The Plan Is in the Best Interests of Creditors (Section 1129(a)(7))*

59.    Section 1129(a)(7)—the "best interests of creditors" test—requires that, with respect to each impaired class of claims or interests that does not vote unanimously to accept the plan, either: (a) each holder of a claim or interest of such class has accepted the plan; or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under

chapter 7.[38]  The best interests test is generally satisfied by a liquidation analysis demonstrating

that an impaired class will receive no less under the plan than under a chapter 7 liquidation.[39]

60.    The Plan satisfies section 1129(a)(7).  The Debtors, with the assistance of their

financial advisors, prepared a liquidation analysis estimating and comparing the range of

recoveries generated under the Plan with the estimated potential recoveries under a hypothetical

chapter 7 liquidation (the "Liquidation Analysis"), a copy of which is attached to the Fox

Declaration as Exhibit A.  The "High" and "Low" estimates of Liquidation Proceeds are

substantially less than the value to be realized by stakeholders under the Plan.  In fact, in a

Chapter 7 liquidation scenario, the Debtors would be administratively insolvent even under the

"High" estimates of recoveries.  In contrast, the Plan provides for payment in full of all Allowed

Administrative Expense Claims, Other Priority Claims, and Other Secured Claims, as well as

significant recoveries to Holders of Allowed General Unsecured Claims in Classes 6, 7 and 8.

61.    Because the recoveries provided under the Plan are at least as much as (and,

indeed, in many instances, exceed) the potential recoveries available in a chapter 7 liquidation,

the Plan satisfies section 1129(a)(7).

**8.      *The Plan Can Be Confirmed Notwithstanding the
Requirements of Section 1129(a)(8)***

62.    Section 1129(a)(8) requires that each class of claims or interests either accept a

plan or be unimpaired under a plan.  As discussed above, each of the four Voting Classes voted

to accept the Plan for each Debtor.  Notwithstanding that Class 10 (Equity Interests in Gibson)

and Class 12 (Equity Interests in Excluded Debtors Subsidiaries) are, and Class 9 (Intercompany

---

[38]*See Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

[39] *See In re Smith*, 357 B.R. 60, 67 (Bankr. M.D.N.C. 2007), *appeal dismissed*, No. 1:07CV30 (JAB), 2007 WL 1087575 (M.D.N.C. Apr. 4, 2007) ("In order to show that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions.") (citations omitted).

Claims) may be, deemed to have rejected the Plan, as set forth below, the Debtors have satisfied the requirements for cramdown under section 1129(b) with respect to these Classes.

> **9.      The Plan Complies with Statutorily Mandated Treatment of Administrative Expense and Priority Tax Claims (Section 1129(a)(9))**

63.      Section 1129(a)(9) requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A), holders of claims of a kind specified in section 507(a)(2)—administrative expenses allowed under section 503(b)—must receive on the effective date cash equal to the allowed amount of such claims.

64.      In accordance therewith, the Plan provides that each Holder of an Allowed Administrative Expense Claim will receive, in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as may be agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder.[40]  In addition, Allowed Professional Fee Claims will be paid in full,[41] and Allowed Priority Tax Claims will be paid in accordance with the terms set forth in section 1129(a)(9)(C).[42]  Further, as described below, amounts due to be paid to the Office of the United States Trustee will be paid as provided for in the Plan.  Accordingly, the Plan complies with the requirements of section 1129(a)(9).

> **10.      At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptance of Insiders (Section 1129(a)(10))**

65.      Section 1129(a)(10) provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.

---

[40] *See* Plan, Art. II.A.
[41] *See* Plan, Art. II.B.
[42] *See* Plan, Art. II.D.

Each of the Voting Classes has accepted the Plan, exclusive of any acceptances by insiders.[43] Accordingly, the Plan satisfies the requirements of section 1129(a)(10).

### 11.    *The Plan is Feasible (Section 1129(a)(11))*

66.    Section 1129(a)(11) requires the Court find that the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is provided for in the Plan.

67.    To demonstrate that a plan is feasible, a plan proponent only has to show reasonable assurance of commercial viability, not provide a guarantee of success.  Therefore, the Court need only determine that "the plan has a reasonable likelihood of success."[44]  As such, when evaluating feasibility, courts typically consider, among other things (a) the adequacy of the capital structure; (b) the earning power of the business; (c) economic conditions; (d) the ability of management; (e) the probability of the continuation of the same management; and (f) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[45]

68.    Under the Plan, the Reorganized Debtors will be substantially deleveraged and will have substantial cash flow as reflected in the business plan and financial projections for fiscal years 2019 through 2023 (the "Financial Projections").  The Financial Projections, together with the assumptions on which they are based, are discussed in detail in the Fox Declaration and are attached thereto as Exhibit B.

69.    With the elimination of approximately $500 million of funded indebtedness and

---

[43] *See* Voting Report.
[44] *See Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988); *see also In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995) (plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan.").
[45] *See, e.g.*, *In re AlerisInt'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664 at *28 (Bankr. D. Del. May 13, 2010).

the added funding availability under the New Exit ABL Facility for up to $70 million,[46] the Reorganized Debtors should have sufficient liquidity, cash flow and cash on hand to make all payments required pursuant to the Plan and conduct its ongoing business operations.   The funding at emergence to the Distribution Agent of the $5.25 million of Cash for Classes 6 and 8 and the Professional Fee Reserve Amount provides for the payments required under the Plan.   Accordingly, confirmation and consummation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors, and the Plan satisfies the feasibility requirements of section 1129(a)(11).

### 12.    *The Plan Provides for All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12))*

70.    Section 1129(a)(12) requires the payment of all fees payable under 28 U.S.C. § 1930.   Article XIII.C. of the Plan provides all such fees shall be paid on the Effective Date and that all such fees payable after the Effective Date shall be paid prior to the closing of the Chapter 11 Cases when due or as soon thereafter as reasonably practicable.   Accordingly, the Plan complies with section 1129(a)(12).

### 13.    *Sections 1129(a)(13)-(16) Are Inapplicable (Sections 1129(a)(13)-(16))*

71.    Section 1129(a)(13) requires chapter 11 plans to continue all retiree benefits (as defined in section 1114).   The Debtors do not have, and will not have after consummation of the Plan, any obligations to pay such retiree benefits and, as such, section 1129(a)(13) does not apply to the Plan.   Sections 1129(a)(14) and (15) apply only to debtors that are individuals and therefore do not apply here.   Section 1129(a)(16) applies only to debtors that are nonprofit entities or trusts and therefore does not apply here.

---

[46] *See* Plan Supplement, Exhibit A, containing a "highly confident" letter from Wells Fargo.  As noted above, the Debtors anticipate entering into a commitment letter with Wells Fargo prior to the Confirmation Hearing and the New Exit ABL Facility Documents prior to the Effective Date.

### 14.    *The Principal Purpose of the Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act (Section 1129(d))*

72.    Section 1129(d) provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the 70 application of section 5 of the Securities Act of 1933." As evidenced in the Plan Declarations, the Debtors commenced these Chapter 11 Cases with a bona fide business need, and business objective, to restructure their indebtedness – which they have accomplished – and not to avoid taxes or the application of section 5 of the Securities Act. Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds. Accordingly, the Plan satisfies the requirements of section 1129(d).

### B.    The Plan Satisfies the "Cramdown" Requirements (Section 1129(b))

73.    Section 1129(b)(1) provides that if all applicable requirements of section 1129(a) are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in section 1129(b) are satisfied. To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8)), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[47] No party has objected on the basis that the Plan either "discriminates unfairly" or is not "fair and equitable."

74.    Indeed, all of the Voting Classes have voted in favor of the Plan. However, as the Deemed Rejecting Classes are deemed to have rejected the Plan, the Plan must satisfy the "cramdown" requirements under section 1129(b) of the Bankruptcy Code with respect to the Deemed Rejecting Classes. It does.

---

[47] *See* 11 U.S.C. § 1129(b)(1); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable.'").

### 1. *The Plan Does Not Unfairly Discriminate with Respect to the Deemed Rejecting Classes (Section 1129(b)(1))*

75.     The Plan does not discriminate unfairly with respect to the Deemed Rejecting

Classes.  Although the Bankruptcy Code does not provide a standard for determining when

"unfair discrimination" exists, courts typically examine the facts and circumstances of the

particular case to make the determination.[48]    Generally, courts have held that a plan unfairly

discriminates in violation of section 1129(b) only if similarly situated claims receive materially

different treatment without a reasonable basis for the disparate treatment.[49]    A plan does not

unfairly discriminate where it provides different treatment to two or more classes that are

comprised of dissimilar claims or interests.[50]    Likewise, there is no unfair discrimination if,

taking into account the particular facts and circumstances of the case, there is a reasonable basis

for the disparate treatment.[51]

76.     Here, the Plan's treatment of the Deemed Rejecting Classes is not unfair in light

of the legal rights of such Deemed Rejecting Classes and the relative treatment of other Classes.

Equity Interests in Gibson (Class 10) and the Debtors' Equity Interests in Excluded Debtor

Subsidiaries (Class 12) are being cancelled as there is no value attributable to these Classes of

Equity Interests.  In contrast, the Debtors have a rational basis to reinstate Equity Interests held

by the Debtors in Subsidiaries other than Excluded Debtor Subsidiaries (Class 11) as doing so

---

[48]*See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds, Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."); *see also In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[49] *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000) (noting that one of the "the hallmarks of the various tests" is "whether there is a reasonable basis for the discrimination. . . .").

[50] *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom., Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[51] *Aztec Co.*, 107 B.R. at 590.

advances an efficient reorganization by avoiding the need to unwind and recreate the corporate structure and relationships of the Reorganized Debtors.  Moreover, reinstatement does not affect the economic substance of the Plan for the Debtors' stakeholders.  Indeed, Class 6 General Unsecured Creditors are receiving value in excess of what the best interest test would require or what a waterfall allocation of the Plan Value would provide by reason of the consent of the senior secured classes.[52]  Further, the Supporting Principals, who hold the majority of the Holders of Equity Interests of Gibson in Class 10, are parties to the Restructuring Support Agreement and support confirmation of the Plan notwithstanding the deemed rejection of the Plan by Class 10.

77.    With respect to the Debtors' Intercompany Claims (Class 9), to the extent such Claims are Impaired, they will receive no distribution under the Plan.  The Reorganized Debtors decision to either leave Unimpaired or to extinguish such Claims will be for purposes of efficient corporate structure and tax planning and will not impact the recovery of other stakeholders.  Accordingly, there is a rational basis for the disparate treatment of Intercompany Claims.

78.    Accordingly, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes and satisfies the requirements of section 1129(b).

### 2.    *The Plan Is Fair and Equitable with Respect to the Deemed Rejecting Classes (Section 1129(b)(2))*

79.    For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority" rule and satisfy the requirements of section 1129(b)(2).[53]

---

[52] *Id.*

[53] 11 U.S.C. § 1129(b)(2)(B)(ii); 11 U.S.C. § 1129(b)(2)(C)(ii); *see also 203 N. LaSalle*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on

Generally, this requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account or its junior claim or interest.[54]

80.     As described above, Class 9 (to the extent impaired) are Intercompany Claims and Classes 10 and 12 are comprised of various Equity Interests; no Class of Claims junior to any of them are receiving any recovery under the Plan.  Although Equity Interests in Class 11 are being reinstated, it is simply to maintain the Debtors' prepetition organizational structure for the administrative benefit of the Reorganized Debtors and has no economic substance and does not result in an allocation of value away from creditors.

81.     Courts have recognized that such technical preservations of equity interests for the purpose of corporate formalities do not violate the absolute priority rule.[55]  Accordingly, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims and Equity Interests and satisfies section 1129(b) of the Bankruptcy Code.

**C.     The Discretionary Contents of the Plan Are Appropriate and Should Be Approved (Section 1123(b))**

82.     Section 1123(b) identifies various additional provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of

---

account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'") (alteration in original).
[54] *See 203 N. LaSalle*, 526 U.S. at 459.
[55] *See In re ION Media Networks, Inc.*, 419 B.R. 585, 661 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

chapter 11.[56]  As set forth below, the Plan includes certain of these discretionary provisions.

### 1. The Global Settlement Incorporated Into the Plan Is Reasonable and in the Best Interests of the Debtors' Estates

83.    The settlement of disputes in bankruptcy is one of the Bankruptcy Code's primary objectives.[57]  Consistent with this key objective, the Bankruptcy Code states that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[58]

84.    Settlements under a plan generally are subject to the same standard as settlements under Bankruptcy Rule 9019.[59]  Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed compromise is fair, reasonable, and in the best interest of the estate.[60]  A proposed compromise need not be the best result that a debtor could have achieved, but only must fall within the "reasonable range of litigation possibilities."[61]

85.    In determining whether a compromise is fair and equitable, the Third Circuit has adopted a balancing test: "(1) the probability of success in litigation; (2) the likely difficulties in

---

[56] 11 U.S.C. § 1123(b)(1)-(3), (6).

[57] "To minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (internal quotations omitted); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) ("Compromises are 'a normal part of the process of reorganization.'") (citations omitted); *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("[s]ettlements are favored [in bankruptcy]"); *In re Key3Media Grp., Inc.*, 2006 WL 2842462, at *3 (D. Del. Oct. 2, 2006) (same); *In re Adelphia Commc'n Corp.*, 361 B.R. 337, 348 (Bankr. D. Del. 2007) (same).

[58] 11 U.S.C. § 1123(b)(3)(A).

[59] *See In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008); *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004) ("The standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019 . . . .").

[60] *See In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'"); *In re Nw. Corp.*, 2008 WL 2704341, at *6 (Bankr. D. Del. July 10, 2008) ("[T]he bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interests of the estate."); *In re Key3Media Grp., Inc.*, 336 B.R. 87, 92 (Bankr D. Del. 2005) ("[T]he bankruptcy court has a duty to make an informed, independent judgment that the compromise is fair and equitable."). *In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.") (internal quotation marks omitted)).

[61] *In re Energy Corp.*, 886 F.2d 921, 929 (7th Cir. 1989); *In re Sea Containers Ltd.*, 2008 WL 4296562, at *5 (Bankr. D. Del. Sept. 19, 2008); *Key3Media Grp., Inc.*, 2006 WL 2842462, at *3.

collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."[62]

86.    When compared against the balancing test factors, it is clear that the Global Settlement is in the best interests of the Debtors' Estates and should be approved—and no party has asserted otherwise.  As described in the Plan Declarations, these factors are satisfied.  **One**, the disputes among the parties absent the Global Settlement regarding valuation, the allocation of value, the allowance of GSO's and Philips' claims against the Debtors' Estates, and the claims against GSO and the Specified Persons, all involve complex fact-driven issues, with legal arguments available to all parties, and an outcome that is uncertain.  **Two**, the magnitude of the secured claims asserted against the Debtors, and the Debtors' enterprise value, limit the ultimate utility (collectability) of litigation over value and allocation of value.  Similarly, the relative cost/benefit of litigation over the amount of GSO's and Philips' claims depends upon the ultimate value (recovery) of the claim in dispute.  Likewise, the value of claims asserted against GSO and the Specified Persons are dependent not only upon the merits (which were contested), but the extent to which unsecured creditors (other than the Holders of the Prepetition Secured Notes) would benefit.  **Three**, all of this litigation would have required a dozen or more depositions, continued protracted and very expensive e-discovery, and potentially multiple trials related not only to confirmation, but the Claims asserted.  **Four**, the Debtors' creditors have demonstrated their support of the Global Settlement through their votes in favor of the Plan, and the Court should give deference to this broad support.[63]  Ultimately, the Global Settlement

---

[62] *In re Nutraquest, Inc.*, 434 F.3d 639, 643 (3d Cir. 2006); *see also Key3Media Grp.*, 336 B.R. 87 at 93 (when determining whether a compromise is in the best interests of the estate, courts must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal") (internal citations omitted)).

[63] *See, e.g.*, *In re New Century TRS Holdings*, 390 B.R. 140, 169 (Bankr. D. Del. 2008) (in approving a settlement, taking into account that "the Plan is supported broadly by a diverse creditor body"), *rev'd on other grounds*, 407 B.R. 576 (D. Del. 2011).

reflects the parties' reasoned determination of a value-maximizing endpoint for the various issues that would be raised in any litigation pursuing the settled dispute.

87.     Moreover, by settling with GSO in a manner that allows it to recover Profits Interests in Class 7 on account of GSO's claims against Gibson Holdings but with GSO not asserting <u>any</u> claim in Class 6, GSO's recovery is not dilutive to creditors (other than to the Holders of the Prepetition Secured Notes who are the only other creditors in Class 7 and who are party to the Global Settlement).  Rather, as a result of the Holders of Prepetition Secured Notes and GSO waiving any recovery in Class 6, the distribution to other holders of Allowed Class 6 Claims is increased.  In addition, by resolving the threatened litigation that was preserved under the Third Amended Plan as against certain of the Debtors' directors, the Reorganized Debtors will benefit from not having the potential indemnity costs, insurance premium increases and distraction associated with such potential claims.

88.     The Global Settlement falls well within the "reasonable range of litigation possibilities."[64]  Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 1123(b), the Court should approve the Global Settlement.

### 2.     *The Debtor Release Is Appropriate and Should Be Approved*

89.     The "Debtor Release" means the release by the Debtors contained in Article X.B. of the Plan.  Section 1123(b) provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[65]  Furthermore, a debtor may release claims under section 1123(b)(3)(A) "if the release is a valid exercise of the

---

[64] *In re Energy Corp.*, 886 F.2d at 929; *In re Sea Containers Ltd.*, 2008 WL 4296562, at *5; *Key3Media Grp.*, 2006 WL 2842462, at *3.

[65] *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004) ("The standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019 . . . .").  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."  *See, e.g., In re Exaeris, Inc.*, 380 B.R. 741, 746-47 (Bankr. D. Del. 2008); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be "within the reasonable range of litigation possibilities") (internal quotation marks omitted).

debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[66]

90.    Courts in this jurisdiction typically assess the propriety of a "debtor release" in light of five *"Zenith* factors" in the context of a chapter 11 plan:  (a) whether there is an identity of interest between the debtor and the third party; (b) whether the third party has made a substantial contribution to the debtor's reorganization; (c) if the release is essential to the debtor's reorganization; (d) whether a substantial majority of creditors support the release; and (e) whether the plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[67]    No one factor is dispositive, nor is a proponent required to establish each factor for the release to be approved.[68]

91.    Each *Zenith* factor supports the proposed Debtor Release here, and no party objects to the Debtor Release.  ***First,*** there is an identity of interest between the Debtors and the parties to be released.  Each of the Released Parties,[69] as stakeholders and critical participants in the Plan process, share a common goal with the Debtors in seeing the Plan succeed and having the Debtors' businesses reorganized.  Like the Debtors, these parties seek to confirm the Plan

---

[66] *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.") (internal quotation marks omitted)).

[67] *In re Indianapolis Downs, LLC,* 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999).

[68] *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) ("These factors . . . simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that factors are not exclusive or conjunctive requirements).

[69] Under the Plan, the term "Released Parties" means "collectively, each in its capacity as such:  (a) the Debtors, (b) the Reorganized Debtors, (c) the DIP Agent, (d) the DIP Lenders, (e) the DIP Backstop Parties, (f) the Prepetition Indenture Trustee (and any of its predecessor trustees under the Prepetition Indenture), (g) the Ad Hoc Committee of Secured Notes and each of its members, (h) each of the Supporting Noteholders, (i) the New Exit ABL Facility Lenders, (j) the New Take-Out Facility Lenders (if any), (k) the New Exit ABL Facility Agent, (l) the New Take-Out Facility Agent (if any), (m) the Committee and each of its members (but solely in their capacity as members of the Committee and not in any other capacity), (n) the Specified Persons, (o) Philips, (p) GSO, (q) the ITLA Agent, (r) the Prepetition ABL/Term Loan Agent, and (s) the Related Persons of each of the foregoing (a) through (r)."

and implement the transactions contemplated thereunder.[70]  Importantly, the Debtors and the Reorganized Debtors are required to indemnify a number of the Released Parties—including (subject to certain exceptions) the Debtors' current directors, officers, and managers under the Debtors organizational documents[71]—such that pursuing litigation against the Released Parties would amount to litigation against the Debtors.[72]  Similarly, the Debtors have ongoing indemnification obligations with respect to, among others, the DIP Agent, the DIP Lenders, the DIP Backstop Parties, the Prepetition Indenture Trustee—and will have indemnification obligations to the New Exit ABL Agent and the New Exit ABL Facility Lenders—and each of their respective officers, directors, employees, and agents.[73]

92.    Any cause of action subject to the foregoing indemnities would create an obligation on behalf of the Debtors and would effectively amount to litigation against the Debtors, depleting assets of the Estates.  The Debtor Release is an essential component of the global resolution embodied in the Plan, including the Global Settlement, and the restructuring transactions by which the Debtors stand to return significant value to their stakeholders.  Based on the foregoing, an identity of interest exists between the Debtors and the Released Parties.

93.    *Second,* each of the Released Parties have made substantial contributions to the

---

[70] *See In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011), *modified,* 464 B.R. 208 (Bankr. D. Del. 2011) (noting that an identity of interest between the debtors and the settling parties where such parties "share[d] the common goal of confirming the DCL Plan and implementing the DCL Plan Settlement"); *Zenith,* 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize").

[71] For example, Article VII, Section 7 of the bylaws of Gibson Brands, Inc. provides that Gibson "shall indemnify its officers, directors, employees and agents to the extent permitted by the General Corporation Law of Delaware". *See* Fox Declaration ¶ 113.

[72] *See In re Millennium Lab Holdings II, LLC*, No. BR 15-12284-LSS, 2018 WL 4521941, at *21 (D. Del. Sept. 21, 2018) ("In the Court's view, the Bankruptcy Court correctly found that each of the Equity Holders, like the other released parties under the Plan, were covered by the Debtors' indemnification, advancement, and defense obligations. Thus, claims brought against the released parties may be viewed as suits against the Debtors, or at minimum as suits that threaten to deplete the Debtors' assets, which is sufficient here to establish identity of interest."); *Indianapolis Downs*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

[73] *See* DIP Term Loan Agreement (Docket No. 119-1) § 15.2; Final DIP Order ¶ 8(b)(iii); Prepetition Indenture § 8.07; Prepetition ABL/Term Loan Agreement § 15.2.

Debtors and their Estates and aided in the reorganization process. The Released Parties played an integral role in the formulation and negotiation of the Plan, including the Global Settlement, and the transactions contemplated thereby. Importantly, the Plan reflects the comprehensive settlement and resolution of costly litigation, including the Global Settlement. The Debtor Release, in particular, is an integral component of the consideration (including the funding for these Chapter 11 Cases) to be provided in exchange for the compromises and resolutions embodied in the Plan.

94.     In short, the Released Parties have made significant contributions to the Debtors and their Estates at critical junctures, including:

- *The Ad Hoc Committee of Secured Notes, the Supporting Noteholders, the Committee, the Supporting Principals, Philips, and GSO.* Each of these parties, and through them their Related Persons, has made substantial contributions to these Chapter 11 Cases and have paved the way to a consensual resolution of these Chapter 11 Cases through the Global Settlement, which required significant compromises by each party. Certain of these parties are also parties to the Restructuring Support Agreement, which has served as the basis for the Plan and the success of these Chapter 11 Cases. Without the support of these parties and the Global Settlement they reached, creditors would have received less (if any) recovery on account of their claims.

- *The DIP Agent and DIP Lenders.* The DIP Agent and DIP Lenders have added substantial value to the Debtors and their Estates by providing the DIP Facilities, which have funded these Chapter 11 Cases and refinanced the Prepetition ABL/Term Loan Agreement, and by agreeing to exchange in full their DIP Facility Claims for New Common Stock, under the Plan.[74]

- *The New Exit ABL Facility Lender and New Exit ABL Agent.* The New Exit ABL Facility Lender and New Exit ABL Facility Agent have made substantial contributions to these Chapter 11 Cases by, agreeing to provide the New Exit ABL Facility. As described herein and in the Plan, the New Exit ABL facility is one of the primary means by which the Debtors will implement the Plan and have liquidity to operate after the Effective Date.

- *The Debtors' Professionals, Directors, Officers, and Employees.* The Debtors' directors, officers, and employees have provided substantial additional value to the Debtors because they, in addition to their ordinary duties, took on additional responsibilities related to the Debtors' restructuring efforts and have facilitated

---

[74] *See* Plan Art. II.C.

transactions that will maximize value through the Plan. The Debtors' professionals have likewise provided value by guiding the Debtors through these Chapter 11 Cases in an efficient and expeditious manner that maximizes value for the benefit of all stakeholders.

95. Without the substantial contributions of the Released Parties, the Debtors' ability to successfully reorganize and emerge from chapter 11—let alone with the financial commitments contemplated by the Plan—would be severely impaired. On this basis alone, the Debtor Release is warranted.

96. *Third,* the Debtor Release is essential to the Plan itself. The Released Parties who negotiated the Global Settlement embodied in the Plan did so on the premise they would receive releases in exchange for consideration to be granted to the Debtors. Without such releases, the Debtors would not have been able to build consensus with respect to the Plan and the transactions contemplated thereby. Importantly, the Debtor Releases were the product of arms'-length negotiations between the Debtors and their key stakeholders and are limited in scope. Such releases do not release any entity other than a Released Party from any Claims or Causes of Action preserved by the Plan, and exclude Claims or Causes of Action that are found to be the result of gross negligence, willful misconduct or intentional fraud. In light of the foregoing, the Debtors believe that the record of these Chapter 11 Cases fully supports the essential nature of these releases.

97. *Fourth,* as evidenced by the Voting Report and as noted herein, the Debtors' stakeholders overwhelmingly support the Plan. All Voting Classes accepted the Plan. Fewer than ten creditors whose claims total less than $100,000 voted to reject the Plan.[75] In contrast, over 160 creditors representing over $400 million in Claims voted to accept the Plan.[76] Additionally, the Committee, as a fiduciary of all General Unsecured Creditors in the Chapter 11

---

[75] *See* Voting Report.
[76] *Id.*

Cases, and after its own extensive diligence process, actively negotiated the terms of the Plan, including the scope of the releases by the Debtors, and supports the Plan's release, exculpation, and injunction provisions. Given the critical nature of the Debtor Release to the Plan, this degree of consensus evidences the Debtors' stakeholders' support for the Debtor Release and the Plan.

98.     **Fifth,** the Plan provides for meaningful recoveries for substantially all classes affected by the releases. Absent the Global Settlement embodied in the Plan, the Debtors may have been forced to engage in protracted litigation regarding the disputes that have been settled in the Plan, which would have significantly impaired the Estates' resources and led to diminished recoveries and benefits for all Holders of Claims. Further, as demonstrated by the Liquidation Analysis, the distributions available for unsecured creditors in particular are substantially diminished in a hypothetical chapter 7, even assuming a "high" recovery scenario. Conversely, the Plan provides recoveries to unsecured creditors in the form of Cash and/or Profits Interests and the Debtors' status as an ongoing business partner on a reorganized basis. In this respect, the Voting Report for Classes 6 and 8 speaks for itself. And, as noted above, these affirmative releases are supported by these constituencies on an overwhelming basis.

99.     On this record, the Debtor Release is justified, is in the best interests of the Debtors' creditors, and should be approved under section 1123(b)(3)(A).

### 3.     *The Third Party Release Should Be Approved*

100.     The Plan provides an appropriately tailored release by the Releasing Parties[77] in

---

[77] Under the Plan, the term "Releasing Parties" means "collectively, each in its capacity as such: (a) the Debtors, (b) the Reorganized Debtors, (c) Holders of Claims that vote to accept the Plan, (d) Holders of Claims that are Unimpaired under the Plan, (e) Holders of Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and that, if entitled to do so, do not indicate that they opt out of granting the releases set forth in Article X, (f) Holders of Claims that vote to reject the Plan but do not indicate that they opt out of granting the releases set forth in Article X, (g) the DIP Agent, (h) the DIP Lenders, (i) the DIP Backstop Parties, (j) the Prepetition Indenture Trustee (and any of its predecessor trustees under the Prepetition Indenture), (k) the Ad Hoc Committee of Secured Notes and each of its members, (l) the Committee and each of its members (but solely in their capacity as members of the Committee and not in any other capacity), (m) the Specified Persons, (n) the New

Article X.C. of the Plan (collectively, the "Third Party Release") and should be approved. Specifically, the Plan provides for a release of claims against the Released Parties (*i.e.*, parties who actively participated in the Debtors' restructuring and Plan negotiations and whose contributions and concessions have facilitated and made possible the Debtors' proposed Plan, as described above), in their respective capacities, for, among other things, acts arising out of these Chapter 11 Cases and transactions related thereto.    Numerous courts have recognized that a chapter 11 plan may include a release of non-debtors by other non-debtors when such release is consensual.[78]    Here, except with respect to Holders of Unimpaired Claims,[79] the third party release is consensual as it only binds parties who were solicited and did not opt out.[80]    Moreover, the Third Party Release was a material inducement for the respective support (financial and otherwise) that the Released Parties have provided in connection with the Plan and the Debtors' restructuring and, accordingly, the Released Parties have required that the Third Party Release be included in the Plan.    The Third Party Release, like the Debtor Release, is a necessary and integral element of the Plan.

101.    As described above in the context of the Debtor Release, the Released Parties made substantial contributions to these Chapter 11 Cases and the Debtors' restructuring.    More specifically, each of the respective beneficiaries of the Third Party Release has made a significant contribution to the Debtors' Estates, including postpetition funding of the Chapter 11 Cases and/or the good faith efforts of the parties to compromise their claims to reach consensus

---

Exit ABL Facility Lenders, (o) the New Take-Out Facility Lenders (if any); (p) the New Exit ABL Facility Agent; (q) the New Take-Out Facility Agent (if any), (r) Philips, (s) GSO, (t) the ITLA Agent, (u) the Prepetition ABL/Term Loan Agent, and (v) the Related Persons of each of the foregoing (a) through (u) other than the GI Representatives and any GI Entity represented by a GI Representative."

[78] *See, e.g., Indianapolis Downs,* 486 B.R. at 305 (collecting cases); *Spansion,* 426 B.R. at 144 (stating that "a third party release may be included in a plan if the release is consensual").

[79] The Third Party Release does not include the Deemed Rejecting Classes.

[80] *See, e.g., In re DBSD N. Am., Inc.,* 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009) (binding impaired creditors to a release when they abstained from voting but did not affirmatively opt out of the release); *Zenith,* 241 B.R. at 111 (approving third party releases for creditors who voted in favor of the plan).

for the benefit of all stakeholders. In light of such contributions, a release is appropriate and warranted.

102.    It is clear in this jurisdiction that a chapter 11 plan may provide for a release of claims by third parties against non-debtor parties where the releasing parties either accept or abstain from voting on the plan and have the opportunity to opt out of the release but do not, thereby becoming bound by the release.[81]    In soliciting votes on the Plan, the Debtors sent ballots to all Holders of Impaired Claims entitled to vote (as approved by the Court), which ballots stated in bold letters that certain releases were contained in the Plan and provided instructions for how to opt out of such releases.[82]    The Debtors also sent to Holders of Unimpaired Claims a notice regarding their Unimpaired status, which described the Third Party Release and the deadline to object to confirmation of the Plan.[83]    Moreover, the Debtors sent to all parties on their creditor matrix (including Holders of Claims or Equity Interests in all Classes) the Confirmation Hearing Notice which described, among other things, the Debtor Release, the Third Party Release, and the deadline to object to confirmation of the Plan.[84]    Finally, the Debtors' published a Confirmation Hearing Notice in the national edition of the *New York Times* that provided affected parties with additional notice of the Third Party Release.[85]    Therefore, all

---

[81] *See Millennium,* 2018 WL 4521941, at *10 ("Nonconsensual third party releases are not per se impermissible in this Circuit"); *Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases with opt-out feature are permissible); *Zenith*, 241 B.R. at 111 (approving Third Party Releases for creditors that voted in favor of the plan); *see also Indianapolis Downs,* 486 B.R. at 304-05 (approving as consensual third-party release that applied to unimpaired holders of claims deemed to accept the plan).
[82] *See* Disclosure Statement Order, Exhibit 4; Amended Solicitation Procedures Order, Exhibits 3, 4; Solicitation Affidavits.
[83] *See* Disclosure Statement Order, Exhibit 5; Solicitation Affidavits.
[84] *See* Disclosure Statement Order, Exhibit 2; Solicitation Affidavits.
[85] *See* Docket No. 578.

affected parties have received sufficient notice of the Third Party Release and have had ample time to raise any objections and/or opt-out of the Third Party Release.[86]

103.    In addition, the Debtors sent to Holders of Equity Interests in the Deemed Rejecting Classes a notice with an opportunity to opt out of the releases.[87]   Nonetheless, to address concerns raised informally by the U.S. Trustee the Fifth Amended Plan has been modified to exclude such parties from the definition of "Releasing Parties."

104.    Each of the Releasing Parties solicited who submitted their ballot to accept[88] or reject the Plan did so inclusive of the Third Party Release.  Further, as explicitly stated on the Ballots, the Releasing Parties entitled to vote who abstained are deemed to have consented to the Third Party Release unless they affirmatively opted out.[89]

105.    With respect to Holders of Claims in Unimpaired Classes that did not have an opportunity to opt out of the Third Party Release, the Debtors believe the Third Party Release is appropriate.   Courts in the Third Circuit have held that a non-consensual release may be approved, without regard to the issue of consent, if such release is fair and necessary to the reorganization, and the court makes specific factual findings to support such conclusions.[90]   In

---

[86]*See In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (courts are not required to scrutinize a release of claims by third parties where the release binds only creditors who voted to accept the plan); *see also In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release. Therefore, the release is purely consensual.").

[87] *See* Disclosure Statement Order, Exhibit 6; Solicitation Affidavits.

[88] *See Coram*, 315 B.R. at 336 (holding that creditors are bound by third party plan release if they voted to accept the plan); *Exide*, 303 B.R. at 74 (holding that creditor are bound by third party release upon voting for the plan); *See also In re Specialty Equip. Cos.*, 3 F.3d 1043, 1046-47 (7th Cir. 1993) (holding that upon affirmative agreement of creditor to terms of plan, third party release is consensual and binding); *In re W. Coast Video Enters., Inc.*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) (same).

[89] *See Indianapolis Downs,* 486 B.R. at 305-06 (confirming plan where abstaining parties were "deemed to consent to the Third Party Release") (internal quotation omitted); *In re Lear Corp.*, No. 09-14326 (ALG), 2009 WL 6677955, at *32 (Bankr. S.D.N.Y. Nov. 5, 2009) (confirming plan where parties were given notice that a vote to accept the plan or abstention from voting constitutes assent to the third-party releases).

[90] *See, e.g., Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 213-14 (3d Cir. 2000) (noting that the "hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, specific factual findings to support these conclusions"); *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017) ("In the Third Circuit, nonconsensual third party releases are permissible in plans of reorganization if

addition, the Third Circuit has found that, for such releases to be permissible, fair consideration must be given in exchange for the release.[91]   There is no question that the Holders of Unimpaired Claims have received fair consideration in exchange for the release of the Released Parties.   As described above, without the Global Settlement—which was achieved only through significant compromises and other contributions of the Released Parties—confirmation of the Debtors' Plan would have been hotly contested, and the results of ensuing litigation would have been uncertain. Through the Plan, however, Holders of Unimpaired Claims will receive full payment of their Allowed Claims, which, as reflected in the Liquidation Analysis, would not be possible under a liquidation scenario.   Thus, the Holders of such Claims have received substantial benefit from the efforts of the Released Parties.

106.   These Chapter 11 Cases have progressed particularly efficiently and, although the key parties had differing positions and opinions as to the Debtors' restructuring along the way, ultimately the Debtors' key constituent groups were able to reach consensus through extensive and hard-fought negotiations.   As described above, each of the Released Parties was responsible for assisting the Debtors during the reorganization process and is an appropriate recipient of the Third Party Release.

107.   Ultimately, given the substantial contributions provided by the Released Parties to the restructuring, the consideration being provided to the third parties bound by the releases as a

---

they meet the *Continental* standard of fairness and necessity to the reorganization."); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (evaluating certain factors to determine whether the "hallmarks" of permissible non-consensual releases are met, including "(i) the non-consensual release is necessary to the success of the reorganization, (ii) releases have provided a critical financial contribution to the Debtors' plan; (iii) the releasee's financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release"); *cf. Washington Mutual*, 442 B.R. at 355 ("[T]he Court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of third party releases.").

[91] *See United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2000) (citing *In re Continental Airlines*, 203 F.3d at 215).

result of the Global Settlement embodied in the Plan, and that the Third Party Release is a critical component to the restructuring and to the Global Settlement, it is appropriate and necessary that the Third Party Release be included in the Plan to effectuate the successful reorganization of the Debtors.  Moreover, the Third Party Release is narrowly tailored and includes a carve-out for actions related to fraud, gross negligence, and willful misconduct.

108.    Accordingly, the Debtors submit that the Third Party Release is appropriately tailored under the circumstances of these Chapter 11 Cases, is justified by the record of these Chapter 11 Cases, is consistent with the practices of this jurisdiction, and should be approved.[92]

### 4.    *The Exculpation Should Be Approved*

109.    Article X.E. of the Plan provides for the exculpation of the Exculpated Parties.  In response to informal comments received from the U.S. Trustee, the Debtors have significantly narrowed the Exculpation to Estate fiduciaries.[93]   The Exculpation provision also preserves the rights of the Debtors, the Reorganized Debtors, the Ad Hoc Committee of Secured Notes (and its members), GSO and Philips to assert that under section 1125(e)[94] they should have no liability in connection with the Plan, the solicitation of votes thereon, or the offer, issuance, sale, or

---

[92] *See, e.g., In re EBHI Holdings, Inc.*, No. 09-12099 (MFW) (Bankr. D. Del. Jan. 26, 2010) (granting a release of "the officers, directors, shareholders, members and/or enrollees, employees, representatives, advisors, attorneys, financial advisors, investment bankers or agents of the Debtors" by "each present and former holder of a [c]laim or [i]nterest who votes in favor of the [p]lan"); *In re JHT Holdings, Inc.*, No. 08-11267 (BLS) (Bankr. D. Del. Oct. 6, 2008) (approving release of debtors, their officers and directors, advisors, and professionals); *In re Dura Auto Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008) (same); *In re Foamex Int'l Inc.*, No. 05-12685 (PJW) (Bankr. D. Del. Feb. 1, 2007) (same); *In re J.L. French Auto. Castings, Inc.*, No. 06-10119 (MFW) (Bankr. D. Del. Jun. 21, 2006) (same).

[93] Under the Plan, the term "Exculpated Parties" means "collectively, each in its capacity as such: (a) the Debtors, (b) the Reorganized Debtors, (c) the Committee and each of its members (but solely in their capacity as members of the Committee and not in any other capacity), (d) the Ad Hoc Committee of Secured Notes and each of its members, and (e) the Related Persons of each of the foregoing (a) through (d)."

[94] That section provides: "A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities." 11 U.S.C. § 1125(e).

purchase of securities thereunder.

110.    There is no question that exculpation provisions are appropriate with respect to conduct of estate fiduciaries not constituting gross negligence or willful misconduct.[95] Thus, it is clear that the exculpation of the Debtors, Reorganized Debtors, the Committee and each of its members (in their capacities as Committee members)—each of whom are estate fiduciaries—is appropriate.

111.    Moreover, the preservation of exculpation rights under Section 1125(e) is appropriate because the parties subject to that provision of the Plan (the Debtors, the Reorganized Debtors, the Ad Hoc Committee of Secured Notes, GSO and Philips) each participated in the Global Settlement that allowed for the reallocation of Profits Interests to Class 6 and Class 7. In addition, each are each receiving securities under the Plan (either in the form of New Common Stock or Profits Interests) and each were actively involved in these Chapter 11 Cases.

112.    Without the good faith efforts and contributions of these parties subject to the Exculpation, the Debtors would not be in a position to confirm the Plan and emerge from chapter 11 on a fully consensual basis.  Moreover, the Exculpation was the product of arms'-length negotiations and was a significant component of the Global Settlement.  Like the releases described above, the Exculpation was important to the development of a feasible, confirmable Plan, and the Exculpated Parties relied upon the protections afforded to them by the Exculpation.

113.    Additionally, the scope of the Exculpation is limited to acts in connection with the Debtors' restructuring and does not protect the Exculpated Parties from liability resulting from any claims based upon gross negligence, willful misconduct or intentional fraud.  And finally,

[95] *See In re Indianapolis Downs, LLC, 486* B.R. 286, 306 (Bankr. D. Del. 2013) ("exculpation clauses should be limited to fiduciaries who have served during the chapter 11 proceedings: estate professionals, committees and their members, and the debtors' directors and officers.") (citing *Wash. Mut.*, 442 B .R. at 350).

the Plan has received overwhelming support from creditors and no economic stakeholder has filed an objection to the Plan on account of the Exculpation. Accordingly, the Exculpation provides reasonable and appropriate protections and should be approved.

**D.     The New Exit ABL Facility Should Be Approved**

114.    The Debtors' entry into the New Exit ABL Facility Documents and consummation of the New Exit ABL Facility, the terms of which will be disclosed prior to the Confirmation Hearing, is in the best interests of the Debtors' Estates and represents a sound exercise of the Debtors' business judgment and no party asserts otherwise. As described in the Finger Declaration following conversations with several potential lenders, and in consultations with A&M, the Debtors and representatives of the Ad Hoc Committee of Secured Notes, Wells Fargo was selected as the lead potential lender. Based upon the Jefferies outreach to the marketplace, the expressions of interest received, the type of facility that is required by the Reorganized Debtors, and the Reorganized Debtors' assets, liabilities and projections, the Debtors believe that the New Exit ABL Facility proposed to be provided by Wells Fargo is fair and reasonable under the circumstances, including the fees and costs to be paid thereunder by the Reorganized Debtors.

115.    The obligations to pay fees and expenses under the New Exit ABL Facility Documents, including the expense deposit and other fees and indemnities will be contained in the commitment letter, are essential components of the New Exit ABL Facility. Such fees, reimbursements, and obligations are necessary and market-based compensation for the substantial undertakings of Wells Fargo under the New Exit ABL Facility. Absent the fees, reimbursements, and indemnification obligations, Wells Fargo would not have been willing to commit to provide their commitment or negotiate definitive documentation for the New Exit ABL Facility. The proceeds of the New Exit ABL Facility support the Debtors' funding of the

Cash distributions contemplated by the Plan and the Reorganized Debtors' ongoing operations. Accordingly, the Debtors request authority to enter into the New Exit ABL Facility Documents and consummate the New Exit ABL Facility, including the payment of all fees and expenses thereunder.

**E.    The Plan Complies with Section 1123(d) of the Bankruptcy Code**

116.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and non-bankruptcy law."  Article VI of the Plan provides that, with respect to Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan, any applicable Cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  To the extent a Cure Objection is not resolved consensually prior to the Confirmation Hearing, the Debtors or the Reorganized Debtors will schedule a hearing to determine such Cure amount following the Confirmation Hearing as more fully described in the Plan.  Any applicable Cure payments with respect to Executory Contracts or Unexpired Leases that are the subject of Cure Objections and that are ultimately assumed (as more fully described in the Plan) shall be made within ten (10) days following the assumption of such Executory Contract or Unexpired Lease.[96]  The Debtors, in accordance with the Disclosure Statement and the Plan, distributed notices of proposed assumption to the applicable counterparties.[97]  These notices included procedures for objecting to the proposed assumptions of Executory Contracts and Unexpired Leases or to the proposed Cure amounts.  Accordingly, the Debtors submit that the Plan complies with section 1123(d).

[96] *See* Plan, Art. VI.B.
[97] *See* Solicitation Affidavits.

**F.**    **The Plan Fairly Allocates the Debtors' Enterprise Value**

      **1.**    *Jefferies Methodology*

117.    As set forth in the Finger Declaration, Jefferies undertook an analysis to estimate a range of value for the Reorganized Debtors' operations on a going-concern basis (the "Enterprise Value").  Jefferies employed three generally accepted valuation methodologies in estimating the Enterprise Value: (i) publicly traded company analysis, (ii) precedent transaction analysis, and (iii) discounted cash flow analysis.

      *a.*    *Publicly Traded Company Analysis*

118.    As described in the Finger Declaration, the publicly traded company analysis is based on the enterprise values of publicly traded companies that have business and operating characteristics that are comparable in certain respects to the Reorganized Debtors.[98]  Under this methodology, financial multiples and ratios were developed to measure each company's valuation and relative performance.  Some of the specific analysis entailed comparing the enterprise value for each publicly traded company to their projected earnings before taxes, depreciation and amortization ("EBITDA").  The publicly traded company analysis then applies a range of such multiples to Gibson's projected EBITDA.

      *b.*    *Precedent Transaction Analysis*

119.    The precedent transactions analysis is based on the implied enterprise values of companies involved in publicly disclosed merger and acquisition transactions for which the targets had operating and financial characteristics comparable in certain respects to the Reorganized Debtors.[99]  Under this methodology, the enterprise value of each such target is determined by an analysis of the consideration paid and the net debt assumed in the merger or

---

[98] *See Nellson Nutraceutical*, 356 B.R. at 371 ("A publicly traded company or comparable company analysis derives the value of a company by examining the trading values of the equity of comparable publicly traded companies.").
[99] *See Nellson Nutraceutical*, 356 B.R. at 371 ("A precedent transaction or comparable transaction analysis derives the value of a company by examining recent control transactions of comparable companies.").

acquisition transaction. The enterprise value is then compared to a selected operating metric, in this case, EBITDA, in order to determine an enterprise value multiple.

### c. *Discounted Cash Flow Analysis*

120. The discounted cash flow analysis relates the value of an asset or business to the present value of expected future cash flows generated by that asset or business.[100] This approach has three components: (i) calculating the present value of the projected unlevered after-tax free cash flows for a determined period, (ii) adding the present value of the terminal value of cash flows, and (iii) adding the present value of any other assets not otherwise included above, if any.

### 2. *Jefferies Value Conclusion*

121. Based upon its analyses of the three valuation methodologies, Jefferies concluded that the Enterprise Value of the Reorganized Debtors, as of an assumed effective date of September 30, 2018 (the "Assumed Effective Date"), will range from approximately $374 million to approximately $445 million, with a midpoint of approximately $410 million. This range of Enterprise Values differs from the range shown in the Disclosure Statement by approximately $15 million due to the value of tax attributes not previously incorporated into the valuation.

122. The Enterprise Value has been adjusted for (a) approximately $20 million of net debt, (b) assumed after-tax estimated proceeds of approximately $7.3 million from the planned post-emergence sale of an asset held-for-sale, and (c) approximately $38 million from the election by the Required Supporting Noteholders to receive Class 7 recovery in the form of new common stock (on account of their TEAC Shares Profits Interests as contemplated by the Global Settlement) of the reorganized Debtors, to arrive at an Effective Date equity value (the "Equity

---

[100] *See Nellson Nutraceutical*, 356 B.R. at 370 ("A DCF analysis derives the value of a company by calculating the company's future cash flows multiplied by a discount factor to determine a present value of those future cash flows.").

Value") that ranges from approximately $399 million to approximately $470 million with a midpoint of approximately $435 million.  In light of the Class 7 election, the Equity Value of the Reorganized Debtors is the same as the Plan Value and the Distributable Value.[101]

123.    Thus, the total value ("Total Value") of the Debtors as of the Assumed Effective Date, calculated as Equity Value plus approximately $10.6 million in Profits Interests of TEAC Shares to be distributed under the Plan, ranges from approximately $410 million to approximately $481 million with a midpoint of approximately $445 million.

### 3.    *The Absolute Priority Rule and The Allocation of Value Under the Plan*

124.    Based upon the its analyses of the three valuation methodologies, Jefferies concluded that the Enterprise Value of the Reorganized Debtors, as of an assumed effective date of September 30, 2018 (the "Assumed Effective Date"), will range from approximately $374 million to approximately $445 million, with a midpoint of approximately $410 million.  This range of Enterprise Values differs from the range shown in the Disclosure Statement by approximately $15 million due to the value of tax attributes not previously incorporated into the valuation.

125.    The Enterprise Value has been adjusted for (a) approximately $20 million of net debt, (b) assumed after-tax estimated proceeds of approximately $7.3 million from the planned post-emergence sale of an asset held-for-sale, and (c) approximately $38 million from the election by the Required Supporting Noteholders to receive Class 7 recovery in the form of new common stock (on account of their TEAC Shares Profits Interests as contemplated by the Global Settlement) of the reorganized Debtors, to arrive at an Effective Date equity value (the "Equity

---

[101] The range of Distributable Values as shown in the Disclosure Statement differs by approximately $8 million. The difference is due to approximately $10.6 million in Profits Interests of TEAC Shares to be distributed to certain stakeholders (as of September 28, 2018), approximately $11.8 million from the change in market value of TEAC Shares from July 31, 2018 to September 28, 2018, and approximately $15 million of value for the tax attributes of the Reorganized Debtors.

Value") that ranges from approximately $399 million to approximately $470 million with a midpoint of approximately $435 million.  In light of the Class 7 election, the Equity Value of the Reorganized Debtors is the same as the Plan Value and the Distributable Value.[102]

126.    Thus, the total value ("Total Value") of the Debtors as of the Assumed Effective Date, calculated as Equity Value plus approximately $10.6 million in Profits Interests of TEAC Shares to be distributed under the Plan, ranges from approximately $410 million to approximately $481 million with a midpoint of approximately $445 million.

**G.    The Management Employment and Consulting Agreements**

127.    Pursuant to Article V.H. of the Plan, as a condition of the Effective Date, Reorganized Gibson and Messrs. Juszkiewicz and Berryman will enter into the Management Employment and Consulting Agreements.  The economic terms of those agreements were negotiated with the creditors that will own the Reorganized Debtors, holders of Prepetition Secured Notes in Class 5 – Class 5 has accepted the Plan and consents to the agreements.  As their businesses transition to new ownership and management, the Reorganized Debtors are retaining Messrs. Juszkiewicz and Berryman to provide services after the Effective Date.  The obligations to Messrs. Juszkiewicz and Berryman are not obligations of the Debtors.  As described in the Carr Declaration and the Fox Declaration, Mr. Juszkiewicz has deep historical and intimate knowledge of the Debtors' businesses.  In addition, Mr. Juszkiewicz is a member of the board of TEAC and will provide substantial benefit to the Reorganized Debtors in continuing that role in helping to realize the value of TEAC over time.  Mr. Berryman operates Gibson's

---

[102] The range of Distributable Values as shown in the Disclosure Statement differs by approximately $8 million. The difference is due to approximately $10.6 million in Profits Interests of TEAC Shares to be distributed to certain stakeholders (as of September 28, 2018), approximately $11.8 million from the change in market value of TEAC Shares from July 31, 2018 to September 28, 2018, and approximately $15 million of value for the tax attributes of the Reorganized Debtors.

*Epiphone* business and operations in China and, as described in the Carr Declaration, is directly responsible for its growth.

### H.    The Changes Embedded in The Fifth Amended Plan Do Not Require Resolicitation

128.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.  Courts have consistently applied this rule.[103]

129.    The Fifth Amended Plan contains various modifications to address informal comments received from the U.S. Trustee, including, among others, modifications to clarify the Claims process, to narrow the definition of "Releasing Parties," and to narrow the Exculpation and the definition of "Exculpated Parties."  In response to the Somera Objection, the Fifth Amended Plan includes language clarifying that the assumption of a contract or lease under the Plan shall not modify the rights of the counterparty, and no shall such assumption be deemed to be a release of any such rights.  The Fifth Amended Plan also includes an Administrative Expense Claims Bar Date (which is 30 days after the Effective Date) and a deadline for objections to such claims, an identification of the members of the Creditors' Oversight Committee, and Profits Interest anti-dilution provisions.  Additionally, flexibility has been added

---

[103]    *See, e.g., In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

with respect to the Excluded Non-Debtor Subsidiaries to accommodate the Reorganized Debtors' corporate structure and tax planning. The modifications do not materially or adversely impact the treatment of any impaired Class under the Fifth Amended Plan and, as such, no resolicitation of votes is required. The modifications thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and should be deemed accepted by all creditors that previously accepted the Plan.

### IV.   ALL OBJECTIONS TO CONFIRMATION HAVE BEEN RESOLVED, ADDRESSED OR SHOULD BE OVERRULED

130.   As discussed herein, the Debtors have addressed certain of the issues raised informally by the UST, and the remaining issues are discussed below. The Debtors have also added language to the Plan to address the issues raised in the Somera Objection and the United States Objection.

131.   The Pacific Rim Objection is not really a plan confirmation objection. Rather Pacific Rim requests treatment as a critical vendor and payment of its section 503(b)(9) claim. These are not confirmation issues and should not be heard at the Confirmation Hearing. Instead, the Pacific Rim Objection should be adjourned to the omnibus hearing currently scheduled for November 19 so that the Debtor can attempt to consensually resolve the Pacific Rim claims or, if that is not possible, so that the Court can make a determination at the appropriate time.

132.   Several objections were filed with respect to Cure amounts under contracts and leases to be assumed under the Plan.[104] Pursuant to the Disclosure Statement Order, such objections, if not resolved, will be scheduled for a hearing at a later date as they do not raise confirmation issues.

---

[104] *See* Docket Nos. 822, 774, 728.

A.    <u>The UST Objection Should be Overruled</u>

133.    The U.S. Trustee raises four objections to the Plan.  **First**, the U.S. Trustee argues that the Third Party Release impermissibly includes "Related Persons" within the definition of "Releasing Parties."  The Debtors submit that it is fair and appropriate to include the Related Persons in the Third Party Release.  The Related Persons are included in the definition of Releasing Parties only in their capacity as such, and the release by the Related Persons is effectively being made by the specifically-named Releasing Party on its Related Person's behalf. To the extent a Releasing Party has the capacity to bind the Related Persons to the Third Party Release they should be able to do so.  To the extent a Releasing Party cannot bind the Related Person, a Related Person's rights to argue that it was not bound by the release are not affected. Moreover, the Third Party Release is narrowly tailored to apply only to matters pertaining to the Debtors and their Chapter 11 Cases.  Accordingly, any "direct" claims of the Related Persons (or of any person) that are unrelated to the Debtors or their Chapter 11 Cases, or are held in a capacity other than as a Related Person to a Releasing Party, will not be released.  Thus, the U.S. Trustee's concerns about direct claims is misplaced.  Moreover, for the reasons more fully described below, the Third Party Release is appropriate as to the Related Persons even though they did not affirmatively consent to such releases.

134.    **Second**, the U.S. Trustee argues that, with regard to the Third Party Release, "Silence cannot be deemed consent.  Thus, creditors who are not entitled to vote on the Plan, as well as those who are entitled to vote but do not return ballots, cannot be deemed to have 'consented.'"  UST Objection ¶ 19.  The U.S. Trustee apparently takes the position that non-consensual third party releases are never permitted.  This is simply not the law within the

Third Circuit.[105] [106]    As described above in section III.E and III.F, the entirety of which are incorporated herein by reference, non-consensual third party releases are appropriate as long as the *Continental* factors are satisfied.  As described above, each of those factors have been met in these Chapter 11 Cases.

135.    Moreover, the Ballots explicitly and conspicuously stated that the Releasing Parties entitled to vote who abstained would be deemed to have consented to the Third Party Release unless they affirmatively opted out.   In addition, each such Holder was mailed a Deemed-to-Accept notice, which described in bold and conspicuous type that such Holder was granting the Third Party Release and advised such Holders of the deadline to object to confirmation of the Plan.    Accordingly, the Debtors have provided more notice and an opportunity to opt-out than is required under the law.   Except for the UST Objection and the United States Objection (which has been addressed by including language in the Confirmation Order), no party filed an objection to the releases in the Plan.   Moreover, numerous courts in this district have granted releases by parties that abstained from voting and/or were unimpaired and not entitled to vote on the plan.[107]   Accordingly, the Debtors submit that the terms of the Third

---

[105]  *See, e.g., Continental Airlines*, 203 F.3d at 213-14; *Millennium*, 575 B.R. at 272 ("In the Third Circuit, nonconsensual third party releases are permissible in plans of reorganization if they meet the *Continental* standard of fairness and necessity to the reorganization."); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001); *cf. Washington Mutual*, 442 B.R. at 355 ("[T]he Court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of third party releases.").

[106] Even within the Second Circuit, where courts have been more reluctant to grant non-consensual third party releases, recent decisions are split on the issue.  *Compare In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017) (holding, based on interpretation of New York contract law, that creditors could not be deemed to impliedly consent to third party releases), with *In re Tops II Holding Corp.*, Case No. 18-22279 (RDD) (Bankr. S.D.N.Y.) (on September 27, 2018, Judge Robert D. Drain of the Southern District of New York approved the disclosure statement with respect to a plan containing "opt-out" release provisions similar to the Plan and overruled arguments by the Office of the United States Trustee in opposition) (transcript not yet available).

[107]  *See, e.g., In re VER Technologies Holdco LLC*, Case No. 18-10834 (KG) (Bankr. D. Del. July 26, 2018); In re EV Energy Partners, L.P., Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018); *In re Remington Outdoor Company, Inc.*, Case No. 18-10684 (BLS) (Bankr. D. Del. May 4, 2018).  *But see In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. Sept. 21, 2018) (releasing parties included (a) holders of impaired claims that voted to accept plan but did not opt out of third party releases and (b) holders of unimpaired claims or interests who did not file a timely objection to the third party releases).

Party Release are fair, appropriate and should be approved and binding on all Releasing Parties.[108]

136.     **Third**, the U.S. Trustee argues that Holders of Equity Interests in the Deemed Rejecting Classes should not be deemed to consent to the Third Party Releases.  As reflected in the modifications to the Fifth Amended Plan, the Debtors have agreed to carve out from the Third Party Release any parties that were deemed to reject the Plan.

137.     **Fourth**, the U.S. Trustee argues that "[t]o the extent that the Debtors are seeking to assume any executory contract with an insider for the payment of severance or bonuses, the Plan cannot be confirmed."  UST Objection ¶ 24.  The Debtors hereby confirm that they are not seeking to assume any executory contract with an insider for the payment of severance or bonuses through the Plan.[109]  However, the Debtors do intend to seek by separate motion approval of certain separation agreements and other agreements.

138.     Accordingly, for all of the foregoing reasons, the Debtors respectfully request that the Court overrule the UST Objection to the extent not resolved or otherwise addressed herein.

## V.     CAUSE EXISTS TO WAIVE A STAY OF THE CONFIRMATION ORDER

139.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule

[108] *See Indianapolis Downs,* 486 B.R. at 305-06 (confirming plan where abstaining parties were "deemed to consent to the Third Party Release") (internal quotation omitted); *In re Lear Corp.,* No. 09-14326 (ALG), 2009 WL 6677955, at *32 (Bankr. S.D.N.Y. Nov. 5, 2009) (confirming plan where parties were given notice that a vote to accept the plan or abstention from voting constitutes assent to the third-party releases).

[109] The Management Employment and Consulting Agreements are obligations of the Reorganized Debtors, entered into by the Reorganized Debtors, and not obligations of the Debtors.

also permits modification of the imposed stay upon court order.

140.    The Debtors respectfully submit that cause exists for waiving the stay of the entry of the Confirmation Order such that the Confirmation Order will be effective immediately upon its entry.[110]    As noted above, the Debtors have undertaken great efforts to facilitate their restructuring to exit chapter 11 as soon as practicable.    Each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.    The Debtors believe that an expeditious effectuation of the Plan will reduce such costs and maximize the value of the Estates. Thus, the Debtors respectfully request a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.[111]

[<em>Remainder of page left intentionally blank</em>]

---

[110]*See, e.g.*, *In re Aspect Software Parent, Inc.*, No. 16-10597 (MFW) (Bankr. D. Del. May 25, 2016) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Apr. 18, 2016) (same).

[111]  For the avoidance of doubt, even though the Debtors are requesting this waiver, the Debtors may ultimately decide not to emerge until after the 14-day period expires.

## VI.    <u>CONCLUSION</u>

For all of the reasons set forth herein, in the Plan Declarations, the Debtors respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Confirmation Order, waiving the stay imposed by Bankruptcy Rule 3020(e), overruling any objections that are not otherwise withdrawn or resolved by the modifications made to the Plan and Confirmation Order, and granting such other and further relief as may be appropriate under the circumstances.

Dated: October 1, 2018
        Wilmington, Delaware

                            PEPPER HAMILTON LLP

                            _____*/s/ David M. Fournier*_____
                            David M. Fournier (DE 2812)
                            Marcy J. McLaughlin (DE 6184)
                            Hercules Plaza, Suite 5100
                            1313 Market Street
                            P.O. Box 1709
                            Wilmington, Delaware 19899-1709
                            Telephone: (302) 777-6500
                            Email: fournied@pepperlaw.com
                                    mclaughlinm@pepperlaw.com

                            - and -

                            GOODWIN PROCTER LLP
                            Michael H. Goldstein (admitted *pro hac vice*)
                            Gregory W. Fox (admitted *pro hac vice*)
                            Barry Z. Bazian (admitted *pro hac vice*)
                            The New York Times Building
                            620 Eighth Avenue
                            New York, NY 10018-1405
                            Tel: (212) 813-8800
                            Email: mgoldstein@goodwinlaw.com
                                    gfox@goodwinlaw.com
                                    bbazian@goodwinlaw.com

                            *Counsel for Debtors and Debtors in Possession*